## BEFORE THE UNITES STATES JUDICIAL PANEL

## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| _____ | : | |
| **IN RE AMERICAN BOARD OF MEDICAL** | : | |
| **SPECIALTIES MAINTENANCE OF** | : | **MDL DOCKET NO. 2888** |
| **CERTIFICATION ANTITRUST** | : | |
| **LITIGATION** | : | |
| _____ | : | |

**PLAINTIFFS GERARD KENNEY, ALEXA JOSHUA, GLEN DELA CRUZ MANALO, KATHERINE MURRAY LEISURE, SADHISH K. SIVA, EMILY ELIZABETH LAZAROU, AND AAFAQUE AKHTER'S RESPONSE IN OPPOSITION TO MOTION OF STEVE MANNIS, M.D., TONIANNE FRENCH, M.D., AND LOUIS LIM, M.D. FOR CONSOLIDATION AND TRANSFER UNDER 28 U.S.C. § 1407**

Plaintiffs Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, Katherine Murray Leisure, Sadhish K. Siva, Emily Elizabeth Lazarou, and Aafaque Akhter submit this brief in opposition to the motion of Plaintiffs Steve Mannis, M.D., Tonianne French, M.D., and Louis Lim, M.D. (the "*Mannis* Plaintiffs") seeking to consolidate for pre-trial purposes several unrelated class actions in the Southern District of California.

## **INTRODUCTION**

The MDL statute was enacted to reduce the burden of multiple federal lawsuits pending in various districts by providing for a temporary transfer of actions to a single district for consolidated pretrial proceedings, but *only* when the transfer will: a) promote judicial efficiency, b) the civil actions involve common questions of fact, and, c) when transfer is for the convenience of the parties and witnesses. 28 U.S.C. § 1407. The *Mannis* Plaintiffs cannot carry their burden here.

There is not a single common Defendant in any of these four actions. As the actions other than *Mannis* make clear, each medical specialty board sets its own policies and procedures for its own unique Maintenance of Certification ("MOC") program. *See, e.g., Kenney* Complaint ("Compl.") (attached as **Exhibit 1**), ¶¶ 24-46 (ABIM-specific MOC requirements); *Lazarou* Compl. (attached as **Exhibit 2**), ¶¶ 15-57 (ABPN-specific MOC requirements); *Siva* Compl. (attached as **Exhibit 3**) ¶¶ 21-51 (ABR-specific MOC requirements). These allegations establish that there are few, if any, common questions of fact in these four actions.

Not only is the *Mannis* Plaintiffs' motion unnecessary, it also proposes a transferee District that has little, if anything, to do with either ABMS or the specialty boards. Indeed, *none* of the specialty boards in *any* of the four related cases is incorporated or headquartered in

1

California. *See Kenney* Compl. ¶ 17; *Lazarou* Compl. ¶ 14; *Siva* Compl. ¶ 14; and *Mannis* Compl. ¶¶ 17-18.

In the event the Panel nevertheless concludes that these actions should be consolidated, the Northern District of Illinois – where ABMS and several of the specialty boards are headquartered – has a far greater nexus to this dispute, is centrally located and convenient, has a wealth of experience handling MDLs, and is more than capable of efficiently coordinating pretrial activity.

Accordingly, Plaintiffs respectfully request that this Panel reject the *Mannis* Plaintiffs' motion in its entirety or, in the alternative, order that the subject actions and any future-filed cases be consolidated with the cases currently proceeding in the Northern District of Illinois.

## I.  FACTUAL BACKGROUND

The *Mannis* Plaintiffs misleadingly claim that these cases arise from "core allegations surrounding anticompetitive and unfair business conduct by *Defendant American Board of Medical Specialties*." Petition at 1 (emphasis added). This is patently false. In fact, the *only* complaint that names ABMS as a Defendant is the *Mannis* Plaintiffs' complaint. The fact that they named this MDL *In re American Board of Medical Specialties Maintenance of Certification Antitrust Litigation* is misleading in and of itself.

ABMS is an "umbrella" organization that does not certify doctors, does not implement specialty-specific MOC programs, and does not dictate any specifics for MOC programs to the specialty boards. *See Kenney* Compl., ¶¶ 24-46; *Lazarou* Compl. ¶¶ 15-57; and *Siva* Compl. ¶¶ 21-51. As its website makes clear, MOC programs are constructed and implemented by the individual specialty boards. Each specialty board develops its own MOC program with its own cognitive testing requirements, including frequency of examination, form, content, and substance

776789.1

of the examinations, the length of certification, the amount and frequency of collecting MOC

fees, activities other than testing used to measure competency, and other specific policies and

procedures. *Compare Kenney* Compl., ¶¶ 24-46 *with Lazarou* Compl. ¶¶ 15-57 and *Siva* Compl.

¶¶ 21-51.

### A. The First-Filed *Kenney v. American Board of Internal Medicine*, No. 2:18cv5260 (E.D. Pa.)

The *Mannis* Plaintiffs conspicuously fail to mention that *Kenney* was the first filed tying

and monopoly case concerning MOC. It was filed by four plaintiffs on December 6, 2018 in the

Eastern District of Pennsylvania, where Defendant ABIM maintains its principal place of

business. *Kenney* does not name ABMS as a defendant and does not include any allegations of

wrongdoing as to any entity other than ABIM. Rather, *Kenney* alleges that "ABIM's activities as

described herein substantially affect interstate trade and commerce in the United States and cause

antitrust injury by, among other things, *de facto* forcing Plaintiffs and other internists to purchase

MOC, charging inflated monopoly prices for MOC, and reducing competition in the maintenance

of certification market." *Kenney* Compl. ¶ 10. The *Kenney* Plaintiffs bring their claims on

behalf of a class of "all internists required by ABIM to purchase MOC from ABIM to maintain

their initial ABIM certifications." *Id.* ¶ 114.

### B. *Mannis et al. v. American Board of Medical Specialties*, No. 3:19-cv-00341

While the *Mannis* Plaintiffs refer to 22 of the 24 specialty boards as "co-conspirators" in

their complaint, the plaintiffs themselves are only certified by two of these boards, the ABEM

and the ABA, and those are the only specialty boards named as Defendants. *Mannis* Compl. ¶¶

13-15. The *Mannis* Plaintiffs are all California residents, and this is, presumably, the reason they

chose to file suit there. *Id.* The *Mannis* Plaintiffs argue, in addition, that "***ABMS's*** contacts with

the State of California are extensive." *Id.* ¶ 12 (emphasis added). But ABMS is itself

3

headquartered in Chicago, and the ABEM and ABA are headquartered in Michigan and North Carolina, respectively. *Id.* ¶¶ 17-18.

### C. *Siva v. American Board of Radiology,* No. 19cv1407 (N.D. Ill)

*Siva* was filed on February 26, 2019 in the Northern District of Illinois against the sole Defendant ABR, which maintains an office and testing facility within the District, in Rosemont, IL. *Siva* Compl. ¶ 14. Siva alleges, *inter alia*, that "[t]hrough its MOC program, ABR controls the market for maintenance of certification of radiologists. ABR has unlawfully obtained and maintained its monopoly power in the market for maintenance of certification services for the anti-competitive purpose of requiring radiologists to purchase MOC and not deal with competing providers of maintenance of certification services." *Id.* ¶ 6. The *Siva* Plaintiff brings his claim on behalf of a class of "all radiologists required by ABR to purchase MOC from ABR to maintain their initial ABR certifications." *Id.* ¶ 93. *Siva* does not name ABMS as a defendant and does not include any allegations of wrongdoing as to that entity or any other specialty board.

### D. *Lazarou et al. v. American Board of Psychiatry and Neurology*, No. 1:19-cv-01614 (N.D. Ill)

*Lazarou* was filed on March 6, 2019 in the Northern District of Illinois, where sole Defendant ABPN maintains its principal place of business. *Lazarou* Compl. ¶ 14. The *Lazarou* Plaintiffs allege that "ABPN has throughout the relevant period controlled the market for initial certification of psychiatrists and neurologists in the United States [and] controlled the market for maintenance of certification of psychiatrists and neurologists." *Id.* ¶ 5. *Lazarou* asserts claims on behalf of a class of "all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications." *Id.* ¶ 111. *Lazarou* does not name ABMS as a defendant and does not include any allegations of wrongdoing as to that entity or any other specialty board.

## II.     CONSOLIDATION AND TRANSFER IS UNWARRANTED AND WILL NOT PROMOTE JUDICIAL EFFICIENCY

The purpose underlying 28 U.S.C. § 1407 is to secure in multi-district litigation the "just, speedy and inexpensive determination of every action."  *In re Nat'l Student Mkty. Litig.*, 368 F. Supp. 1311, 1316 (J.P.M.L. 1973).  Where, as here, the *Mannis* Plaintiffs are seeking to only transfer four cases (two of which are in Illinois); such transfers should only be granted in "exceptional cases sharing unusually complex questions of fact" where "the accompanying common discovery [would be] so time-consuming as to overcome the inconvenience to the party whose action is being transferred and its witnesses."  *In Re Multidistrict Civil Antitrust Actions Involving The Distribution of Scotch Whiskey*, 299 F. Supp. 543,544 (J.P.M.L. 1969); *see also In re Bank of Am. Fiduciary Accounts Litig.*, 435 F. Supp. 2d 1349, 1350 (J.P.M.L. 2006) ("Given the minimal number of actions involved in this docket, we are not persuaded that Section 1407 centralization is appropriate . . . .  Alternatives to Section 1407 transfer exist that can minimize whatever possibilities there might be of duplicative discovery, inconsistent pretrial rulings, or both"); *In re Boeing Co. Employment Practices Litig. (No. II)*, 293 F. Supp. 2d 1382, 1383 (J.P.M.L. 2003) (same, declining to consolidate three actions).

Under the circumstances here, consolidation is neither appropriate nor warranted.

### A.  The Consolidation of Only Four Cases Does Not Promote Judicial Efficiency

The Panel holds the moving party to a high burden and applies the "minimal number" analysis to cases in which a plaintiff seeks to consolidate four or fewer pending lawsuits.  *See, e.g., In Re Highway Accident in Buffalo County, Neb., on August 22, 2000*, 305 F. Supp. 2d 1359, 1360 (J.P.M.L. 2004) (denying the transfer of four actions); *In Re: Directbuy, Inc., Mkty. & Sales Practices Litig.*, MDL No. 2132, Slip op. at 1-2 (J.P.M.L. Feb. 5, 2010) (denying transfer of four actions); *In Re: Best Buy Co., Inc., Price Match Mktg., & Sales Practices Litig.*,

MDL No. 2129, slip op. at 1-2 (J.P.M.L. Feb. 5, 2010) (denying transfer of four actions); *In re Dorel Juvenile Group, Inc., Stroller (MODEL 834) Products Liability Litig.*, 598 F. Supp. 2d 1365, 1366 (J.P.M.L., 2009) (denying transfer of two actions); *In re BMW Reverse Transmission Products Liability Litig.*, 543 F. Supp. 2d 1382 (J.P.M.L. 2008) (denying transfer of two actions); *In re AT&T Broadband Telecommunication Services Litig.*, 237 F.Supp.2d 1380 (denying transfer of two actions). The minimal number analysis was set forth in *In re Scotch Whiskey Antitrust Litigation*, *supra,* where the Panel held that in order to demonstrate that the just and efficient conduct of the litigation would be promoted by transfer where only a minimal number of actions were involved, the moving party bears the strong burden to show that the common questions of fact are so complex and the accompanying discovery is so time consuming as to overcome the inconvenience to the party whose action is being transferred and its witnesses. 229 F. Supp. at 544.

Instead, discovery that overlaps between the cases (if any, see below) can be informally coordinated between the parties. On March 18, 2019, counsel for all parties in all four actions had a telephone conference to discuss the possibility of coordinated discovery. All Defendants and the *Kenney*, *Siva*, and *Lazarou* plaintiffs committed to coordinating any overlapping discovery that may arise in any of the cases.

### B. There Are No Common Parties in Any of the Cases and Consolidation Will Not Achieve Efficiency

Consolidating all of the cases here is unnecessary as there is little, if any, anticipated duplicative discovery or the possibility of conflicting pretrial rulings.

ABMS is not a defendant in any case other than *Mannis*. The *Mannis* Plaintiffs' complaint fails to set forth any *specific facts* suggesting that ABMS acted in concert with all of the specialty boards. Further, Plaintiffs' investigation reveals the exact opposite: that ABMS

does not issue certifications, that each specialty board runs its own MOC program autonomously and sets its own MOC policies and procedures. *Kenney* Compl., ¶¶ 24-46; *Lazarou* Compl. ¶¶ 15-57; *Siva* Compl. ¶¶ 21-51.

Because each specialty board is unique, discovery in each case will necessarily relate to that specific specialty board. It is clear that each of the actions will seek discovery into the MOC program relating to the Defendant specialty board, and such discovery will be tailored to each action specifically. The documents produced by each Defendant specialty board would be unique, and the depositions of each specialty board's employees would not be redundant. To consolidate proceedings under such circumstances would not eliminate potentially duplicative discovery.

Because the facts underlying the actions are not common, there is no inherent risk of conflicting pretrial rulings. Because each of the specialty boards have different MOC policies and procedures, a District Court could well rule on a motion to dismiss (or motion for summary judgment or motion for class certification) that, because of these different facts, would not conflict with another ruling by a different District Court as to a different specialty. And again, no two defendants overlap in any of these four cases.

Simply stated, the actions, "which involve not only different defendants but also different products [and] marketing … do not involve similarly uniform conduct sufficient to justify centralization." *In re Credit Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 753 F. Supp. 2d 1375, 1376 (J.P.M.L. 2010); *see also In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, 867 F. Supp. 2d 1341, 1342 (J.P.M.L. 2012) (centralization inappropriate where the "actions involve different products, subject to potentially different methods of … processing, different advertisements, and different putative classes of consumers who purchased each

product"); *In re: Victoria's Secret Undergarments/Intimate Apparel Prods. Liab. Litig.*, 626

F.Supp.2d 1349, 1350 (J.P.M.L. 2009); *In re Pharm. Benefit Plan Adm'rs Pricing Litig.*, 206 F.

Supp. 2d 1362, 1363 (J.P.M.L. 2002) (finding "unique questions of fact predominate over any

common questions of fact" where defendants operated under "different contracts" and no

allegations that the defendants conspired with one another).   Accordingly, centralization and

transfer are unwarranted.

## III.   IF CENTRALIZATION IS APPROPRIATE, TRANSFER TO SAN DIEGO IS UNWARRANTED

### A.  San Diego Has No Connection to This Subject Matter

The conduct at issue in this litigation has very little connection to San Diego.  None of

the named Defendants in any of the cases is incorporated or headquartered there.  Only the

*Mannis* Plaintiffs arguing for centralization in San Diego are residents of California; none of the

Plaintiffs or Defendants in *Kenney, Lazarou,* or *Siva* are residents of California.  Not even

ABMS, named only in the *Mannis* Complaint, is headquartered or incorporated in California.

The *Mannis* Plaintiffs' best argument for centralization in San Diego seems to be that California

is a big state with a large population.  Petition at 9-10.  This line of thinking would militate in

favor of every potential nationwide class action being centralized in California, where the most

class members are likely to reside given that the population of California comprises more than

12% of the total U.S. population.

Regardless, the *Mannis* Plaintiffs craft this argument around the assertion that California

has more *ABMS-certified* doctors than any state.  *Id.*  But this is really another way of saying that

California has the most doctors certified in *any* of the 24 specialty boards, a fact that is

immaterial when the certifications themselves are overseen independently by each of these 24

8

boards, 22 of which are not named Defendants in the *Mannis* Complaint, and none of which are common parties between any two cases.

In contrast, Chicago and the Northern District of Illinois have a far greater nexus to this dispute, a critical factor for this Panel in determining the appropriate locus for consolidation. *See, e.g.*, *In re Dairy Farmers of Am., Inc.*, 626 F. Supp. 2d 1348, 1349 (J.P.M.L. 2009) ("We concur that the Northern District of Illinois is an appropriate transferee forum for this litigation. All actions arise out of the [defendants'] purchases on the CME in Chicago, Illinois, and relevant documents and witnesses will likely be located in that district.").

If the Panel is persuaded that all of the specialty boards are indispensable to the proper resolution of this litigation, three of them (ABPN, the American Board of Thoracic Surgery, and the American Board of Preventative Medicine) are headquartered in or around Chicago. *Mannis* Compl. ¶¶ 36, 37, and 40. ABMS is also headquartered in Chicago. *Id.* ¶ 16. *None* of the specialty boards are headquartered anywhere in California, let alone in San Diego. *Id.* ¶¶ 16-41.

In addition, two out of four related actions are pending in the Northern District of Illinois, further favoring centralization there. *See In re Kreurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2014 U.S. Dist. LEXIS 81170 at *6 (JPML June 9, 2014) (consolidating eight cases in the Southern District of New York, finding that "[t]he majority of actions are pending in this district, which is conveniently located for this nationwide litigation"); *Bott v Delphi Auto. LLP (In re Auto. Wire Harness Sys. Antitrust Litig.*, 844 F Supp 2d 1367, 1367-1368 (JPML 2012]) ("We are persuaded that the Eastern District of Michigan is the most appropriate transferee district. Most responding parties support centralization there, where the vast majority of the actions are pending, including the first-filed action"); *In re Online DVD Rental Antitrust Litig.*, 609 F Supp 2d 1376, 1377 (JPML 2009) ("We are persuaded that the Northern District of

California is an appropriate transferee forum for this litigation. The vast majority of the actions are already pending in the Northern District of California.").

The judges in the Northern District of Illinois have extensive experience overseeing consolidated multi-district proceedings, and the courthouse has the resources necessary to handle the instant litigation, as it employs state-of-the-art courtroom technology, including flat-panel monitors for the judge, counsel, and jury; an annotation monitor; a digital document camera, computer inputs, and a wide range of audio/visual components, including wireless microphones; equipment through which witnesses can listen to courtroom audio (with headsets available if needed); second-language and assistive-listening devices; and pink noise to mask bench conferences.

