IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EMILY ELIZABETH LAZAROU and AAFAQUE AKHTER<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY,<br><br>Defendant. | Case No.: 1-19-cv-01614<br><br>Honorable John Z. Lee |

**BRIEF OF DEFENDANT IN SUPPORT OF ITS MOTION TO DISMISS PLANTIFFS' CLASS ACTION COMPLAINT**

Defendant American Board of Psychiatry and Neurology ("ABPN"), by and through its counsel, submits this Brief in Support of its Motion to Dismiss Plaintiffs' Class Action Complaint ("*Cmplt.*"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

The ABPN is an independent not-for-profit 501(c)(6) corporation and a member board of the American Board of Medical Specialties ("ABMS") responsible for creating, maintaining and administering physician certification and maintenance of certification standards in psychiatry, neurology and several subspecialties of those fields. *Cmplt.* ¶¶ 3, 14. ABPN certification is completely voluntary and is not required to practice medicine as a physician and the ABPN plays no role in physician licensing. *Cmplt.* ¶¶ 15, 20. For decades, board certification has been the 'gold-standard' of quality in medicine and has provided hospitals, insurers, and patients crucial market information about the qualifications of physicians. *See*, *Cmplt.* ¶¶ 18, 19.

With a three-count putative class-action complaint – Sections 1 & 2 of the Sherman Act and an unjust enrichment claim – Plaintiffs seek to dismantle this decades-long history and deny

1

the market of the information the ABPN provides to the health industry – all based on a theory that the Plaintiffs should be able to retain the moniker of "board-certified" without having to demonstrate that they have continued the lifelong learning required to maintain board certification. Plaintiffs' allegations fail to meet the standards to withstand a Rule 12(b)(6) motion to dismiss and, for the reasons explained below, Plaintiffs' Complaint should be dismissed, with prejudice.

## LEGAL STANDARD

The ABPN moves to dismiss the Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case, but rather to test the sufficiency of the complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, a complaint must contain **sufficient factual matter**, accepted as true, to state a plausible claim on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)) (internal quotation marks omitted) (emphasis added). A pleading that offers labels and conclusions will not suffice. *Id.* Where a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of a line between possibility and plausibility of entitlement to relief." *Id.* Moreover, to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a "specific time, place, or person involved in the alleged conspiracies…" *In re Se. Milk Antitrust Litig.*, 555 F.Supp.2d 934, 941–42 (E.D. Tenn. 2008); *In re LTL Shipping Services Antitrust Litig.*, 2009 WL 323219, at *10 (N.D. Ga. 2009) ("for allegations of conspiracy to reach the plausibility threshold required by *Twombly,* they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged.").

Secondly, the pleading standard in antitrust cases articulated in *Twombly* is rooted in the practical reality that in antitrust cases the discovery process can be enormously expensive. This

standard requires the Court to insist upon pleadings that provide sufficient factual basis demonstrating an antitrust claim is plausible, before subjecting antitrust defendants to expensive discovery proceedings. *Twombly,* 550 U.S. at 558; *Limestone Dev. Corp. v. Vill. of Lemont,* 520 F.3d 797, 803–804 (7th Cir. 2008) (in complex antitrust cases, where discovery is likely to be costly, a fuller set of factual allegations may be necessary). This is even more so true where, as here, the antitrust case seeks class action status. *Twombly,* 550 U.S. at 559; *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 n. 4 (2d Cir. 2007).

## ARGUMENT

### I. THE RULE OF REASON APPLIES HERE.

Antitrust cases generally, and tying arrangements specifically, can be analyzed under a *per se* rule or a rule of reason. *See Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 322 (7th Cir. 2006); *Association of Am. Physicians & Surgeons, Inc.* ("*AAPS*") *v. American Board of Med. Specialties*, 2017 WL 6821094, at *3–4 (N.D. Ill. 2017).

