**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EMILY ELIZABETH LAZAROU** | ) | |
| and **AAFAQUE AKHTER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 1:19-cv-01614** |
| | ) | |
| **AMERICAN BOARD OF PSYCHIATRY** | ) | |
| **AND NEUROLOGY,** | ) | **Hon. John Z. Lee** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY'S
<u>MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT</u>**

**<u>TABLE OF CONTENTS</u>**

**Page(s)**

INTRODUCTION ................................................................................................ 1

SUMMARY OF FACTS RELEVANT TO MOTION ...................................... 2

LEGAL STANDARD........................................................................................ 4

ARGUMENT .................................................................................................... 4

I.     Plaintiffs State A Claim For Illegal Tying Of Separate Products........................... 4

     A.    The Court Need Not Decide Now Whether a "*Per Se*"
           or "Rule Of Reason" Treatment Applies Here or Determine
           the Result of Either Analysis ....................................................... 5

     B.    Plaintiffs Adequately Allege that Initial Certification and
           MOC are Distinct Products...........................................................7

           1.   Plaintiffs allege separate demand for initial certification and MOC ......7

           2.   ABPN's "single product changed" defense is a functional
                relation analysis rejected by the Supreme Court....................................11

     C.    Plaintiffs Allege and ABPN Admits on Its Website that ABPN Forces
           Psychiatrists and Neurologists to Purchase MOC ..................................... 13

     D.    Plaintiffs Allege Unreasonable Restraint of Trade .................................... 14

II.    Plaintiffs Allege ABPN Has the Requisite Monopoly (and Market) Power ......... 16

III.   Plaintiffs' Claims Were Timely Filed Within The Limitations Periods................ 18

IV.   Plaintiffs State A Claim For Unjust Enrichment ................................................... 20

CONCLUSION.................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Allyn v. Am. Bd. Of Med. Specialties, Inc.,*
No. 5:18-cv-00355-OC-30PRL,
2019 U.S. Dist. LEXIS 10805 (M.D. Fla. Jan. 3, 2019) ...................................... 10

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946) ......................................................................................... 17

*Arizona v. Maricopa Cty. Med. Soc.,*
457 U.S. 332 (1982) ........................................................................................... 6

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................... 4

*Ass'n of Am. Phys. & Surgeons v. Am. Bd. of Med. Specialties, Inc.,*
No. 14-cv-02705, 2017 U.S. Dist. LEXIS 205845 (N.D. Ill. Dec. 13, 2017) ........... 6, 15, 17

*BCB Anesthesia Care, Ltd. v. Passavant Mem. Area Hosp. Ass'n,*
36 F.3d 664 (7th Cir. 1994) ................................................................................ 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 4

*Broadcast Music, Inc. v. CBS, Inc.*,
441 U.S. 1 (1979) ............................................................................................... 6

*Brunswick Corp. v. Riegal Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .............................................................................18

*Burda v. Wendy's Int'l Inc.,*
659 F. Supp. 2d 928 (S. D. Ohio 2009)...............................................................19

*Chicago Title Ins. Co., v. Plitt Theaters,*
No. 95 C 3892, 1995 U.S. Dist. LEXIS 18009 (N.D. Ill. Nov. 28, 1995) ...........................20

*City of Rockford v. Mallinckrodt ARD, Inc.,*
360 F. Supp. 3d 730 (N.D. Ill. 2019) ................................................................... 5

*Coal Exps. Ass'n. v. United States*,
745 F.2d 76 (D.C. Cir. 1984) ............................................................................ 17

*Collins v. Assoc. Pathologists, Ltd.*,
844 F.2d 473 (7th Cir. 1988) ............................................................................ 10

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ......................................................................................... 15

*DM Res, Inc., v. Coll of Am. Pathol.*
   170 F. 3d 53 (1st Cir. 1999) ...........................................................................15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ................................................................ 6, 7, 8, 13, 16

*Found. for Int. Design Educ. Res. v. Savannah Coll. of Art and Design*,
   73 F. Supp. 2d 829 (W.D. Mich. 1999)...............................................................7

*Gordon v. Ortho McNeil Phama., Inc.*,
   430 F. Supp. 2d 814 (N.D. Ill. 2006)................................................................20

*Gumwood HP Shop. Ptners., L.P.* v. *Simon Prop. Grp., Inc.*,
   No. 3:11-CV-268 JD, 2016 U.S. Dist. LEXIS 35759 (N.D. Ind. Mar. 18, 2016) .............. 18

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) ........................................................ 5, 6, 15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ................................................................................ *passim*

*Jovic v. L-3 Servs., Inc.*,
   69 F. Supp. 3d 750 (N.D. Ill. 2014)................................................................18

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d 677 (D. Del. 2013) ................................................................ 5

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*,
   63 F.3d 1540 (10th Cir. 1995) ......................................................................12

*Park v. Thomson Corp.*,
   No. 05 Civ. 2931 (WHP), 2007 U.S. Dist. LEXIS 2001 (S.D.N.Y. Jan. 11, 2007) ........8, 12

*Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*,
   826 F.2d 712 (7th Cir. 1987) ................................................................... 7, 13

*Poindexter v. Am. Bd. Of Surgery, Inc.*,
   911 F. Supp. 1510 (N.D. Ga. 1994) ............................................................. 15

*PSI Repair Servs. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ...................................................................... 8

*Reifert v. S. Cent. Wis. MLS Corp.*,
   450 F.3d 312 (7th Cir. 2006) ...................................................................... 5

*Serv. & Training, Inc. v. Data Gen. Corp.*,
   963 F.2d 680 (4th Cir. 1992) ..................................................................... 12

*Sherman Coll. Of Straight Chiro. v. Am. Chiro. Ass'n, Inc.*,
    654 F. Supp. 716 (N.D. Ga. 1986) .......................................................................6

