# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| EMILY ELIZABETH LAZAROU, | ) | |
| and AAFAQUE AKHTER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01614 |
| | ) | |
| AMERICAN BOARD OF PSYCHIATRY | ) | |
| AND NEUROLOGY, | ) | CLASS ACTION |
| | ) | Trial by Jury Demanded |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter, ("Plaintiffs"), for their

Complaint against Defendant American Board of Psychiatry and Neurology ("ABPN" or

"Defendant") hereby allege as follows:

### INTRODUCTION

1.      This case is about ABPN's illegal and anti-competitive conduct in the market for

initial board certification of psychiatric physicians ("psychiatrists") and neurological physicians

("neurologists") and the market for maintenance of certification of psychiatrists and neurologists.

ABPN is illegally tying its initial certification product to its maintenance of certification product,

referred to by ABPN as MOC.

2.      This case is also about ABPN's illegal creation and maintenance of its monopoly

power in the market for maintenance of certification. ABPN is the monopoly supplier of initial

certifications for psychiatrists and neurologists. Beginning in or about 1994, ABPN used its

monopoly position in the initial certification market to create a monopoly in the market of

maintenance of certifications for psychiatrists and neurologists, which is the subject of this lawsuit. Since then, ABPN has used various anti-competitive, exclusionary, and unlawful actions to promote MOC and prevent and limit the growth of competition from new providers of maintenance of certification for psychiatrists and neurologists. ABPN's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by psychiatrists and neurologists.

3.     The tying product is ABPN's initial board certification, which it sells to psychiatrists and neurologists nationwide. ABPN currently sells initial certifications in three primary areas: psychiatry, neurology, and child neurology, and fourteen subspecialty certifications within the fields of psychiatry and neurology. Many psychiatrists and neurologists hold multiple ABPN certifications, purchasing one or more initial certifications or subspecialty certifications.

4.     The tied product is MOC, ABPN's maintenance of certification. ABPN has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABPN has forced psychiatrists and neurologists to purchase MOC, charged supracompetitive monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5.     Approximately 70,000 psychiatrists and neurologists have purchased initial ABPN certifications. ABPN has throughout the relevant period controlled the market for initial certification of psychiatrists and neurologists in the United States. Through its MOC program, ABPN has also controlled the market for maintenance of certification of psychiatrists and neurologists. ABPN has unlawfully obtained and maintained its monopoly power in the market

for maintenance of certification services for the anti-competitive purpose of requiring psychiatrists and neurologists to purchase MOC and not deal with competing providers of maintenance of certification services.

6.     Plaintiffs bring this Class Action to recover damages and for injunctive and other equitable relief on behalf of all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications.

## JURISDICTION AND VENUE

7.     Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABPN's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

8.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

9.     ABPN sells its initial certifications and its MOC product in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABPN's initial certification services and its MOC program are sold by ABPN in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABPN's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiffs and other psychiatrists and neurologists to purchase MOC, charging supracompetitive monopoly prices for MOC, and reducing competition in the maintenance of certification market.

10.     ABPN is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABPN is found in and transacts business herein.

11.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because ABPN resides in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred herein.

## PARTIES

12.      Plaintiff Emily Elizabeth Lazarou, MD ("Dr. Lazarou") is a graduate of the University of Texas Medical School. She completed her residency in general adult psychiatry in 2006 at USF Health at University of South Florida in Tampa, Florida, where she also served as Chief Resident of Psychiatry and in 2007 completed a fellowship in forensic psychiatry. She has been a practicing psychiatrist since 2008. Dr. Lazarou is a resident of Florida.

13.     Plaintiff Aafaque Akhter, MD ("Dr. Akhter") finished medical school at Patna Medical College in Bihar, India, and received his diploma in psychological medicine from the Royal College of Surgeons in Ireland. He has also passed the MRCPsych (I) examination conducted by the Royal College of Psychiatrists, London, United Kingdom. Dr. Akhter completed his residency in general adult psychiatry in 2002 at Harvard Medical School. Dr. Akhter has been a practicing physician since 2003 and is a resident of New York.

14.     Defendant ABPN is incorporated under the laws of the State of Delaware with its principal place of business at 7 Parkway North, Deerfield, Illinois, and files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization. ABPN is a member board of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in forty specialties and eighty-seven subspecialties.

4

## **BACKGROUND**

15.     Licenses to practice medicine in the United States are granted by medical licensing boards of the individual States. To obtain a license a physician must, among other things, have either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO") and pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

16.     According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care." Similarly, the NBOME website provides that its examination assesses "competence in the foundational competency domains required for general physicians to deliver safe and effective osteopathic medical care and promote health in unsupervised clinical settings."

17.     Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuing medical education courses, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

18.     According to the ABMS website, initial certification demonstrates "expertise in a medical specialty." A recent ABMS publication likewise describes initial board certification as

an assessment of "medical knowledge, clinical knowledge, and diagnostic skills." Most

psychiatrists and neurologists purchase initial ABPN certifications. Those who do not may

include researchers, teachers, academics, and others who may not regularly treat patients.

19.     To obtain initial ABPN certification a physician must, among other things, pass

an ABPN-administered examination. ABPN first began selling initial certifications in 1935.