The judges of the Northern District of Illinois have administered and resolved a large number of MDLs. As of September 30, 2018, the Northern District of Illinois has successfully resolved 96 MDLs, more than almost any other district in the country.[1] Moreover, the Judges of the Northern District of Illinois are efficient, with a median time from filing to disposition of 7.5 months, well below the national median of 10.1 months.[2] The Northern District is clearly able to support and resolve an MDL if the panel chooses to centralize.

**B. A Transfer to San Diego Will Be Inconvenient for the Parties and Witnesses**

Transfer is appropriate where it "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. Here, few, if any, of the relevant witnesses will be in San Diego. In contrast, given that the headquarters of

---

[1] J.P.M.L., Multidistrict Litigation Terminated Through September 30, 2018, https://www.jpml.uscourts.gov/sites/jpml/files/JPML_Cumulative_Terminated_Litigations-FY-2018.pdf. Only the Southern District of New York (169), the Central District of California (107), and the Northern District of California (99), have terminated more MDLs.
[2] Administrative Office of the U.S. Courts, Federal Court Management Statistics (December 2018), https://www.uscourts.gov/sites/default/files/fcms_na_distprofile1231.2018.pdf.

three of the specialty boards (as well as ABMS, to the extent its presence in the *Mannis* case is proper) are in Chicago, and at least one other board, the ABR, maintains an office and testing facility near Chicago, the relevant witnesses with knowledge of the practices of those boards are likely located in the Northern District of Illinois, and it is likely that relevant documents will be found there. These facts alone heavily favor transfer to the Northern District of Illinois.[3]

Beyond serving as the home to these boards, the Northern District of Illinois is centrally located and is convenient for the parties and any potential witnesses. Three of the plaintiffs (comprising two of the four pending cases) have already filed actions in the Northern District of Illinois, indicating that those plaintiffs believe that the Northern District of Illinois is a convenient and accessible forum.

Additionally, this panel has recognized that the Northern District of Illinois is "conveniently located," *In re Starlink Corn Products Liability Litig.*, 152 F. Supp. 2d 1378, 1381 (J.P.M.L. 2001), and would consequently be an ideal forum in which to consolidate related actions. *See also In re Air Crash Disaster near Chi.*, 476 F. Supp. 445, 449 (J.P.M.L. 1979) (lauding Northern District of Illinois's "central location and concomitant ease of accessibility"). Notably, attorneys for the *Mannis* parties all have offices in Chicago, whereas only one firm in all of the other cases has an office in San Diego.

---

[3] *See, e.g.*, *In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 474 F. Supp. 1357, 1358 (J.P.M.L. 2007) (transfer appropriate to district that "encompasses the headquarters of the common defendant"); *In re Flat Glass Antitrust Litig.*, 559 F. Supp. 2d 1407, 1408 (J.P.M.L. 2008) (transfer appropriate to district encompassing defendant's headquarters because "relevant documents and witnesses will likely be found there"); *In re Family Dollar Stores, Inc.*, 545 F. Supp. 2d 1363, 1365 (J.P.M.L. 2008) (same).

## CONCLUSION

For the reasons set forth above, the Panel should deny the *Mannis* Plaintiffs' motion for transfer and consolidation. In the alternative, should the Panel deem consolidation for pretrial proceedings prudent, such consolidation should take place in the Northern District of Illinois.

Dated: March 22, 2019                          Respectfully submitted,

*/s/C. Philip Curley*
C. Philip Curley
Cynthia H. Hyndman
Laura R. Feldman
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: 312.663.3100
Fax: 312.663.0303
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
lfeldman@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
LITE DEPALMA GREENBERG, LLC
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Tele: 312.750.1265
Fax: 312.212.5919
kcarroll@litedepalma.com

Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
mfreed@fklmlaw.com
bhogan@fklmlaw.com

776789.1

Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
jjagher@fklmlaw.com

*Counsel for Plaintiffs Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, Katherine Murray Leisure, Sadhish K. Siva, Emily Elizabeth Lazarou, and Aafaque Akhter*

# Exhibit 1

JS 44 (Rev 06/17)

# CIVIL COVER SHEET

18-CV-5260

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

## I. (a) PLAINTIFFS

Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, and Katherine Murray Leisure

**(b)** County of Residence of First Listed Plaintiff **Centre County, PA**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

## DEFENDANTS

American Board of Internal Medicine

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer w/Disabilities - Other | **Other:** | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
15 U.S.C. Sections 15 and 26, 28 U.S.C. Sections 1 and 2

Brief description of cause
Illegal tying and illegal monopolization and monopoly maintenance

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P

**DEMAND $**

CHECK YES only if demanded in complaint
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____    DOCKET NUMBER _____

DATE 12/06/2018

SIGNATURE OF ATTORNEY OF RECORD

DEC - 6 2018

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

18cv 5260

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: ___ ___ ___ — Please see attachment

Address of Defendant: ___ ___ ___ 510 Walnut Street, Philadelphia, PA 19106 ___ ___ ___

Place of Accident, Incident or Transaction: ___ ___ Philadelphia ___ ___

---

**RELATED CASE, IF ANY:**

Case Number: ___ ___ ___ Judge ___ ___ Date Terminated. ___ ___

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | |
|---|---|---|---|
| 1 | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 2 | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 3 | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☑ |
| 4 | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☑ |

I certify that, to my knowledge, the within case ☐ is / ☑ is **not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE 12/06/2018 _____ ___ ___ ___
*Attorney-at-Law / Pro Se Plaintiff* *Attorney I D # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.** *Federal Question Cases:*

- ☐ 1 Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2 FELA
- ☐ 3 Jones Act-Personal Injury
- ☑ 4 Antitrust
- ☐ 5 Patent
- ☐ 6 Labor-Management Relations
- ☐ 7 Civil Rights
- ☐ 8 Habeas Corpus
- ☐ 9 Securities Act(s) Cases
- ☐ 10 Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify)* ___ ___ ___

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1 Insurance Contract and Other Contracts
- ☐ 2 Airplane Personal Injury
- ☐ 3 Assault, Defamation
- ☐ 4 Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6 Other Personal Injury *(Please specify)* ___ ___
- ☐ 7 Products Liability
- ☐ 8 Products Liability - Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify)* ___ ___ ___

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Mindee J. Reuben _____, counsel of record or pro se plaintiff, do hereby certify:

- ☐ Pursuant to Local Civil Rule 53 2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs

- ☑ Relief other than monetary damages is sought

DEC - 6 2018

DATE 12/06/2018 _____ 75308 (PA) ___
*Attorney-at-Law / Pro Se Plaintiff* *Attorney I D # (if applicable)*

NOTE A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

*Civ 609 (5/2018)*

Gerard Kenney
171 Treetops Drive
State College, Pennsylvania 16801


Alexa Joshua
8200 East Jefferson
Apartment 709
Detroit, Michigan 48214


Glen Dela Cruz Manalo
P.O. Box 3363
Walla Walla, Washington 99362


Katherine Murray Leisure
16 Sanderson Drive
Plymouth, Massachusetts 02360



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

GERARD KENNEY, ALEXA JOSHUA, GLEN DELA :     CIVIL ACTION
CRUZ MANALO, and KATHERINE MURRAY LEISURE, :

        v.                    :

AMERICAN BOARD OF INTERNAL MEDICINE    :     NO. 18cv5260

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)      (x)

(f) Standard Management – Cases that do not fall into any one of the other tracks.



December 6, 2018       Mindee Reuben       Plaintiffs
**Date**                 **Attorney-at-law**        **Attorney for**

267-519-8306          973-623-0858         mreuben@litedepalma.com
**Telephone**          **FAX Number**        **E-Mail Address**

(Civ. 660) 10/02

DEC - 6 2018



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERARD KENNEY, ALEXA JOSHUA, GLEN DELA CRUZ MANALO, and KATHERINE MURRAY LEISURE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 18cv5260 |
| AMERICAN BOARD OF INTERNAL MEDICINE, | ) ) ) | Trial by Jury Demanded |
| Defendant. | ) ) | CLASS ACTION |

## CLASS ACTION COMPLAINT

Plaintiffs Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, and Katherine Murray-Leisure, (collectively "Plaintiffs"), for their complaint against Defendant American Board of Internal Medicine ("ABIM" or "Defendant") hereby allege as follows:

### INTRODUCTION

1.      This case is about ABIM's illegal and anti-competitive conduct in the market for initial board certification of physicians practicing internal medicine (or internists) and the market for maintenance of certification of internists. ABIM is illegally tying its initial certification product to its maintenance of certification product, referred to by ABIM as MOC.

2.      This case is also about ABIM's illegal creation and maintenance of its monopoly power in the market for maintenance of certification. ABIM is the monopoly supplier of initial certifications for internists. Beginning in or about 1990, ABIM used its monopoly position in the initial certification market to create a monopoly in the market of maintenance of certifications for internists, which is the subject of this lawsuit. Since then ABIM has used various anti-

1

competitive, exclusionary, and unlawful actions to promote MOC and prevent and limit the growth of competition from new providers of maintenance of certification for internists. ABIM's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by internists.

3. The tying product is ABIM's initial board certification, which it sells to internists nationwide. ABIM sells initial certification services to physicians in internal medicine and twenty foundational subspecialties within the field of internal medicine. Many internists hold multiple ABIM certifications, purchasing initial certifications in both internal medicine and one or more additional subspecialties.

4. The tied product is MOC, ABIM's maintenance of certification. ABIM has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABIM has forced physicians to purchase MOC, charged inflated monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5. Approximately 200,000 internists, or one of every four physicians in the United States, have purchased initial ABIM certifications. ABIM has throughout the relevant period controlled the market for initial certification of internists in the United States. Through its MOC program, ABIM has also controlled in excess of 95% of the market for maintenance of certification of internists. ABIM has unlawfully obtained and maintained its monopoly power in the market for maintenance of certification services for the anti-competitive purpose of requiring internists to purchase MOC and not deal with competing providers of maintenance of certification services.

2

6.　　Plaintiffs bring this Class Action to recover damages and injunctive and other equitable relief on behalf of all internists required by ABIM to purchase MOC to maintain their initial ABIM certifications.

## JURISDICTION AND VENUE

7.　　Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABIM's violations of Sections 1 and 2 of the Sherman Act (28 U.S.C. §§ 1 and 2).

8.　　Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

9.　　ABIM sells its initial certifications and its MOC program in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABIM's initial certification services and its MOC program are sold by ABIM in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABIM's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiffs and other internists to purchase MOC, charging inflated monopoly prices for MOC, and reducing competition in the maintenance of certification market.

10.　　ABIM is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because ABIM is found in and transacts business herein.

3

11.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because ABIM resides in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred herein.

## PARTIES

12.     Plaintiff Gerard Francis Kenney, M.D., ("Dr. Kenney") is a graduate of Pennsylvania State University College of Medicine. He completed his residency in internal medicine in 1993 at Lankenau Medical Center in Wynnewood, Pennsylvania and a fellowship in gastroenterology in 1995, also at Lankenau Medical Center. He has pursued a career in internal medicine with a principal emphasis in gastroenterology. Dr. Kenney is a resident of Pennsylvania.

13.     Plaintiff Alexa Joshua, M.D., ("Dr. Joshua") graduated in 1986 from Wayne State University School of Medicine, one of the top two ranked medical research institutions in Michigan, according to U.S. News and World Report. She completed her residency in internal medicine at Henry Ford Hospital and has been a practicing internist since 1989. Dr. Joshua is a resident of Michigan.

14.     Plaintiff Glen Dela Cruz Manalo, M.D., ("Dr. Manalo") graduated from Manila Central University College of Medicine in 1990. Dr. Manalo relocated to the United States in 1994 where he completed his residency in internal medicine at the University of Tennessee Medical Center at Knoxville in 1997, a fellowship in gastroenterology at East Tennessee State University in Johnson City, Tennessee in 2000, and a fellowship in hepatology at Carolinas Medical Center in Charlotte, North Carolina in 2001. He has been a practicing gastroenterologist since 2002. Dr. Manalo is a naturalized United States citizen and a resident of Washington.

4

15.     Plaintiff Katherine Murray-Leisure, M.D., ("Dr. Murray") is a graduate of Harvard Medical School. She completed her infectious diseases fellowship at Penn State Hershey Medical Center and has pursued a career in internal medicine with a principal emphasis in infectious diseases. Dr. Murray is a resident of Massachusetts.

16.     Defendant ABIM is incorporated under the laws of the State of Iowa with its principal place of business at 510 Walnut Street, Philadelphia Pennsylvania, and files with the Internal Revenue Service as a Section 501(c)(3) not-for-profit organization. Through most of its existence ABIM has been led by academic physicians with scant clinical experience treating patients. ABIM is a member board of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in thirty-nine specialties and eighty-six subspecialties.

## BACKGROUND

17.     Licenses to practice medicine in the United Sates are granted by medical boards of the individual States. To obtain a license a physician is required, among other things, to have an MD degree and to pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME").

18.     According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care."

19.     Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation

5

Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuous medical education, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

20.     According to its 2016 Form 990 filed with the Internal Revenue Service, ABIM's initial certification "demonstrates that physicians have completed internal medicine and subspecialty training and have met rigorous standards through intensive study, self-assessment and evaluation" and "encompasses the six general competencies established by the Accreditation Council for Graduate Medical Education." Approximately 80% of internists, and almost all practicing internists, purchase initial ABIM certifications. Those who do not include researchers, teachers, academics, and others who may not regularly treat patients.

21.     To obtain initial ABIM board certification a physician must, among other things, pass an ABIM-administered examination. ABIM first began selling initial certifications in 1936.

22.     No State requires an initial ABIM certification for an internist to obtain a license to practice medicine.

**ABIM Requires Internists to Purchase MOC To Maintain Their Initial Certifications**

23.     Initially, ABIM certifications were lifelong and no subsequent examinations or other requirements were imposed by ABIM on internists.

24.     In or about 1975, ABIM devised a voluntary Continuous Professional Development Program ("CPD") for ABIM-certified internists as a complement to its initial board certification. The first CPD examination was administered by ABIM in 1974. Only 3,355 internists took the voluntary examination. Just 2,240 internists took the second voluntary CPD examination in 1977. Even after re-branding it as representing "Advanced Achievement in

6

Internal Medicine" only 1,947 internists took the third voluntary examination in 1980. This 42%
drop in participants from the first voluntary examination reflected the minimal value placed on
the examinations by internists, the medical community as a whole, and the public.

25.     Faced with declining participation and the resulting drop in enrollment fees paid
by internists for the voluntary examinations, ABIM announced it would no longer issue lifelong
certifications and would instead require internists to take subsequent must-pass examinations. By
no later than 1990, ABIM issued only time-limited initial certifications and forced internists to
take new must-pass examinations every ten years or lose their ABIM certification. For example,
those internists obtaining an initial certification in 1990 were forced to take another examination
in 2000. ABIM also required internists to complete five self-evaluation modules every ten years.

26.     All internists were required to participate in and purchase MOC by no later than
2000, *except that* physicians with ABIM initial certifications purchased prior to 1990 are
"grandfathered" by ABIM: they are not required to purchase MOC and yet are reported as
"Certified" on ABIM's website. The President and Chief Executive Officer of ABIM has been
quoted as admitting "Grandfathering is a really vexing challenge. It's difficult to defend ... I
would not see those doctors as equivalent to doctors who recertify."

27.     Thus, ABIM holds "grandfathered" internists to a different standard than their
peers, despite the fact these older physicians are many years out of their residency training and
may be among those least up to date on current practice.

28.     Upon information and belief, approximately 40% of the internists who obtained
their initial certification from ABIM have been "grandfathered."

29.     Requiring internists to purchase MOC from ABIM has allowed ABIM to collect
to date hundreds of millions of dollars in related fees from internists. In addition, internists, to

7

their financial and personal detriment, have been required to take countless hours away from their practice and families in order to prepare for and take repeated examinations and to complete the self-assessment modules and other MOC "activities." MOC also takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care.

30.　　In January 2006, ABIM imposed burdensome changes to MOC. Internists were now also required to accumulate 100 "MOC points" every ten years by completing medical knowledge and practice performance processes. This resulted in substantial additional MOC fees for ABIM. No other organization or entity offered competing maintenance of certification for internists at this time. ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified."

31.　　In 2014, ABIM imposed even more burdensome changes to MOC. Internists were still required to take a must-pass examination every ten years, but were now also required to complete a "MOC activity" every two years and to complete a patient safety and patient survey module every five years. They were also required to accumulate 100 MOC points every five years instead of ten years.

32.　　These changes resulted in substantial additional indirect costs to internists in terms of time taken away from their practice, patients, and families. ABIM-certified internists were also now required to "enroll" in MOC. If they did not, ABIM reported them on its website as "Not Meeting MOC Requirements." No other organization or entity offered competing maintenance of certification for internists at this time. ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified."

8

33.     In 2018, ABIM changed MOC once again. Internists are now required to pay an annual program fee to participate in MOC ($155 in 2018 if paid in the year due), in addition to paying an "assessment fee" for MOC examinations. Those purchasing MOC for internal medicine now have the option of taking a "Knowledge Check-In" test every two years or the single "traditional" must-pass examination every ten years, both of which are now "open-book" further undermining the credibility of MOC. ABIM is phasing in the "Knowledge Check-In" option for subspecialties over the next three years.

34.     Currently, internists who have not purchased MOC from ABIM are reported on ABIM's website as "Not Certified" even though they purchased an initial ABIM certification. ABIM, however, reports "grandfathered" internists as "Certified" even though they do not participate in MOC solely because they purchased an initial ABIM certification before 1990. In fact, upon information and belief, "grandfathered" internists who have voluntarily taken and failed MOC examinations are still reported by ABIM as "Certified."