The *per se* rule is only appropriately applied where the nature of a defendant's activities is inherently anti-competitive and without redeeming societal value and has no other purpose except to stifle competition. *Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1, 8–10 (1979); *Talone v. American Osteopathic Ass'n*, 2017 WL 2539394, at *5 (D.N.J. 2017). However, where, as here, an antitrust case involves professional or educational standards, the "rule of reason" applies as "the general presumption is that the public interest is served by the promotion of enhanced education and training requirements." *Sherman Coll. of Straight Chiropractic v. American Chiropractic Ass'n, Inc.*, 654 F.Supp. 716, 722 (N.D. Ga. 1986) (citing *National Soc'y of Prof'l Eng'r v. United States,* 435 U.S. 679, 696 (1978); *see also BCB Anesthesia Care Ltd. v. Passavant Mem. Area Hosp. Ass'n,* 36 F.3d 664, 667 (7th Cir. 1994) (noting that courts "invariably analyze" antitrust

claims based on hospital credentialing decisions under the rule of reason because "there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many or all."); *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art and Design*, 73 F.Supp.2d 829, 836 (W.D. Mich. 1999) ("Accreditation has pro competitive effects ('redeeming value') in that it enhances competition and promotes efficiency by clarifying and informing choices that market actors must make."); *AAPS*, 2017 WL 6821094, at *4 (merely stating in a conclusory manner that concerted actions are *per se* violations because they are plainly anticompetitive will not suffice, "[Plaintiff] has not alleged any type of agreement suggesting a *per se* unlawful restraint, such as a horizontal agreement among competitors to fix prices or to divide markets."). Under a Rule of Reason analysis, the ABPN asserts the defenses below.

## II. PLAINTIFFS' COMPLAINT FAILS TO STATE ANY PLAUSIBLE CLAIM UNDER THE "SINGLE PRODUCT DEFENSE."

Plaintiffs' entire complaint, and each of its causes of action, is built around the assumption that ABPN has engaged in illegal tying of maintenance of certification ("MOC") to its initial certification ("IC"). *See e.g.*, *Cmplt*., at ¶¶ 1, 3-4, 67, 111, 119, 128. In other words, to survive a motion to dismiss, Plaintiffs must demonstrate based on the pleadings the IC and MOC are two *distinct* products. They have not and, therefore, the complaint should be dismissed in its entirety.

To state a valid tying claim under the Sherman Act the tying product and tied product must be separate, *i.e.*, each must be in a separate and distinct product market. *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2nd Cir. 2016). This is because if there are not separate markets, there can be no fear of leveraging a monopoly in one market to harm competition in a second; the second market simply does not exist. *Id.,* at 142.

Whether two products are separate for purposes of a tying claim is governed by the "consumer demand test." *See United States v. Microsoft Corp.*, 253 F.3d 34, 85–89 (D.C. Cir. 2001). Under the "consumer demand test", a court looks to the independent character of the demand for the two items. *Viamedia, Inc. v. Comcast Corp.*, 218 F.Supp.3d 674, 693 (N.D. Ill. 2016).

A tying arrangement cannot exist unless it is shown that there is a sufficient demand for the purchase of the tied product separate from the tying product in order to establish distinctive product markets. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir. 2008) (quoting and citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 5 (1984)). Relevant evidence of separate and distinct consumer demand for the tying and tied products is the history of the products being, or not being, sold separately. *Kaufman*, 836 F.3d at 142.

Here, the ABPN provides only one product – *i.e.*, board certification of physicians in specific medical specialties. *See Cmplt.* at ¶ 3. While, in the past, the ABPN offered lifelong certifications, for the past twenty-five years it has only offered time-limited certifications requiring additional activities to maintain that certification on an ongoing basis. *Id.*, at ¶ 22. Regardless, the one and only product that physicians demand is board certification, MOC is not a separate stand-alone product that is offered distinctively from IC, nor is MOC a stand-alone product that any physician demands independent of IC. *See Cmplt.,* generally.[1]

Moreover, the named Plaintiffs were each certified by the ABPN ***after*** the introduction of time-limited certificates[2] – in other words, when each Plaintiff applied for and, eventually,

---

[1] This fact – that physicians do not demand MOC separately from IC is, indeed, the entire theory and gravamen of Plaintiffs' Complaint.