*Smith v. Ebay Corp.*,
    No. C 10-03825 JSW, 2012 U.S. Dist. LEXIS 1211 (N.D. Cal. Jan. 5, 2012) ...................19

*Stevens v. Interactive Fin. Advisors, Inc.*,
    No. 11 C 2223, 2015 U.S. Dist. LEXIS 21518 (N.D. Ill. Feb. 24, 2015) .......................... 20

*Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*,
    No. 14 C 1512, 2017 U.S. Dist. LEXIS 42980 (N.D. Ill. March 24, 2017) ....................... 20

*Talone v. Am. Ost. Ass'n*,
    No. 1:16-cv-04644-*NLH-JS*, 2017 U.S. Dist. LEXIS 89395
    (D.N.J. June 12, 2017) ........................................................................... 6, 9-10

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ..................................................................... 4

*Thompson v. Metropolitan Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) ................................................................... 9

*United States v. E.I. duPont de Nemours & Co.*,
    351 U.S. 377 (1956) ...............................................................................16, 17

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................... 16

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................... 16, 17

*United States v. Spectrum Brands*,
    No. 18-1785, 2019 U.S. App. LEXIS 13934 (7th Cir. May 9, 2019) ...................................18

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................................. 14

*U.S. Gypsum Co. v. Ind. Gas Co., Inc.*,
    350 F.3d 623 (7th Cir. 2003) .....................................................................18

*Viamedia, Inc. v. Comcast Corp.*,
    218 F. Supp. 3d 674 (N.D. Ill. 2016) ..................................................... 5, 7, 8, 9

*Witt Co. v. Riso, Inc.*,
    948 F. Supp. 2d 1227 (D.Or. 2013) ...............................................................19

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) .....................................................................18

**Statutes**

15 U.S. C. § 1 ................................................................................................... 1, 16

15 U. S. C. §2 .......................................................................................... 1, 6, 14, 16

**Rules**

Federal Rule of Civil Procedure 8(a) ................................................................4

Federal Rule of Civil Procedure 12(b)(6) ...............................................10 , 17, 19

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter ("Plaintiffs") submit this Response Brief in Opposition to American Board of Psychiatry and Neurology's ("ABPN") Motion to Dismiss Plaintiffs' Class Action Complaint. (ECF Dkt. No. 22).

## INTRODUCTION

ABPN sells initial certifications to new doctors to demonstrate satisfactory completion of their graduate medical education. ABPN has a 100 percent market share in the market for initial certifications, possessing monopoly (and market) power. ABPN also sells a maintenance of certification product to older psychiatrists and neurologists ("MOC"). According to ABPN, MOC tests something it calls "lifelong learning." ABPN sold initial certifications for more than sixty years before it began selling MOC. ABPN forces doctors to buy MOC or have their initial certifications terminated, illegally tying its MOC product to its initial certification product in violation of Section 1 of the Sherman Act.

Psychiatrists and neurologists do not want to purchase MOC or would prefer to buy "lifelong learning" products from other providers, but cannot without ABPN terminating their initial certifications subjecting them to substantial economic consequences. In this way, ABPN holds each doctor's initial certification hostage and controls the maintenance of certification market. Through these and other anticompetitive acts ABPN also has a nearly 100 percent market share in the separate maintenance of certification market. It obtained and continues to maintain its monopoly position in that market in violation of Section 2 of the Sherman Act.

ABPN's grounds for dismissal consist mostly of disputing Plaintiffs' well-pleaded factual allegations. Indeed, ABPN candidly admits its motion simply "asserts [ ] defenses." Def. Br. 4. But at issue is whether Plaintiffs have stated plausible claims, which they have, and not whether ABPN believes it may have plausible defenses.

1

## SUMMARY OF FACTS RELEVANT TO MOTION

ABPN is the monopoly supplier of initial certifications and has market power in the market for initial certification. ¶¶ 2, 69. "[N]o other organization or entity has ever offered meaningful competing initial certifications for psychiatrists and neurologists." ¶ 68. ABPN sold only initial certifications for more than sixty years before it sold MOC. ¶¶ 19, 22, 67, 70. Since initial certification tests graduate medical education and residency training, ABPN historically imposed no other requirements on doctors beyond initial certification. ¶ 21. Now, however, ABPN requires older psychiatrists and neurologists to buy MOC or have their certifications terminated. ¶¶ 25, 48, 67, 74, 90, 92. Thus, ABPN forces doctors to buy MOC, tying it to ABPN's initial certification. ¶¶ 4, 5.[1]

This is abundantly clear from ABPN's website: "participation in the MOC Program is required to maintain certification." ¶ 48. Doctors are forced to buy MOC or forfeit their certifications even when they meet Continuing Medical Education ("CME") and other State licensing requirements. ¶¶ 17, 43, 48, 55, 72. The only exception to ABPN's MOC requirement is that doctors who purchased initial certifications before 1990 are "grandfathered" by ABPN, not required to buy MOC, and still reported as "Certified" by ABPN. ¶¶ 25, 29. Up to 50 percent of psychiatrists and neurologists have been "grandfathered" by ABPN. ¶ 28.

ABPN refers to MOC as "the 'gold standard' of quality in medicine" and as providing "crucial market information." Def. Br. 1. Plaintiffs allege the opposite. In truth, MOC is "no uniform standard" at all. ¶¶ 36, 38. This is confirmed by ABPN "hold[ing] 'grandfathered' physicians to a different standard" than those doctors that ABPN forces to buy MOC, and by the

---

[1] References to "Def. Br. ___" are to pages in ABPN's Brief in Support of its Motion to Dismiss Plaintiffs' Class Action Complaint. (ECF Dkt. No. 23). References to "¶ ___" are to paragraphs of the Class Action Complaint ("Complaint"). (ECF Dkt. No. 1).

dizzying array of different MOC requirements ABPN has imposed that together have made a uniform standard against which "to assess and compare" physicians impossible, much less created a so-called gold standard. ¶¶ 26, 36, 38. As for "crucial market information," ABPN gives no detail about what that information might be. Plaintiffs, however, allege that "no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public." ¶ 53. Moreover, MOC has been "a constantly moving target … varying wildly in substantial ways" over the years making it "impossible to undertake any meaningful analysis" of MOC. ¶¶ 35, 46.