20.     No State requires initial ABPN certification for a psychiatrist or neurologist to

obtain a license to practice medicine.

**ABPN Requires Psychiatrists and Neurologists
to Purchase MOC to Maintain Their Initial Certifications**

21.     Initially, ABPN primary certifications and its subspecialty certification in child

and adolescent psychiatry were lifelong and no subsequent examinations or other requirements

were imposed by ABPN on psychiatrists and neurologists.

22.     In or about 1994, however, ABPN announced it would no longer issue lifelong

initial certifications. Instead, it would issue ten-year certificates and require participation in a

new maintenance of certification program, which ABPN called its 10-Year MOC Program. This

required, among other things, passing a secure, proctored, high-stakes, cognitive MOC

examination every ten years; completing a specified number of CME credits, including a certain

number of Self-Assessment ("SA") CME activities pre-approved by ABPN; and fulfilling

burdensome and meritless Improvement in Medical Practice ("PIP") requirements.

23.     A recent ABMS publication explains that a maintenance of certification program

such as ABPN MOC "requires a different set of expectations and requirements" than initial

certification, and "clarif[ies] that initial certification and continuing certification have different

purposes."

6

24.     ABPN asserts on its website that ABPN MOC has "guaranteed that physicians were current in ways not immediately available for testing," without citing any evidence in support of its "guarantee."

25.     All ABPN-certified psychiatrists and neurologists are required to purchase MOC to maintain their ABPN certifications, *except that* physicians who purchased initial ABPN certifications prior to October 1, 1994, are "grandfathered" by ABPN: they are exempt from MOC and yet are reported on ABPN's website as "Certified" and holding a "certificate valid indefinitely." Upon information and belief, "grandfathered" psychiatrists and neurologists who have voluntarily taken and failed MOC examinations are still reported by ABPN as "Certified." ABPN reports "grandfathered" psychiatrists and neurologists as "Certified" even though they do not participate in MOC, solely because they purchased an initial ABPN certification before it began issuing only time-limited certificates.

26.     Thus, ABPN holds "grandfathered" physicians to a different standard than their peers, despite the fact these older physicians can be many years out of their residency training and may be among those least up to date on current medical practices.

27.     The President and CEO of the American Board of Internal Medicine ("ABIM"), like ABPN a member board of ABMS, has been quoted as admitting with respect to a similar "grandfather" exemption for internists, that "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify."

28.     Upon information and belief, up to 50% of psychiatrists and neurologists who have obtained an initial ABPN certification have been "grandfathered."

29.     After it stopped issuing lifetime certificates, ABPN has charged MOC fees up to an annual average of $212.50 per physician, not including subspecialty costs. Throughout most

7

of this time, no other organization or entity offered competing maintenance of certification for

psychiatrists and neurologists. ABPN continues to exempt "grandfathered" psychiatrists and

neurologists from the requirement to purchase MOC and to report them as "Certified." These

ABPN MOC fees are in addition to State medical license fees and federal and State fees to

prescribe controlled substances for patient care, which psychiatrists and neurologists also pay

and that total several hundred dollars annually.

30.     ABPN has realized to date tens of millions of dollars in ABPN MOC revenue

from psychiatrists and neurologists who have purchased ABPN initial certifications. In addition,

psychiatrists and neurologists, to their financial and personal detriment, have been required to

take countless hours away from their practice and family in order to prepare for and take required

examinations and to complete other MOC requirements. MOC also takes time away from

patients and detracts from relevant patient services, to the detriment of ongoing patient care.

31.     ABPN automatically enrolls all psychiatrists and neurologists in MOC after they

have obtained an initial ABPN certification.

32.     Physicians ineligible to be "grandfathered" who choose not to buy MOC, pay

MOC fees, and complete MOC requirements are reported on the ABPN website as "Not

Certified," even though they obtained initial ABPN certifications.

33.     The ABPN ten-year cognitive MOC examination does not meet the stated goals of

maintenance of certification of continuous and ongoing learning and improvement. For example,

the American Board of Radiology ("ABR"), another member board of ABMS, also requires a

ten-year cognitive MOC examination. ABR's David Laszakovits, however, has acknowledged

that it "became pretty apparent pretty quickly" that the ten-year examination "did not meet the

aims of maintenance of certification" and had no "formative aspects to aid in continuous learning and continuous improvement." [1]

34.     Similarly, ABPN President and CEO, Dr. Larry R. Faulkner ("Dr. Faulkner") conceded in 2014 that the ABPN ten-year cognitive MOC examination "might be modified to more closely resemble what happens during diplomates' professional activities, including the possibility for diplomates to have access to relevant reference material during MOC examinations." Five years later, however, ABPN still uses the same ten-year cognitive MOC examination.

35.     ABPN MOC requirements are a constantly moving target and have gone through many iterations over the years, varying wildly in substantial ways depending upon, among other things, when a physician obtained his or her most recent time-limited certificate.