35.     One analysis projected that complying with MOC costs internists an average of $23,607 in money and time cost over a ten year period, with costs up to $40,495 for some specialists, and that "[t]he 2015 MOC is projected to cost $5.7 billion [internal reference omitted] over the coming decade" from 2015 to 2024, including time costs resulting from 32.7 million physician hours.

36.     MOC has become increasingly mandatory for internists across the country. Plaintiffs and other internists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the

9

practice of medicine. To create an incentive for internists to purchase MOC, ABIM also obtained as part of the Affordable Care Act a temporary 0.5% Medicare payment incentive for doctors participating in MOC. As a result of these and other circumstances described herein, ABIM-certified internists are forced to purchase MOC or suffer substantial economic consequences.

37.    For example, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. With the assistance and encouragement of ABIM, and/or persons affiliated with ABIM, many hospitals have adopted bylaws mandating that physicians purchase MOC. This is magnified in hospital markets that are highly concentrated, *i e* , those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

38.    As another example, many Blue Cross Blue Shield companies ("BCBS"), again with the assistance and encouragement of ABIM, and/or persons affiliated with ABIM, require physicians to participate in MOC to receive a panel of patients in their plans or be included in their networks. Patients of internists that do not purchase MOC have been told that their physicians are no longer preferred providers and that they should look for another primary care doctor. In addition, patients whose internists have been denied coverage by BCBS because they have not complied with ABIM's MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

10

39.     As a further example, internists who lose hospital privileges because they have not complied with ABIM's MOC requirements typically lose coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

40.     As with ABIM's initial certification, no State requires maintenance of board certification for an internist to be licensed.

41.     Almost thirty years after ABIM's action to force internists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research.

42.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts that: (a) ABIM does not require those it has "grandfathered" to comply with MOC, and (b) according to its website, even ABIM's own recently-funded research only "suggest[s] that MOC is a marker of care quality …." Indeed, at least two ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

43.     ABIM's website makes clear that except for those "grandfathered" by ABIM, initial certifications "must be maintained through ABIM's MOC program." By requiring internists to purchase MOC to remain certified, ABIM created a wholly new and artificial market for maintenance of certification that has generated substantial additional fees for ABIM.

11

44.     By "grandfathering" older internists, ABIM has also discriminated against younger internists, including women and persons of color, who are under-represented in the group of internists "grandfathered" by ABIM.

45.     The American Medical Association ("AMA") has adopted AMA Policy H-275.924, Principles on Maintenance of Certification (MOC), which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." ABIM's MOC fails in all of these respects.

### ABIM's Illegal Conduct In Violation Of The Anti-Trust Laws

46.     The product markets relevant to this action are the market for initial board certification of internists and the market for maintenance of certification of internists.

47.     The relevant geographic market is the United States.

48.     Beginning in or about 1990, all internists purchasing initial ABIM certifications have been required to purchase MOC or have their certification terminated by ABIM. Initial ABIM certification is required by ABIM to purchase MOC.

49.     ABIM has throughout the relevant period controlled the market for initial certification of internists in the United States. There are high barriers to entry in the market for initial certification, including technical, economic, and organizational barriers, as demonstrated

by the fact that no other organization or entity has ever offered meaningful competing initial certifications for internists.

50.    ABIM has market power in the tying market of initial certification of internists.

51.    Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABIM sold initial certification services for more than fifty years before it started selling MOC establishes that the two markets are distinct.

52.    MOC, according to ABIM's 2016 Form 990, "means something different from initial certification" and "speaks to the question of whether or not an internist is staying current with knowledge and practice in his/her discipline" and is "anchored in whether a physician is meeting a performance standard."

53.    Thus, MOC serves substantially the same function as CME. Indeed, MOC points are granted for some contracted external CME activities from subspecialty societies. And, likewise, completion of some MOC education modules might count towards a physician's state licensure CME requirement. Importantly, however, MOC differs from CME because if physicians do not see value in particular CME courses or classes they are free to purchase other CME offerings; there is no such meaningful option regarding MOC.

54.    Internists have a desire to obtain maintenance of certification from providers other than ABIM but have been almost entirely unsuccessful as a result of ABIM's illegal tying and the unlawful and exclusionary use of its monopoly power.

55.    The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including

13

internal medicine. NBPAS does not offer initial certifications to internists or any other physicians, but only maintenance of certification.

56.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid state license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an ABIM certification has lapsed). NBPAS fees are vastly lower than those charged by ABIM for MOC, and NBPAS maintenance of certification requires vastly less physician time. For example, in 2017, NBPAS fees were less than 15% of the fees assessed by ABIM for MOC and required much less administrative time for registration.

57.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

58.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association ("AHA") and community hospitals. According to the NBPAS website, as of September 2, 2018, only 91 hospitals, less than one percent, accept NBPAS maintenance of certification, and not a single insurance company is known to accept NBPAS maintenance of certification.  In addition, ABIM does not recognize NBPAS maintenance of certification.

59.     Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABIM.

14

60.     ABIM is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiffs and other internists have been forced to purchase MOC from ABIM since at least 1990 or lose their ABIM certifications.

61.     ABIM also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring internists to purchase MOC or lose their ABIM certification.

62.     ABIM has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require internists to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

63.     An indication of ABIM's illegal tying and monopoly maintenance is that it is able to charge inflated monopoly prices for MOC, increasing the fees it generates from MOC by 276% since 2000.

64.     As a direct and proximate result of ABIM's illegal tying and monopoly maintenance, Plaintiffs and other internists have together been forced to pay hundreds of millions of dollars in MOC fees and incur other out-of-pocket costs.

65.     Initial certification and maintenance of certification are separate products and services. Numerous board certified internists do not want to be required to buy ABIM's MOC and/or would seek to obtain maintenance of certification from a source other than ABIM.

66.     Because of the repeated changes to MOC, internists purchasing initial ABIM certification and MOC cannot assess the lifetime cost of ABIM certification over the several decades of their practice, making it impossible to calculate the life cycle cost.

15

67.     In addition, ABIM has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiffs and other internists who are forced to buy MOC at inflated monopoly prices or lose their certification.

68.     ABIM's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABIM on internists forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiffs and other internists; constrain the supply of internists thereby harming competition, decrease the supply of certified internists, and increase the cost of medical services to patients and consumers; and present barriers to patient care.

69.     ABIM's illegal tying, exclusive dealing, and monopoly maintenance results in ABIM *de facto* forcing Plaintiffs and other internists to purchase MOC in order to hold hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. ABIM's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for internists' services.

70.     ABIM is governed by a board of directors that includes active participants in the market for internists' services and related markets. ABIM's restraint on competition in the market for internists' services, demonstrated conflicts of interests, and private anticompetitive motives force internists, other than those "grandfathered" by ABIM, to purchase MOC or lose their ABIM certification.

16

71. Any alleged justification ABIM might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

72. ABIM has economically coerced purchasers of its initial certification to purchase overpriced, unnecessary MOC from ABIM or lose ABIM certification as internists. ABIM's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of internists.

**Anti-Trust Injury Suffered By Plaintiffs**

**Gerard Francis Kenney, MD**

73. Dr. Kenney entered private practice in 1995 as a partner in Digestive Health Specialists, Inc. ("Digestive Health") in Seneca, Pennsylvania and has been practicing gastroenterology for almost twenty-five years. Gastroenterologists diagnose and treat digestive disorders, such as stomach pain, ulcers, reflux, and Crohn's disease. He has served as President of the Venango County Medical Society and Councilor (Region I) of the Pennsylvania Society of Gastroenterology. Dr. Kenney is a member of, among other professional associations, the American Gastroenterological Association and the American College of Gastroenterology.

74. Dr. Kenney obtained an initial board certification in internal medicine from ABIM in 1993, and a gastroenterology subspecialty certification in 1995. ABIM did not "grandfather" these initial certifications because they were purchased after 1990. Dr. Kenney later passed the MOC examination in gastroenterology in 2007. A proctor who administered the examination referred to MOC as a "money-making operation."

75. In November 2017, Dr. Kenney accepted an offer of employment from Mount Nittany Physicians Group ("MNPG") that would double his income. MNPG is a multi-specialty

group practice owned by Mount Nittany Medical Center in State College, Pennsylvania. In order to assure an orderly transition, Dr. Kenney told his partner that he planned to leave Digestive Health at year-end 2017 and would begin employment with MNPG in early 2018. He also told his staff, about thirty in number, of his plans to give them time to find alternative employment.

76.    Dr. Kenney was later told that to be employed by MNPG he would be required to maintain his ABIM certification in gastroenterology, which was scheduled to be terminated by ABIM effective December 31, 2017. He had already decided by this time, however, not to take the MOC examination again, though he had already paid his MOC annual fees through December 31, 2018. In addition, it was impossible for Dr. Kenney to meet MNPG's requirement because ABIM was not offering the MOC gastroenterology examination again in 2017.

77.    MNPG then revised its offer extending Dr. Kenney's start date to June 30, 2018, but only contingent upon his passing the next MOC gastroenterology examination, scheduled for April 2018. In other words, if Dr. Kenney did not pass the MOC examination, MNPG would rescind its offer.

78.    It was untenable for Dr. Kenney to ask his partner and staff to put their own futures on hold and remain with Digestive Health until he both took the April 2018 MOC examination and then learned the results, expected to take up to an additional ninety days. Alternatively, if Dr. Kenney left private practice at year-end 2017 as originally planned, he faced at least six months without any income from Digestive Health (or MNPG), or longer if he did not pass the MOC examination. Accordingly, Dr. Kenney ultimately could not accept MNPG's revised offer.

79.    ABIM currently reports Dr. Kenney as "Not Certified" on its website even though he obtained initial certifications in internal medicine and gastroenterology. This is misleading

18

because it makes it appear the initial certifications were revoked due to failure to pass a MOC examination, misconduct, or some similar reason rather than having been terminated by ABIM simply because they had lapsed. This is reinforced by ABIM's failure to report Dr. Kenney's gastroenterology MOC certification in 2007 on its website. Because of this presentation by ABIM, Dr. Kenney appears less qualified to patients, hospitals, insurance companies, medical corporations, other employers, and others. Dr. Kenney believes this method of reporting by ABIM on its website pressures doctors into purchasing MOC.

**Alexa Joshua, MD**

80.     Dr. Joshua has provided care for patients in hospital and medical office settings as well as through visits with home-bound patients. She has served patients of ethnically and culturally diverse backgrounds, caring for the insured, underinsured, and uninsured. In 2013, Dr. Joshua was selected for advancement to Fellowship by the American College of Physicians ("ACP"), described on the ACP website as "a mark of distinction representing the pinnacle of integrity, professionalism, and scholarship for doctors pursuing careers in internal medicine," but ultimately declined the invitation for cost reasons.

81.     In 1989, Dr. Joshua began working as an internist affiliated with Henry Ford Hospital providing inpatient care as an employee of Metro-Medical Group, a subsidiary of Health Alliance Plan. Dr. Joshua held consulting and admitting privileges through her affiliation with Henry Ford Hospital. In 2000, Dr. Joshua founded Amethyst Medical Offices, PLC, dba Docrxtor Patience Medical Clinics, PLC, a private internal medicine practice.

82.     Dr. Joshua obtained an initial board certification in internal medicine from ABIM in 2003. ABIM did not "grandfather" her initial certification because it was purchased after 1990.

19

83.     In 2003, Dr. Joshua affiliated with Detroit Medical Center ("DMC"), the leading

Detroit hospital and largest health care provider in Southeast Michigan. Dr. Joshua held

consulting and admitting privileges at five area hospitals through her affiliation with DMC,

allowing her to admit patients and to consult with other doctors regarding their admitted patients.

84.     In 2009, six years after she began her affiliation with DMC, Dr. Joshua and the

rest of the DMC medical staff received a written notice titled "IMPORTANT

CREDENTIALING INFORMATION" requiring that effective July 1, 2009, "Board certification

must be maintained in those specialty boards that are time-limited." Dr. Joshua did not pass the

required MOC examination in 2014, after which ABIM terminated her certification in internal

medicine. She continued to participate in MOC through December 31, 2017.

85.     After Dr. Joshua's certification was terminated by ABIM, her DMC patients were

treated by another doctor who because he had never been certified by ABIM was not required by

DMC to participate in MOC.

86.     On June 1, 2016, Dr. Joshua was told that Blue Cross Blue Shield ("BCBS")

would no longer cover her because it "require[d] certification through the American Board of

Internal Medicine only." Dr. Joshua appealed the decision, telling BCBS, among other things,

that she had been certified by NBPAS in 2015. BCBS rejected her appeal on September 8, 2016.

87.     Dr. Joshua's DMC consulting and admitting privileges expired effective

December 31, 2017. Because she had not complied with MOC she was not allowed by DMC to

renew those privileges. As a result, Dr. Joshua was no longer permitted to provide inpatient care.

Inpatient care is the care of patients whose condition requires admission to a hospital. Instead,

Dr. Joshua was restricted to "Membership Only" status, allowing her to provide only outpatient

care to DMC patients. Outpatient care, also referred to as ambulatory care, is care that can be

20

provided in a medical center without an overnight stay. A practice including inpatient care is typically more remunerative than a practice limited to outpatient care.

88.     ABIM currently reports Dr. Joshua on its website as "Not Certified" even though she obtained an initial certification in internal medicine. The ABIM website also advises that if a doctor is not listed as certified, "they may be certified by another board of the American Board of Medical Specialties" but does not also refer to NBPAS, from which Dr. Joshua holds a current certification, as an alternative certifying board.

**Glen Dela Cruz Manalo, MD**

89.     Dr. Manalo held teaching appointments at James H. Quillen College of Medicine as a clinical instructor from 1997 to 2000, and at Vanderbilt University School of Medicine as an associate professor of medicine from 2002 to 2007. Dr. Manalo was selected as a top gastroenterologist in Billings, Montana by the International Association of Healthcare Professionals for 2011.

90.     Dr. Manalo obtained an initial board certification in internal medicine from ABIM in 1997, and a gastroenterology subspecialty certification in 2000. ABIM did not "grandfather" these initial certifications because they were purchased after 1990.

91.     Dr. Manalo served as staff gastroenterologist with Tennessee Valley Health Care Systems, a United States Department of Veterans Affairs medical center, from September 2002 to September 2007. In October 2007, Dr. Manalo took a position at St. Vincent Healthcare in Billings, Montana ("St. Vincent") at a base salary of $400,000, capped at $800,000 annually, and also received a lump sum recruitment incentive of $50,000. He replaced a doctor who had recently retired and who had never been certified by ABIM in internal medicine or gastroenterology.

21

92.     Dr. Manalo's ABIM certification in internal medicine was terminated in 2007 after he decided not to purchase MOC. He wrote ABIM on June 6, 2009, among other things, that it was "unfair and outright discriminatory that practitioners certified on or after 1990 are the only ones required to certify" and that he was "interested in recertifying in my subspecialty [gastroenterology] and would do so provided that all are required to certify ..." Dr. Manalo never received a response or even the courtesy of an acknowledgement of receipt of his email from ABIM, which terminated his certification in gastroenterology in December 2010 after he again decided not to purchase MOC.

93.     Based on his review of the medical literature at the time and continuing to today, Dr. Manalo has found no connection between MOC and doctor competence or improved patient outcomes. He also believes ABIM's grant of a blanket "grandfather" status to all internists who purchased their initial certifications prior to 1990 to be discriminatory and unfair. Based on his own observations, shared by other doctors whose views and comments he monitors on medical websites, Dr. Manalo considers MOC to be a money-making monopoly that imposes unnecessary and burdensome time and financial constraints on internists.

94.     St. Vincent told Dr. Manalo that he would lose his staff privileges unless he maintained his ABIM gastroenterology certification (which could only be only be maintained by purchasing MOC) and that ABIM certification was required by the St. Vincent Medical Staff bylaws. He was told that maintaining his ABIM certification was "also a requirement of many payers [insurance companies] to ensure reimbursement for your services." Dr. Manalo offered to earn additional CME credits beyond what was required by the St. Vincent bylaws. He was told, however, that this was not an acceptable alternative to ABIM certification and MOC.

22

95.     Dr. Manalo was terminated by St. Vincent effective December 31, 2010, due to

his refusal to participate in MOC and to purchase a renewal of his ABIM certification. He was

also caused upon his termination to forfeit $33,514.60 in his St. Vincent Retirement Plan

account.

96.     Dr. Manalo received positive reviews from patients and staff who advocated with

St. Vincent to allow Dr. Manalo to remain on the medical staff. For example:

> -- a Registered Nurse wrote: "Dr. Manalo does the most endoscopic procedures for the
> hospital. He is requested more and more by our patient population … I am pleading you
> to find a way to keep him here."

> -- a patient wrote: "Dr. Manalo is in a league of his own … Since he conducts his
> business, his commitments, and his personal interactions with such unquestioned
> professionalism and unflagging concern for others, I feel he is a doctor that is a must for
> GI Diagnostics. Please keep this doctor on board for my future visits and medical needs.
> He is really that good!"

> -- another Registered Nurse wrote: "I would like to say that Dr. Manalo is a rare find. He
> is loved by his patients and staff alike. His caliber of expertise, compassion and overall
> likeability will be a hard (if not impossible) act to follow."

> -- an endoscopy technician wrote: "Dr. Manalo is one of the most knowledgeable and
> thorough gastroenterologists I have worked with."

> -- another St. Vincent staff member wrote: "I would have to say that after what I have
> seen I would have my family see Dr. Manalo as my first choice … The loss of revenue
> when Dr. Manalo leaves will be dramatic."

97.     In addition, the St. Vincent Chief Medical Officer wrote Dr. Manalo that: "My

personal sentiments are that I would love to continue having you as a colleague. You have

provided excellent care of my patients that I have referred, and you have a great reputation

among your colleagues and in the endoscopy suite." He also acknowledged that he found MOC

"at times onerous and not particularly relevant to my clinical practice of medicine." Nonetheless,

he reiterated that the St. Vincent bylaws required MOC and that "[m]any insurers have also made

board certification a requirement for procedural reimbursement."