[2] *Cmplt.,* at ¶¶ 94, 103.

5

obtained ABPN board certification **they knew it would be time-limited and subject to MOC requirements**. *See Id.*, at ¶ 104.

The name MOC itself dictates it is one product that is sold – MOC is maintenance of what? It is maintenance of *certification*. Moreover, the fact that ABPN automatically enrolls its physicians in MOC after they have obtained IC[3], is further proof it is one product; when a consumer enters an automatic renewal program, they are not buying two products – the product itself and a "renewal" product – they are buying one product which they wish to renew on an ongoing basis.

Other than offering a myriad of "labels and conclusions", Plaintiffs allege *only two* "factual matters" to support their theory of two separate products. The first is that because the ABPN "sold initial certification services for more than sixty years before it started selling ABPN MOC establishes that the two markets are distinct." *Cmplt.*, at ¶ 70. This assertion, candidly, is a complete *non sequitur*. The fact that a single product *changed* is not proof of two products, instead it is proof that a *single product* changed.

The only other "factual matter" supposedly supporting two separate products is that the National Board of Physicians and Surgeons ("NBPAS") only offers MOC but not IC. *Id.*, at ¶ 77. But this is untrue; the NBPAS provides single-product "board certification". *See* https://nbpas.org/ ("The National Board of Physicians and Surgeons (NBPAS) is committed to *providing certification* that ensures physician compliance with national standards and promotes lifelong learning."); https://nbpas.org/criteria/ ("NBPAS requires fulfillment of the following criteria *for board certification*:"); https://nbpas.org/apply-or-renew/ ("*Certification by NBPAS* is a measure of training, experience and life-long learning. It does not guarantee competence or any specific medical outcomes."); https://nbpas.org/apply/?level=1 (in "Terms and Conditions", "The National

---

[3] *Cmplt.*, at ¶ 31.

Board of Physicians and Surgeons (NBPAS) reserves the right to ***deny certification*** to any individual believed by the board to lack sufficient qualifications. This may include individuals who meet the stated requirements but are found by the NBPAS to have characteristics that make them ***unsuitable for certification***."); https://nbpas.org/why-nbpas/ ("***Currently, NBPAS certifies physicians*** in non-surgical ABMS specialties.")[4] (emphasis added in all examples). In fact, the NBPAS' prime "Objective and Purpose" is "certification of physicians." NBPAS Bylaws, Art. III at https://nbpas.org/wp-content/Downloads/2014-08-25%20National%20Board%20of%20Physicians%20and%20Surgeons%20Bylaws.pdf.

These examples not only demonstrate that Plaintiffs' factual assertion that NBPAS only offers MOC but not IC is false, it also demonstrates that NBAS, too, treats board certification as one product – *e.g.*, "The National Board of Physicians and Surgeons (NBPAS) is committed to ***providing certification*** that ensures physician compliance with national standards ***and promotes lifelong learning.***" At https://nbpas.org/ (emphasis added). Most importantly, however, these NBPAS examples demonstrate there is no market demand for MOC (or "lifelong learning") apart from and distinctive of the market demand for board certification, and nowhere else in the Complaint do Plaintiffs allege any independent market demand for MOC apart from IC – a failing that is fatal to their Complaint. *See Viamedia*, 218 F.Supp.3d at 693.