ABPN used its monopoly power in the initial certification market to obtain and then maintain a monopoly in the maintenance of certification market, tie its initial certification and MOC products, charge supracompetititive prices for MOC, and injure competition in the market for maintenance of certification. ¶¶ 2, 4-5, 55, 80, 82, 87. These anticompetitive acts and restraints of trade by ABPN, "raise the cost of medicine for Plaintiffs and other physicians; constrain the supply of psychiatrists and neurologists, thereby harming competition; and decrease the supply of certified psychiatrists and neurologists, thereby increasing the cost of medical services to patients and consumers and presenting barriers to patient care." ¶ 88.

Psychiatrists and neurologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to maintain their initial certifications to hold hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. ¶ 48. Thus, doctors must purchase MOC or suffer substantial economic consequences. ¶¶ 48, 89. *See also* ¶ 99 (Dr. Lazarou).

## LEGAL STANDARD

Under the notice pleading standard of Rule 8(a), "[a] plaintiff's complaint need only provide a short and plain statement" of a claim entitling the pleader to relief, "sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal citations omitted). In the antitrust context, Rule 8(a) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.   Plaintiffs State A Claim For Illegal Tying Of Separate Products.

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). ABPN uses its monopoly (and market) power in the initial certification market to force psychiatrists and neurologists to buy MOC and not buy maintenance of certification or other "lifetime learning" products from other providers. ¶¶ 4, 55, 67, 74. "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.

Plaintiffs assert alternatively both a "*per se* rule" and a "rule of reason" tying claim. ABPN does not (and cannot) dispute that courts often apply the *per se* rule to tying claims. To

4

state a *per se* tying claim, a plaintiff must show: (1) two distinct products or services, (2) that defendant has sufficient economic power in the tying market, (3) a not insubstantial amount of interstate commerce is affected, and (4) that the tying seller has an economic interest in the tied product. *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 692 (N.D. Ill. 2016) (quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316–17 (7th Cir. 2006)). [2]

Plaintiffs have alleged all of these elements of a *per se* tying claim. ¶¶ 9, 29, 39, 43, 68, 83, 85, 119. In the alternative, Plaintiffs have stated a rule of reason tying claim by pleading the above elements as well as unreasonable harm to competition in the tied market (maintenance of certification) that is not outweighed by any legitimate procompetitive justification. ¶¶ 9, 88, 89, 92, 120-22.

A.      **The Court Need Not Decide Now Whether a "*Per Se*" or "Rule Of Reason" Treatment Applies Here or Determine the Result of Either Analysis.**

ABPN disregards the *per se* tying claim alleged by Plaintiffs, and instead "[u]nder a rule of reason analysis" simply raises "defenses." Def. Br. 3-4. Whether a particular claim merits *per se* or rule of reason treatment, however, is a highly factual undertaking that courts typically decline to address on a motion to dismiss. *In re Sulfuric Acid Antitrust Litig.,*743 F. Supp. 2d 827, 866-67 (N.D. Ill. 2010) (inappropriate even at summary judgment); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) (motion to dismiss) (quoting with approval from treatise: "often … the decision about which rule is to be employed will await facts that are developed only in discovery"); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 689 (D. Del. 2013) ("[a] determination of the applicability of the *per se* rule is better

---

[2]     ABPN does not dispute that a not insubstantial amount of interstate commerce is affected or that it has an economic interest in the tied product (MOC).

undertaken after careful consideration of the evidentiary record.") (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992)). [3]

ABPN is wrong that whenever so-called "professional or educational standards" are involved a rule of reason analysis is mandated, especially at an early stage of litigation. *See* Def. Br. 3. This case is "not so markedly different" from other contexts "in which the *per se* rule has been applied that the Court is prevented from applying the rule here." *Sulfuric Acid,* 743 F. Supp. 2d at 874. *See also Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 348-51 (1982) (health care industry not exempt from *per se* rule). [4]

None of the cases on which ABPN relies holds otherwise. The plaintiffs in *Talone v. Am. Ost. Ass'n*, No. 1:16-cv-04644-NLH-JS, 2017 U.S. Dist. LEXIS 89395, *15-16 (D.N.J. June 12, 2017), like Plaintiffs here, pleaded both *per se* and rule of reason tying claims and the court denied the motion to dismiss without addressing which analysis should ultimately govern. In *Ass'n of Am. Phys. & Surgeons v. Am. Bd. of Med. Specialties, Inc.*, No. 14-cv-02705, 2017 U.S. Dist. LEXIS 205845, *10 (N.D. Ill. Dec. 13, 2017) ("*AAPS*"), plaintiff did not even bring tying claims and pleaded "no facts" at all to support *per se* treatment for the antitrust conspiracy that was claimed. Both *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979), and *Sherman Coll. Of Straight Chiro. v. Am. Chiro. Ass'n, Inc.*, 654 F. Supp. 716 (N.D. Ga. 1986), were decided after trial. *Broadcast Music* was also decided before the Supreme Court established the current *per se*

---

[3]    ABPN asserts that "Plaintiff's entire complaint, and each of its causes of action, is built" on illegal tying. Def. Br. 4. In fact, illegal tying is but one example of ABPN's anticompetitive conduct supporting the illegal monopolization claim in Count Two brought under the Sherman Act, Section 2. The only argument ABPN makes with regard to Plaintiffs' illegal monopolization claim is to dispute Plaintiffs' allegation that ABPN has monopoly power in the maintenance of certification market. Def. Br. 11-12.