36.     By 2010, eight different sets of MOC requirements were mandated as part of the 10-Year MOC Program, depending on when between 2001 and 2009 a physician's last time-limited certificate was issued. There is no available evidence suggesting ABPN evaluated whether any of these MOC requirements actually met the stated goals of maintenance of certification before they were imposed, or whether the eight different sets of requirements would yield comparative results. In other words, no meaningful analysis could be made whether ABPN MOC had met the stated goals of maintenance of certification before the requirements were abruptly changed. And due to the ever-shifting MOC requirements, there was no uniform standard against which to assess and compare, for example, a physician with a 2003 certification and one with a 2008 certification.

---

[1] OLA Webinar, The American Board of Radiology, https://youtu.be/zCeWCAoGAzo (published December 4, 2018).

37.     In 2012, just two years later, ABPN announced more changes to MOC, re-designing the product completely and re-branding it as Continuous Maintenance of Certification ("C-MOC"). ABPN also announced at the same time that the 10-Year MOC Program was scheduled to sunset in 2021. Physicians with time-limited certificates issued in 2012 and later are now required to participate in C-MOC. The required MOC activities are different under C-MOC and compliance is evaluated every three years rather than every ten years, except that the ten-year cognitive MOC examination is still required. Thus, ABPN is now selling two different MOC products. As the ABPN website states, there are "two active MOC programs and specific activity requirements exist for each." Again, there is no available evidence suggesting that ABPN evaluated whether C-MOC actually met the stated goals of maintenance of certification before it was imposed.

38.     Having in place "two active MOC programs" has further exacerbated the already existing flaws in ABPN MOC noted above. Now there are two different MOC products, neither of which has been in place long enough to analyze whether the stated goals of maintenance of certification are being met. And the fact that two entirely different MOC products are being imposed in parallel further underscores the lack of a uniform MOC standard to assess and compare physicians. ABPN's Dr. Faulkner has characterized ABPN MOC as "continuously evolving," as if that were a virtue. In fact, the opposite is true.

39.     ABPN also used C-MOC to raise its MOC fees. At the time ABPN announced C-MOC, it charged an application fee ($700) and examination fee ($800), at or close to the time the MOC examination was taken, resulting in an average annual MOC fee over ten years of $150, not including subspecialty costs. Under C-MOC, ABPN instead charges an annual MOC fee of $175.

40.     In 2017, ABPN's "continuously evolving" MOC product was changed yet again, adding a new, so-called "patient safety activity." As before, there is no available evidence suggesting that ABPN evaluated whether this new requirement actually met the stated goals of maintenance of certification before it was imposed.

41.     In January 2019, after just another two years, ABPN again changed its MOC product, re-inventing it for at least the seventh time. ABPN introduced an optional Pilot Project as an alternative to the ten-year cognitive MOC examination, limited just to physicians whose time-limited certifications expire between 2019 and 2021. The new on-line cognitive test requires physicians to select within a three-year period at least thirty but no more than forty medical journal articles pre-approved by ABPN, and correctly answer four out of five multiple-choice questions for each. ABPN refers to these as "mini-exams" and if fewer than thirty "mini-exams" are passed, the physician must take the ten-year cognitive MOC examination. In other words, only 120 out of a possible 200 questions, or just 60%, need be answered correctly. Why does passing thirty "mini-exams" suffice, but passing twenty-nine does not? Why can only forty pre-approved articles be chosen? Is a physician who needs to take forty-one "mini-exams" to pass thirty unworthy of ABPN certification? How were these seemingly arbitrary parameters set? These are just some of the unanswered questions about the Pilot Project.

42.     Once again, there is no available evidence suggesting that ABPN evaluated the Pilot Project before it was imposed. It is highly questionable that the Pilot Project, any more than its many antecedents, has "guaranteed" that physicians are "current" -- as ABPN promises on its website – or that the stated MOC goals of continuous and ongoing learning and improvement are being met.

43.    An articles-based cognitive test such as the Pilot Project, in addition to apparently being designed so that all or most physicians pass, is redundant of the CME credits already required for physicians to maintain their State license to practice medicine. CME activities and journal articles both serve the same goal of keeping physicians up to date on new medical developments. CME providers represent a range of organizational types, including professional societies, hospitals and health systems, government agencies, medical schools, and publishing and education companies. They already provide over 160,000 educational activities each year, comprising one million hours of instruction and 28 million interactions with physicians and physician teams. The thirty journal articles making up the Pilot Project pale in comparison to these already-existing CME programs. CME is also already designed to identify knowledge gaps, develop educational programs to address those gaps, and utilize adult learning principles to give physicians the skills, competencies, and intellectual fulfilment required for their practice. These are precisely the goals of ABPN MOC. The Pilot Project, like all prior iterations of ABPN MOC, validates nothing more than ABR's ability to force psychiatrists and neurologists to purchase MOC and continue assessing MOC fees. Further, journal articles and their underlying research too often lack independence, and can reflect the interests and biases of sponsoring institutions and medical and pharmaceutical corporations.