23

98.     Dr. Manalo was told when he started at St. Vincent that it had taken almost ten years to recruit a gastroenterologist, and believes it took St. Vincent several years to fill his position after he was terminated, to the detriment of St. Vincent and its patients.

99.     After looking for employment for several months, Dr. Manalo took a position in April 2011 as staff gastroenterologist at Jonathan M. Wainwright Memorial Veterans Affairs Medical Center in Walla Walla, Washington ("Wainwright"). His annual salary at Wainwright was $265,000, substantially less than the base salary of $400,000 he had been receiving at St. Vincent. He also received a recruitment incentive of $66,250 from Wainwright, paid over time.

100.     Dr. Manalo remained at Wainwright until its gastroenterology practice closed in July 2017. Despite actively searching for another position, he remains unemployed. Although he is eligible for NPBAS certification, he was told by hospitals at which he sought employment that they recognized only ABIM certification and MOC.

101.     ABIM currently reports Dr. Manalo on its website as "Not Certified" even though he obtained initial certifications in internal medicine and gastroenterology.

**Katherine Murray-Leisure, MD**

102.     Dr. Murray worked with leprosy and syphilis patients as a Lieutenant JG in the Commissioned Corps of the United States Public Health Service. She investigated sand fly-borne leishmaniasis in veterans of Operation Desert Shield and Operation Desert Storm, a disease with ulcers of the skin or inside the nose with cyclic fevers and sometimes an enlarged spleen. Dr. Murray and colleagues shared their medical research findings at microbiology and infectious diseases meetings and with the Pennsylvania Medical Society, the American Medical Association, and the United States Congress. She received national recognition from the United States Department of Veterans Affairs, Veterans of Foreign Wars, and the American Legion. She has thirty peer-reviewed publications in the field of infectious diseases and is a member of the

24

American Society of Tropical Medicine and the Infectious Diseases Society of America. Dr. Murray is a past President of the Lebanon County Medical Society, Pennsylvania, and is currently a County Delegate for the Massachusetts Medical Society.

103.    Dr. Murray obtained an initial and lifelong board certification in internal medicine from ABIM in 1984. She had her first child in 1986 during her infectious diseases fellowship, and purchased an infectious diseases subspecialty initial ABIM certification in 1990. Although Dr. Murray is "grandfathered" in internal medicine with a lifelong certification, ABIM did not "grandfather" her initial infectious diseases certification because it was purchased after 1990.

104.    Dr. Murray was required to purchase infectious diseases MOC recertifications in 2000 and again ten years later in order to maintain her subspecialty certification. This required disruptive patient practice questionnaires, two years of test-taking practices, four years of meritless so-called self-evaluation modules, and six hour examinations with standardized two-minute test questions at a remote test site under uncomfortable conditions.

105.    Dr. Murray was the infectious diseases ("ID") consultant and hospital epidemiologist for twenty years, from 1987-2007, at three hospitals in Lebanon, Pennsylvania: the Lebanon Veterans Administration Medical Center, Good Samaritan Hospital, and the Lebanon Valley General Hospital birthing facility. In 2010, Dr. Murray relocated from Pennsylvania back to Massachusetts, closer to her aging parents, and started infectious diseases consultations in Plymouth, Massachusetts. She associated with another ID consultant at Beth Israel Deaconess Hospital-Plymouth ("BID-Plymouth") in the South Shore region of Massachusetts, then known as Jordan Hospital. She was one of only two specialists in infectious

25

diseases with consulting staff privileges. Her consultative practice grew quickly during the time Dr. Murray was associated with Jordan Hospital.

106.    Holding privileges in infectious diseases at Jordan Hospital was a crucial part of Dr. Murray's practice. Physicians holding such privileges provide a service not otherwise available or available only in limited supply by other members of the medical staff. Infectious disease consultants see patients on hospital floors, in Emergency Rooms, and in intensive care units. They provide services only at the request of other members of the medical staff. Bedside infectious disease consultations improve patient survival, control deadly *Clostridium difficile* gut infections, and lessen the thirty-day readmission risk for patients after discharge.

107.    The Jordan Hospital bylaws required that physicians holding staff privileges such as Dr. Murray be ABIM-certified in their area of specialty. Dr. Murray reviewed Jordan Hospital's bylaws which exempted certain senior physicians but required all new physicians to have not only an ABIM certification but also participate in MOC to continue hospital work in their subspecialty.

108.    ABIM terminated Dr. Murray's infectious diseases certification after she did not pass her MOC examination in 2009. In spite of strongly supportive patient and colleague recommendations, Dr. Murray's infectious diseases privileges (but not her "grandfathered" internal medicine privileges) were revoked by Jordan Hospital in May 2011, consistent with the bylaws requirement that Dr. Murray maintain her ABIM certification and participate in MOC.

109.    Dr. Murray received no patient complaints and had received positive performance reviews from Jordan Hospital colleagues before ABIM terminated her infectious diseases certification. Citing among other things that her certification in internal medicine had been "grandfathered" by ABIM, Dr. Murray, with staff support, sought to retain her infectious

26

diseases consulting staff privileges at Jordan Hospital as extended internal medicine reports, but to no avail.

110. Dr. Murray passed her MOC examination later in May 2012. Infectious diseases privileges were restored by Jordan Hospital. During enrollment in MOC she had notified ABIM of serious typographical errors (for example, systemic vascular resistance versus sustained viral response) and other mistakes, and erroneous information particularly on the practice exam modules. She noted that best answers were frequently not offered in complex case scenarios. She found many questions on MOC exams irrelevant to clinical practice and today's resource-constricted needs. For example, no commercial laboratories were differentiating *Rickettsia rickettsii* from *Rickettsia parkeri* on serum antibody tests. Four of 170 questions focused on shingles Varicella zoster virus vaccine, whereas none addressed common diabetic foot infections possibly resulting in leg amputations. So-called correct answers were too often flawed or biased due to what appeared to Dr. Murray to be conflicted commercial interests. For example, ABIM promoted inflated shingles vaccine efficacy rates among their correct answers based upon manufacturer-sponsored studies on young volunteers rather than objective data involving frail elderly patients like those seen in Dr. Murray's clinical practice.

111. Dr. Murray lost one year's infectious diseases consulting income, as a result of the MOC requirement, and more importantly, the opportunity to help hundreds of patients recover from serious, often drug-resistant, infections.

112. Dr. Murray's personal professional standing and reputation were tarnished by the even-temporary loss of her infectious diseases certification. She found it necessary to explain to bewildered patients how professional careers were arbitrarily and wrongfully damaged to support the revenue flow of an unaccountable, highly-flawed private testing and recertification

27

monopoly. She lamented with patients and practicing medical staff how MOC compromised patient access to already certified, experienced specialists. Beginning in 2013 on behalf of young and mid-career doctors, Dr. Murray worked with other staff to update the Jordan Hospital bylaws to eliminate MOC requirements and to recognize recertification by the National Board of Physicians and Surgeons, the sponsor of a substantially less expensive and time consuming and more relevant recertification process. These efforts were unsuccessful.

## CLASS ACTION ALLEGATIONS

113. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all internists required by ABIM to purchase MOC from ABIM to maintain their initial ABIM certifications. Specifically excluded from this Class are the officers, directors, or employees of ABIM, or of any entity in which ABIM has a controlling interest, or any affiliate, legal representative, or assign of ABIM. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

114. The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 100,000 internists.

115. Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABIM is engaging in illegal tying; (2) whether ABIM has illegally created and is maintaining its monopoly power in the market for maintenance of certification; (3) whether the conduct of Defendant, as alleged in this Complaint, caused injury to

28

the business or property of Plaintiffs and the members of the Class; (4) the appropriate injunctive and related equitable relief; and (5) the appropriate class-wide measure of damages.

116. Plaintiffs' claims are typical of the claims of other Class Members. Plaintiffs and all members of the Class are similarly affected by Defendant's wrongful conduct in that they were all forced to purchase ABIM's MOC in order to maintain certification. Plaintiffs' interests are coincident with and not antagonistic, or in conflict with, other Class Members'. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs will fairly and adequately protect the interests of other Class Members.

117. Plaintiffs have retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

118. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

119. The Class is manageable, and management of this action will not preclude its maintenance as a class action.

29

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

120.   Plaintiffs incorporate by reference all of the above allegations.

121.   ABIM's tying of its initial board certification service and its MOC program is a

*per se* violation of Section 1 of the Sherman Act.

122.   Alternatively, even if ABIM's tying arrangement is not *per se* illegal, it

nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an

unreasonable restraint on trade.

123.   There is no legitimate business or other pro-competitive justification for

ABIM's illegal tying of its initial certification service to its MOC program.

124.   As described above, ABIM's illegal conduct has anticompetitive effects in the

market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance
### in Violation of Section 2 of the Sherman Act

125.   Plaintiffs incorporate by reference all of the above allegations.

126.   ABIM's creation of its monopoly power in the market for maintenance of

certification is a violation of Section 2 of the Sherman Act.

127.   ABIM's maintenance of its monopoly power in the market for maintenance of

certification is a violation of Section 2 of the Sherman Act.

128.   As described above, ABIM's illegal conduct has anticompetitive effects in the

market for maintenance of certification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against ABIM as follows:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2.    The unlawful conduct alleged herein be adjudged and decreed:

    a.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    b.    A *per se* violation of Section 1 of the Sherman Act; and

    c.    Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act;

3.    Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws;

4.    Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.    Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

31

6. Plaintiffs and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

7. Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: December 6, 2018

Respectfully submitted,

/s/ Mindee Reuben

C. Philip Curley
Alan F. Curley
Cynthia H. Hyndman
Samuel G. Royko
ROBINSON CURLEY, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 · Telephone
(312) 663-0303 · Fax
pcurley@robinsoncurley.com
acurley@robinsoncurley.com
chyndman@robinsoncurely.com
sroyko@robinsoncurley.com

*Counsel for Plaintiffs, Gerard Kenney,
Alexa Joshua, Glen Dela Cruz Manalo,
and Katherine Murray Leisure*

Steven J. Greenfogel
Mindee J. Reuben
LITE DEPALMA GREENBERG, LLC
1835 Market Street - Suite 2700
Philadelphia, PA 19103
Tel: 267.519.8306
Fax: 973.623.0858
sgreenfogel@litedepalma.com
mreuben@litedepalma.com

Katrina Carroll
LITE DEPALMA GREENBERG, LLC
111 West Washington
Suite 1240
Chicago, IL 60602
Tel: 312.750.1265
Fax: 312.212.5919
kcarroll@litedepalma.com

*Counsel for Plaintiffs, Gerard Kenney,
Alexa Joshua, Glen Dela Cruz Manalo, and
Katherine Murray Leisure*

32

Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| EMILY ELIZABETH LAZAROU, and AAFAQUE AKHTER | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01614 |
| | ) | |
| AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY, | ) ) | CLASS ACTION |
| | ) | Trial by Jury Demanded |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter, ("Plaintiffs"), for their

Complaint against Defendant American Board of Psychiatry and Neurology ("ABPN" or

"Defendant") hereby allege as follows:

### INTRODUCTION

1.       This case is about ABPN's illegal and anti-competitive conduct in the market for

initial board certification of psychiatric physicians ("psychiatrists") and neurological physicians

("neurologists") and the market for maintenance of certification of psychiatrists and neurologists.

ABPN is illegally tying its initial certification product to its maintenance of certification product,

referred to by ABPN as MOC.

2.       This case is also about ABPN's illegal creation and maintenance of its monopoly

power in the market for maintenance of certification. ABPN is the monopoly supplier of initial

certifications for psychiatrists and neurologists. Beginning in or about 1994, ABPN used its

monopoly position in the initial certification market to create a monopoly in the market of

maintenance of certifications for psychiatrists and neurologists, which is the subject of this lawsuit. Since then, ABPN has used various anti-competitive, exclusionary, and unlawful actions to promote MOC and prevent and limit the growth of competition from new providers of maintenance of certification for psychiatrists and neurologists. ABPN's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by psychiatrists and neurologists.

3.      The tying product is ABPN's initial board certification, which it sells to psychiatrists and neurologists nationwide. ABPN currently sells initial certifications in three primary areas: psychiatry, neurology, and child neurology, and fourteen subspecialty certifications within the fields of psychiatry and neurology. Many psychiatrists and neurologists hold multiple ABPN certifications, purchasing one or more initial certifications or subspecialty certifications.

4.      The tied product is MOC, ABPN's maintenance of certification. ABPN has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABPN has forced psychiatrists and neurologists to purchase MOC, charged supracompetitive monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5.      Approximately 70,000 psychiatrists and neurologists have purchased initial ABPN certifications. ABPN has throughout the relevant period controlled the market for initial certification of psychiatrists and neurologists in the United States. Through its MOC program, ABPN has also controlled the market for maintenance of certification of psychiatrists and neurologists. ABPN has unlawfully obtained and maintained its monopoly power in the market

for maintenance of certification services for the anti-competitive purpose of requiring psychiatrists and neurologists to purchase MOC and not deal with competing providers of maintenance of certification services.

6.     Plaintiffs bring this Class Action to recover damages and for injunctive and other equitable relief on behalf of all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications.

## JURISDICTION AND VENUE

7.     Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABPN's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

8.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

9.     ABPN sells its initial certifications and its MOC product in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABPN's initial certification services and its MOC program are sold by ABPN in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABPN's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiffs and other psychiatrists and neurologists to purchase MOC, charging supracompetitive monopoly prices for MOC, and reducing competition in the maintenance of certification market.

10. ABPN is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABPN is found in and transacts business herein.

11. Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because ABPN resides in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred herein.

## PARTIES

12. Plaintiff Emily Elizabeth Lazarou, MD ("Dr. Lazarou") is a graduate of the University of Texas Medical School. She completed her residency in general adult psychiatry in 2006 at USF Health at University of South Florida in Tampa, Florida, where she also served as Chief Resident of Psychiatry and in 2007 completed a fellowship in forensic psychiatry. She has been a practicing psychiatrist since 2008. Dr. Lazarou is a resident of Florida.

13. Plaintiff Aafaque Akhter, MD ("Dr. Akhter") finished medical school at Patna Medical College in Bihar, India, and received his diploma in psychological medicine from the Royal College of Surgeons in Ireland. He has also passed the MRCPsych (I) examination conducted by the Royal College of Psychiatrists, London, United Kingdom. Dr. Akhter completed his residency in general adult psychiatry in 2002 at Harvard Medical School. Dr. Akhter has been a practicing physician since 2003 and is a resident of New York.

14. Defendant ABPN is incorporated under the laws of the State of Delaware with its principal place of business at 7 Parkway North, Deerfield, Illinois, and files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization. ABPN is a member board of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in forty specialties and eighty-seven subspecialties.

# BACKGROUND

15.     Licenses to practice medicine in the United States are granted by medical licensing boards of the individual States. To obtain a license a physician must, among other things, have either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO") and pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

16.     According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care." Similarly, the NBOME website provides that its examination assesses "competence in the foundational competency domains required for general physicians to deliver safe and effective osteopathic medical care and promote health in unsupervised clinical settings."

17.     Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuing medical education courses, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

18.     According to the ABMS website, initial certification demonstrates "expertise in a medical specialty." A recent ABMS publication likewise describes initial board certification as

an assessment of "medical knowledge, clinical knowledge, and diagnostic skills." Most psychiatrists and neurologists purchase initial ABPN certifications. Those who do not may include researchers, teachers, academics, and others who may not regularly treat patients.

19.     To obtain initial ABPN certification a physician must, among other things, pass an ABPN-administered examination. ABPN first began selling initial certifications in 1935.

20.     No State requires initial ABPN certification for a psychiatrist or neurologist to obtain a license to practice medicine.

**ABPN Requires Psychiatrists and Neurologists
to Purchase MOC to Maintain Their Initial Certifications**

21.     Initially, ABPN primary certifications and its subspecialty certification in child and adolescent psychiatry were lifelong and no subsequent examinations or other requirements were imposed by ABPN on psychiatrists and neurologists.

22.     In or about 1994, however, ABPN announced it would no longer issue lifelong initial certifications. Instead, it would issue ten-year certificates and require participation in a new maintenance of certification program, which ABPN called its 10-Year MOC Program. This required, among other things, passing a secure, proctored, high-stakes, cognitive MOC examination every ten years; completing a specified number of CME credits, including a certain number of Self-Assessment ("SA") CME activities pre-approved by ABPN; and fulfilling burdensome and meritless Improvement in Medical Practice ("PIP") requirements.

23.     A recent ABMS publication explains that a maintenance of certification program such as ABPN MOC "requires a different set of expectations and requirements" than initial certification, and "clarif[ies] that initial certification and continuing certification have different purposes."

6

24.     ABPN asserts on its website that ABPN MOC has "guaranteed that physicians were current in ways not immediately available for testing," without citing any evidence in support of its "guarantee."

25.     All ABPN-certified psychiatrists and neurologists are required to purchase MOC to maintain their ABPN certifications, *except that* physicians who purchased initial ABPN certifications prior to October 1, 1994, are "grandfathered" by ABPN: they are exempt from MOC and yet are reported on ABPN's website as "Certified" and holding a "certificate valid indefinitely." Upon information and belief, "grandfathered" psychiatrists and neurologists who have voluntarily taken and failed MOC examinations are still reported by ABPN as "Certified." ABPN reports "grandfathered" psychiatrists and neurologists as "Certified" even though they do not participate in MOC, solely because they purchased an initial ABPN certification before it began issuing only time-limited certificates.

26.     Thus, ABPN holds "grandfathered" physicians to a different standard than their peers, despite the fact these older physicians can be many years out of their residency training and may be among those least up to date on current medical practices.

27.     The President and CEO of the American Board of Internal Medicine ("ABIM"), like ABPN a member board of ABMS, has been quoted as admitting with respect to a similar "grandfather" exemption for internists, that "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify."

28.     Upon information and belief, up to 50% of psychiatrists and neurologists who have obtained an initial ABPN certification have been "grandfathered."