---

[4] With an accompanying *Motion Requesting Judicial Notice of NBPAS' Website* ("*Judicial Notice Motion*"), the ABPN requests this Court to take judicial notice of the above-cited examples from the NBPAS' website (all of which are attached to the *Judicial Notice* Motion) on the grounds that the counter-assertions were made in Plaintiffs' Complaint, are central to Plaintiffs' argument here, and the accuracy of the NBPAS' own webpages about itself cannot be reasonably questioned. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F.Supp.3d 931, 938 (N.D. Ill. 2018) ("a court ruling on a motion to dismiss can rely on the complaint itself, documents attached to the complaint, documents that are critical and referred to in it, and information that is subject to proper judicial notice.").

These two factual matters alleged by Plaintiffs in support of two separate products, in fact, *undermine* Plaintiffs' argument and certainly are insufficient "factual matter" under *Ashcroft*, 556 U.S. at 678 to survive a motion to dismiss.[5]

### III. PLAINTIFFS HAVE FAILED TO SUFFICIENTLY PLEAD "ACTUAL COERCION" OR "FORCE".

To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing both that i) the seller uses ***actual coercion to force*** buyers to purchase the tied product; and ii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product. *Jefferson Parish Hosp.*, 466 U.S. at 13–14; *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir.1994), *as amended on denial of reh'g* (Jan. 11, 1995) ("Substantial market power is an essential ingredient of every antitrust case under the Rule of Reason.").

The only allegation of force or coercion in the Complaint directed against the ABPN is that "ABPN forced psychiatrists and neurologists to purchase MOC…" *Cmplt.*, at ¶ 4. This lone assertion is conclusory, without any factual underpinning, and insufficient to withstand a dismissal on this point. Regardless, nobody is forcing physicians to be board certified as it is completely voluntary and optional. Likewise, participation in MOC is completely up to each individual physician with the consequence of the physicians not maintaining his/her certification status if they do not comply with the MOC within the allotted timeframe – something that they knew when applying for IC. *See Id.*, at ¶¶ 22, 94, 104.

---

[5] In analogous cases, Courts have routinely rejected tying claims under the antitrust statutes. *Allyn v. American Bd. of Med. Specialties, Inc.*, 2019 WL 297459, at *6 (M.D. Fla. 2019) (dismissing antitrust unlawful tying complaint against the ABMS and the American Board of Dermatology stating, "it is not clear from the complaint what two separate products are allegedly being tied together."); *see also Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir. 1988) ("[P]athology services are not a separate and distinct product from hospital services, they combine in the form of one product, not two tied products. Without two products, the alleged tying arrangement is impossible.").

Plaintiffs also allege that "many" hospitals, insurers and industry related companies require physicians to be board certified. *See Id.*, at ¶¶ 48. But even if true, the requirement is levied by independent non-parties – not by the ABPN. Plaintiffs do contend "upon information and belief" that these independent non-party requirements were enacted with "the assistance and encouragement of ABMS and its member boards"[6], but offer no factual basis or underpinning for this conclusory label. Not only do Plaintiffs fail to offer any factual basis for their coercion narrative, they also fail to mention that thirteen states have already enacted litigation limiting these independent non-party entities from requiring board certification, with legislation pending in many additional states.[7] In other words the "many" is not many and is dwindling quickly so that, effectively, there is no power or force to this alleged (though unsubstantiated) coercion. The ABPN does not require any physician to become board certified, or maintain certification for any given length of time. Absent any plausible forcing or coercion, there can be no illegal tying and the Complaint should be dismissed.

---

[6] *See Id.*, at ¶¶ 49-50; *see also Id.*, at ¶ 81.