[4]    Plaintiffs allege MOC is "no uniform standard" at all, and that there is "no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public." ¶¶ 36, 38, 54. Thus, MOC does not even fall within "professional or educational standards" as ABPN assumes.

rule for tying claims in *Jefferson Parish*. Finally, *BCB Anesthesia Care, Ltd. v. Passavant Mem. Area Hosp. Ass'n*, 36 F.3d 664 (7th Cir. 1994), concerned only a staffing decision at a single hospital, and *Found. for Int. Design Educ. Res. v. Savannah Coll. of Art and Design*, 73 F. Supp. 2d 829 (W.D. Mich. 1999), concerned neither illegal tying nor monopolization.

### B. Plaintiffs Adequately Allege that Initial Certification and MOC are Distinct Products.

*Jefferson Parish* establishes the test for whether products combined by a seller are separate or a single product for purposes of a tying claim. "Our cases indicate … that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." 466 U.S. at 19. *See also Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 (7th Cir. 1987). Thus, courts look at whether there is sufficient demand for the tied product separate from the tying product. *Jefferson Parish*, 466 U.S. at 21. Separate demand can be shown when consumers are forced to buy a second product they either do not want or would prefer to buy from another provider. *Id*. at 12. ABPN agrees that whether two products exist is "governed" by their demand. Def. Br. 5.[5]

### 1. Plaintiffs allege separate demand for initial certification and MOC.

In exploring separate demand courts have identified several important factors, all of which have been alleged by Plaintiffs. First, separateness can be satisfied by evidence that the two products have been "sold separately in the past and still are sold separately." *Eastman Kodak*, 504 U.S. at 462. *See also Viamedia*, 218 F. Supp. 3d at 693. Plaintiffs have alleged

---

[5]    ABPN, however, mystifyingly contends that "the entire theory and gravamen" of the Complaint is that doctors do not demand MOC separately from initial certification. Def. Br. 5, fn. 1. As detailed below, Plaintiffs allege precisely the opposite, that there is separate demand. Likewise, ABPN's assertion that Plaintiffs allege only two "factual matters" supporting separate products is yet another distortion of the Complaint, as also detailed below. Def. Br. 6.

exactly that: ¶¶ 19, 22, 67, 70 (ABPN first sold initial certifications in 1935 and did not begin selling MOC until 2002, more than sixty years later); ¶¶ 22, 31, 59 (MOC sold separately after purchase of initial certifications); ¶¶ 25-28, 54 (doctors "grandfathered" by ABPN not required to purchase MOC). ABPN concedes that a history of two products being sold separately is "[r]elevant evidence of separate and distinct consumer demand for the tying and tied products." Def. Br. 5.

Second, courts also consider whether other sellers of the tied product do so without selling the tying product. *See Eastman Kodak*, 504 U.S. at 462 ("service and parts have been sold separately in the past [by different providers] and are still sold separately"); *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 816 (6th Cir. 1997) (that some repair services "do not even involve the purchase of components" is evidence of separate products); *Viamedia*, 218 F. Supp. 3d at 693-94 (firms providing tied but not tying product evidence of separate products); *Park v. Thomson Corp.*, No. 05 Civ. 2931 (WHP), 2007 U.S. Dist. LEXIS 2001, *10 (S.D.N.Y. Jan. 11, 2007) (evidence that other sellers "offer an MBE-only or specific-state course to buyers every year answers the question as to whether there is separate demand for separate courses"). Here, the National Board of Physicians and Surgeons ("NBPAS"), a competing seller of a maintenance of certification product, does not sell initial certifications. ¶¶ 75-77.[6]

Third, courts look to whether consumers "differentiate between" the tied and tying products. *Jefferson Parish*, 466 U.S. at 22 ("the anesthesiological component of the package offered by the hospital could be provided separately and selected either by the individual patient

---

[6] Plaintiffs are filing a separate response to Defendant's Motion Requesting Judicial Notice of NBPAS' Website. (ECF Dkt. No. 24). Suffice it to say, however, ABPN well knows that NBPAS does not sell initial certifications to new doctors demonstrating satisfactory completion of their graduate medical education. ¶ 75. If ABPN truly denies this, the proper place to do so is in an Answer.

or by one of the patient's doctors"). *See also Viamedia*, 218 F. Supp. 3d at 694 (allegation that purchasers prefer to buy from third-party providers supports separate products). Plaintiffs allege that psychiatrists and neurologists "differentiate between" ABPN's initial certification and MOC products: ¶¶ 73, 84 (doctors do not want to buy MOC or would prefer to purchase maintenance of certification products from other providers such as NPBAS); ¶ 75-77 (NPBAS sells only maintenance of certification product, reflecting differentiation by both another market participant and doctors); ¶ 78 (some hospitals (though less than 1 percent) recognize NPBAS maintenance of certification product as maintenance of ABPN initial certification); ¶ 94 (Dr. Lazarou has purchased the NBPAS maintenance of certification product).

Fourth, courts inquire whether the tying seller charges separately for the tied product. *Jefferson Parish*, 466 U.S. at 22 ("anesthesiological services are billed separately from the hospital services petitioners provide"); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991) (fact that the "the bill for [the tied product] is separate" from the bill for the tying product is evidence of separate products). ABPN charges for MOC separately from initial certification. ¶¶ 22, 31, 59, 67, 82, 83. *See also* ¶ 94 (Dr. Lazarou), ¶ 103 (Dr. Akhter).