44.    The Pilot Project also has many of the same flaws as the ten-year cognitive MOC examinations. The pre-approved journal articles may not fit the interest of the physician or be relevant to his or her clinical practice. Nor does the process represent their actual work environment, as a psychiatrist or neurologist does not have the luxury of waiting weeks, months, or even years to arrive at a clinical diagnosis or conclusion. The Pilot Project also does not ensure continuous learning; instead, like the ten-year cognitive examination, completion can be

"crammed" into a short time period, including at or near the expiration of the MOC evaluation period. In addition, while ABPN provides on-line links to its pre-approved journal articles at least some must be purchased, adding to the cost of ABN MOC

45.     Because it has only been in place a matter of weeks, little more is known about the Pilot Project or how it is being implemented, except that ABPN has not yet committed to eliminating the ten-year cognitive MOC examination, adding to the uncertainty of what ABPN MOC will look like in the future.

46.     What has become a constantly moving target of ABPN MOC requirements has not only been confusing and enforced by ABPN unfairly, it has made it impossible to undertake any meaningful analysis whether, as ABPN claims, there is a causal relationship between any of the many iterations of ABPN MOC and a beneficial impact on physicians, patients, or the public.

47.     The American Academy of Neurology (with more than 25,000 members worldwide) has criticized ABPN MOC, challenging in particular the burdensome and meritless PIP requirements, "especially in the absence of convincing research showing that it is effective in improving physicians' practice and the quality of care they provide." The American Psychiatric Association and many State-based associations have voiced similar objections.

48.     MOC has become increasingly mandatory for psychiatrists and neurologists across the country. ABPN admits on its website that "participation in the MOC Program is required to maintain certification for diplomates with time-limited certificates." Moreover, Plaintiffs and other psychiatrists and neurologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABPN-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other

requirements of the practice of medicine. To create an incentive to purchase MOC, ABMS and its member boards also obtained as part of the Affordable Care Act a 0.5% Medicare payment incentive for physicians participating in MOC. Some health plans pay bonuses or higher fees to physicians for completing MOC activities. As a result of these and other circumstances described herein, ABPN-certified psychiatrists and neurologists are forced to purchase MOC or suffer substantial economic consequences.

49.     As another example of how MOC is becoming mandatory, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. Many hospitals, upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, have adopted by-laws mandating that physicians purchase MOC. This is magnified in hospital markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

50.     As another example, many Blue Cross Blue Shield companies ("BCBS"), upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, require physicians to participate in MOC to be included in their networks. In addition, patients whose doctors have been denied coverage by BCBS because they have not complied with MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

51.     As a further example, doctors who lose hospital privileges because they have not complied with ABPN MOC requirements face the possibility of also losing coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

52.     As with initial ABPN certification, no State requires ABPN MOC for a psychiatrist or neurologist to be licensed.

53.     Twenty-five years after ABPN began issuing time-limited certificates and forced psychiatrists and neurologists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research, which is notably lacking with regard to ABPN MOC and its claimed salutary impact.

54.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts, among others, that: (a) ABPN does not require the many thousands of physicians it has "grandfathered" to comply with MOC, and (b) ABPN keeps changing its MOC requirements without allowing sufficient time to evaluate the efficacy and value of its "continuously evolving" product. Indeed, at least two other ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

55.     ABPN's website makes clear that except for those "grandfathered" by ABPN, initial ABPN certifications can be maintained only by purchasing ABPN MOC. By requiring physicians to purchase MOC to remain ABPN-certified, ABPN created a wholly new and

artificial market for maintenance of certification that has generated substantial additional fees for ABPN.

56.     By "grandfathering" older psychiatrists and neurologists, ABPN has also discriminated against younger physicians, including women and persons of color, who are under-represented in the group of psychiatrists and neurologists "grandfathered" by ABPN.

57.     The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," "should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." ABPN MOC fails in all of these respects.

**ABPN MOC Revenue**

58.     Between 2004 and 2017, after the advent of ABPN MOC, ABPN's "Program service revenue" account exceeded its "Program service expenses" account by a yearly average of $8,777,319, as reported in its Forms 990 for those years. During that same period of time, ABPN's "Net assets or fund balances" account skyrocketed 730%, from $16,508,407 to $120,727,606. In other words, at year-end 2017, as ABPN MOC revenue continued to grow, ABPN net assets (assets less liabilities) more than septupled, which included, according to its 2017 Form 990, almost $102 million in cash, savings, and securities.

16

59.     These data demonstrate that ABPN MOC is an ever-increasing revenue source and apparently immensely profitable for ABPN. This is not surprising. Recent residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay the bulk of initial certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABPN on older doctors who have been practicing for as long as several decades, and have more financial wherewithal to pay ABPN MOC fees. In short, ABPN created a lucrative new revenue source by imposing MOC on older and more established doctors.

60.     ABPN separately reports on its Form 990 the total amount it pays in "salaries, other compensation, employee benefits," to its roughly 45 employees, which between 2008 and 2017 has averaged approximately $5.5 million. Those amounts include overly generous compensation paid to current ABPN President and CEO, Dr. Faulkner, who was hired by ABPN in 2006 as Executive Vice President, its most senior staff position. In 2007, he was paid total compensation of $500,726 as Executive Vice President. Dr. Faulkner became ABPN President and CEO in 2009. In 2017, the last year for which data could be located, his total compensation as President and CEO was $2,872,861, including a bonus of $1,884,920. Thus, as ABPN MOC revenue continued to grow, Dr. Faulkner's total compensation almost sextupled.