29.     After it stopped issuing lifetime certificates, ABPN has charged MOC fees up to an annual average of $212.50 per physician, not including subspecialty costs. Throughout most

7

of this time, no other organization or entity offered competing maintenance of certification for psychiatrists and neurologists. ABPN continues to exempt "grandfathered" psychiatrists and neurologists from the requirement to purchase MOC and to report them as "Certified." These ABPN MOC fees are in addition to State medical license fees and federal and State fees to prescribe controlled substances for patient care, which psychiatrists and neurologists also pay and that total several hundred dollars annually.

30.     ABPN has realized to date tens of millions of dollars in ABPN MOC revenue from psychiatrists and neurologists who have purchased ABPN initial certifications. In addition, psychiatrists and neurologists, to their financial and personal detriment, have been required to take countless hours away from their practice and family in order to prepare for and take required examinations and to complete other MOC requirements. MOC also takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care.

31.     ABPN automatically enrolls all psychiatrists and neurologists in MOC after they have obtained an initial ABPN certification.

32.     Physicians ineligible to be "grandfathered" who choose not to buy MOC, pay MOC fees, and complete MOC requirements are reported on the ABPN website as "Not Certified," even though they obtained initial ABPN certifications.

33.     The ABPN ten-year cognitive MOC examination does not meet the stated goals of maintenance of certification of continuous and ongoing learning and improvement. For example, the American Board of Radiology ("ABR"), another member board of ABMS, also requires a ten-year cognitive MOC examination. ABR's David Laszakovits, however, has acknowledged that it "became pretty apparent pretty quickly" that the ten-year examination "did not meet the

8

aims of maintenance of certification" and had no "formative aspects to aid in continuous learning and continuous improvement." [1]

34.     Similarly, ABPN President and CEO, Dr. Larry R. Faulkner ("Dr. Faulkner") conceded in 2014 that the ABPN ten-year cognitive MOC examination "might be modified to more closely resemble what happens during diplomates' professional activities, including the possibility for diplomates to have access to relevant reference material during MOC examinations." Five years later, however, ABPN still uses the same ten-year cognitive MOC examination.

35.     ABPN MOC requirements are a constantly moving target and have gone through many iterations over the years, varying wildly in substantial ways depending upon, among other things, when a physician obtained his or her most recent time-limited certificate.

36.     By 2010, eight different sets of MOC requirements were mandated as part of the 10-Year MOC Program, depending on when between 2001 and 2009 a physician's last time-limited certificate was issued. There is no available evidence suggesting ABPN evaluated whether any of these MOC requirements actually met the stated goals of maintenance of certification before they were imposed, or whether the eight different sets of requirements would yield comparative results. In other words, no meaningful analysis could be made whether ABPN MOC had met the stated goals of maintenance of certification before the requirements were abruptly changed. And due to the ever-shifting MOC requirements, there was no uniform standard against which to assess and compare, for example, a physician with a 2003 certification and one with a 2008 certification.

---

[1] OLA Webinar, The American Board of Radiology, https://youtu.be/zCeWCAoGAzo (published December 4, 2018).

37. In 2012, just two years later, ABPN announced more changes to MOC, re-designing the product completely and re-branding it as Continuous Maintenance of Certification ("C-MOC"). ABPN also announced at the same time that the 10-Year MOC Program was scheduled to sunset in 2021. Physicians with time-limited certificates issued in 2012 and later are now required to participate in C-MOC. The required MOC activities are different under C-MOC and compliance is evaluated every three years rather than every ten years, except that the ten-year cognitive MOC examination is still required. Thus, ABPN is now selling two different MOC products. As the ABPN website states, there are "two active MOC programs and specific activity requirements exist for each." Again, there is no available evidence suggesting that ABPN evaluated whether C-MOC actually met the stated goals of maintenance of certification before it was imposed.

38. Having in place "two active MOC programs" has further exacerbated the already existing flaws in ABPN MOC noted above. Now there are two different MOC products, neither of which has been in place long enough to analyze whether the stated goals of maintenance of certification are being met. And the fact that two entirely different MOC products are being imposed in parallel further underscores the lack of a uniform MOC standard to assess and compare physicians. ABPN's Dr. Faulkner has characterized ABPN MOC as "continuously evolving," as if that were a virtue. In fact, the opposite is true.

39. ABPN also used C-MOC to raise its MOC fees. At the time ABPN announced C-MOC, it charged an application fee ($700) and examination fee ($800), at or close to the time the MOC examination was taken, resulting in an average annual MOC fee over ten years of $150, not including subspecialty costs. Under C-MOC, ABPN instead charges an annual MOC fee of $175.

10

40. In 2017, ABPN's "continuously evolving" MOC product was changed yet again, adding a new, so-called "patient safety activity." As before, there is no available evidence suggesting that ABPN evaluated whether this new requirement actually met the stated goals of maintenance of certification before it was imposed.

41. In January 2019, after just another two years, ABPN again changed its MOC product, re-inventing it for at least the seventh time. ABPN introduced an optional Pilot Project as an alternative to the ten-year cognitive MOC examination, limited just to physicians whose time-limited certifications expire between 2019 and 2021. The new on-line cognitive test requires physicians to select within a three-year period at least thirty but no more than forty medical journal articles pre-approved by ABPN, and correctly answer four out of five multiple-choice questions for each. ABPN refers to these as "mini-exams" and if fewer than thirty "mini-exams" are passed, the physician must take the ten-year cognitive MOC examination. In other words, only 120 out of a possible 200 questions, or just 60%, need be answered correctly. Why does passing thirty "mini-exams" suffice, but passing twenty-nine does not? Why can only forty pre-approved articles be chosen? Is a physician who needs to take forty-one "mini-exams" to pass thirty unworthy of ABPN certification? How were these seemingly arbitrary parameters set? These are just some of the unanswered questions about the Pilot Project.

42. Once again, there is no available evidence suggesting that ABPN evaluated the Pilot Project before it was imposed. It is highly questionable that the Pilot Project, any more than its many antecedents, has "guaranteed" that physicians are "current" -- as ABPN promises on its website – or that the stated MOC goals of continuous and ongoing learning and improvement are being met.

43.     An articles-based cognitive test such as the Pilot Project, in addition to apparently being designed so that all or most physicians pass, is redundant of the CME credits already required for physicians to maintain their State license to practice medicine. CME activities and journal articles both serve the same goal of keeping physicians up to date on new medical developments. CME providers represent a range of organizational types, including professional societies, hospitals and health systems, government agencies, medical schools, and publishing and education companies. They already provide over 160,000 educational activities each year, comprising one million hours of instruction and 28 million interactions with physicians and physician teams. The thirty journal articles making up the Pilot Project pale in comparison to these already-existing CME programs. CME is also already designed to identify knowledge gaps, develop educational programs to address those gaps, and utilize adult learning principles to give physicians the skills, competencies, and intellectual fulfilment required for their practice. These are precisely the goals of ABPN MOC. The Pilot Project, like all prior iterations of ABPN MOC, validates nothing more than ABR's ability to force psychiatrists and neurologists to purchase MOC and continue assessing MOC fees. Further, journal articles and their underlying research too often lack independence, and can reflect the interests and biases of sponsoring institutions and medical and pharmaceutical corporations.

44.     The Pilot Project also has many of the same flaws as the ten-year cognitive MOC examinations. The pre-approved journal articles may not fit the interest of the physician or be relevant to his or her clinical practice. Nor does the process represent their actual work environment, as a psychiatrist or neurologist does not have the luxury of waiting weeks, months, or even years to arrive at a clinical diagnosis or conclusion. The Pilot Project also does not ensure continuous learning; instead, like the ten-year cognitive examination, completion can be

"crammed" into a short time period, including at or near the expiration of the MOC evaluation period. In addition, while ABPN provides on-line links to its pre-approved journal articles at least some must be purchased, adding to the cost of ABN MOC

45.    Because it has only been in place a matter of weeks, little more is known about the Pilot Project or how it is being implemented, except that ABPN has not yet committed to eliminating the ten-year cognitive MOC examination, adding to the uncertainty of what ABPN MOC will look like in the future.

46.    What has become a constantly moving target of ABPN MOC requirements has not only been confusing and enforced by ABPN unfairly, it has made it impossible to undertake any meaningful analysis whether, as ABPN claims, there is a causal relationship between any of the many iterations of ABPN MOC and a beneficial impact on physicians, patients, or the public.

47.    The American Academy of Neurology (with more than 25,000 members worldwide) has criticized ABPN MOC, challenging in particular the burdensome and meritless PIP requirements, "especially in the absence of convincing research showing that it is effective in improving physicians' practice and the quality of care they provide." The American Psychiatric Association and many State-based associations have voiced similar objections.

48.    MOC has become increasingly mandatory for psychiatrists and neurologists across the country. ABPN admits on its website that "participation in the MOC Program is required to maintain certification for diplomates with time-limited certificates." Moreover, Plaintiffs and other psychiatrists and neurologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABPN-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other

requirements of the practice of medicine. To create an incentive to purchase MOC, ABMS and its member boards also obtained as part of the Affordable Care Act a 0.5% Medicare payment incentive for physicians participating in MOC. Some health plans pay bonuses or higher fees to physicians for completing MOC activities. As a result of these and other circumstances described herein, ABPN-certified psychiatrists and neurologists are forced to purchase MOC or suffer substantial economic consequences.

49.     As another example of how MOC is becoming mandatory, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. Many hospitals, upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, have adopted by-laws mandating that physicians purchase MOC. This is magnified in hospital markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

50.     As another example, many Blue Cross Blue Shield companies ("BCBS"), upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, require physicians to participate in MOC to be included in their networks. In addition, patients whose doctors have been denied coverage by BCBS because they have not complied with MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

14

51.     As a further example, doctors who lose hospital privileges because they have not complied with ABPN MOC requirements face the possibility of also losing coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

52.     As with initial ABPN certification, no State requires ABPN MOC for a psychiatrist or neurologist to be licensed.

53.     Twenty-five years after ABPN began issuing time-limited certificates and forced psychiatrists and neurologists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research, which is notably lacking with regard to ABPN MOC and its claimed salutary impact.

54.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts, among others, that: (a) ABPN does not require the many thousands of physicians it has "grandfathered" to comply with MOC, and (b) ABPN keeps changing its MOC requirements without allowing sufficient time to evaluate the efficacy and value of its "continuously evolving" product. Indeed, at least two other ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

55.     ABPN's website makes clear that except for those "grandfathered" by ABPN, initial ABPN certifications can be maintained only by purchasing ABPN MOC. By requiring physicians to purchase MOC to remain ABPN-certified, ABPN created a wholly new and

15

artificial market for maintenance of certification that has generated substantial additional fees for ABPN.

56.     By "grandfathering" older psychiatrists and neurologists, ABPN has also discriminated against younger physicians, including women and persons of color, who are under-represented in the group of psychiatrists and neurologists "grandfathered" by ABPN.

57.     The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," "should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." ABPN MOC fails in all of these respects.

## ABPN MOC Revenue

58.     Between 2004 and 2017, after the advent of ABPN MOC, ABPN's "Program service revenue" account exceeded its "Program service expenses" account by a yearly average of $8,777,319, as reported in its Forms 990 for those years. During that same period of time, ABPN's "Net assets or fund balances" account skyrocketed 730%, from $16,508,407 to $120,727,606. In other words, at year-end 2017, as ABPN MOC revenue continued to grow, ABPN net assets (assets less liabilities) more than septupled, which included, according to its 2017 Form 990, almost $102 million in cash, savings, and securities.

16

59.     These data demonstrate that ABPN MOC is an ever-increasing revenue source and apparently immensely profitable for ABPN. This is not surprising. Recent residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay the bulk of initial certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABPN on older doctors who have been practicing for as long as several decades, and have more financial wherewithal to pay ABPN MOC fees. In short, ABPN created a lucrative new revenue source by imposing MOC on older and more established doctors.

60.     ABPN separately reports on its Form 990 the total amount it pays in "salaries, other compensation, employee benefits," to its roughly 45 employees, which between 2008 and 2017 has averaged approximately $5.5 million. Those amounts include overly generous compensation paid to current ABPN President and CEO, Dr. Faulkner, who was hired by ABPN in 2006 as Executive Vice President, its most senior staff position. In 2007, he was paid total compensation of $500,726 as Executive Vice President. Dr. Faulkner became ABPN President and CEO in 2009. In 2017, the last year for which data could be located, his total compensation as President and CEO was $2,872,861, including a bonus of $1,884,920. Thus, as ABPN MOC revenue continued to grow, Dr. Faulkner's total compensation almost sextupled.

61.     ABPN's pension plan accruals and contributions are also lavish, and between 2009 and 2017 averaged 8.1%. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5%.

**ABPN MOC is Not Self-Regulation**

62.     ABPN has arrogated to itself the mantle of self-regulation of psychiatrists and

neurologists. For example, former ABMS President and CEO and "grandfathered" ABPN

neurologist Dr. Lois Margaret Nora, spoke at the ABPN Crucial Issues Forum 2016. An ABPN

publication summarized her remarks as including a description of the medical profession "as a

social compact" and "how board certification, at its core, is service to others through professional

self-regulation in the past, today and in the future." This and similar statements provide an

unwarranted veneer of respectability and integrity to ABPN MOC when, as alleged herein, the

facts are to the contrary.

63.     ABPN MOC is not self-regulation for at least two reasons. First, not meeting

MOC requirements is not grounds for revocation or suspension of a physician's license to

practice medicine or to undertake any other disciplinary action. Those self-regulatory functions

are mandated and implemented by the medical licensing boards of the individual States, the only

relevant self-regulatory bodies. As alleged above, however, physicians who do not comply with

ABPN MOC requirements and who are not "grandfathered" face the loss of hospital consulting

and admitting privileges, reimbursement by insurance companies, employment by medical

corporations and other employers, malpractice coverage, and other requirements of the practice

of medicine. In substance, ABPN seeks nothing less than to usurp the medical licensing boards

of the individual States as the self-regulatory bodies of the medical profession.

64.     Second, ABPN is not a "self"-regulatory body in any meaningful sense for,

 among other reasons, its complete lack of accountability. Unlike the medical licensing boards of

the individual States, for example, ABPN is a revenue-driven entity beholden to its own financial

interests, including those of its directors and staff. ABPN itself is not subject to legislative,

18

regulatory, administrative, or other oversight by any other persons, entity, or organization. It answers to no one, much less to the psychiatrist and neurologist community which it brazenly claims to self-regulate.

### ABPN's Illegal Conduct in Violation of The Anti-Trust Laws

65.     The product markets relevant to this action are the market for initial board certification of psychiatrists and neurologists and the market for maintenance of certification of psychiatrists and neurologists.

66.     The relevant geographic market is the United States.

67.     By no later than 2002, all physicians purchasing initial ABPN certifications after 1994 have been required to purchase MOC or have their certification terminated by ABPN. Initial ABPN certification is required by ABPN to purchase MOC.

68.     ABPN has throughout the relevant period controlled the market for initial certification of psychiatrists and neurologists in the United States. There are high barriers to entry in the market for initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for psychiatrists and neurologists.

69.     ABPN has market power in the tying market of initial certification of psychiatrists and neurologists.

70.     Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABPN sold initial certification services for more than sixty years before it started selling ABPN MOC establishes that the two markets are distinct.

19

71.     A recent ABMS publication explains that a maintenance of certification program such as ABPN MOC "requires a different set of expectations and requirements" than initial certification, and "clarif[ies] that initial certification and continuing certification have different purposes."

72.     MOC serves substantially the same function as CME. Importantly, however, MOC differs from CME because psychiatrists and neurologists who do not see value in particular CME courses or classes are free to purchase other CME offerings; there is no such meaningful option regarding ABPN MOC.

73.     Physicians have a desire to maintain their initial ABPN certification by purchasing maintenance of certification from other providers, but have been unsuccessful as a result of ABPN's illegal tying and the unlawful and exclusionary use of its monopoly power.

74.     ABPN is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiffs and other physicians have been forced to purchase MOC from ABPN or lose their ABPN certifications.

75.     The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including psychiatry and neurology. NBPAS does not offer initial certifications to psychiatrists, neurologists, or any other physicians, but only maintenance of certification.

76.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid State license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an initial certification has lapsed). NBPAS fees

are vastly lower than those charged by ABPN for its MOC product, and NBPAS maintenance of certification requires vastly less physician time. For example, in 2019, the average annual cost of NBPAS maintenance of certification is $84.50 ($94.50 for a DO), while ABPN charges an annual fee of $175 under C-MOC.

77.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

78.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association ("AHA") and community hospitals. According to the NBPAS website, as of February 26, 2019, only 108 hospitals, approximately one percent of hospitals nationwide, accept NBPAS maintenance of certification and not a single insurance company is known to accept NBPAS maintenance of certification. For example, Blue Cross Blue Shield of Michigan is on record refusing certification through NBPAS. In addition, ABPN does not recognize NBPAS maintenance of certification.

79.     Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABPN.

80.     ABPN also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring physicians to purchase ABPN MOC or lose their ABPN certification.

81.     Upon information and belief, ABPN has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require psychiatrists and

neurologists to be ABPN-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

82.    An indication of ABPN's illegal tying and monopoly maintenance is that it is able to charge supracompetitive monopoly prices for MOC, as evidenced by the 550% increase in its "Net assets or fund balances" account between 2004 and 2015, as ABPN MOC revenue continued to grow, and the $91 million in cash, savings, and securities held by ABPN at year-end 2015.

83.    As a direct and proximate result of ABPN's illegal tying and monopoly maintenance, Plaintiffs and other physicians have together been forced to pay tens of millions of dollars in MOC fees and incur other out-of-pocket costs.

84.    Initial certification and maintenance of certification are separate products and services. Numerous board-certified psychiatrists and neurologists do not want to be required to buy ABPN's MOC and/or would seek to obtain maintenance of certification from a source other than ABPN were it worthwhile to do so.