[7] *See e.g.*, AZ ST § 32-1439; GA ST § 43-34-46 ("Nothing … to require a physician to secure a maintenance of certification … as a prerequisite for employment in state medical facilities, reimbursement from third parties, or malpractice insurance coverage"); KY ST § 311.566; MD HEALTH OCCUP § 14-322; ME ST T. 32 § 3271; MO ST 334.285; NC ST § 90-8.1; ND ST 26.1-47-12 & ND ST 23-16-18 ("… a physician may not be denied staff privileges or employment by a facility licensed under this chapter based solely on the physician's decision to not participate in maintenance of certification."); OK ST T. 59 § 492 ("Nothing in [this Act] shall be construed as to require a physician to secure a Maintenance of Certification (MOC) as a condition of licensure, reimbursement, employment or admitting privileges at a hospital in this state"); SC ST § 40-47-38 ("Maintenance of Certification not required for licensure, reimbursement, employments, or admitting privileges."); TX OCC § 151.0515 ("Except as otherwise provided by this section, the following entities may not differentiate between physicians based on a physician's maintenance of certification…"); TN ST § 56-7-1006 ("A health insurance entity… shall not discriminate with respect to reimbursement levels based solely on a physician's decision not to participate in any form of maintenance of licensure or maintenance of certification, including basing a physician's reimbursement level on any form of maintenance of licensure tied to maintenance of certification."); WA ST 18.71.083.

### IV. PLAINTIFFS HAVE FAILED TO PLEAD THE NECESSARY UNREASONABLE RESTRAINT OF TRADE.

The Sherman Act does not prohibit every restraint on trade, but only those agreements which ***unreasonably*** restrain trade. *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. Of Podiatric Surgery, Inc.*, 185 F.3d 606, 619. "There can be no restraint of trade without a restraint." *Schachar v. American Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397, 399 (C.A.7 (Ill.), 1989). ("That truism decides this case" in favor of defendant in that when a trade association provides information but does not constrain others to follow its recommendation, it does not violate the antitrust laws).

Here, other than a mere conclusory recitation of a label in a single paragraph, under Count One of their Complaint on page 32, Plaintiffs allege no restraints. *See Cmplt.*, at ¶ 120 ("… it [the tying arrangement] nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint of trade.") There is no definition of the restraint, the enforcement mechanism of the restraint, or how the restraint affected trade. Such is insufficient to state a cause of action.

Moreover, even if the Court were to read between the lines of the pleadings and determine that plaintiffs have alleged a restraint in trade, the only possible antitrust restraints to be gleaned from the Complaint are i) the "very limited success" of NBPAS in the "certification market"; and/or ii) that "many" hospitals, insurers, *etc.* require ABMS member board certification. *See Cmplt.*, at ¶¶ 48-51, 78, and 79. But again, in both instances, the alleged "restraint" is the result of independent third-party decision-making and action. There is no specific allegation that the ABPN imposed, forced or even cooperated in these so-called "restraints". Such is insufficient to state a cause of action. *See AAPS*, 2017 WL 6821094, at \*5 (N.D. Ill. 2017) ("Nor has AAPS sufficiently pleaded that the alleged restraint is unreasonable. '[I]t is commonplace, and often very

10

useful, for organizations to recommend quality standards ... or adopt them as part of a certification process.... Merely to say that the standards … have some market effects has not generally been enough to condemn them as 'unreasonable' under the Sherman Act.' More would be needed to conclude that any restraint is unreasonable, such as the use of standards setting as a predatory device by some competitors to injure others (for example, by "showing that the standard was deliberately distorted by competitors of the injured party ... through lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosure.") (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57 (1st Cir. 1999); *Poindexter v. American Bd. of Surgery, Inc.*, 911 F.Supp. 1510, 1519–20 (N.D. Ga. 1994) ("Finally, there is no proof that the Board acted to constrain Plaintiff's ability to compete. Hospitals, patients and insurers *voluntarily* rely on the Board's certification decision…. users of that information have the sole power to determine whether that surgeon is entitled to patronage, surgical privileges, or preferred insurance rates.").

### V. PLAINTIFFS HAVE FAILED TO PLEAD THE NECESSARY "SUBSTANTIAL MARKET POWER".

Under both Sections 1 and 2 of the Sherman Act[8], substantial market power is necessary to state a cause of action. *Sanjuan*, 40 F.3d at 251 ("Substantial market power is an essential ingredient of every antitrust case under the Rule of Reason.") Market power must be alleged in more than vague and conclusory terms to prevent the dismissal of the complaint on a Rule 12(b)(6) motion. *Foundation for Interior Design Educ. Research*, 73 F.Supp.2d at 837.