ABPN's "grandfathering" further confirms that MOC and initial certification are separate. ¶ 25. If ABPN thought initial certification and MOC were a single product, it would not have freed half of psychiatrists and neurologists from buying MOC. ¶¶ 26-28. "Grandfathering" by ABPN also reflects the "different purposes" of initial certification and MOC, demonstrating that not only consumers (psychiatrists and neurologists) but the tying seller (ABPN) also "differentiate[s] between" the two products. ¶ 23.

This case is similar to *Talone*, 2017 U.S. Dist. LEXIS 89395, where the court denied a motion to dismiss brought by osteopathic physicians against the American Osteopathic

Association ("AOA") "for its alleged unlawful tying of board certification [the tying product] and professional association membership [the tied product]." *Id.* at *1. As here, the *Talone* plaintiffs were forced to purchase a separate product or AOA terminated their certifications. The court held that plaintiffs' allegations "show that the AOA ties two distinct products." *Id.* at *15.[7]

ABPN asserts an affirmative defense of consent, noting that Plaintiffs were aware of MOC when they purchased their initial certifications. Def. Br. 5-6. An affirmative defense, however, belongs in an Answer and not in a Rule 12(b)(6) motion. ABPN fails to explain as well how Plaintiffs' foreknowledge of MOC is relevant to the separate demand for initial certification and MOC. Plaintiffs' knowledge that ABPN was going to force them to buy MOC in the future or have their initial certifications terminated did not constitute consent. This lawsuit is proof enough that Plaintiffs have not consented to ABPN's illegal tying.

Lastly, ABPN contends, with no case support, that ABPN's "automatic renewal program" is "proof" that initial certification and MOC are not separate products. Def. Br. 6. ABPN's power to automatically enroll doctors in MOC, however, does not abrogate the separate demand for initial certification and MOC. Rather, it is "proof" of ABPN's monopoly power in the initial certification market and its use of that market power to force doctors to buy MOC. *See Jefferson Parish*, 466 U.S. at 13-14 ("By conditioning his sale of one commodity on the purchase of

---

[7]     *Talone* is more on point than the cases ABPN cites. *See* Def. Br. 8, n. 5. The claim in *Allyn v. Am. Bd. Of Med. Specialties, Inc.*, No. 5:18-cv-00355-OC-30PRL, 2019 U.S. Dist. LEXIS 10805 (M.D. Fla. Jan. 3, 2019), was dismissed on ripeness grounds because the challenged program had not been implemented. *Id.* at *10-11. To the extent the court discussed the substance of the claim, it noted the lack of allegations of "market power" and "forcing" and that "it [was] not clear from the complaint" what separate products were alleged. *Id.* at *14. Here, by contrast, the allegations of market power and forcing are clear, and the separate products are plainly identified. *Collins v. Assoc. Pathologists, Ltd.*, 844 F.2d 473 (7th Cir. 1988), was decided on summary judgment, not a motion to dismiss, and only after plaintiff failed to produce any evidence of a demand for pathologist services separate from the demand for hospital services generally.

another, a seller coerces the abdication of buyers' independent judgment as to the 'tied'

product's merits and insulates it from the competitive stresses of the open market.").[8]

### 2. ABPN's "single product changed" defense is a functional relation analysis rejected by the Supreme Court.

Despite its acknowledgment that whether two products exist is "governed" by their

demand, ABPN's single product "defense" focuses mostly not on demand but on a contention

that initial certification and MOC constitute "a single product changed." Def. Br. 4, 6. This is

wordplay. MOC is not a "changed" initial certification, which ABPN to this day sells to new

doctors to demonstrate satisfactory completion of their graduate medical education. Instead,

more than sixty years after it began selling initial certifications, ABPN created MOC as a distinct

product and sold it to older doctors, "who have been practicing for as long as several decades."

¶¶ 59, 70, 84. *See also* ¶¶ 12, 94, 97 (Dr. Lazarou); ¶¶ 13, 103 (Dr. Akhter). ABPN ignores these

allegations as well as the allegation that initial certification and MOC "are not interchangeable or

a component of one another." ¶ 70.[9]

---

[8]  Nor is ABPN's "automatic renewal program" similar to a "consumer" renewing, for example, a magazine subscription. *See* Def. Br. 6. If consumers choose not to renew a magazine subscription they are not required to return prior issues. Here, if doctors later refuse to buy MOC despite being automatically enrolled by ABPN (itself evidencing separate demand), their prior initial certifications are terminated by ABPN.

[9]  A recent article published by the Journal of the American Medical Association (JAMA), one of the authors of which is the President of the American Board of Medical Specialties ("ABMS"), expressly delineates the difference between initial certification and MOC:

> "[I]nitial certification is the culmination of a structured and supportive graduate medical educational program with rigorous assessment to determine achievement of specialty-based standards. In contrast, the primary intent of continuing [maintenance of] certification is to demonstrate whether diplomates remain current in knowledge and skills and in the application of the advances in medicine."

Colenda CC, Scanlon WJ, Hawkins RE, *Vision for the Future of Continuing Board Certification*, May 17, 2019. doi:10.1001/jama.2019.4815. ABPN is a member board of ABMS, an umbrella organization of twenty-four medical specialty boards that certify doctors in forty specialties and eighty-seven subspecialties. ¶ 14.

ABPN's "single product changed" argument rests on the functional relation between initial certification and MOC. Doctors after obtaining their initial certification must now buy MOC, the alleged purpose of which in ABPN's own words is to "demonstrate that they have continued [ ] lifelong learning." Def. Br. 2. [10] Thus, ABPN argues, "MOC is not a separate stand-alone product … independent of [initial certification]." Def. Br. 5. But this functional relation analysis was rejected in *Jefferson Parish* thirty-five years ago: "[T]he answer to the question whether one or two products are involved turns not on the functional relation between them." 466 U.S. at 19. *See also Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 684 (4th Cir. 1992) ("inquiry into purpose and use is indistinguishable from the inquiry into the 'functional relationship' between products that was rejected in *Jefferson Parish*"); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 63 F. 3d 1540, 1547 (10th Cir. 1995) (incorporating alleged improvement into a package does not necessarily result in one product); *Park*, 2007 U.S. Dist. LEXIS 2001, at *9-11 (rejecting argument that different test preparation products are "a single, functionally integrated package of services").