61.     ABPN's pension plan accruals and contributions are also lavish, and between 2009 and 2017 averaged 8.1%. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5%.

## ABPN MOC is Not Self-Regulation

62.     ABPN has arrogated to itself the mantle of self-regulation of psychiatrists and neurologists. For example, former ABMS President and CEO and "grandfathered" ABPN neurologist Dr. Lois Margaret Nora, spoke at the ABPN Crucial Issues Forum 2016. An ABPN publication summarized her remarks as including a description of the medical profession "as a social compact" and "how board certification, at its core, is service to others through professional self-regulation in the past, today and in the future." This and similar statements provide an unwarranted veneer of respectability and integrity to ABPN MOC when, as alleged herein, the facts are to the contrary.

63.     ABPN MOC is not self-regulation for at least two reasons. First, not meeting MOC requirements is not grounds for revocation or suspension of a physician's license to practice medicine or to undertake any other disciplinary action. Those self-regulatory functions are mandated and implemented by the medical licensing boards of the individual States, the only relevant self-regulatory bodies. As alleged above, however, physicians who do not comply with ABPN MOC requirements and who are not "grandfathered" face the loss of hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. In substance, ABPN seeks nothing less than to usurp the medical licensing boards of the individual States as the self-regulatory bodies of the medical profession.

64.     Second, ABPN is not a "self"-regulatory body in any meaningful sense for, among other reasons, its complete lack of accountability. Unlike the medical licensing boards of the individual States, for example, ABPN is a revenue-driven entity beholden to its own financial interests, including those of its directors and staff. ABPN itself is not subject to legislative,

regulatory, administrative, or other oversight by any other persons, entity, or organization. It answers to no one, much less to the psychiatrist and neurologist community which it brazenly claims to self-regulate.

## ABPN's Illegal Conduct in Violation of The Anti-Trust Laws

65.     The product markets relevant to this action are the market for initial board certification of psychiatrists and neurologists and the market for maintenance of certification of psychiatrists and neurologists.

66.     The relevant geographic market is the United States.

67.     By no later than 2002, all physicians purchasing initial ABPN certifications after 1994 have been required to purchase MOC or have their certification terminated by ABPN. Initial ABPN certification is required by ABPN to purchase MOC.

68.     ABPN has throughout the relevant period controlled the market for initial certification of psychiatrists and neurologists in the United States. There are high barriers to entry in the market for initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for psychiatrists and neurologists.

69.     ABPN has market power in the tying market of initial certification of psychiatrists and neurologists.

70.     Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABPN sold initial certification services for more than sixty years before it started selling ABPN MOC establishes that the two markets are distinct.

19

71.     A recent ABMS publication explains that a maintenance of certification program such as ABPN MOC "requires a different set of expectations and requirements" than initial certification, and "clarif[ies] that initial certification and continuing certification have different purposes."

72.     MOC serves substantially the same function as CME. Importantly, however, MOC differs from CME because psychiatrists and neurologists who do not see value in particular CME courses or classes are free to purchase other CME offerings; there is no such meaningful option regarding ABPN MOC.

73.     Physicians have a desire to maintain their initial ABPN certification by purchasing maintenance of certification from other providers, but have been unsuccessful as a result of ABPN's illegal tying and the unlawful and exclusionary use of its monopoly power.

74.     ABPN is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiffs and other physicians have been forced to purchase MOC from ABPN or lose their ABPN certifications.

75.     The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including psychiatry and neurology. NBPAS does not offer initial certifications to psychiatrists, neurologists, or any other physicians, but only maintenance of certification.

76.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid State license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an initial certification has lapsed). NBPAS fees

are vastly lower than those charged by ABPN for its MOC product, and NBPAS maintenance of certification requires vastly less physician time. For example, in 2019, the average annual cost of NBPAS maintenance of certification is $84.50 ($94.50 for a DO), while ABPN charges an annual fee of $175 under C-MOC.

77.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

78.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association ("AHA") and community hospitals. According to the NBPAS website, as of February 26, 2019, only 108 hospitals, approximately one percent of hospitals nationwide, accept NBPAS maintenance of certification and not a single insurance company is known to accept NBPAS maintenance of certification. For example, Blue Cross Blue Shield of Michigan is on record refusing certification through NBPAS. In addition, ABPN does not recognize NBPAS maintenance of certification.

79.     Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABPN.

80.     ABPN also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring physicians to purchase ABPN MOC or lose their ABPN certification.

81.     Upon information and belief, ABPN has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require psychiatrists and

21

neurologists to be ABPN-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

82.     An indication of ABPN's illegal tying and monopoly maintenance is that it is able to charge supracompetitive monopoly prices for MOC, as evidenced by the 550% increase in its "Net assets or fund balances" account between 2004 and 2015, as ABPN MOC revenue continued to grow, and the $91 million in cash, savings, and securities held by ABPN at year-end 2015.

83.     As a direct and proximate result of ABPN's illegal tying and monopoly maintenance, Plaintiffs and other physicians have together been forced to pay tens of millions of dollars in MOC fees and incur other out-of-pocket costs.