85.    While an analysis of the average cost to comply with the ABPN MOC specifically is not available, one study has projected that complying with ABIM's maintenance of certification costs internists an average of $23,607 in money and time over a ten-year period.

86.    Because of the repeated changes to MOC, physicians purchasing initial ABPN certification and MOC cannot assess the lifetime cost of ABPN certification over the several decades of their practice, making it impossible to calculate the life cycle cost. It is also impossible for physicians to assess how much time away from their patients and families that

participation in MOC will require, because, by ABPN's own admission, MOC is a "continuously evolving" product.

87. In addition, ABPN has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiffs and other physicians who are forced to buy ABPN MOC at supracompetitive monopoly prices or lose their certification.

88. ABPN's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABPN on physicians forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiffs and other physicians; constrain the supply of psychiatrists and neurologists, thereby harming competition; and decrease the supply of certified psychiatrists and neurologists, thereby increasing the cost of medical services to patients and consumers and presenting barriers to patient care.

89. ABPN's illegal tying, exclusive dealing, and monopoly maintenance results in ABPN *de facto* forcing Plaintiffs and other physicians to purchase MOC in order to hold hospital consulting and admitting privileges, receive reimbursement by insurance companies, secure employment by medical corporations and other employers, obtain malpractice coverage, and satisfy other requirements of the practice of medicine. ABPN's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for services of psychiatrists and neurologists.

90. ABPN is governed and managed by a board of directors that include active participants in the market for services of psychiatrists and neurologists and related markets.

ABPN's restraint on competition in the market for services of psychiatrists and neurologists, demonstrated conflicts of interests, and private anticompetitive motives force psychiatrists and neurologists, other than those "grandfathered" by ABPN, to purchase MOC or lose their ABPN certification.

91.     Any alleged justification ABPN might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

92.     ABPN has economically coerced purchasers of its initial certification to also purchase overpriced, unnecessary ABPN MOC or lose ABPN certification. ABPN's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of psychiatrists and neurologists, to the detriment of their income, reputation, and patients.

### Anti-Trust Injury Suffered By Plaintiffs

**Emily Elizabeth Lazarou, MD**

93.     Dr. Lazarou began practicing as a psychiatrist in 2008 as Associate Medical Director for Behavioral Health at Health Integrated in Tampa, Florida. She has continued practicing as a psychiatrist to the present, and most recently served as Medical Director of Health Integrated until January 2019. Dr. Lazarou has also maintained a private psychiatry practice from 2008 to the present dedicated to providing comprehensive individualized psychiatric medical care, including psychotherapy and medication management. Dr. Lazarou is a member of the Florida Medical Association and the American Academy of Psychiatry and the Law.

94.     Dr. Lazarou obtained an initial certification in psychiatry from ABPN in 2007 and a forensic psychiatry initial subspecialty certification in 2009. Her initial psychiatry certification was not "grandfathered" because it was obtained after 1994. She was automatically enrolled in ABPN MOC upon obtaining her initial psychiatric certification, payed the required MOC fees, and began complying with other ABPN MOC requirements. Dr. Lazarou also pays fees for multiple State medical licenses and fees for federal and State controlled substance licenses. She currently holds NBPAS certifications in psychiatry and forensic psychiatry.

95.     Dr. Lazarou also practices telepsychiatry. In general, telepsychiatry is the delivery of psychiatric assessment and care via telecommunications technology such as teleconferencing. Access to proper psychiatric care, especially in rural and economically underdeveloped areas, is one of the biggest challenges of the American health care system. Telepsychiatry provides patient-centered, affordable, and effective interventions for individuals needing psychiatric care and decreases the cost by providing a more affordable framework for delivering psychiatric services, including making quality mental health care available in any clinic with an internet connection.

96.     Dr. Lazarou also maintains a practice in forensic psychiatry. A forensic psychiatrist examines aspects of human behavior related to the legal process. Dr. Lazarou consults with both plaintiff and defense counsel in the civil arena, including in the areas of medical malpractice, worker's compensation, psychiatric disability determination, sexual harassment, and testamentary capacity. She consults in the criminal arena with counsel for both the prosecution and defense, including competency, sanity, and prediction of dangerousness. Dr. Lazarou's areas of expertise include PTSD, battered spouse syndrome, personality disorders, and

malingering. Forensic psychiatric engagements typically involve formulating expert opinions and providing expert testimony related to those opinions.

97.     After experiencing a high-risk pregnancy, Dr. Lazarou gave birth to her second set of twins in December 2017. Because she was breast-feeding and pumping milk for 45 minutes every three hours, she asked for a private room for her upcoming ten-year cognitive MOC psychiatry examination. Dr. Lazarou was told in an email from ABPN that "[t]he board does not make accommodations for nursing mothers who need to pump during an exam." ABPN did, however, "as a professional courtesy" treat the request "as a comfort aid" which ultimately meant Dr. Lazarou could have to travel up to several hours back and forth to a test center with private rooms, requiring her to be away from her newborn twins and unable to provide them breast milk.

98.     Under those circumstances, Dr. Lazarou was unable to take the MOC examination, her psychiatry ABPN certification lapsed, and she is now reported on the ABPN website as "Not Certified." In addition, ABPN also reports Dr. Lazarou as "Not Certified" in her forensic psychiatry subspecialty, even though that ten-year certificate remains valid through December 31, 2019, as confirmed on the ABPN website. According to ABPN, the subspecialty certification is dependent on Dr. Lazarou maintaining her psychiatry certification, another example of anticompetitive conduct by ABPN.

99.     Because ABPN forces Dr. Lazarou to purchase ABPN MOC to maintain ABPN certification, and due to Dr. Lazarou being reported as "Not Certified" by ABPN, she is no longer able to practice telepsychiatry, notwithstanding her NBPAS certifications, with a resulting loss of income and to the detriment of patients in need of telepsychiatric care. Her opportunities for forensic psychiatry assignments were also diminished. Dr. Lazarou has been told by ABPN

26

that if she wishes to have her certifications reinstated, she will be required to take the ten-year cognitive MOC examination, even though her forensic psychiatry certificate remains valid through December 31, 2019.

**Aafaque Akhter, MD**

100.    Dr. Akhter is the founder and Medical Director of Norton Health Care, where since 2003 he has practiced addiction psychiatry. Norton Health Care employs eleven physicians and operates clinics in Massachusetts and New Hampshire.

101.    Dr. Akhter was among the first physicians to prescribe Suboxone as a drug dependency treatment modality. Suboxone has become the leading medication used to treat opioid addiction. Suboxone is associated with increased sobriety and reduced painkiller abuse, and mitigates withdrawal symptoms.

102.    Dr. Akhter has served the medical community by instructing more than 3,000 physicians annually between 2002 and 2014 as a Medical Director of Premier Review Inc., preparing United States and foreign medical school graduates studying for USMLE and COMLEX examinations. Dr. Akhter is active in the medical and psychiatric communities and is a member of the American Medical Association, American Psychiatric Association, American Society of Addiction Medicine, the Massachusetts Medical Society, and the Massachusetts Psychiatric Society.

103.    Dr. Akhter obtained an initial certification in psychiatry from ABPN in 2005. His initial certification was not "grandfathered" because it was obtained after 1994. He was automatically enrolled in ABPN MOC upon obtaining his initial certification, paid the required MOC fees, and began complying with other ABPN MOC requirements. He completed all ABPN MOC requirements and his psychiatry certification was renewed in 2014. On January 1, 2018,

Dr. Akhter obtained an initial subspecialty certification in addiction medicine from the American

Board of Preventive Medicine ("ABPM"), with an expiration date January 31, 2028.

Dr. Akhter pays the required fees for both ABPN MOC and ABPM MOC. He also pays fees for

multiple State medical licenses and fees for federal and State controlled substance licenses.

104.    When Dr. Akhter purchased his initial ABPN psychiatric certification in 2005, he

understood it would remain valid for ten years and that he would be required to take the ten-year

cognitive MOC examination to maintain his certification. When he completed his ABPN MOC

requirements in 2014, he expected his certification would remain valid for another ten years.

However, ABPN automatically enrolled him in C-MOC, which instead required him to be

evaluated every three years. As part of each three-year cycle, Dr. Akhter was required to

complete ninety CME credits, including twenty-four credits for Self-Assessment ("SA")

activities. ABPN defines SA activities as "a specific type of CME activity that assist physicians

in recognizing their current knowledge base in order to identify specific topics for gaining further

knowledge." The 2019 ABPN MOC Booklet states that "Diplomates of the ABPN are required

to participate in ABPN-approved Self-Assessment activities relevant to either their specialty

and/or subspecialty."

105.    When Dr. Akhter completed his three-year C-MOC cycle in 2017, he

believed based on the above pronouncements that he had dutifully completed his ABPN MOC

requirements, including the required SA CME activities, by, among other things, obtaining the

initial addiction medicine subspecialty certification and by completing Medscape CME credits

that included self-assessment activities. As detailed further below, however, ABPN arbitrarily

determined that obtaining the subspecialty certification from ABPM, a fellow ABMS board

member, including the completion of sixty CME credits that included self-assessment activities, did not fulfill Dr. Akhter's SA CME requirements.

106.     On August 2, 2018, ABPN contacted Dr. Akhter to inform him he had been randomly selected for an audit of his ABPN MOC activities. Specifically, ABPN told Dr. Akhter that his "SA CME requirement has not been met." The ABPN MOC audit process allows physicians being audited ninety days to submit documentation of their activities that have not been separately verified. Physicians who do not provide documentation to ABPN's satisfaction are reported on the ABPN website as "Certified, not meeting MOC requirements." Physicians who do not provide documentation to ABPN's satisfaction by the end of the next three-year C-MOC cycle are reported as "Not Certified," even though, like Dr. Akhter, they hold valid ABPN certifications.

107.     ABPN requires physicians seeking ABPN certification to complete SA CME credits from ABPN-approved providers, which it calls "Sponsor provided SA CME." There is no available information about precisely how ABPN chooses its SA CME sponsors, and there is no known process to petition for approval of other providers of SA CME credit.

108.     Dr. Akhter told ABPN he had completed over sixty CME credits as part of the process of obtaining his initial addiction medicine subspecialty certification and asked ABPN to either recognize those as SA CME credits, or to give him SA CME credits for obtaining his subspecialty certification.

109.     Despite the fact that ABPM and ABPN are fellow ABMS board members, ABPN refused to allow Dr. Akhter any SA CME credit for obtaining his initial addiction medicine subspecialty certification, and refused to recognize any of the CME credits he had

29

completed as part of the subspecialty certification as SA CME credits. As a result, ABPN reports Dr. Akhter on its website as "Not Meeting MOC Requirements."

110.     But for his automatic enrollment by ABPN in C-MOC, Dr. Akhter would have remained in the 10-year MOC Program, which instead of a three-year cycle requires twenty-four SA CME credits over ten years. Thus, Dr. Akhter would have had until 2024 to complete those credits before being reported as "Not meeting MOC requirements." Finally, sixteen SA CME credits are waived by ABPN for successful completion of the Pilot Project. If Dr. Akhter were allowed to participate in the Pilot Project, he would upon successful completion in or before 2021, satisfy the SA CME requirements under the 10-Year MOC Program.

## CLASS ACTION ALLEGATIONS

111.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications. Specifically excluded from this Class are directors, staff, and employees of ABPN, or of any entity in which ABPN has a controlling interest, or any affiliate, legal representative, or assign of ABPN. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

112.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 physicians.

113.     Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not

limited to: (1) whether ABPN is engaging in illegal tying; (2) whether ABPN has illegally created and is maintaining its monopoly power in the market for maintenance of certification; (3) whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class; (4) whether ABPN was unjustly enriched as a result of the conduct alleged in this Complaint; (5) the appropriate injunctive and related equitable relief; and (6) the appropriate class-wide measure of damages.

114.  Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and all members of the Class are similarly affected by Defendant's wrongful conduct in that they were all forced to purchase ABPN's MOC in order to maintain certification. Plaintiffs' interests are coincident with and not antagonistic, or in conflict with, other Class members' interests. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs will fairly and adequately protect the interests of other Class members.

115.  Plaintiffs have retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

116.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions

by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

117.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

118.    Plaintiffs incorporate by reference all of the above allegations.

119.    ABPN's tying of its initial board certification service and its MOC program is a *per se* violation of Section 1 of the Sherman Act.

120.    Alternatively, even if ABPN's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

121.    There is no legitimate business or other pro-competitive justification for ABPN's illegal tying of its initial certification service to ABPN MOC.

122.    As described above, ABPN's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance
### in Violation of Section 2 of the Sherman Act

123.    Plaintiffs incorporate by reference all of the above allegations.

124.    ABPN's creation of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

125.    ABPN's maintenance of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

126.    As described above, ABPN's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT THREE

### Unjust Enrichment

127.    Plaintiffs incorporate by reference all of the above allegations.

128.    Plaintiffs and members of the Class conferred a benefit on ABPN in the form of the money and property ABPN wrongfully obtained as a result of Plaintiffs and other physicians being *de facto* forced to pay ABPN MOC fees, as described in detail above.

129.    ABPN has retained these benefits that it acquired from charging Plaintiffs and members of the Class inappropriate, unreasonable, and unlawful ABPN MOC fees. ABPN is aware of and appreciates these benefits.

130.    ABPN's conduct has caused it to be unjustly enriched at the expense of Plaintiffs and the other Class members. As such, it would be unjust to permit retention of these monies by ABPN under the circumstances of this case without the payment of restitution to Plaintiffs and Class members.

131.    ABPN should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against ABPN as follows:

132.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

133.    The unlawful conduct alleged herein be adjudged and decreed:

    a.    A *per se* violation of Section 1 of the Sherman Act;

    b.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    c.    Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act; and

    d.    To constitute unjust enrichment;

134.    Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, and Defendant be required to disgorge the amounts by which it has been unjustly enriched;

135.    Defendant, its affiliates, successors, transferees, assignees and other directors and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

136.    Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

137.    Plaintiffs and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

138.    Plaintiffs and the members of the Class have such other and further relief as the case may require and deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Date: March 6, 2019       Respectfully submitted,


            /s/  C. Philip Curley

            C. Philip Curley
            Cynthia H. Hyndman
            Laura R. Feldman
            Benjamin E. Schwab
            ROBINSON CURLEY P.C.
            300 South Wacker Drive, Suite 1700
            Chicago, IL 60606
            Tel: 312.663.3100
            Fax: 312.663.0303
            pcurley@robinsoncurley.com
            chyndman@robinsoncurley.com
            lfeldman@robinsoncurley.com
            bschwab@robinsoncurley.com


            Katrina Carroll
            LITE DEPALMA GREEBERG, LLC
            111 West Washington, Suite 1240
            Chicago, IL 60602
            Tel: 312.750.1265
            Fax: 312.212.5919
            kcarroll@litedepalma.com


            *Counsel for Plaintiffs Emily Elizabeth Lazarou*
            *and Aafaque Akhter*

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

SADHISH K. SIVA,                              )
                                             )
          **Plaintiff,**                    )
                                             )
          **v.**                            )          **No. 1:19-cv-01407**
                                             )
**AMERICAN BOARD OF RADIOLOGY,**              )
                                             )          **CLASS ACTION**
                                             )          **Trial by Jury Demanded**
          **Defendant.**                   )

### CLASS ACTION COMPLAINT

Plaintiff Sadhish K. Siva, ("Plaintiff"), for his Complaint against Defendant American

Board of Radiology ("ABR" or "Defendant") hereby alleges as follows:

### INTRODUCTION

1.     This case is about ABR's illegal and anti-competitive conduct in the market for

initial board certification of radiology physicians ("radiologists") and the market for maintenance

of certification of radiologists. In very general terms, a radiologist identifies and assesses

abnormalities in imaging studies such as X-rays, computer tomography (CT) scans, and magnetic

resonance imaging (MRI) scans. ABR is illegally tying its initial certification product to its

maintenance of certification product, referred to by ABR as MOC.

2.     This case is also about ABR's illegal creation and maintenance of its monopoly

power in the market for maintenance of certification. ABR is the monopoly supplier of initial

certifications for radiologists. Beginning in or about 1994, ABR used its monopoly position in

the initial certification market to create a monopoly in the market of maintenance of

certifications for radiologists, which is the subject of this lawsuit. Since then ABR has used

various anti-competitive, exclusionary, and unlawful actions to promote MOC and prevent and

limit the growth of competition from new providers of maintenance of certification for radiologists. ABR's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by radiologists.

3.      The tying product is ABR's initial board certification, which it sells to radiologists nationwide. ABR currently sells initial certification services to radiologists in four primary areas of radiology, diagnostic radiology, radiation oncology, medical physics, and interventional radiology/diagnostic radiology, and several subspecialties within the field of radiology. Many radiologists hold multiple initial ABR certifications, purchasing one or more primary certifications or subspecialties.

4.      The tied product is MOC, ABR's maintenance of certification. ABR has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABR has forced radiologists to purchase MOC, charged supracompetitive monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5.      Currently, approximately 1,500-2,000 radiologists in the United States purchase ABR primary initial certifications annually. ABR has throughout the relevant period controlled the market for initial certification of radiologists in the United States.

6.      In 2016, the last year for which data is publicly available, ABR sold its MOC product to approximately 26,000 radiologists. Through its MOC program, ABR controls the market for maintenance of certification of radiologists. ABR has unlawfully obtained and maintained its monopoly power in the market for maintenance of certification services for the

anti-competitive purpose of requiring radiologists to purchase MOC and not deal with competing providers of maintenance of certification services.

7.    Plaintiff brings this Class Action to recover damages and for injunctive and other equitable relief on behalf of all radiologists required by ABR to purchase MOC to maintain their initial ABR certifications.

## JURISDICTION AND VENUE

8.    Plaintiff brings this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABR's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

9.    Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

10.    ABR sells its initial certifications and its MOC program in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABR's initial certification services and its MOC program are sold by ABR in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABR's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiff and other radiologists to purchase MOC, charging supracompetitive monopoly prices for MOC, and reducing competition in the maintenance of certification market.