---

[8] Although monopoly power under Section 2 is similar to market power under Section 1, Section 2 requires something *greater* than market power – it requires monopoly power. *Spanish Broad. Sys., Inc. v. Clear Channel Commc'n, Inc.*, 242 F.Supp.2d 1350, 1362 (S.D. Fla. 2003). Moreover, the offense of monopolization under Section 2 of the Sherman Act also consists of the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product. *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 112, 126 (W.D.N.Y. 1997).

Substantial market power means that a defendant "can raise prices above a competitive level without losing its business." See *42nd Parallel North v. E Street Denim Co.,* 286 F.3d 401, 404 (7th Cir. 2002).[9] In order to sufficiently allege market power, a plaintiff must allege an ability to control prices. *Daniel*, 988 F.Supp. at 125.

Here, Plaintiffs have alleged that, far from raising prices above competitive levels, the ABPN has, in real terms, *reduced* the price. From an annual average cost high of $212.50, the ABPN reduced it to $150 (a 29.4% reduction) only to allegedly raise it to $175 (still a 17.6% reduction from its high). See *Cmplt.*, at ¶¶ 29, 39. Secondly, far from "above competitive" or "supra-competitive" levels, NBPAS is still competing with prices that are, at worst, $90.50 less than the ABPN or, roughly, $7.54 a month. *Id.*, at ¶ 76. Finally, nowhere in the Complaint do Plaintiffs allege that the ABPN has driven-out competition from the certification market. These allegations are insufficient to withstand a motion to dismiss. *See AAPS*, 2017 WL 6821094, at *4 ("AAPS has not alleged facts sufficient to suggest that ABMS has sufficient market power to cause a restraint of trade. There are no factual allegations that ABMS's activities have cut back output in the market or driven up prices to consumers—particularly as ABMS certification is a voluntary process, failure to be certified does not render a physician unable to practice medicine.").

## VI. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' COMPLAINT.

Sherman Act antitrust claims are subject to a four-year statute of limitations and the unjust enrichment claim a five-year limitation. 15 U.S.C. § 15b; 735 Ill. Comp. Stat. 5/13-205. While this Court applies the discovery rule and typically will not bar a complaint for statute of limitations at the pleading stage since a complaint need not anticipate an affirmative defense, in this case the Complaint should be dismissed – with prejudice – because "it is clear from the face of the ...

---

[9] For Section 2, market power means the ability to raises prices to "supra-competitive" levels or the power to drive out competition from the relevant market. *Spanish Broadcasting Sys.*, 242 F.Supp.2d at 1362.

complaint that it is hopelessly time-barred." *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 806 (N.D. Ill. 2017) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009)).

Under the discovery rule, a claim accrues when the plaintiff "discovers that he has been *injured* and who has *caused* the injury." In re Sulfuric Acid Antitrust Litigation, 743 F.Supp.2d 827, 854 (N.D.Ill.,2010) (quoting *In re Copper Antitrust Litig.,* 436 F.3d 782, 789 (7th Cir. 2006) (emphasis in original). Here, Plaintiffs admit and aver the following:

- In 1994, the ABPN introduced its MOC program. *Cmplt.*, at ¶ 22;

- At all times since 1994, physicians were required to comply with MOC in order to maintain their IC. *Id.*, at ¶ 22, 67;

- And while the details of the MOC program changed over the years the key complained of characteristics remained the same: i) physicians are automatically enrolled in MOC; and ii) without complying with MOC a physician loses IC status. *Id.*, at ¶ 4, 37;