Moreover, simply asserting at the motion to dismiss stage that "ABPN provides only one product – *i.e.,* board certification" does not make it so. Def. Br. 5. Indeed, when it suits its purposes ABPN refers to board certification as "one product" while in another context, ABPN accurately refers to board certification as merely a "moniker." *Cf.* Def. Br. 2 and 5. The fact ABPN uses the same word "certification" in the name of both its initial certification and MOC products does not *a fortiori* make them one product. MOC is a separate product from initial certification that ABPN now forces doctors to buy to keep the board certification "moniker."

---

[10] "Lifelong learning" is different from initial certification, which tests satisfactory completion of graduate medical education. Further, "lifelong learning" is already fulfilled by psychiatrists and neurologists meeting CME and other State licensing requirements. ¶¶ 17, 72.

As part of its functional relation defense ABPN acknowledges it offered lifelong initial certifications in the past (in fact, for over sixty years), but explains its current "time-limited" initial certifications as simply "requiring additional activities to maintain that certification." Def. Br. 5. This supports the separateness of MOC, which ABPN admits mandates "additional activities" over and above initial certification. ABPN argues lastly that the name MOC (maintenance of certification) "itself dictates it is one product that is sold." Def. Br. 6. An antitrust violation, though, is not ignored simply because of the label the tying seller puts on the tied product. Especially when, as here, ABPN admits it is merely a "moniker." Def. Br. 2. In any event, "maintenance" products are often found to be separate. *See*, *e.g.*, *Eastman Kodak,* 504 U.S at 478-81; *Parts and Elec.*, 826 F.2d at 720 ("[r]epair parts and finished goods have been expressly held to be separate products capable of being tied").

### C. Plaintiffs Allege and ABPN Admits on Its Website that ABPN Forces Psychiatrists and Neurologists to Purchase MOC.

ABPN calls MOC "completely voluntary and optional." Def. Br. 8. But that is contrary to Plaintiffs' express allegations. ¶¶ 25, 48, 55, 67, 74, 90, 92. In fact, ABPN admits on its website that except for the "grandfathered" doctors it exempts from MOC: "participation in the MOC Program is required to maintain certification." ¶ 48.[11] By ABPN's own admission, and despite what its lawyers now say, MOC is not voluntary for doctors who want to or must (as discussed below) keep their previously purchased initial certification.[12]

---

[11]    Its website admission belies ABPN's assertion that there is no "factual underpinning" for Plaintiffs' allegation that ABPN forces psychiatrists and neurologists to purchase MOC. *See* Def. Br. 8.

[12]    The Class herein is defined as: "[A]ll physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications." ¶¶ 6, 111.

Psychiatrists and neurologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to maintain their initial certifications to hold hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. ¶ 48. Thus, doctors must purchase MOC or suffer substantial economic consequences. ¶¶ 48, 89. *See also* ¶ 99 (Dr. Lazarou).[13]

ABPN's illegal tying forces psychiatrists and neurologists into a catch-22: either pay ABPN to prevent it from terminating their initial certifications, or not pay ABPN and sustain the adverse commercial and career impact. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001), *aff'd*, 344 F. 3d 229 (2d Cir. 2003) (because allowing consumers to use credit cards is an economic necessity for businesses, argument of credit card companies that use of their services by those businesses was voluntary deemed illusory).

Finally, ABPN refers to state legislation limiting "independent non-party entities from requiring" MOC. Def. Br. 9. The fact that such legislation is necessary confirms, as Plaintiffs allege, that many hospital, insurers, and others require MOC and that doctors suffer substantial economic consequences when they do not buy MOC. ABPN's reference to the legislation is nonetheless a smoke screen. Discovery of the application and enforcement of the statutes (beyond a Rule 12(b)(6) motion) will show them to be rife with loopholes and ineffective.

### D. Plaintiffs Allege Unreasonable Restraint of Trade.

As previously noted, Plaintiffs allege alternatively both *per se* and rule of reason tying claims. As to the *per se* claim, unreasonable restraint of trade, also referred to in the caselaw as

---

[13] Despite ABPN's intimations, Plaintiffs do not allege illegal forcing or tying on the part of hospitals, insurers, or other non-parties, nor do they allege ABPN has combined or conspired with any such persons or entities in violation of the antitrust laws. *See* Def. Br. 9. Rather, ABPN's "induce[ments]" of such persons and entities is but one example of its anticompetitive conduct alleged in support of the illegal monopolization claim in Count Two brought under the Sherman Act, Section 2. ¶ 81. *See also* ¶¶ 49-50.

unreasonable harm to competition, is presumed. *Sulfuric Acid*, 743 F. Supp. 2d at 864

("Activities such as … tying arrangements are so inherently anticompetitive, they are considered

illegal *per se*.") (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).

As to the rule of reason claim, Plaintiffs allege the following unreasonable harm to

competition arising from ABPN's unlawful conduct:

> "ABPN's illegal tying … has resulted in overly burdensome
> conditions imposed by ABPN on psychiatrists and neurologists
> forced to purchase MOC. These overly burdensome conditions
> raise the cost of the practice of medicine for Plaintiffs and other
> psychiatrists and neurologists; constrain the supply of psychiatrists
> and neurologists, thereby harming competition; and decrease the
> supply of certified psychiatrists and neurologists, thereby
> increasing the cost of medical services to patients and consumers
> and presenting barriers to patient care."