84.     Initial certification and maintenance of certification are separate products and services. Numerous board-certified psychiatrists and neurologists do not want to be required to buy ABPN's MOC and/or would seek to obtain maintenance of certification from a source other than ABPN were it worthwhile to do so.

85.     While an analysis of the average cost to comply with the ABPN MOC specifically is not available, one study has projected that complying with ABIM's maintenance of certification costs internists an average of $23,607 in money and time over a ten-year period.

86.     Because of the repeated changes to MOC, physicians purchasing initial ABPN certification and MOC cannot assess the lifetime cost of ABPN certification over the several decades of their practice, making it impossible to calculate the life cycle cost. It is also impossible for physicians to assess how much time away from their patients and families that

participation in MOC will require, because, by ABPN's own admission, MOC is a "continuously evolving" product.

87.    In addition, ABPN has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiffs and other physicians who are forced to buy ABPN MOC at supracompetitive monopoly prices or lose their certification.

88.    ABPN's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABPN on physicians forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiffs and other physicians; constrain the supply of psychiatrists and neurologists, thereby harming competition; and decrease the supply of certified psychiatrists and neurologists, thereby increasing the cost of medical services to patients and consumers and presenting barriers to patient care.

89.    ABPN's illegal tying, exclusive dealing, and monopoly maintenance results in ABPN *de facto* forcing Plaintiffs and other physicians to purchase MOC in order to hold hospital consulting and admitting privileges, receive reimbursement by insurance companies, secure employment by medical corporations and other employers, obtain malpractice coverage, and satisfy other requirements of the practice of medicine. ABPN's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for services of psychiatrists and neurologists.

90.    ABPN is governed and managed by a board of directors that include active participants in the market for services of psychiatrists and neurologists and related markets.

ABPN's restraint on competition in the market for services of psychiatrists and neurologists, demonstrated conflicts of interests, and private anticompetitive motives force psychiatrists and neurologists, other than those "grandfathered" by ABPN, to purchase MOC or lose their ABPN certification.

91.     Any alleged justification ABPN might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

92.     ABPN has economically coerced purchasers of its initial certification to also purchase overpriced, unnecessary ABPN MOC or lose ABPN certification. ABPN's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of psychiatrists and neurologists, to the detriment of their income, reputation, and patients.

## Anti-Trust Injury Suffered By Plaintiffs

**Emily Elizabeth Lazarou, MD**

93.     Dr. Lazarou began practicing as a psychiatrist in 2008 as Associate Medical Director for Behavioral Health at Health Integrated in Tampa, Florida. She has continued practicing as a psychiatrist to the present, and most recently served as Medical Director of Health Integrated until January 2019. Dr. Lazarou has also maintained a private psychiatry practice from 2008 to the present dedicated to providing comprehensive individualized psychiatric medical care, including psychotherapy and medication management. Dr. Lazarou is a member of the Florida Medical Association and the American Academy of Psychiatry and the Law.

94.     Dr. Lazarou obtained an initial certification in psychiatry from ABPN in 2007 and a forensic psychiatry initial subspecialty certification in 2009. Her initial psychiatry certification was not "grandfathered" because it was obtained after 1994. She was automatically enrolled in ABPN MOC upon obtaining her initial psychiatric certification, payed the required MOC fees, and began complying with other ABPN MOC requirements. Dr. Lazarou also pays fees for multiple State medical licenses and fees for federal and State controlled substance licenses. She currently holds NBPAS certifications in psychiatry and forensic psychiatry.

95.     Dr. Lazarou also practices telepsychiatry. In general, telepsychiatry is the delivery of psychiatric assessment and care via telecommunications technology such as teleconferencing. Access to proper psychiatric care, especially in rural and economically underdeveloped areas, is one of the biggest challenges of the American health care system. Telepsychiatry provides patient-centered, affordable, and effective interventions for individuals needing psychiatric care and decreases the cost by providing a more affordable framework for delivering psychiatric services, including making quality mental health care available in any clinic with an internet connection.

96.     Dr. Lazarou also maintains a practice in forensic psychiatry. A forensic psychiatrist examines aspects of human behavior related to the legal process. Dr. Lazarou consults with both plaintiff and defense counsel in the civil arena, including in the areas of medical malpractice, worker's compensation, psychiatric disability determination, sexual harassment, and testamentary capacity. She consults in the criminal arena with counsel for both the prosecution and defense, including competency, sanity, and prediction of dangerousness. Dr. Lazarou's areas of expertise include PTSD, battered spouse syndrome, personality disorders, and

malingering. Forensic psychiatric engagements typically involve formulating expert opinions and providing expert testimony related to those opinions.

97.     After experiencing a high-risk pregnancy, Dr. Lazarou gave birth to her second set of twins in December 2017. Because she was breast-feeding and pumping milk for 45 minutes every three hours, she asked for a private room for her upcoming ten-year cognitive MOC psychiatry examination. Dr. Lazarou was told in an email from ABPN that "[t]he board does not make accommodations for nursing mothers who need to pump during an exam." ABPN did, however, "as a professional courtesy" treat the request "as a comfort aid" which ultimately meant Dr. Lazarou could have to travel up to several hours back and forth to a test center with private rooms, requiring her to be away from her newborn twins and unable to provide them breast milk.