11.    ABR is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABR is found in and transacts business herein.

3

12.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because ABR maintains an office and testing center in Rosemont, Illinois and a substantial part of the events giving rise to Plaintiff's claims occurred herein.

## PARTIES

13.     Plaintiff Sadhish K. Siva, MD ("Dr. Siva") is a graduate of Temple University School of Medicine, where he also completed a cardiac rehabilitation internship. He completed his residency in radiology in 2003 at MetroHealth Medical Center in Cleveland, Ohio, and a fellowship in interventional radiology in 2004, also at MetroHealth Medical Center. MetroHealth Center is Cuyahoga County's public health system and home to the county's most experienced Level I Adult Trauma Center, and the only adult and pediatric burn center in the State of Ohio. Dr. Siva has been a practicing radiology physician since 2004, and also held the position of Assistant Professor at Case Western Medical School from 2004 to 2006. Dr. Siva is a resident of Tennessee.

14.     Defendant ABR is incorporated under the laws of the District of Columbia and files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization. ABR maintains an office and testing center in Rosemont, Illinois. ABR is a member board of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in thirty-nine specialties and eighty-six subspecialties.

## BACKGROUND

15.     Licenses to practice medicine in the United States are granted by medical boards of the individual States. To obtain a license a physician must, among other things, have either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO") and pass

4

the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

16.     According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care." Similarly, the NBOME website provides that its examination assesses "competence in the foundational competency domains required for general physicians to deliver safe and effective osteopathic medical care and promote health in unsupervised clinical settings."

17.     Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuing medical education courses, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

18.     According to its 2016 Form 990 filed with the Internal Revenue Service, the objective of ABR's initial certification is to "determine if candidates have acquired [the] requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics." Most clinical radiologists purchase initial ABR certifications. Those who do not may include researchers, teachers, academics, and others who may not regularly treat patients.

19.     To obtain initial ABR certification a physician must, among other things, pass an ABR-administered examination. ABR first began selling initial certifications in 1934.

20.     No State requires an initial ABR certification for a radiologist to obtain a license to practice medicine.

**ABR Requires Radiologists to Purchase MOC To Maintain Their Initial Certifications**

21.     Initially, ABR certifications were lifelong and no subsequent examinations or other requirements were imposed by ABR on radiologists.

22.     In or about 1994, however, ABR announced it would not issue lifelong initial certifications for its pediatric and vascular and interventional subspecialties, and would instead require participation in a new maintenance of certification process to maintain those certifications. By 2002, ABR had eliminated all lifetime certificates and was issuing only time-limited ten-year certificates. By 2007, ABR had fully implemented its MOC program requiring, among other things, passing a secure, proctored, high-stakes, cognitive examination every ten years and completing burdensome and meritless "Practice Quality Improvement" ("PQI") projects.

23.     All ABR-certified radiologists are required to purchase MOC to maintain their ABR certifications, *except that* physicians with initial ABR certifications purchased prior to 1995 (or up to 2002 depending on the certificate) are "grandfathered" by ABR: they are exempt from MOC and yet are reported as having a "Valid" certificate on ABR's website. Upon information and belief, "grandfathered" radiologists who have voluntarily taken and failed MOC examinations are also still reported by ABR as having a "Valid" certificate. ABR reports "grandfathered" radiologists as having "Valid" certificates even though they do not participate in

MOC, solely because they purchased an initial ABR certification before it began issuing only time-limited certificates.

24.     Thus, ABR holds "grandfathered" radiologists to a different standard than their peers, despite the fact these older physicians can be many years out of their residency training and may be among those least up to date on current practice.

25.     The President and Chief Executive Officer of the American Board of Internal Medicine ("ABIM"), another member board of ABMS, has been quoted as admitting with respect to a similar "grandfather" exemption for internists, that "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify."

26.     Upon information and belief, up to 50% of the radiologists who obtained an initial ABR certification have been "grandfathered."

27.     Since it has stopped issuing lifetime certificates, ABR has collected substantial MOC fees of up to $340 or more annually per doctor. Throughout most of this time, no other organization or entity offered competing maintenance of certification for radiologists. ABR continues to exempt "grandfathered" radiologists from the requirement to purchase MOC and continues to report them as having "Valid" certificates.

28.     ABR has collected to date tens of millions of dollars in MOC fees from radiologists who have purchased ABR's initial certification. In addition, radiologists, to their financial and personal detriment, have been required to take countless hours away from their practice and family in order to prepare for and take required examinations and to complete mandatory PQI projects. MOC also takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care.

29.    ABR automatically enrolls all radiologists with initial ABR certifications in MOC, and charges them a MOC enrollment fee. Dr. Siva paid a $400 MOC enrollment fee to ABR on January 3, 2005, and took a ten-year MOC cognitive examination on October 19, 2012, at an ABR test center in the Chicago area.

30.    Radiologists ineligible to be "grandfathered" who choose not to buy MOC and pay MOC annual fees have been reported on the ABR website as "Not Meeting" MOC requirements or having an "Expired" or "Lapsed" certificate, even though they obtained initial ABR certifications.

31.    In a webinar recently posted to YouTube, ABR's David Laszakovits, responsible for oversight of the development and implementation of ABR MOC from August 2005 to December 2016, reports that *after* MOC was imposed ABR "immediately began evaluating the efficacy of the program." He also admitted that it "became pretty apparent pretty quickly" that the ten-year cognitive examination "did not meet the aims of maintenance of certification" and had no "formative aspects to aid in continuous learning and continuous improvement." [1]  Thus, ABR has admitted that it did not evaluate the efficacy of its MOC product before imposing it on radiologists, and that when ABR did make an evaluation it "became pretty apparent pretty quickly" that the ten-year examination failed to address the stated goals of maintenance of certification. Nonetheless, ABR continued to require the ten-year examination as part of MOC for another ten or more years.

32.    This is especially concerning because while ABR now admits it "became pretty apparent pretty quickly" of the shortcomings of the ten-year cognitive examination privately, it took the exact opposite stance publicly. In an article by the ABR Executive Director and others

---

[1] OLA Webinar, The American Board of Radiology, https://youtu.be/zCeWCAoGAzo (published December 4, 2018).

"For the Board of Trustees" of ABR, copyrighted by ABR and published October 1, 2013, in the *International Journal of Radiation Oncology • Biology • Physics*, ABR forcefully declared with respect to both initial certification and MOC, that "no component is more integral" than the "secure proctored examinations." Nonetheless, as detailed below, ABR discarded the MOC ten-year examination just a few years later.

33.     In 2013, only six years after it imposed MOC, ABR changed its MOC product to "Continuous Certification." Again, there is no available evidence suggesting that ABR evaluated whether its new MOC 2.0 product actually met the stated goals of maintenance of certification before it was imposed. MOC 2.0 would supposedly "link the ongoing validity of certificates to meeting the requirements of MOC," an admission that there had been no such link with the old MOC product. The main feature of MOC 2.0 was that radiologists would now be evaluated annually on their compliance with MOC. ABR advised its diplomates in an email blast that "their MOC requirements will not change but will be evaluated on a more frequent basis." Thus, ABR continued to administer the ten-year MOC cognitive examination despite the fact it "did not meet the aims of maintenance of certification" and also continued to require burdensome and meritless PQI projects. MOC 2.0 also imposed increased annual fees on radiologists. For example, ABR increased the MOC annual fee by almost 30% for radiologists holding certificates in diagnostic radiology.

34.     In January 2019, after just another six years, ABR again changed its MOC product, re-inventing it for the third time in twelve years. What has become a constantly moving target of MOC requirements has not only been confusing and enforced by ABR unfairly, it has made it impossible to undertake any meaningful analysis whether, as ABR claims, there is a

9

causal relationship between any of ABR's iterations of MOC and a beneficial impact on physicians, patients, or the public.

35.    MOC 3.0 eliminated the requirement of a ten-year cognitive examination for some ABR certificate holders in 2019, and for most of the remaining certificate holders in 2020. That examination, however, has been replaced with a new cognitive test, referred to by ABR as Online Longitudinal Assessment ("OLA").  OLA, however, is not available for the subspecialties of hospice and palliative medicine or pain medicine whose certificate holders must continue to take the traditional examination.

36.    Under OLA, ABR circulates 104 questions each year (two per week) to radiologists, of which only 52 must be answered annually. Radiologists after seeing the question may also decline to answer up to ten questions each year. ABR typically allows one minute to answer each question, although some questions allow up to three minutes to answer. Even radiologists who have recently taken and passed the ten-year MOC cognitive examination are required to participate in OLA. Little information has been made available by ABR about how a radiologist will know if he or she is passing OLA, other than that the "passing standard" will "vary slightly" among radiologists, without explaining what "slightly" means; and that it will take "several years" before an initial evaluation is even made, after which OLA performance will be updated quarterly.

37.    Once again, there is no available evidence suggesting that ABR has evaluated whether MOC 3.0 and OLA actually meet the stated goals of maintenance of certification. In fact, OLA simulates poor clinical practices that could have a detrimental impact on patient care. First, no competent radiologist would limit himself or herself to one to three minutes when making a medical decision. Yet OLA promotes just that by encouraging and rewarding speed,

10

which in actual clinical practice could result in more subtle radiological findings being overlooked. Nor does OLA represent the actual work flow or environment of a real world radiologist, whose job is to identify and carefully assess abnormalities in X-rays, CT scans, MRI scans, and other imaging studies. No radiologist commits to memory every potential diagnosis for every potential abnormality. Often times, a radiologist may recognize an abnormality but is faced with multiple possible diagnoses, which he or she will then research through online medical databases and other means or confer with a colleague. None of this is provided within the framework of OLA.

38.     In the same YouTube webinar referred to above, ABR admits that no studying will be necessary for OLA and that ABR "doesn't anticipate" incorrect answers "will happen often." ABR also confirms on its website that "[t]he goal with all OLA content is that diplomates won't have to study." When a question is answered incorrectly, an explanation of the correct answer is provided so that when a similar question is asked in the future it can be answered correctly. Unsurprisingly, ABR admits it does "not anticipate a high failure rate." In short, to maintain ABR certification under OLA, a radiologist need only spend as little as 52 minutes per year (one minute for each of 52 questions) answering questions designed so as not to require studying, and for which ABR anticipates neither incorrect answers nor a high failure rate.

39.     Because OLA has been designed so that all or most radiologists will pass, it validates nothing more than ABR's ability to force radiologists to purchase MOC and continue assessing MOC fees. MOC 3.0 also still requires burdensome and meritless PQI projects.

40.     Since imposing MOC 3.0, ABR has required radiologists who have recently passed the ten-year cognitive examination to participate in OLA, even though the ten-year period has not expired. For example, one radiologist who took and passed the ten-year examination in

2016 learned just months later that his examination result would be disregarded and he would be required to participate in OLA. Thus, while ABR had previously "grandfathered" tens of thousands of older radiologists from participating in MOC entirely, when it comes to OLA it has refused to "grandfather" younger radiologists even though they have recently passed the ten-year cognitive examination and the ten-year period has not expired.

41.     While an analysis of the average cost to a radiologist to comply with ABR's MOC program specifically is not available, one study has projected that complying with ABIM's maintenance of certification costs internists an average of $23,607 in money and time over a ten year period.

42.     MOC has become increasingly mandatory for radiologists across the country. Plaintiff and other radiologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABR-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. To create an incentive to purchase MOC, ABMS and its member boards also obtained as part of the Affordable Care Act a 0.5% Medicare payment incentive for doctors participating in MOC. Some health plans pay bonuses or higher fees to doctors for completing MOC activities. As a result of these and other circumstances described herein, ABR-certified radiologists are forced to purchase MOC or suffer substantial economic consequences.

43.     For example, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. Many hospitals, upon information and belief with the assistance and encouragement of ABMS and its

12

member boards and/or persons affiliated with ABMS and its member boards, have adopted bylaws mandating that physicians purchase MOC. This is magnified in hospital markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

44.     As another example, many Blue Cross Blue Shield companies ("BCBS"), upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, require physicians to participate in MOC to be included in their networks. In addition, patients whose doctors have been denied coverage by BCBS because they have not complied with MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

45.     As a further example, doctors who lose hospital privileges because they have not complied with MOC requirements face the possibility of also losing coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

46.     As with ABR's initial certification, no State requires ABR MOC for a radiologist to be licensed.

47.     Almost twenty-five years after ABR's actions to force radiologists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing

the use of evidence from well-designed and well-conducted research, which is notably lacking with regard to ABR MOC and its alleged salutary impact.

48.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts, among others, that: (a) ABR does not require the many thousands of radiologists it has "grandfathered" to comply with MOC, and (b) ABR admitted in its Annual Report 2012-2013 that it still had "significant work ahead to establish [the] evidence base" that MOC is "associated with superior quality of care, efficiency, and better outcomes." With respect to longitudinal assessments such as OLA in particular, Dr. David W. Price, Senior Vice President of an ABMS-related entity, co-authored a 2018 article in *Medical Teacher*, admitting that evaluating the association between longitudinal assessments "and outcomes of care [and] quality of care" will be "most challenging and time consuming to investigate due to the many factors beyond knowledge that influence the process and outcomes of care." Indeed, at least two ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

49.     ABR's website makes clear that except for those "grandfathered" by ABR, initial certifications can only be maintained by purchasing ABR MOC. By requiring radiologists to purchase MOC to remain ABR-certified, ABR created a wholly new and artificial market for maintenance of certification that has generated substantial additional fees for ABR.

50.     By "grandfathering" older radiologists, ABR has also discriminated against younger physicians, including women and persons of color, who are under-represented in the group of radiologists "grandfathered" by ABR.

14

51. The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," "should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." ABR's MOC fails in all of these respects.

**ABR MOC Revenue and Compensation of Management and Key Employees**

52. Between 2004 and 2017, during which time ABR was collecting new MOC fees, its "Program service revenue" account almost tripled, from $6,072,290 to $16,291,444, as reported in its Form 990 for the fiscal years ending March 31, 2005 and 2017, respectively. During that same period of time, ABR's "Net assets or fund balances" account more than tripled, from $12,906,311 to $38,956,788.

53. According to its Form 990's, for just the fiscal years ending March 31, 2009, through 2013 (the only years from 2004 to 2016 that ABR disclosed revenue and expenses for initial certification and MOC separately on its From 990), ABR's "Maintenance [of] certification fees" account increased approximately 30% from $5,099,722 to $6,539,395. During that same time, MOC revenue exceeded MOC expenses by an average of about $2.2 million. For fiscal years ending March 31, 2012 and 2013, however, initial certification expenses exceeded initial certification revenue. Thus, revenue from ABR's MOC product was subsidizing ABR's initial certification product.

15

54.    These data demonstrate that MOC is an ever-increasing revenue source for ABR. This is not surprising. Recent residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay the bulk of initial certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABR on older doctors who have been practicing for as long as several decades, and have more financial wherewithal to pay ABR's MOC fees. In short, ABR created a lucrative new revenue source by imposing MOC on older and more established doctors. This is confirmed by the fact that MOC revenue has increased at a much faster rate than initial certification revenue, and, based on the latest publicly available data, is at least half of ABR's total program revenue.

55.    The fact that MOC is a necessary and lucrative revenue source is especially noteworthy considering that ABR's "Total functional expenses" account as reported on its Form 990 increased from $4 million for the fiscal year ending March 31, 2005 to over $15 million for the fiscal year ending March 31, 2017, an increase of 375%.  A large part of this expense is overhead, including overly generous compensation to ABR Executive Directors. For the fiscal year ending March 31, 2005, Dr. Robert R. Hattery, ABR's former Executive Director, was paid total compensation of $443,563. When he retired just three years later in 2008, by which time ABR was realizing increasing millions of dollars in MOC revenue, his total annual compensation had jumped to $788,910. The next ABR Executive Director, Dr. Gary J. Becker, was likewise paid between $612,357 and $821,439 annually between 2009 and 2014. Dr. Valerie P. Jackson, current ABR Executive Director, was paid total compensation of $751,307 for fiscal year ending March 31, 2016. ABR stopped disclosing MOC revenue and MOC expenses on its Form 990

when Dr. Jackson became Executive Director, after ABR increased its MOC annual fees by approximately 30%

57. Compensation for other ABR key employees has also increased since the advent of MOC. For fiscal year ending March 31, 2005, only compensation for the ABR Executive Director ($443,563) was included in the Form 990 in the "List of Officers, Directors, Trustees and Key Employees." By fiscal year ending March 31, 2017, the account for "Compensation of current officers, directors, trustees and key employees" had almost quadrupled to $1,714,448, reaching a high of $2,075,865 for fiscal year ending March 31, 2015.

57. Also included in overhead are ABR's lavish pension plan accruals and contributions, which between fiscal years ending March 31, 2015 and 2017 averaged 10.3%. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5%.

### ABR MOC is Not Self-Regulation

58. ABR claims that MOC is a part of a "social contract" and constitutes self-regulation. For example, former ABR Executive Director Dr. Becker in the ABR Annual Report 2012-2013 stressed "the social contract that defines our relationship with the public. Through this contract, the pubic grants [ABR] the privilege to self-regulate." This and numerous similar statements provide an unwarranted veneer of respectability and integrity to MOC when, as alleged herein, the facts are to the contrary. ABR makes it appear that MOC is accepted by radiologists as self-regulation, which is misleading and untrue.

59. ABR's statement that MOC constitutes self-regulation is misleading and untrue for at least two reasons. First, not meeting MOC requirements is not grounds for revocation or suspension of a radiologist's license to practice medicine or to undertake any other disciplinary

action. Those self-regulatory functions are mandated and implemented by the medical boards of the individual States, the only relevant self-regulatory bodies. As alleged above, however, radiologists who do not comply with MOC requirements face the loss of hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. In substance, ABR seeks nothing less than to usurp the medical boards of the individual States as the self-regulatory bodies of the medical profession.