- The last "major" change was the introduction of C-MOC in 2012. *Id.;*

- Plaintiff Dr. Lazarou was certified by the ABPN in 2007 and, also beginning in 2007, "[s]he was automatically enrolled in ABPN MOC upon obtaining her initial psychiatric certification, payed the required MOC fees, and began complying with other ABPN MOC requirements." *Id.*, at ¶ 94;

- Plaintiff Dr. Akhter was certified by the ABPN in 2005 and, also beginning in 2005, "[h]e was automatically enrolled in ABPN MOC upon obtaining his initial psychiatric certification, payed the required MOC fees, and began complying with other ABPN MOC requirements." *Id.*, at ¶ 103. In addition, Dr. Akhter completed all ABPN MOC requirements and his psychiatry certification was renewed in 2014." *Id.;*

- Moreover, at the time Dr. Akhter received his IC in 2005, "he understood it would remain valid for ten years and that he would be required to take the ten-year cognitive MOC examination to maintain his certification.: which he did so in 2014. *Id.*, at ¶ 104.

Thus, the question is when did Plaintiffs discover that each has been *injured* and who has *caused* the injury. Undeniably it is when each was certified *by the ABPN*, became subject to

13

MOC *by the ABPN* and began paying MOC fees *to the ABPN* – 2005 for Dr. Akhter and 2007 for Dr. Lazarou – both well beyond the applicable statute of limitations period.

Additionally, although continuing violations may restart the antitrust statute of limitations, there must be a "new and independent act that is not merely a reaffirmation of a previous act". *Witt Co. v. RISO, Inc.*, 948 F.Supp.2d 1227, 1236–37 (D.Or. 2013) (antitrust tying case holding performance of an alleged illegal contractual tie-in provision does not satisfy the continuing violation requirements) (quoting *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237, 238 (9th Cir.1987). Here there was no new and independent act; rather, it was a reaffirmation of a previous act with the same predicated alleged antitrust violations (*e.g.*, mandatory MOC and the payment of MOC fees).

**VII.     THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED**

"Under Illinois law, when two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 14-C-1512, 2017 WL 1105400, *13 (N.D. Ill. 2017) (internal quotations and citation omitted). Here, plaintiffs allege that they purchased certifications and MOC from ABPN. Thus, although plaintiffs do not expressly claim they entered into contracts with ABPN, that is the clear and unmistakable import of their allegations. Plaintiffs then claim that ABPN has been unjustly enriched by plaintiffs' payment of MOC program fees – *i.e.*, plaintiffs essentially assert that ABPN was unjustly enriched by its contracts with plaintiffs. Although plaintiffs claim they were "forced" to pay MOC fees, they do not dispute that they entered into contracts when making their purchases. Because express contracts govern the relationship between plaintiffs and ABPM, the unjust enrichment claim fails as a matter of law and must be dismissed with prejudice.

14

## **CONCLUSION**

For the above reasons, the Complaint should be dismissed in its entirety and with prejudice for failure to state a claim upon which relief can be granted.

Dated: May 10, 2019

Respectfully submitted,

By: /s/ *Christopher Sullivan*
Christopher B. Sullivan
PRICE PARKINSON & KERR
5742 West Harold Gatty Drive
Salt Lake City, Utah 84116
Tel: (801) 517-7009
Sullivan@ppktrial.com

Anne I-Pin Shaw
Darryl Tom
SHAW LEGAL SERVICES, LTD.
540 W. Briar Place, Unit B
Chicago, Illinois 60657
ashaw@shawattorneys.com
dtom@shawattorneys.com

*Attorneys for Defendant American Board of Psychiatry and Neurology*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 10, 2019, the foregoing **BRIEF OF DEFENDANT IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing by email to the following:

C. Philip Curley
Cynthia H. Hyndman
Laura R. Feldman
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
lfeldman@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
LITE DEPALMA GREENBERG, LLC
111 West Washington, Suite 1240
Chicago, IL 60602
kcarroll@litedepalma.com

                                             */s/ Christopher Sullivan*
                                              Christopher Sullivan