¶ 88. *See also* ¶¶ 9, 89, 92. Thus, Plaintiffs specifically allege unreasonable restraint of trade,

satisfying the additional requirements for a rule of reason tying claim.[14]

ABPN's cases are inapposite. There were no allegations of illegal tying in *AAPS* or that

the defendant restrained competition in the market for a tied product. *AAPS*, 2017 U.S. Dist.

LEXIS 205845. In *DM Res., Inc. v. Coll. of Am. Pathol.*, 170 F.3d 53 (1st Cir. 1999), the alleged

conspiracy was deemed implausible and, thus, there could be no unreasonable restraint of trade.

Finally, *Poindexter v. Am. Bd. Of Surgery, Inc.*, 911 F. Supp. 1510 (N.D. Ga. 1994), was decided

on summary judgment, there was no evidence presented to support the alleged conspiracy, and

plaintiff claimed damage only to his own ability to compete. By contrast, this case is at the

motion to dismiss stage, there is no antitrust conspiracy alleged, and Plaintiffs allege

unreasonable harm to competition. ¶¶ 9, 88, 89, 92.

---

[14]    Plaintiffs do not allege restraint of trade as "the result of independent third-party decision-making
and action" such as by "hospitals, insurers, etc." *See* Def. Br. 10.

## II.     Plaintiffs Allege ABPN Has The Requisite Monopoly (And Market) Power.

ABPN confusingly combines Plaintiffs' Sherman Act, Section 1 and 2 claims in its discussion of monopoly power and market power. Def. Br. 11-12. Plaintiffs, however, properly plead possession of monopoly (and market) power, which is the ability to raise price or exclude competition. *See, e.g., United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

Plaintiffs' Sherman Act, Section 1 claims allege illegal tying. ¶¶ 118-122. Market power in the tying market (initial certification) is an element of those claims. *See* p. 5, *supra*. Plaintiffs allege ABPN possesses monopoly power (and hence market power) in the initial certification market: "[N]o other organization or entity has ever offered meaningful competing initial certifications for psychiatrists and neurologists" and "there are high barriers to entry in the market for initial certification." ¶ 68. ABPN has long enjoyed a 100 percent market share in the initial certification market and the monopoly power that goes along with it. *See, e.g., Eastman Kodak,* 504 U.S at 481 (monopoly power inferred from 80 to 95 percent market share); *United States v. Grinnell Corp.*, 384 U.S. 563, 567, 571 (1966) (monopoly power inferred from 87 percent market share). Thus, Plaintiffs allege (more than) the requisite ABPN market power in the initial certification market for their illegal tying claims.

Plaintiffs' Sherman Act, Section 2 claim alleges illegal monopolization in the separate market for maintenance of certification. ¶¶ 123-126. Plaintiffs allege ABPN's monopoly power in that market. ¶¶ 2, 5, 73, 79, 80, 87. ABPN attacks these allegations by focusing on the amount it charges for MOC. Def. Br. 12. But ABPN does not contest its ability to control the price of MOC. Nor could it since ABPN also has an almost 100 percent market share in the maintenance of certification market. ¶ 78 (NPBAS maintenance of certification product accepted by only one

16

percent of hospitals and no insurers). While ABPN disputes Plaintiffs' allegations of supracompetitive pricing, that presents a fact issue not properly considered on a Rule 12(b)(6) motion. Def. Br. 12. And no matter how ABPN slices and dices the data to soft pedal the facts, Plaintiffs allege specific price data showing that ABPN currently charges more than double for MOC compared to the NPBAS maintenance of certification product. ¶ 76.[15]

Finally, Plaintiffs allege many other long-recognized indicia supporting ABPN's monopoly power in the maintenance of certification market in addition to its ability to control price, that ABPN ignores:  ¶¶ 2, 87 (exclusionary acts); ¶¶ 4, 9 (reducing competition in the maintenance of certification market); ¶¶ 25, 29, 55, 56 (ABPN price discrimination by "grandfathering" doctors); ¶¶ 75-79 (NBPAS inability to gain market share, and as sole competitor indicates high barriers to entry); ¶ 88 (creating barriers to patient care); ¶ 89 (creating barriers to entry to the market for services of psychiatrists and neurologists); ¶ 126 (anticompetitive effects in the market for maintenance of certification).[16] *See generally E.I. duPont de Nemours & Co.*, 351 U.S. at 390-91; *American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946); *Microsoft Corp.*, 253 F. 3d at 51; *Coal Exps. Ass'n. v. United States*, 745 F. 2d 76, 91 (D.C. Cir. 1984) (price discrimination).[17]

---

[15]    ABPN does not address Plaintiffs' allegation that since the advent of MOC its "Net assets or fund balances" account skyrocketed 730 percent from $16,508,407 to $120,727,606, including almost $102 million in cash, savings, and securities on hand at year-end 2017. ¶ 58.

[16]    Plaintiffs' allegation in Paragraph 87 of the Complaint that NBPAS has been "shut out of a substantial portion of the market for maintenance of certification" contradicts ABPN's assertion that "[n]owhere in the Complaint" is there an allegation that competition has been "driven-out." *See* Def. Br. 12.

[17]    *AAPS* is the only case ABPN cites in support of its position that Plaintiffs' allegations of market power and monopoly power are insufficient. *AAPS*, 2017 U.S. Dist. LEXIS 205845. The defendant there, however, was not alleged to have a 100 percent market share. Nor, apparently, did plaintiff there allege the other indicia of monopoly power that Plaintiffs here allege.