98.     Under those circumstances, Dr. Lazarou was unable to take the MOC examination, her psychiatry ABPN certification lapsed, and she is now reported on the ABPN website as "Not Certified." In addition, ABPN also reports Dr. Lazarou as "Not Certified" in her forensic psychiatry subspecialty, even though that ten-year certificate remains valid through December 31, 2019, as confirmed on the ABPN website. According to ABPN, the subspecialty certification is dependent on Dr. Lazarou maintaining her psychiatry certification, another example of anticompetitive conduct by ABPN.

99.     Because ABPN forces Dr. Lazarou to purchase ABPN MOC to maintain ABPN certification, and due to Dr. Lazarou being reported as "Not Certified" by ABPN, she is no longer able to practice telepsychiatry, notwithstanding her NBPAS certifications, with a resulting loss of income and to the detriment of patients in need of telepsychiatric care. Her opportunities for forensic psychiatry assignments were also diminished. Dr. Lazarou has been told by ABPN

that if she wishes to have her certifications reinstated, she will be required to take the ten-year cognitive MOC examination, even though her forensic psychiatry certificate remains valid through December 31, 2019.

**Aafaque Akhter, MD**

100.　Dr. Akhter is the founder and Medical Director of Norton Health Care, where since 2003 he has practiced addiction psychiatry. Norton Health Care employs eleven physicians and operates clinics in Massachusetts and New Hampshire.

101.　Dr. Akhter was among the first physicians to prescribe Suboxone as a drug dependency treatment modality. Suboxone has become the leading medication used to treat opioid addiction. Suboxone is associated with increased sobriety and reduced painkiller abuse, and mitigates withdrawal symptoms.

102.　Dr. Akhter has served the medical community by instructing more than 3,000 physicians annually between 2002 and 2014 as a Medical Director of Premier Review Inc., preparing United States and foreign medical school graduates studying for USMLE and COMLEX examinations. Dr. Akhter is active in the medical and psychiatric communities and is a member of the American Medical Association, American Psychiatric Association, American Society of Addiction Medicine, the Massachusetts Medical Society, and the Massachusetts Psychiatric Society.

103.　Dr. Akhter obtained an initial certification in psychiatry from ABPN in 2005. His initial certification was not "grandfathered" because it was obtained after 1994. He was automatically enrolled in ABPN MOC upon obtaining his initial certification, paid the required MOC fees, and began complying with other ABPN MOC requirements. He completed all ABPN MOC requirements and his psychiatry certification was renewed in 2014. On January 1, 2018,

Dr. Akhter obtained an initial subspecialty certification in addiction medicine from the American

Board of Preventive Medicine ("ABPM"), with an expiration date January 31, 2028.

Dr. Akhter pays the required fees for both ABPN MOC and ABPM MOC. He also pays fees for

multiple State medical licenses and fees for federal and State controlled substance licenses.

104.    When Dr. Akhter purchased his initial ABPN psychiatric certification in 2005, he

understood it would remain valid for ten years and that he would be required to take the ten-year

cognitive MOC examination to maintain his certification. When he completed his ABPN MOC

requirements in 2014, he expected his certification would remain valid for another ten years.

However, ABPN automatically enrolled him in C-MOC, which instead required him to be

evaluated every three years. As part of each three-year cycle, Dr. Akhter was required to

complete ninety CME credits, including twenty-four credits for Self-Assessment ("SA")

activities. ABPN defines SA activities as "a specific type of CME activity that assist physicians

in recognizing their current knowledge base in order to identify specific topics for gaining further

knowledge." The 2019 ABPN MOC Booklet states that "Diplomates of the ABPN are required

to participate in ABPN-approved Self-Assessment activities relevant to either their specialty

and/or subspecialty."

105.    When Dr. Akhter completed his three-year C-MOC cycle in 2017, he

believed based on the above pronouncements that he had dutifully completed his ABPN MOC

requirements, including the required SA CME activities, by, among other things, obtaining the

initial addiction medicine subspecialty certification and by completing Medscape CME credits

that included self-assessment activities. As detailed further below, however, ABPN arbitrarily

determined that obtaining the subspecialty certification from ABPM, a fellow ABMS board

28

member, including the completion of sixty CME credits that included self-assessment activities, did not fulfill Dr. Akhter's SA CME requirements.

106.    On August 2, 2018, ABPN contacted Dr. Akhter to inform him he had been randomly selected for an audit of his ABPN MOC activities. Specifically, ABPN told Dr. Akhter that his "SA CME requirement has not been met." The ABPN MOC audit process allows physicians being audited ninety days to submit documentation of their activities that have not been separately verified. Physicians who do not provide documentation to ABPN's satisfaction are reported on the ABPN website as "Certified, not meeting MOC requirements." Physicians who do not provide documentation to ABPN's satisfaction by the end of the next three-year C-MOC cycle are reported as "Not Certified," even though, like Dr. Akhter, they hold valid ABPN certifications.

107.    ABPN requires physicians seeking ABPN certification to complete SA CME credits from ABPN-approved providers, which it calls "Sponsor provided SA CME." There is no available information about precisely how ABPN chooses its SA CME sponsors, and there is no known process to petition for approval of other providers of SA CME credit.