60.     Second, ABR is not a "self"-regulatory body in any meaningful sense for, among other reasons, its complete lack of accountability. Unlike the medical boards of the individual States, for example, as alleged above, ABR is a revenue-driven entity beholden to its own financial interests and those of its officers, governors, trustees, management, and key employees. ABR itself is not subject to legislative, regulatory, administrative, or other oversight by any other person, entity, or organization. It answers to no one, much less to the radiologist community which it brazenly claims to self-regulate.

### ABR's Illegal Conduct In Violation Of The Anti-Trust Laws

61.     The product markets relevant to this action are the market for initial board certification of radiologists and the market for maintenance of certification of radiologists.

62.     The relevant geographic market is the United States.

63.     By 2002, all radiologists purchasing initial ABR certifications have been required to purchase MOC or have their certification terminated by ABR. Initial ABR certification is required by ABR to purchase MOC.

64.     ABR has throughout the relevant period controlled the market for initial certification of radiologists in the United States. There are high barriers to entry in the market for

18

initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for radiologists.

65.     ABR has market power in the tying market of initial certification of radiologists.

66.     Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABR sold initial certification services for more than sixty years before it started selling MOC establishes that the two markets are distinct.

67.     According to its 2016 Form 990 filed with the Internal Revenue Service, the objective of ABR's initial certification is to "determine if candidates have acquired requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics." ABR's MOC product, on the other hand, is something different. According to ABR's 2016 Form 990, MOC is intended "to provide continuous quality improvement, professional development and quality patient care." As explained by ABR in a white paper dated June 10, 2004, describing its MOC product: "The intent of the [MOC] examinations is to reinforce the process of individual lifelong learning, rather than to serve as recertification examinations."

68.     Thus, MOC serves substantially the same function as CME. Importantly, however, MOC differs from CME because if radiologists do not see value in particular CME courses or classes they are free to purchase other CME offerings; there is no such meaningful option regarding MOC.

19

69.     Radiologists have a desire to maintain their initial ABR certification by purchasing maintenance of certification from other providers, but have been unsuccessful as a result of ABR's illegal tying and the unlawful and exclusionary use of its monopoly power.

70.     ABR is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiff and other radiologists have been forced to purchase MOC from ABR since at least 1994 or lose their ABR certifications.

71.     The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including radiology. NBPAS does not offer initial certifications to radiologists or any other physicians, but only maintenance of certification.

72.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid state license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an initial certification has lapsed). NBPAS fees are vastly lower than those charged by ABR for its MOC product, and NBPAS maintenance of certification requires vastly less physician time.  For example, in 2019, the average yearly cost of NBPAS maintenance of certification is $84.50 ($94.50 for a DO), while the ABR MOC annual fee is $340 ($205 for medical physics).

73.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

74.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association

("AHA") and community hospitals. According to the NBPAS website, as of February 14, 2019, only 107 hospitals, approximately one percent of hospitals nationwide, accept NBPAS maintenance of certification and not a single insurance company is known to accept NBPAS maintenance of certification. For example, Blue Cross Blue Shield of Michigan is on record refusing certification through NBPAS. In addition, ABR does not recognize NBPAS maintenance of certification.

75.     Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABR.

76.     ABR also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring radiologists to purchase MOC or lose their ABR certification.

77.     ABR has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require radiologists to be ABR-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

78.     An indication of ABR's illegal tying and monopoly maintenance is that it is able to charge supracompetitive monopoly prices for MOC, as evidenced by the almost three-fold increase in ABR's "Net assets or fund balances" account reported on its Form 990 between fiscal years ending March 31, 2005 and 2017, after it imposed MOC.

79.     As a direct and proximate result of ABR's illegal tying and monopoly maintenance, Plaintiff and other radiologists have together been forced to pay tens of millions of dollars in MOC fees and incur other out-of-pocket costs.

80.     Initial certification and maintenance of certification are separate products and services. Numerous board certified radiologists do not want to be required to buy ABR's MOC and/or would seek to obtain maintenance of certification from a source other than ABR were it worthwhile to do so.

81.     Because of the repeated changes to MOC, radiologists purchasing initial ABR certification and MOC cannot assess the lifetime cost of ABR certification over the several decades of their practice, making it impossible to calculate the life cycle cost.

82.     In addition, ABR has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiff and other radiologists who are forced to buy MOC at supracompetitive monopoly prices or lose their certification.

83.     ABR's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABR on radiologists forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiff and other radiologists; constrain the supply of radiologists, thereby harming competition; and decrease the supply of certified radiologists, thereby increasing the cost of medical services to patients and consumers and presenting barriers to patient care.

84.     ABR's illegal tying, exclusive dealing, and monopoly maintenance results in ABR *de facto* forcing Plaintiff and other radiologists to purchase MOC in order to hold hospital consulting and admitting privileges, receive reimbursement by insurance companies, secure employment by medical corporations and other employers, obtain malpractice coverage, and satisfy other requirements of the practice of medicine. ABR's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for radiologists' services.

85.     ABR is governed and managed by a board of governors and others that include active participants in the market for radiologists' services and related markets. ABR's restraint on competition in the market for radiologists' services, demonstrated conflicts of interests, and private anticompetitive motives force radiologists, other than those "grandfathered" by ABR, to purchase MOC or lose their ABR certification.

86.     Any alleged justification ABR might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

87.     ABR has economically coerced purchasers of its initial certification to purchase overpriced, unnecessary MOC from ABR or lose ABR certification as radiologists. ABR's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of radiologists.

**Anti-Trust Injury Suffered By Plaintiff**

88.     Dr. Siva began practicing as a radiology physician in 2004 as a diagnostic and interventional radiologist at MetroHealth Medical Center. He relocated to Tennessee in 2006 and has practiced since then at the Murfreesboro Medical Clinic. Dr. Siva's areas of expertise include

digital and 3D mammography, ultrasound, Doppler ultrasound, breast MRI, GI studies, MRI breast biopsies, CT scans, and nuclear medicine. He is a member of the American Roentgen Ray Society.

89.     When Dr. Siva began his radiology residency program, ABR issued lifetime initial certifications. In the second year of his radiology residency, however, ABR announced it would no longer issue lifetime certifications and that instead only time-limited, ten-year certificates would be issued. Dr. Siva obtained an initial board certification in diagnostic radiology from ABR in 2003. His initial certification was not "grandfathered" because it was obtained after 2001. He was automatically enrolled by ABR in its MOC program upon obtaining his initial certification, charged a $400 MOC enrollment fee, started paying the required MOC annual fees, and began meeting other ABR MOC requirements.

90.     Dr. Siva took his first (and ultimately last) ten-year MOC cognitive examination in 2012 at an ABR testing facility in the Chicago area. He estimates spending at least 100 hours studying for the examination, incurred travel and hotel costs, lost income as a result of taking time off from work, and paid another radiologist $3,000 to cover for him while he was in Chicago, all as a result of being required to take the MOC cognitive examination. Dr. Siva passed the examination with the well-informed belief that he had now satisfied the ABR MOC cognitive requirement for the next ten years and would not be subject to additional cognitive testing until the ten-year period had expired. There was nothing in his letter from ABR announcing his results or in the earlier email blast described above, that indicated any further cognitive testing would be required to maintain his certification before the ten-year schedule then in place.

91.     In 2018, however, he learned ABR was changing MOC and that he would now be

24

required to participate in OLA beginning in 2019, even though his cognitive examination results were to have been valid until 2022. ABR refused his request to honor the full ten-year length of his cognitive examination and Dr. Siva began OLA in January 2019. In effect, Dr. Siva was allowed to use only 60% of the ten-year cognitive examination results.

92.     Dr. Siva, in order to protect his professional position and economic livelihood, has been forced to purchase ABR MOC. He has continued paying his MOC annual fees and completing required MOC activities, including OLA and the burdensome and meritless PQI projects, up through the filing of this Class Action Complaint.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all radiologists required by ABR to purchase MOC from ABR to maintain their initial ABR certifications. Specifically excluded from this Class are officers, governors, trustees, or employees of ABR, or of any entity in which ABR has a controlling interest, or any affiliate, legal representative, or assign of ABR. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

94.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 radiologists.

95.      Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABR is engaging in illegal tying, and (2) whether ABR has illegally

created and is maintaining its monopoly power in the market for maintenance of certification; (3)

whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or

property of Plaintiff and the members of the Class; (4) whether ABR was unjustly enriched as a

result of the conduct alleged in this Complaint; (5) the appropriate injunctive and related

equitable relief; and (6) the appropriate class-wide measure of damages.

96.     Plaintiff's claims are typical of the claims of other Class members. Plaintiff and all

members of the Class are similarly affected by Defendant's wrongful conduct in that they were

all forced to purchase ABR's MOC in order to maintain certification. Plaintiff's interests are

coincident with and not antagonistic, or in conflict with, other Class members' interests.

Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the

other members of the Class. Plaintiff will fairly and adequately protect the interests of other

Class members.

97.     Plaintiff has retained competent counsel experienced in class action and complex

litigation to prosecute this action vigorously.

98.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Among other things, such treatment will permit a large number

of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that

numerous individual actions would engender. The benefits of proceeding through the class

mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any

difficulties that may arise in management of this class action. The prosecution of separate actions

26

by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

99.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

100.    Plaintiff incorporates by reference all of the above allegations.

101.    ABR's tying of its initial board certification service and its MOC program is a *per se* violation of Section 1 of the Sherman Act.

102.    Alternatively, even if ABR's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

103.    There is no legitimate business or other pro-competitive justification for ABR's illegal tying of its initial certification service to its MOC program.

104.    As described above, ABR's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance in Violation of Section 2 of the Sherman Act

105.    Plaintiff incorporates by reference all of the above allegations.

106.    ABR's creation of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

107.    ABR's maintenance of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

108.     As described above, ABR's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT THREE

### Unjust Enrichment

109.     Plaintiff incorporates by reference all of the above allegations.

110.     Plaintiff and members of the Class conferred a benefit on ABR in the form of the money and property ABR wrongfully obtained as a result of Plaintiff and other radiologists being *de facto* forced to pay MOC-related fees, as described in detail above.

111.     ABR has retained these benefits that it acquired from charging Plaintiff and members of the Class inappropriate, unreasonable, and unlawful MOC-related fees. ABR is aware of and appreciates these benefits.

112.     ABR's conduct has caused it to be unjustly enriched at the expense of Plaintiff and the other Class members. As such, it would be unjust to permit retention of these monies by ABR under the circumstances of this case without the payment of restitution to Plaintiff and Class members.

113.     ABR should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against ABR as follows:

114.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

115.     The unlawful conduct alleged herein be adjudged and decreed:

        a.     A *per se* violation of Section 1 of the Sherman Act;

b.      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

c.      Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act; and

d.      To constitute unjust enrichment;

116.    Plaintiff and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, and Defendant be required to disgorge the amounts by which it has been unjustly enriched;

117.    Defendant, its affiliates, successors, transferees, assignees and other officers, governors, trustees, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

118.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

119.    Plaintiff and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

120.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: February 26 , 2019                    Respectfully submitted,


                                             /s/  C. Philip Curley

                                            C. Philip Curley
                                            Cynthia H. Hyndman
                                            Laura R. Feldman
                                            Benjamin E. Schwab
                                            ROBINSON CURLEY P.C.
                                            300 South Wacker Drive, Suite 1700
                                            Chicago, IL 60606
                                            Tel: 312.663.3100
                                            Fax: 312.663.0303
                                            pcurley@robinsoncurley.com
                                            chyndman@robinsoncurley.com
                                            lfeldman@robinsoncurley.com
                                            bschwab@robinsoncurley.com

                                            Katrina Carroll
                                            LITE DEPALMA GREEBERG, LLC
                                            111 West Washington, Suite 1240
                                            Chicago, IL 60602
                                            Tel: 312.750.1265
                                            Fax: 312.212.5919
                                            kcarroll@litedepalma.com

                                            Michael J. Freed
                                            Brian M. Hogan
                                            FREED KANNER LONDON & MILLEN LLC
                                            2201 Waukegan Road, Suite 130
                                            Bannockburn, IL 60015
                                            Telephone: (224) 632-4500
                                            Facsimile:  (224) 632-4521
                                            mfreed@fklmlaw.com
                                            bhogan@fklmlaw.com

                                            Jonathan M. Jagher
                                            FREED KANNER LONDON & MILLEN LLC
                                            923 Fayette Street
                                            Conshohocken, PA 19428
                                            Telephone: (610) 234-6487
                                            Facsimile:  (224) 632-4521
                                            jjagher@fklmlaw.com

                                            *Counsel for Plaintiff, Sadhish K. Siva*

30

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN re AMERICAN BOARD OF MEDICAL SPECIALTIES MAINTENANCE OF CERTIFICATION ANTITRUST LITIGATION | : : : : : : : : : |

MDL DOCKET NO. 2888

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of **Plaintiffs Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, Katherine Murray Leisure, Sadhish K. Siva, Emily Elizabeth Lazarou, and Aaffaque Akhter's Response in Opposition to Motion of Steve Mannis, M.D., Tonianne French, M.D., and Louis Lim, M.D. for Consolidation and Transfer under 28 U.S.C. § 1407** and this Certificate of Service were served via electronic mail and/or the Court's ECF notification system on March 22, 2019, to the following:

David W. Mitchell
Carmen A. Medici
Arthur L. Shingler III
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900, San Diego, CA 92101-8498
Tel: (619) 231-1058
Fax: (619) 231-7423
davem@rgrdlaw.com
cmedici@rgrdlaw.com
ashingler@rgrdlaw.com

Brian J. Robbins
George C. Aguilar
Jenny L. Dixon
Eric M. Carrino
**ROBBINS ARROYO LLP**
5040 Shoreham Place, San Diego, CA 92122
Tel: (619) 525-3990
Fax: (619) 525-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
jdixon@robbinsarroyo.com
ecarrino@robbinsarroyo.com

*Counsel for Plaintiffs Steve Mannis, M.D., Tonianne French, M.D., and Louis Lim, M.D.*

Leslie E. John
Jason A. Leckerman
Elizabeth P. Weissert
Mansi Shah
**BALLARD SPAHR ANDREWS & INGERSOLL**
1735 Market Street, 51st Floor, Philadelphia, PA 19103
Tel: (215) 864-8266
Fax: (215) 864-8999
john@ballardspahr.com
leckermanj@ballardspahr.com
weisserte@ballardspahr.com
shahm@ballardspahr.com

*Counsel for Defendant American Board of Internal Medicine*

Ronald F. Price
Christopher B. Sullivan
Price Parkinson & Kerr, PLLC
5742 West Harold Gatty Drive, Suite 101, Salt Lake City, Utah 84116
Tel: (801) 530-2964
ronprice@ppktrial.com
chrissullivan@ppktrial.com

*Counsel for Defendant American Board of Psychiatry and Neurology*

Jaime Stilson
Erik D. Ruda
**DORSEY & WHITNEY LLP**
50 S. Sixth Street, Suite 1500, Minneapolis, MN 55402
Tel: (612) 492-6749
Fax: (612) 340-2868
stilson.jaime@dorsey.com
ruda.erik@dorsey.com

Matthew O. Stromquist
Ke Liu
**PILGRIM CHRISTAKIS LLP**
321 N. Clark St., 26th Floor, Chicago, IL 60654
Tel: (312) 361-3457
Fax: (312) 939-0983
mstromquist@pilgrimchristakis.com
kliu@pilgrimchristakis.com

*Counsel for Defendant American Board of Radiology*

Jack R. Bierig
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 7100, Chicago, IL 60606
Tel: (312) 258-5511
Fax: (312) 258-5600
jbierig@schiffhardin.com

Jean-Paul Phillip Cart
**SCHIFF HARDIN LLP**
Four Embarcadero Center, Suite 1350, San Francisco, CA 94111
Tel: (415) 901-8700
Fax: (415) 901-8701
jcart@schiffhardin.com

*Counsel for American Board of Medical Specialties and American Board of Emergency Medicine*

John Shaeffer
**FOX ROTHSCHILD LLP**
1800 Century Park East, Suite 300, Los Angeles, CA 90067
Tel: (310) 598-4150
Fax: (310) 556-9828
jshaeffer@foxrothschild.com

Maureen Demarest Murray
**FOX ROTHSCHILD LLP**
300 North Greene Street, Suite 1400 Greensboro, NC 27401
Tel: (336) 378-5258
Fax: (336) 378-5400
mmurray@foxrothschild.com

*Counsel for American Board of Anesthesiology*

Dated: March 22, 2019                                 Respectfully submitted,

<u> /s/C. Philip Curley                         </u>

C. Philip Curley
Cynthia H. Hyndman
Laura R. Feldman
Benjamin E. Schwab
**ROBINSON CURLEY P.C.**
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: (312) 663-3100
Fax: (3120 663-0303
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
lfeldman@robinsoncurley.com
bschwab@robinsoncurley.com

Steven J. Greenfogel
Mindee J. Reuben
**LITE DEPALMA**
**GREENBERG, LLC**
1835 Market Street
Suite 2700
Philadelphia, PA 19103
Tel: (267) 519-8306
Fax: (973) 623-0858
sgreenfogel@litedepalma.com
mreuben@litedepalma.com

Katrina Carroll
**LITE DEPALMA**
**GREENBERG, LLC**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
Fax: (312) 212-5919
kcarroll@litedepalma.com

Michael J. Freed
Brian M. Hogan
**FREED KANNER LONDON**
**& MILLEN, LLC**
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4521
mfreed@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Jagher
**FREED KANNER LONDON**
**& MILLEN, LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
Fax: (224) 632-4521
jjagher@fklmlaw.com

*Counsel for Plaintiffs Gerard Kenney, Alexa*
*Joshua, Glen Dela Cruz Manalo, Katherine*
*Murray Leisure, Sadhish K. Siva, Emily*
*Elizabeth Lazarou, and Aafaque Akhter*