### III.     Plaintiffs' Claims Were Timely Filed Within The Limitations Periods.

Statute of limitations is an affirmative defense, which in this Circuit is "typically unsuitable for consideration at the motion to dismiss stage." *Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 765 (N.D. Ill. 2014). ABPN, however, asserts Plaintiffs' claims are time-barred on their face. Def. Br. 12-13. They are not. Timeliness here is not properly viewed in the first instance through the lens of the discovery rule, as ABPN wrongly assumes. Instead, "[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) ("improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place"). *See also U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003).[18]

This means that "the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete." *United States  v. Spectrum Brands*, No. 18-1785, 2019 U.S. App. LEXIS 13934, *26 (7th Cir. May 9, 2019) (emphasis in original). "Each discrete act with fresh adverse consequences starts its own period of limitations." *Xechem*, 372 F.3d at 902. Thus, Plaintiffs need only allege injuries coupled with "overt acts" by defendant within the four-year limitations period. *Gumwood HP Shop. Ptners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 U.S. Dist. LEXIS 35759, *38 (N.D. Ind. Mar. 18, 2016).

In tying cases, so long as the defendant "enforce[d] the tie during the limitations period" the overt act requirement is met. *Gumwood*, 2016 U.S. Dist. LEXIS 35759, at *40. *See also*

---

[18]     In an antitrust case, "if a continuing violation extends into the statutory period, the victim is entitled to complain about the whole violation, no matter how long ago it began." *Brunswick Corp. v. Riegal Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984).

*Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d  928, 937 (S.D. Ohio 2009) (overt acts met by "continuing to maintain" the illegal tying). The overt act requirement can also be met by "continued modification" of the tying during the limitations period that "inflicts 'a new and accumulating injury.'" *Smith v. Ebay Corp.*, No. C 10-03825 JSW, 2012 U.S. Dist. LEXIS 1211, *8, *13 (N.D. Cal. Jan. 5, 2012) (internal citation omitted).[19]

Plaintiffs allege injuries and an abundance of overt acts, for example:  ¶¶ 98-99 (Dr. Lazarou); ¶¶ 105-09 (Dr. Akhter); ¶¶ 9, 88, 89, 92 (actual harm to competition in the maintenance of certification market, including affecting Dr. Lazarou and Dr. Akhter as market participants); ¶¶ 35-38, 40-46 (ABPN's continued modification of tied product (MOC)); ¶¶ 25, 48, 55 (ABPN enforced the illegal tying throughout the limitations period). At the very least, whether the requisite injuries and overt acts occurred within the four year limitations period raise these and other material fact questions that cannot be resolved on a Rule 12(b)(6) motion.

Similarly, ABPN's discovery rule argument rests on the assumption that Plaintiffs were injured only when they purchased their initial certifications. Def. Br. 13. First, Plaintiffs are not even challenging ABPN's initial certification requirements. Second, this is simply a reiteration of ABPN's argument that Plaintiffs' foreknowledge of MOC constituted some kind of consent. *See* p. 10, *supra*. Third, when the injuries to Plaintiffs from being forced to buy MOC occurred raises material fact questions. For example, ABPN contends the last "major" change to MOC was in 2012. Def. Br. 13. In fact, as Plaintiffs clearly allege, substantial changes were made to MOC in 2017 and again as recently as six months ago in January 2019. ¶¶ 40-41. This case falls squarely in line with the ample precedent that application of the discovery rule is fact intensive and not

---

[19]    *Witt Co. v. Riso, Inc.*, 948 F. Supp. 2d 1227, 1237-38 (D.Or. 2013), relied on by ABPN, supports timeliness here, by noting that claims based on the conduct within the limitations period would have been timely had it been substantively actionable. Def. Br. 14.

properly considered on a motion to dismiss. *Gordon v. Ortho McNeil Pharma., Inc.*, 430 F. Supp. 2d 814, 818 (N.D. Ill. 2006).[20]

## IV.     Plaintiffs State A Claim For Unjust Enrichment.

Plaintiffs allege they conferred a benefit on ABPN (their MOC fees), that ABPN wrongfully obtained those fees by forcing Plaintiffs and other psychiatrists and neurologists to buy MOC or have their certifications terminated, and it would be unjust for ABPN to retain MOC fees obtained as a result of its unlawful conduct. ¶¶ 4, 32, 55, 89, 128-130. This is all that is required at the pleading stage to state a claim for unjust enrichment. *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 U.S. Dist. LEXIS 21518, *50 (N.D. Ill. Feb. 24, 2015).

ABPN nevertheless argues that because a written agreement governs the parties' relationship, Plaintiffs cannot state a claim for unjust enrichment. Def. Br. 14. But Plaintiffs plead neither the existence nor breach of a contract. And ABPN itself does not identify the contract, describe its subject matter, or provide its terms or provisions. In any event, Plaintiffs' claim that ABPN was unjustly enriched due to its unlawful conduct forcing Plaintiffs to buy MOC is outside the scope of any contract the parties could have entered. *See Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, No. 14 C 1512, 2017 U.S. Dist. LEXIS 42980, *41 (N.D. Ill. Mar. 24, 2017) (unjust enrichment claim can proceed when claim falls outside the contract).

## CONCLUSION

For all of the reasons stated above, Plaintiffs request that the American Board of Psychiatry and Neurology's Motion to Dismiss Plaintiffs' Class Action Complaint be denied.

---

[20]     The five-year limitations period for the unjust enrichment claim also begins to run when the last payment is made. *Chicago Title Ins. Co. v. Plitt Theaters*, No. 95 C 3892, 1995 U.S. Dist. LEXIS 18009, *11 (N.D. Ill. Nov. 28, 1995) (claim accrues on final payment).

Date: June 17, 2019

Respectfully submitted,

/s/  C. Philip Curley

C. Philip Curley
Cynthia H. Hyndman
Laura R. Feldman
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: 312.663.3100
Fax: 312.663.0303
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
lfeldman@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
Tel: 312.750.1265
Fax: 312.212.5919
kcarroll@carlsonlynch.com

*Attorneys for Plaintiffs Emily Elizabeth Lazarou
and Aafaque Akhter*