108.    Dr. Akhter told ABPN he had completed over sixty CME credits as part of the process of obtaining his initial addiction medicine subspecialty certification and asked ABPN to either recognize those as SA CME credits, or to give him SA CME credits for obtaining his subspecialty certification.

109.    Despite the fact that ABPM and ABPN are fellow ABMS board members, ABPN refused to allow Dr. Akhter any SA CME credit for obtaining his initial addiction medicine subspecialty certification, and refused to recognize any of the CME credits he had

completed as part of the subspecialty certification as SA CME credits. As a result, ABPN reports Dr. Akhter on its website as "Not Meeting MOC Requirements."

110.    But for his automatic enrollment by ABPN in C-MOC, Dr. Akhter would have remained in the 10-year MOC Program, which instead of a three-year cycle requires twenty-four SA CME credits over ten years. Thus, Dr. Akhter would have had until 2024 to complete those credits before being reported as "Not meeting MOC requirements." Finally, sixteen SA CME credits are waived by ABPN for successful completion of the Pilot Project. If Dr. Akhter were allowed to participate in the Pilot Project, he would upon successful completion in or before 2021, satisfy the SA CME requirements under the 10-Year MOC Program.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications. Specifically excluded from this Class are directors, staff, and employees of ABPN, or of any entity in which ABPN has a controlling interest, or any affiliate, legal representative, or assign of ABPN. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

112.    The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 physicians.

113.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not

limited to: (1) whether ABPN is engaging in illegal tying; (2) whether ABPN has illegally created and is maintaining its monopoly power in the market for maintenance of certification; (3) whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class; (4) whether ABPN was unjustly enriched as a result of the conduct alleged in this Complaint; (5) the appropriate injunctive and related equitable relief; and (6) the appropriate class-wide measure of damages.

114. Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and all members of the Class are similarly affected by Defendant's wrongful conduct in that they were all forced to purchase ABPN's MOC in order to maintain certification. Plaintiffs' interests are coincident with and not antagonistic, or in conflict with, other Class members' interests. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs will fairly and adequately protect the interests of other Class members.

115. Plaintiffs have retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

116. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions

by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

117.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

118.    Plaintiffs incorporate by reference all of the above allegations.

119.    ABPN's tying of its initial board certification service and its MOC program is a *per se* violation of Section 1 of the Sherman Act.

120.    Alternatively, even if ABPN's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

121.    There is no legitimate business or other pro-competitive justification for ABPN's illegal tying of its initial certification service to ABPN MOC.

122.    As described above, ABPN's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance in Violation of Section 2 of the Sherman Act

123.    Plaintiffs incorporate by reference all of the above allegations.

124.    ABPN's creation of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

125.    ABPN's maintenance of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

126.     As described above, ABPN's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT THREE

### Unjust Enrichment

127.     Plaintiffs incorporate by reference all of the above allegations.

128.     Plaintiffs and members of the Class conferred a benefit on ABPN in the form of the money and property ABPN wrongfully obtained as a result of Plaintiffs and other physicians being *de facto* forced to pay ABPN MOC fees, as described in detail above.

129.     ABPN has retained these benefits that it acquired from charging Plaintiffs and members of the Class inappropriate, unreasonable, and unlawful ABPN MOC fees. ABPN is aware of and appreciates these benefits.

130.     ABPN's conduct has caused it to be unjustly enriched at the expense of Plaintiffs and the other Class members. As such, it would be unjust to permit retention of these monies by ABPN under the circumstances of this case without the payment of restitution to Plaintiffs and Class members.

131.     ABPN should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against ABPN as follows:

132.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

133.    The unlawful conduct alleged herein be adjudged and decreed:

    a.    A *per se* violation of Section 1 of the Sherman Act;

    b.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    c.    Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act; and

    d.    To constitute unjust enrichment;

134.    Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, and Defendant be required to disgorge the amounts by which it has been unjustly enriched;

135.    Defendant, its affiliates, successors, transferees, assignees and other directors and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

136.    Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

137.    Plaintiffs and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

138.    Plaintiffs and the members of the Class have such other and further relief as the case may require and deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Date: March 6, 2019                                  Respectfully submitted,


                                     /s/  C. Philip Curley


                                     C. Philip Curley
                                     Cynthia H. Hyndman
                                     Laura R. Feldman
                                     Benjamin E. Schwab
                                     ROBINSON CURLEY P.C.
                                     300 South Wacker Drive, Suite 1700
                                     Chicago, IL 60606
                                     Tel: 312.663.3100
                                     Fax: 312.663.0303
                                     pcurley@robinsoncurley.com
                                     chyndman@robinsoncurley.com
                                     lfeldman@robinsoncurley.com
                                     bschwab@robinsoncurley.com


                                     Katrina Carroll
                                     LITE DEPALMA GREEBERG, LLC
                                     111 West Washington, Suite 1240
                                     Chicago, IL 60602
                                     Tel: 312.750.1265
                                     Fax: 312.212.5919
                                     kcarroll@litedepalma.com


                                     *Counsel for Plaintiffs Emily Elizabeth Lazarou*
                                     *and Aafaque Akhter*