# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| GERARD KENNEY, ALEXA JOSHUA, GLEN DELA CRUZ MANALO, and KATHERINE MURRAY LEISURE, | : : : : | CIVIL ACTION |
| Plaintiffs, | : : | No. 18-5260 |
| v. | : : |  |
| AMERICAN BOARD OF INTERNAL MEDICINE, | : : : |  |
| Defendant. | : : |  |

## <u>MEMORANDUM</u>

**ROBERT F. KELLY, Sr. J.**                                          **SEPTEMBER 26, 2019**

Plaintiffs Gerard Kenney ("Kenney"), Alexa Joshua ("Joshua"), Glen Dela Cruz Manalo ("Manalo"), and Katherine Murray Leisure ("Murray") (collectively, "Plaintiffs") bring this action against Defendant American Board of Internal Medicine ("ABIM") alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and a claim of unjust enrichment.

ABIM moves to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs filed a Memorandum of Law in Opposition to ABIM's Motion and ABIM filed a Reply in Support.

For the reasons noted below, ABIM's Motion to Dismiss the Amended Complaint is granted.

I.      **BACKGROUND**[1]

A.      **Initial Certification and Maintenance of Certification Market**

Licenses to practice medicine in the United States are granted by the medical boards of individual states.  (Am. Compl. ¶ 18.)  To obtain a license, a physician is required to, among other things, have a medical degree and to pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME").  (*Id.*)  According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care."  (*Id.* ¶ 19.)

Most states require physicians to periodically complete continuing medical education courses ("CME") to remain licensed.  (*Id.* ¶ 20.)  According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuous medical education, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."  (*Id.*)

ABIM offers its own certification.  Its certification "demonstrates that physicians have completed internal medicine and subspecialty training and have met rigorous standards through intensive study, self-assessment and evaluation" and "encompasses the six general competencies established by the Accreditation Council for Graduate Medical Education."  (*Id.* ¶ 21.)

---

[1] We take the facts alleged in the Amended Complaint as true, as we must when deciding a motion under Federal Rule of Civil Procedure 12(b)(6).  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

Approximately 80% of internists, and almost all practicing internists, purchase initial ABIM certifications. (*Id.*) Those who do not include researchers, teachers, academics, and others who may not regularly treat patients. (*Id.*)

To obtain initial ABIM board certification, a physician must, among other things, pass an ABIM-administered examination. (*Id.* ¶ 22.) ABIM first began selling initial certifications in 1936. (*Id.*) No state requires an initial ABIM certification for an internist to obtain a license to practice medicine. (*Id.*)

At the start, ABIM certifications were lifelong and no subsequent examinations or other requirements were imposed by ABIM on internists. (*Id.* ¶ 24.) However, in or about 1974, ABIM devised a voluntary Continuous Professional Development Program ("CPD") for ABIM-certified internists as a complement to its initial board certification. (*Id.* ¶ 25.) The first CPD examination was administered by ABIM in 1974. (*Id.*) Only 3,355 internists took the voluntary examination. (*Id.*) In 1977, just 2,240 internists took the second voluntary CPD examination. (*Id.*) Only 1,947 internists took the third voluntary examination in 1980. (*Id.*)

Faced with declining participation, and the resulting drop in enrollment fees paid by internists for the voluntary examinations, ABIM announced that it would no longer issue lifelong certifications and would, instead, require internists to take subsequent must-pass examinations. (*Id.* ¶ 26.) By no later than 1990, ABIM issued only time-limited initial certifications and forced internists to take new, must-pass examinations every ten years or lose their ABIM certification. (*Id.*) However, physicians that purchased ABIM initial certifications prior to 1990 were "grandfathered" in and exempt from purchasing these Maintenance of Certification products ("MOC"). (*Id.* ¶ 27.) ABIM still considers these pre-1990 certified internists "certified." (*Id.*)

3

In January 2006, ABIM imposed changes to MOC. (*Id.* ¶ 31.) Internists were now also required to accumulate 100 "MOC points" every ten years by completing medical knowledge and practice performance processes, which resulted in substantial additional MOC fees for ABIM. (*Id.*) No other organization or entity offered competing maintenance of certification for internists at this time. (*Id.*) ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified." (*Id.*) In 2014, in addition to the must-pass examination every ten years, ABIM-certified internists were required to complete an "MOC activity" every two years and a patient safety and patient survey module every five years. (*Id.* ¶ 32.) They were also required to accumulate 100 MOC points every five years, instead of the original ten. (*Id.*)

These changes resulted in substantial additional indirect costs to internists in terms of time taken away from their practice, patients, and families. (*Id.* ¶ 33.) ABIM-certified internists were now also required to "enroll" in MOC. (*Id.*) If they did not, ABIM reported them on its website as "Not Meeting MOC Requirements." (*Id.*) No other organization or entity offered competing MOC for internists at this time. (*Id.*) ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified." (*Id.*)

In 2018, ABIM changed MOC once again. (*Id.* ¶ 34.) Internists are now required to pay an annual program fee to participate in MOC ($160 in 2019 if paid in the year due), in addition to paying an "assessment fee" for MOC examinations. (*Id.*) Those purchasing MOC for internal medicine now have the option of taking a "Knowledge Check-In" test every two years or the single "traditional" must-pass examination every ten years, both of which are now "open-book."

(*Id.*)  ABIM is phasing in the "Knowledge Check-In" option for subspecialties over the next three years.  (*Id.*)

Currently, internists who have not purchased MOC from ABIM are reported on ABIM's website as "Not Certified," even though they purchased an initial ABIM certification.  (*Id.* ¶ 35.) ABIM, however, reports "grandfathered" internists as "Certified" even though they do not participate in MOC solely because they purchased an initial ABIM certification before 1990. (*Id.*)  Allegedly, "grandfathered" internists who have voluntarily taken and failed MOC examinations are still reported by ABIM as "Certified."  (*Id.*)

One analysis projected that complying with MOC costs internists an average of $23,607 in money and time over a ten year period, with costs up to $40,495 for some specialists, and that "[t]he 2015 MOC is projected to cost $5.7 billion [internal reference omitted] over the coming decade" from 2015 to 2024, including time costs resulting from 32.7 million physician hours. (*Id.* ¶ 36.)

Hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year.  (*Id.* ¶ 38.)  The second largest component is physician and clinical services, many of which are now provided by hospitals.  (*Id.*)  Allegedly, with the assistance and encouragement of ABIM, and/or persons affiliated with ABIM, many hospitals have adopted bylaws mandating that physicians purchase MOC.  (*Id.*)  This is magnified in hospital markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals.  (*Id.*)  Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.  (*Id.*)

MOC has become increasingly mandatory for internists across the country.  (*Id.* ¶ 37.) Plaintiffs and other internists are required by many hospitals and related entities, insurance

companies, medical corporations, and other employers to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. (*Id.*) To create incentive for internists to purchase MOC, ABIM also obtained, as part of the Affordable Care Act, a temporary 0.5% Medicare payment incentive for doctors participating in MOC. (*Id.*) As a result of these and other circumstances described herein, ABIM-certified internists are forced to purchase MOC or suffer substantial economic consequences. (*Id.*)

As an example, many Blue Cross Blue Shield companies ("BCBS"), again with the alleged assistance and encouragement of ABIM, and/or persons affiliated with ABIM, require physicians to participate in MOC to receive a panel of patients in their plans or be included in their networks. (*Id.* ¶ 39.) Patients of internists that do not purchase MOC have been told that their physicians are no longer preferred providers and that they should look for another primary care doctor. (*Id.*) In addition, patients whose internists have been denied coverage by BCBS because they have not complied with ABIM's MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. (*Id.*) Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS. (*Id.*)

No state requires ABIM certification for an internist to be licensed. (*Id.* ¶ 41.) Almost thirty years after ABIM's action to require internists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. (*Id.* ¶ 42.) This is in marked contrast with the evidence-based medicine ("EBM") practiced today. (*Id.*) EBM optimizes medical decision-making by emphasizing the

6

use of evidence from well-designed and well-conducted research. (*Id.*) That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts that: (1) ABIM does not require those it has "grandfathered" to comply with MOC, and (2) according to its website, even ABIM's own recently-funded research only "suggest[s] that MOC is a marker of care quality . . . ." (*Id.* ¶ 43.) Indeed, at least two ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent." (*Id.*)

The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." (*Id.* ¶ 46.)

Plaintiffs contend that the product markets relevant to this action are the market for initial board certification of internists and the market for maintenance of certification of internists, while the relevant geographic market is the United States. (*Id.* ¶¶ 47–48.) ABIM's website makes clear that, except for those "grandfathered" by ABIM, certifications "must be maintained through ABIM's MOC programs." (*Id.* ¶ 44.) By requiring internists to purchase MOC to remain certified, ABIM supposedly created a wholly new and artificial market for MOC that has generated substantial fees for ABIM. (*Id.*)

According to ABIM's 2016 Form 990 filed with the Internal Revenue Service, MOC "means something different from initial certification" and "speaks to the question of whether or not an internist is staying current with knowledge and practice in his/her discipline" and is "anchored in whether a physician is meeting a performance standard." (*Id.* ¶ 53.) Thus, MOC serves substantially the same function as CME. (*Id.* ¶ 54.) Indeed, MOC points are granted for some contracted external CME activities from subspecialty societies. (*Id.*) Likewise, completion of some MOC education modules might count towards a physician's state licensure CME requirement. (*Id.*) Importantly, however, MOC differs from CME because if physicians do not see value in particular CME courses they are free to purchase other CME offerings; there is no such meaningful option regarding MOC. (*Id.*)

Beginning in or about 1990, all internists purchasing initial ABIM certifications have been required to purchase MOC or have their certification terminated by ABIM. (*Id.* ¶ 49.) Initial ABIM certification is required by ABIM to purchase MOC. (*Id.*) Throughout the relevant period, ABIM has controlled the market for initial certification of internists in the United States. (*Id.* ¶ 50.) There are high barriers to entry in the market for initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for internists. (*Id.*) According to Plaintiffs, ABIM has the market power in the market of initial certification of internists and has used that power to unlawfully tie its MOC products. (*Id.* ¶¶ 51–52.)

However, internists have a desire to obtain MOC from providers other than ABIM, but have been almost entirely unsuccessful as a result of ABIM's alleged illegal tying and unlawful and exclusionary use of its monopoly power. (*Id.* ¶ 55.) The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing MOC

product to physicians. (*Id.* ¶ 56.) Its product extends to physicians practicing in all twenty-four ABMS specialties, including internal medicine. (*Id.*) NBPAS does not offer initial certifications to internists or any other physicians, but only MOC. (*Id.*)

To obtain MOC from NBPAS, a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid state license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an ABIM certification has lapsed). (*Id.* ¶ 57.) NBPAS fees are vastly lower than those charged by ABIM for MOC, and NBPAS MOC requires vastly less physician time. (*Id.*) In 2017, NBPAS fees were less than 15% of the fees assessed by ABIM for MOC and required much less administrative time for registration. (*Id.*)

According to Plaintiffs, the fact that NBPAS offers MOC, but not initial certification further establishes that the two markets are separate. (*Id.* ¶ 58.) NBPAS has had very limited success. (*Id.* ¶ 59.) In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association ("AHA") and community hospitals, however, as of September 2, 2018, only 91 hospitals, less than one percent, accepted NBPAS maintenance of certification, and not a single insurance company is known to accept NBPAS. (*Id.*) In addition, ABIM does not recognize NBPAS maintenance of certification. (*Id.*) Upon information and belief, organizations in addition to NBPAS, have considered entering, or sought to enter, the market for MOC services. but have been unsuccessful because of the monopoly power and unlawful exclusionary conduct of ABIM. (*Id.* ¶ 60.)

Allegedly, ABIM is illegally tying its initial certification to MOC. (*Id.* ¶ 61.) As a direct and proximate result, Plaintiffs allege that they and other internists have been forced to purchase MOC from ABIM since at least 1990 or lose their ABIM certifications. (*Id.* ¶¶ 61, 65.) ABIM

9

also allegedly created and maintained unlawful monopoly power for MOC by requiring internists to purchase MOC or lose their ABIM certification. (*Id.* ¶ 62.) According to Plaintiffs, ABIM has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require internists to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. (*Id.* ¶ 63.)

ABIM is governed by a board of directors that includes active participants in the market for internists' services and related markets. (*Id.* ¶ 71.) Plaintiffs allege that ABIM's restraint on competition in the market for internists' services, demonstrated conflicts of interests, and private anticompetitive motives force internists, other than those "grandfathered" by ABIM, to purchase MOC or lose their ABIM certification. (*Id.*)

### B.  Background of Named Plaintiffs

#### 1.  Gerard Francis Kenney, MD

Kenney entered private practice in 1995 as a partner in Digestive Health Specialists, Inc. ("Digestive Health") in Seneca, Pennsylvania, and has been practicing gastroenterology for almost 25 years. (*Id.* ¶ 74.) Gastroenterologists diagnose and treat digestive disorders, such as stomach pain, ulcers, reflux, and Crohn's disease. (*Id.*) He served as President of the Venango County Medical Society and Councilor (Region I) of the Pennsylvania Society of Gastroenterology. (*Id.*) Kenney is a member of, among other professional associations, the American Gastroenterological Association and the American College of Gastroenterology. (*Id.*)

Kenney obtained an initial board certification in internal medicine from ABIM in 1993, and a gastroenterology subspecialty certification in 1995. (*Id.* ¶ 75.) ABIM did not

"grandfather" these initial certifications because they were purchased after 1990.  (*Id.*)  Kenney later passed MOC examination in gastroenterology in 2007.  (*Id.*)  Allegedly, a proctor who administered the examination referred to MOC as a "money-making operation."  (*Id.*)

In November 2017, Kenney accepted an offer of employment from Mount Nittany Physicians Group ("MNPG") that would have doubled his income.  (*Id.* ¶ 76.)  MNPG is a multi-specialty group practice owned by Mount Nittany Medical Center in State College, Pennsylvania.  (*Id.*)  In order to assure an orderly transition, Kenney told his partner that he planned to leave Digestive Health at year-end 2017 and would begin employment with MNPG in early 2018.  (*Id.*)  He also told his staff of thirty of his plans, in order to give them time to find alternative employment.  (*Id.*)

Kenney was later told that, in order to be employed by MNPG, he would be required to maintain his ABIM certification in gastroenterology, which was scheduled to be terminated by ABIM effective December 31, 2017.  (*Id.* ¶ 77.)  By this time, Kenney had already decided not to take the MOC examination again, though he had already paid his MOC annual fees through December 31, 2018.  (*Id.*)  In addition, it was impossible for Kenney to meet MNPG's requirement because ABIM was not offering the MOC gastroenterology examination again in 2017.  (*Id.*)  MNPG then revised its offer, extending Kenney's start date to June 20, 2018, but only contingent upon his passing the next MOC gastroenterology examination, which was scheduled for April 2018.  (*Id.* ¶ 78.)  It was understood that MNPG's offer would be rescinded if Kenney failed the April examination.  (*Id.*)

Kenney had already given his notice of departure to Digestive Health; therefore, he would effectively be unemployed at the end of 2017.  (*Id.* ¶ 79.)  Thus, Kenney, who was unwilling to face at least six months without any income, which would become longer if he did

not pass the MOC examination, decided to reject the revised offer of employment from MNPG. (*Id.*)

ABIM currently reports Kenney as "Not Certified" on its website even though he obtained initial certifications in internal medicine and gastroenterology. (*Id.* ¶ 80.) Plaintiffs contend that this is misleading because it makes it appear as if the initial certifications were revoked due to failure to pass a MOC examination, misconduct, or some similar reason rather than having been terminated by ABIM simply because they had lapsed. (*Id.*) This is reinforced by ABIM's failure to report Kenney's gastroenterology MOC certification in 2007 on its website. (*Id.*) Because of this presentation by ABIM, Kenney appears less qualified to patients, hospitals, insurance companies, medical corporations, other employers, and other. (*Id.*) Kenney believes this method of reporting by ABIM on its website pressures doctors into purchasing MOC. (*Id.*)

### 2. Alexa Joshua, MD

Joshua has provided care for patients in hospital and medical office settings, as well as through visits with home-bound patients. (*Id.* ¶ 81.) She has served patients of ethnically and culturally diverse backgrounds, caring for the insured, underinsured, and uninsured. (*Id.*) In 2013, Joshua was selected for advancement to Fellowship by the American College of Physicians ("ACP"), described on the ACP website as "a mark of distinction representing the pinnacle of integrity, professionalism, and scholarship for doctors pursuing careers in internal medicine," but ultimately declined the invitation for cost reasons. (*Id.* ¶ 81.)

In 1989, Joshua began working as an internist affiliated with Henry Ford Hospital, providing inpatient care as an employee of Metro-Medical Group, a subsidiary of Health Alliance Plan. (*Id.* ¶ 82.) Joshua held consulting and admitting privileges through her affiliation

with Henry Ford Hospital. (*Id.*) In 2000, Joshua founded Amethyst Medical Offices, PLC, d/b/a Docrxtor Patience Medical Clinics, PLC, a private internal medicine practice. (*Id.*) Joshua obtained an initial board certification in internal medicine from ABIM in 2003. (*Id.* ¶ 83.) ABIM did not "grandfather" her initial certification because it was purchased after 1990. (*Id.*)

Also in 2003, Joshua affiliated with Detroit Medical Center ("DMC"), the leading Detroit hospital and largest health care provider in Southeast Michigan. (*Id.* ¶ 84.) Joshua held consulting and admitting privileges at five area hospitals through her affiliation with DMC, allowing her to admit patients and to consult with other doctors regarding their admitted patients. (*Id.*)

In 2009, six years after she began her affiliation with DMC, Joshua and the rest of the DMC medical staff received a written notice titled, "IMPORTANT CREDENTIALING INFORMATION" requiring that effective July 1, 2009, "Board certification must be maintained in those specialty boards that are time-limited." (*Id.* ¶ 85.) Joshua did not pass the required MOC examination in 2014, after which ABIM terminated her certification in internal medicine. (*Id.*) However, she continued to participate in MOC through December 31, 2017. (*Id.*)

After Joshua's certification was terminated by ABIM, her DMC patients were treated by another doctor, who, because he had never been certified by ABIM, was not required by DMC to participate in MOC. (*Id.* ¶ 86.) On June 1, 2016, Joshua was told that BCBS would no longer cover her because it required certification through ABIM. (*Id.* ¶ 87.) Joshua appealed the decision, telling BCBS, among other things, that she had been certified by NBPAS in 2015. (*Id.*) BCBS rejected her appeal. (*Id.*)

Joshua's DMC consulting and admitting privileges expired on December 31, 2017.

(*Id.* ¶ 88.)  Because she had not complied with DMC's certification requirement, she was not allowed to renew those privileges.  (*Id.*)  As a result, Joshua was no longer permitted to provide inpatient care.  (*Id.*)  Joshua was restricted to "Membership Only" status, allowing her to provide only outpatient care to DMC patients.  (*Id.*)

ABIM currently reports Joshua on its website as "Not Certified" even though she obtained an initial certification in internal medicine.  (*Id.* ¶ 89.)  The ABIM website also advises that if a doctor is not listed as certified, "they may be certified by another board of the American Board of Medical Specialties," but does not refer to NBPAS, from which Joshua holds a certification, as an alternative certifying board.  (*Id.*)

### 3. Glen Dela Cruz Manalo, MD

Manalo held teaching appointments at James H. Quillen College of Medicine as a clinical instructor from 1997 to 2000, and at Vanderbilt University School of Medicine as an associate professor of medicine from 2002 to 2007.  (*Id.* ¶ 90.)  Manalo was selected as a top gastroenterologist in Billings, Montana, by the International Association of Healthcare Professionals for 2011.  (*Id.*)  Manalo obtained an initial board certification in internal medicine from ABIM in 1997, and a gastroenterology subspecialty certification in 2000.  (*Id.* ¶ 91.)  ABIM did not "grandfather" these initial certifications because they were purchased after 1990.  (*Id.*)

Manalo served as staff gastroenterologist with Tennessee Valley Health Care Systems, a United States Department of Veterans Affairs medical center, from September 2002 to September 2007.  (*Id.* ¶ 92.)  In  October 2007, Manalo took a position at St. Vincent Healthcare ("St. Vincent") in Billings, Montana, at a base salary of $400,000, capped at $800,000 annually, and also received a lump sum recruitment incentive of $50,000.  (*Id.*)  He replaced a doctor who

14

had recently retired and who had never been certified by ABIM in internal medicine or gastroenterology.  (*Id.*)

Manalo's ABIM certification in internal medicine was terminated in 2007 after he decided not to purchase MOC.  (*Id.* ¶ 93.)  He wrote ABIM on June 6, 2009, among other things, that it was "unfair and outright discriminatory that practitioners certified on or after 1990 are the only ones required to certify" and that he was "interested in recertifying in my subspecialty [gastroenterology] and would do so provided that all are required to certify . . . ."  (*Id.*)  Manalo never received a response or even the courtesy of an acknowledgement of receipt of his email from ABIM, which terminated his certification in gastroenterology, in December 2010, after he again decided not to purchase MOC.  (*Id.*)

St. Vincent told Manalo that he would lose his staff privileges unless he maintained his ABIM gastroenterology certification (which could only be maintained by purchasing MOC) and that ABIM certification was required by the St. Vincent Medical Staff bylaws.  (*Id.* ¶ 95.)  He was told that maintaining his ABIM certification was "also a requirement of many payers [insurance companies] to ensure reimbursement for your services."  (*Id.*)  Manalo offered to earn additional CME credits beyond what was required by the St. Vincent bylaws.  (*Id.*)  He was told, however, that this was not an acceptable alternative to ABIM certification and MOC.  (*Id.*)

Manalo was terminated by St. Vincent effective December 31, 2010, due to his refusal to participate in MOC and purchase a renewal of his ABIM certification.  (*Id.* ¶ 96.)  He was also caused upon his termination to forfeit $33,514.60 in his St. Vincent Retirement Plan account.  (*Id.*)

After looking for employment for several months, Manalo took a position in April 2011 as staff gastroenterologist at Jonathan M. Wainwright Memorial Veterans Affairs Medical Center

("Wainwright") in Walla Walla, Washington. (*Id.* ¶ 100.) His annual salary at Wainwright was $265,000, plus a $66,250 recruitment incentive, which was substantially less than the base salary of $400,000 he had been receiving at St. Vincent. (*Id.*) He remained at Wainwright until its gastroenterology practice closed in July 2017. (*Id.*) Despite actively searching for another position, he remains unemployed. (*Id.*) Although he is eligible for NPBAS certification, he was told by hospitals at which he sought employment that they recognized only ABIM certification and MOC. (*Id.* ¶ 101.) ABIM currently reports Manalo on its website as "Not Certified" even though he obtained initial certifications in internal medicine and gastroenterology. (*Id.*)

      4.    <u>Katherine Murray-Leisure, MD</u>

Murray worked with leprosy and syphilis patients as a Lieutenant JG in the Commissioned Corps of the United States Public Health Service. (*Id.* ¶ 103.) She investigated sand fly-borne leishmaniasis in veterans of Operation Desert Shield and Operation Desert Storm, a disease with ulcers of the skin or inside the nose with cyclic fevers and sometimes an enlarged spleen. (*Id.*) Murray and colleagues shared their medical research findings at microbiology and infections diseases meetings and with the Pennsylvania Medical Society, the American Medical Association, and the United States Congress. (*Id.*) She received national recognition from the United States Department of Veterans Affairs, Veterans of Foreign Wars, and the American Legion. (*Id.*) She has thirty peer-reviewed publications in the field of infectious diseases and is a member of the American Society of Tropical Medicine and the Infectious Diseases Society of America. (*Id.*) Murray is a past President of the Lebanon County Medical Society, Pennsylvania, and is currently a County Delegate for the Massachusetts Medical Society. (*Id.*)

Murray obtained an initial and lifelong board certification in internal medicine from ABIM in 1984. (*Id.* ¶ 104.) She purchased an infectious diseases subspecialty initial ABIM

16

certification in 1990. (*Id.*) Although Murray is "grandfathered" in internal medicine with a lifelong certification, ABIM did not "grandfather" her initial infectious diseases certification because it was purchased after 1990. (*Id.*) Murray was required to purchase infectious diseases MOC recertifications in 2000 and again ten years later in order to maintain her subspecialty certification. (*Id.* ¶ 105.) This required disruptive patient practice questionnaires, two years of test-taking practices, four years of meritless self-evaluation modules, and hours of examinations with standardized two-minute test questions at a remote test site under uncomfortable conditions. (*Id.*)

Murray was the infectious diseases ("ID") consultant and hospital epidemiologist for twenty years, from 1987–2007, at three hospitals in Lebanon, Pennsylvania: the Lebanon Veterans Administration Medical Center, Good Samaritan Hospital, and the Lebanon Valley General Hospital birthing facility. (*Id.* ¶ 106.) In 2010, Murray relocated from Pennsylvania back to Massachusetts, closer to her aging parents, and started infectious diseases consultations in Plymouth, Massachusetts. (*Id.*) She associated with another ID consultant at Beth Israel Deaconess Hospital-Plymouth ("BID-Plymouth") in the South Shore region of Massachusetts, then known as Jordan Hospital. (*Id.*) Holding privileges in infectious diseases at Jordan Hospital was a crucial part of Murray's practice. (*Id.* ¶ 107.)

The Jordan Hospital bylaws required that physicians holding staff privileges, such as Murray, be ABIM-certified in their area of specialty. (*Id.* ¶ 108.) Murray reviewed Jordan Hospital's bylaws, which exempted certain senior physicians, but required all new physicians to have an ABIM certification and participate in MOC in order to continue hospital work in their subspecialty. (*Id.*)

ABIM terminated Murray's infectious diseases certification after she did not pass her MOC examination in 2009. (*Id.* ¶ 109.) Despite strongly supportive patient and colleague recommendations, Murray's infectious disease privileges (but not her "grandfathered" internal medicine privileges) were revoked by Jordan Hospital in May 2011, consistent with the bylaws requirement that Murray maintain her ABIM certification and participate in MOC. (*Id.*) Murray later passed her MOC examination in May 2012, and her infectious diseases privileges were restored by Jordan Hospital. (*Id.* ¶ 111.)

Plaintiffs initiated this class action lawsuit in this Court on December 6, 2018. (Doc. No. 1.) An Amended Complaint was filed on January 23, 2019, asserting violations of Sections 1 and 2 of the Sherman Antitrust Act, Section 1962(c) of the RICO Act, and a claim of unjust enrichment. (Doc. No. 19.) ABIM filed its Motion to Dismiss the Amended Complaint on March 18, 2019. (Doc. No. 22.) Plaintiffs filed a Memorandum of Law in Opposition, (Doc. No. 28), and ABIM filed a Reply, (Doc. No. 31).

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)

(quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)) (internal

quotation marks omitted). However, courts need not "accept mere[] conclusory factual

allegations or legal assertions." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133

(3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678–79). "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555.

Finally, we may consider "only the complaint, exhibits attached to the complaint, matters of

public record, as well as undisputedly authentic documents if the complainant's claims are based

upon [those] documents." *Davis*, 824 F.3d at 341 (quoting *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010)) (internal quotation marks omitted).

### B. Federal Rule of Civil Procedure 9(b)

In order to adequately plead fraud under Rule 9(b), a party "must plead with particularity

'the "circumstances" of the alleged fraud in order to place the [other party] on notice of the

precise misconduct with which they are charged, and to safeguard the [other party] against

spurious charges of immoral and fraudulent behavior.'" *Travelers Indem. Co. v. Cephalon, Inc.*,

620 F. App'x 82, 85 (3d. Cir. 2015) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir.

2004)). However, the United States Court of Appeals for the Third Circuit ("Third Circuit") has

instructed courts not to focus exclusively on the narrow "particularity requirement," but also to

consider the "general simplicity and flexibility contemplated by the rules." *Craftmatic Sec. Litig.

v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989). In the case of corporate fraud, where a party

"cannot be expected to have personal knowledge of the details of corporate internal affairs," a

party may "accompany their allegations with facts indicating why the charges against [another

party] are not baseless and why additional information lies exclusively within defendants'

control." *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994) (quoting *Craftmatic*, 890 F.2d at 646).

## III.   DISCUSSION

Plaintiffs' Amended Complaint alleges several claims against ABIM.  Count I asserts ABIM violated Section 1 of the Sherman Act by unlawfully tying its initial certification, the "tying" product, and its MOC programs, the "tied" product.  (Pls.' Mem. Law in Opp'n Mot. to Dismiss 9–10.)  Count II alleges a violation of Section II of the Sherman Act based on ABIM's "anticompetitive conduct," including unlawful tying, to obtain and maintain monopoly power.  (*Id.* at 20.)  In Count III, Plaintiffs contend that ABIM violated Section 1962(c) of the RICO Act by fraudulent misrepresentations that MCOs have a beneficial impact on physicians, patients, and the public.  (*Id.* at 27–29.)  Count IV alleges a claim of unjust enrichment.  (*Id.* at 37.)  We address these claims in this order below.

### A.   Plaintiffs Fail to Assert a Claim of Unlawful Tying under the Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."  15 U.S.C. § 1.  "[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958).  In order to state a *per se* claim of unlawful tying, a plaintiff must allege that: (1) a defendant seller ties "two distinct products;" (2) the purchase of the tying product is conditioned on the sale of the tied product; (3) the seller possesses market power in the tying product market to coerce purchasers into buying the tied product; and (4) a "not insubstantial amount of interstate

20

commerce is affected." *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (citing *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)); *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 21–22 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *N. Pac. Ry. Co.*, 356 U.S. at 5–6.

The relevant element for our analysis is whether ABIM's initial certification is a separate product from its MOC offering. In its Motion to Dismiss, ABIM contends that its initial certification and MOC are not "distinct" products, but rather a single product. (Def.'s Mem. Law in Supp. Mot. Dismiss 9.) When evaluating whether the two products are "distinct," the court's analysis turns "not [on] a functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19. Meaning, there must be sufficient demand for the purchase of the tied, or unwanted, product separate from the tying, or wanted, product. *Id.* at 21–22. "Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately or the sale of the products separately in similar markets." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (internal citations omitted) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 85–89 (D.C. Cir. 2001); *Kodak*, 504 U.S. at 462).

In *Kodak*, the Supreme Court of the United States ("Supreme Court") found that Kodak's policy of selling replacement parts for micrographic and copying machines only to those who used Kodak Service or planned to repair their own machines was a potential tying arrangement. 504 U.S. at 458, 563. The Supreme Court found that Kodak's intent by not selling parts separate from service was to make it more difficult for third party companies to sell repair and maintenance services for Kodak's machines. *See id.* at 458. Moreover, the Court found that

sufficient consumer demand existed for either the machine services or parts.  *See id.* at 463.

Namely, it found that "[a]t least some consumers would purchase service without parts, because

some service does not require parts, and some consumers, those who self-service for example,

would purchase parts without service."  *Id.*  Therefore, the existence of two distinct markets for

Kodak's separate products created a possible unlawful tying arrangement.  *See id.*

Conversely, in *Kaufman*, a recent decision by the United States Court of Appeals for the

Second Circuit ("Second Circuit"), the court found that there was no tying arrangement where

the plaintiff alleged that a cable company required purchasers who bought a package of

television channels to also lease the cable boxes necessary to transmit that programming.  836

F.3d at 140, 144.  In addressing the plaintiff's allegations that cable boxes and television services

are separate products, including that the cable company separately itemizes charges for leasing

cable boxes and providing television services on consumers' bills, the Second Circuit stated that

to be useful, "a cable box must be cable-provider specific, like the keys to a padlock," and,

despite the allegation of a tie-in, "the core issue is a cable provider's right to refuse to enable

cable boxes it does not control to unscramble its coded signal."  *Id.* at 144.  Accordingly, the

court found that the plaintiffs were unable to show the existence of a demand for cable boxes

separate from the television services.  *See id.* at 145.

In the present case, Plaintiffs assert that separate demand exists for initial certification

and MOC.  (Pls.' Mem. Law in Opp'n Mot. to Dismiss 10–14.)  Plaintiffs offer five reasons to

support their claim.  First, Plaintiffs argue that the products were sold separately in the past,

stating that "ABIM first sold initial certifications in 1936 and did not begin selling MOC until

1990."  (*Id.* at 11 (citing *Kodak*, 504 U.S. at 462).)  Second, Plaintiffs assert that there are other

competitors, specifically NBPAS, that sell MOCs without selling the initial certification.  (*Id.*)

Third, Plaintiffs claim that internists " 'differentiate between' ABIM's initial certification and MOC products" and, therefore, "have a desire to purchase a maintenance of certification product from providers other than ABIM." (*Id.* (citing Am. Compl. ¶¶ 55, 66).) Fourth, Plaintiffs contend that ABIM, itself, differentiates between the products due to ABIM's "practice of both charging for MOC fees separately and distinguishing between initial certification fees and MOC fees on its financial statements." (*Id.*) Finally, Plaintiffs raise the issue of ABIM's policy to "grandfather" internists who purchased initial certifications prior to 1990. (*Id.* at 12.) According to Plaintiffs, ABIM's grandfathering demonstrates that "[i]f ABIM considered initial certification and MOC to be components of a single product, it would not have freed 40% of ABIM-certified internists from buying MOC." (*Id.* at 12.)

We disagree with Plaintiffs and find that ABIM's initial certification and MOC products are part of a single product and do not occupy distinct markets. Not only are we unconvinced by Plaintiffs' arguments, we find that Plaintiffs' entire framing of the ABIM certification to be flawed. In essence, Plaintiffs are arguing that, in order to purchase ABIM's initial certification, internists are forced to purchase MOC products as well. However, this is not the case. As Plaintiffs state in their Amended Complaint, Kenney, Joshua, Manalo, and Murray were all able to purchase ABIM's initial certification without also buying MOC programs. (Am. Compl. ¶¶ 75 (Kenney), 83 (Joshua), 91 (Manalo), 104 (Murray).) Nowhere in the Amended Complaint do Plaintiffs allege that they were forced to buy MOC products in order to purchase the initial certification. In fact, some ultimately decided not to purchase MOC altogether.

This is because what internists are actually buying is ABIM certification. Initial certification is just that, *initial* certification for a specific period of time. (*Id.* ¶¶ 26–34.) In order to obtain the initial certification, internists must pass an "ABIM-administered examination" that

establishes that the internists have "met rigorous standards." (*Id.* ¶¶ 21–22.) The subsequent "maintenance of certification" program allows ABIM to ensure that those it has certified are still able to meet its "rigorous standards" and stay up-to-date on the general practice of internal medicine. (*Id.* ¶¶ 32–34 (highlighting the periodic maintenance programs required by ABIM).) Under the *Jefferson Parish* test, the "character of the demand" for the initial certification and the MOC is the same: certification from ABIM. Internists are not buying "initial certification" or "maintenance of certification," but rather ABIM certification. This is made clear by hospitals and other medical service providers requiring ABIM certification, in general. This fundamental misconception about the nature of the entire certification product offered by ABIM undercuts Plaintiffs' arguments.[2]

Moreover, addressing Plaintiffs' specific arguments, we start with their contention that the sales history supports their claim that initial certification and MOC products are separate because ABIM began selling initial certification "more than fifty years" before requiring MOC. (Pls.' Mem. Law in Opp'n Mot. to Dismiss 11.) However, again this is misleading. While we accept that ABIM started selling initial certification without requiring MOC in 1935, ABIM did not develop and offer its first MOC-style program until 1974–75. (Am. Compl. ¶ 25.) Then,

---

[2] In its Memorandum of Law in Support, ABIM compares its certification process to several franchise cases. (Def.'s Mem. Law in Supp. Mot. to Dismiss 11–12.) For example, ABIM cites *Krehl v. Baskin-Robbins Ice Cream Co.*, in which the United States Court of Appeals for the Ninth Circuit rejected a tying claim where the ice cream franchisor tied the purchase of the ice cream to the purchase of the franchise trademark. 664 F.2d 1348, 1351 (9th Cir. 1982). The *Krehl* court held that the "desirability of the trademark and the quality of the product it represents are so inextricably interrelated . . . as to preclude any findings that the trademark is a separate item for tie-in purposes." *Id.* at 1354. While not a perfect comparator, the franchise model is very instructive in our analysis of ABIM's certification process. Both cases highlight the importance of allowing the company controlling the product to control the quality of the product. *See id.* ("The desirability of the trademark is . . . utterly dependent upon the perceived quality of the product it represents."). For an ice cream franchisor, it is important that it ensures that a customer that wishes to purchase that particular brand of ice cream at franchise location has the same experience as another customer at another location. *See id.* ("[S]ale of substandard products under the mark would dissipate . . . goodwill and reduce the value of the trademark."). Likewise, ABIM has an interest in ensuring that all ABIM-certified internists can meet and maintain the same standards and requirements. Otherwise, hospitals, insurance companies, and patients would lose faith in the ABIM certification process.

fifteen years later, in 1990, ABIM began to require MOC after the initial certification. (Pls.

Mem. Law in Opp'n Mot. to Dismiss 11.) Meanwhile, Plaintiffs initially brought this case in

late-2018, over 28 years after the MOC requirement. Thus, history shows that MOC has been a

requirement of ABIM certification for longer than it has not. Therefore, we give the past sales

history very little weight in Plaintiffs' favor in our analysis. *See Kodak*, 504 U.S. at 462

(examining past sales practices as only one element in determining whether products were

distinct).

Plaintiffs' second and third arguments are related and, again, both misunderstand the

product being offered. Because ABIM offers the certification, it has the right to ensure those

standards are met. Through offering its own MOC program, ABIM has full control over the

standards required to achieve certification. It would entirely alter the nature of the certification if

outside vendors could re-certify internists and potentially disrupt the trust hospitals, patients, and

insurance companies place on the ABIM certification.

While Plaintiffs assert that another organization, NBPAS, offers its own "maintenance of

certification" program, they also state the NBPAS does not offer an "initial certification" or

require an applicant to meet any set of standards. (Am. Compl. ¶ 56; Pls.' Mem. Law in Opp'n

Mot. to Dismiss 11–12.) While NBPAS might offer a cheaper maintenance of certification

program, it is not a sufficient program to maintain ABIM certification. (Am. Compl. ¶ 59

("ABIM does not recognize NBPAS maintenance of certification.").) While they may be

functionally similar as a type of continuing education program, ABIM's MOC and NBPAS

maintenance of certification offering are clearly not the same product, as they are not

"maintaining" the same certification. (*Id.*) For example, much like a university has a right to

ensure that students who earn a degree have met certain requirements set by that university,

ABIM has a right to ensure it is certifying internists that meet ABIM's standards. Because ABIM has no control over how NBPAS evaluates those seeking a certification, it would be unfair to ABIM and the internists that passed ABIM's MOC to allow other internists to maintain the same certification through an outside, and possibly inferior, third-party process. Therefore, there is no viable alternative program to ABIM's MOC program that is at a competitive disadvantage because of ABIM's requirement.

Plaintiffs' fourth argument highlights ABIM's practice of listing initial certification and MOC as separate products on billing statements and other financial documents. (Pls.' Mem. Law in Opp'n Mot. to Dismiss 12.) In support of this argument, Plaintiffs cite *Jefferson Parish*, 466 U.S. at 22, and *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991). First, *Jefferson Parish* is distinguishable from the facts of this case. There, the Supreme Court briefly mentioned that the defendant-hospital was listing its hospital services separately from the anesthesiological services. *See Jefferson Parish*, 466 U.S. at 22. However, in finding no tying arrangement because of a lack of coercion, the Court noted that both services were part of the same transaction. *See id.* at 25. However, here, there is no indication in the Amended Complaint that internists purchase their initial certification at the same time they purchase MOC programs.

As for *Thompson*, the United States Court of Appeals for the Eleventh Circuit cited separate billing practices as merely one example of evidence of separate services offered by separate entities. 934 F.2d at 1570, 1575–76. Plaintiffs make no such claim as to a separate entity tying their product to the purchase of ABIM's initial certification or MOC products. Therefore, *Thompson* is not instructive in this case.

Finally, Plaintiffs allege that ABIM does not consider MOC to be a requirement of initial certification because it has "grandfathered" those that purchased a lifetime certification prior to 1990. (Pls.' Mem. Law in Opp'n Mot. to Dismiss 13.) However, Plaintiffs provide no support as to why ABIM should not be allowed to modify its certification process over time. We see no problem that at some point ABIM realized there was a need to have its certified internists undergo an MOC program, whether because the internists could not keep up with the advances in their particular field, saw their skills diminish, or any other reason. In fact, the need to require a MOC program is highlighted in this case, as Murray initially failed her infectious disease MOC program in 2009 and Joshua was unable to pass her required MOC program in 2014. (Am. Compl. ¶¶ 85, 109.)

We are unconvinced by Plaintiffs' arguments that ABIM's initial certification and MOC programs are distinct products. Plaintiffs' failure to establish two products means there can be no unlawful tying arrangement and we need not continue our analysis. *See Kaufman*, 836 F.3d at 142 ("[I]f there is no separate market for the allegedly tied product, there can be no fear of leveraging a monopoly in one market to harm competition in a second market. The second market simply does not exist."). Therefore, ABIM's Motion to Dismiss Plaintiffs Section 1 claim is granted. Count I of the Amended Complaint is dismissed with prejudice.[3]

---

[3] According to Federal Rule of Civil Procedure 15, "a party may amend its pleading once as a matter of course"; otherwise they must have consent from the opposing party or leave from the court. Fed. R. Civ. P. 15(b). Leave to amend shall be freely given. *Id.* However, the Third Circuit has held that the District Court may deny an opportunity to amend where the amendment would be futile. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (citing *Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir. 1998), *rev'd on other grounds*, 525 U.S. 459 (1999); *Centifanti v. Nix*, 865 F.2d 1422, 1431 (3d Cir. 1989)). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Id.* at 121. In deciding this issue, the District Court "applies the same standard of legal sufficiency as under [Federal Rule of Civil Procedure] 12(b)(6)." *See Smith*, 139 F.3d at 190 (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

As there are no separate markets at issue in this case, it would be futile for Plaintiffs to amend its unlawful tying claim. Therefore, Count I is dismissed with prejudice.

**B.    Plaintiffs are Unable to Establish any Anticompetitive Conduct to Support a Monopolization Claim under the Sherman Act**

Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.  In order to assert a violation of Section 2 against a defendant, the plaintiff must establish two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *See United States v. Grinnell Corp.*, 284 U.S. 563, 570–71 (1966).

The Supreme Court defines monopoly power as "the power to control prices or exclude competition" and may be "inferred from the predominant share of the market."  *See id.* (quoting *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)).

Here, Plaintiffs assert that "ABIM maintains and abuses its monopoly power" of the MOC market on a basis other than the merits of the product.  (Pls.' Mem. Law in Opp'n Mot. to Dismiss 20.)  Plaintiffs include several allegations of unfair conduct, however, a majority of them revolve around ABIM's supposed monopoly in the "maintenance of certification market." (*Id.* at 20–21.)  As we described above, ABIM's MOC product is not a separate market, but rather a part of its offering in the overall certification market.  ABIM cannot have a monopoly in a market that does not exist.

However, Plaintiffs do provide two allegations that, at least tangentially, relate to the overall certification market.  Namely, that "ABIM's board of directors includes active participants in the market for internists' services and related markets with their own private anticompetitive motives to restrain competition" and that "ABIM deceives the public, including

28

hospitals, insurance companies, medical corporations, and other employers that MOC has a
beneficial impact. Thus, internists must purchase [certification] to obtain hospital privileges,
insurance reimbursement, employment, malpractice coverage, and other requirements of the
practice of medicine." (*Id.* at 21.)

While these two allegations are not initially invalidated by their reliance on the non-
existent MOC market, they are still unconvincing. Plaintiffs' assertion concerning ABIM's
unnamed board members is a mere conclusory allegation that is insufficient to defeat a motion to
dismiss. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103–04 (3d Cir. 2010).
In what is only a single, passing line in Plaintiffs' Amended Complaint, they fail to provide the
names of any ABIM board member or how they have used their position as "active participants
in the market for internists' services and related markets" to pursue anticompetitive behavior for
the benefit of ABIM. (Am. Compl. ¶ 71.) While there is no heightened pleading standard in
antitrust cases, "some claims require more factual explication than others to state a plausible
claim for relief." *W. Penn Allegheny Health*, 627 F.3d at 98 (quoting *In re Ins. Brokerage
Antitrust Litig.*, 618 F.3d 300, 320 n.18 (3d Cir. 2010)); *but see Hosp. Bldg. Co. v. Trs. of Rex
Hosp.*, 425 U.S. 738, 746 (1976) (citing *Poller v. Columbia Broad.*, 368 U.S. 464, 473 (1962);
*Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)) ("We have held that 'a complaint should not be
dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle him to relief. And in antitrust cases,
where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the
plaintiff ample opportunity for discovery should be granted very sparingly.").

Plaintiffs argue that the Supreme Court applies a "rigorous standard" for antitrust case
dismissals and recognizes the need for discovery for certain types of anticompetitive conduct.

*See id.*  However, this allegation is far too broad and would subject unnamed board members to indiscriminate discovery requests left to the whim of Plaintiffs.

Meanwhile, Plaintiffs' allegation concerning ABIM's supposed deception of "hospitals, insurance companies, medical corporations, and other employers" is also unavailing.  (Pls.' Mem. Law in Opp'n Mot. to Dismiss 21.)  This claim shares common factual allegations with Plaintiffs RICO claim in Count III and will be further addressed in more detail below.  However, we address it here in the antitrust context.

Essentially, Plaintiffs assert ABIM waged a "successful campaign" to deceive the public that MOC "benefits physicians, patients and the public and constitutes self-regulation by internists." (Am. Compl. ¶ 6.)  In turn, this has allegedly led hospitals, insurance companies, and other such medical providers to more frequently require internists to purchase and maintain ABIM certification as a condition for employment or reduced medical malpractice insurance premiums.  (*Id.*  ¶¶ 37–40.)  Plaintiffs believe this must be deceptive because there is "no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients or the public." (*Id.*  ¶¶ 42–43.)  However, in support, Plaintiffs merely put forth several public marketing materials from ABIM.  (Am. Compl. ¶¶ 133–38.)  There is no claim that ABIM actually deceived or coerced any hospital into requiring its internists to be ABIM-certified.

Rather, the Amended Complaint, itself, provides more reasonable and legitimate explanations as to why hospitals and medical service providers require ABIM certification, such as ABIM's long established history of certification and its creation of a national standard to compare internists from different states.  To the extent ABIM has market power over the certification industry, we find that the Amended Complaint states no anticompetitive conduct on the part of ABIM.  Therefore, ABIM's Motion to Dismiss the Amended Complaint is granted

with respect to Plaintiffs' Section 2 claim. Count II of the Amended Complaint is dismissed without prejudice.

### C.    Plaintiffs Fail to Assert a Proper RICO Claim

Turning to Plaintiffs' RICO claim, we note that Plaintiffs provide supplemental background material in their Amended Complaint to support this allegation. (*Id.* ¶¶ 131–61.) We accept Plaintiffs' additional assertions as true for the purposes of deciding this motion, many of which are specific, allegedly fraudulent, false, and misleading, statements, as well as, a summary of relevant statistics, financial information, and organizational structure. However, we decline to repeat those allegations here for the sake of relevancy and brevity, as ABIM does not move for dismissal on grounds related to much of the information provided.

Instead, ABIM argues Plaintiffs' RICO claim should be dismissed for two reasons. First, ABIM argues that Plaintiffs lack standing to bring this claim, as they have not suffered an economic injury as a direct result of ABIM's conduct. (Def.'s Mem. Law in Supp. Mot. to Dismiss 20–26.) Second, ABIM asserts that Plaintiffs failed to plead a fraud-based claim with sufficient peculiarity as required by Federal Rule of Civil Procedure 9(b). (*Id.* at 26–27.)

Standing to assert a RICO claim requires two prongs: (1) a plaintiff must show that they have suffered an injury to their business or property; and (2) the injury was directly related to the conduct of defendant's alleged RICO violation. *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015) (citing 18 U.S.C. § 1964). "[A] showing of injury requires proof of a concrete financial loss, and not mere injury to a valuable intangible property interest." *Id.* (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)).

In the present case, it is difficult to discern what Plaintiffs claim as their relevant injuries. Looking, initially, at the supplemental background provided under the Amended Complaint's

RICO count, there are no specific allegations concerning Kenney, Joshua, Manalo, or Murray, or any monetary injury sustained. Instead, there is a claim that Plaintiffs were "forced to pay MOC-related fees," (Am. Compl. ¶ 163), and a generic claim that "Plaintiffs have been injured in their business and property," (*Id.* ¶ 171). However, the Amended Complaint, in its entirety, includes more detailed information on potential injury claims. For instance, MNPG was forced to postpone Kenney's start date by six months so that he could pass the MOC examination, thus causing Kenney, who had already given his notice at his then-current job, to be without income for at least that much time. (*Id.* ¶¶ 78–79.) Kenney then decided that he had to turn down the MNPG offer altogether. (*Id.*) Joshua lost consulting and admitting privileges at five hospitals affiliated with DMC in 2014 after failing the MOC examination. (*Id.* ¶ 85.) Likewise, Joshua eventually lost her BCBS insurance coverage because of her lapsed ABIM certification and was effectively limited to outpatient care. (*Id.* ¶ 88.) St. Vincent terminated Manalo's employment at the end of 2010 due to his refusal to participate in MOC and purchase a renewal of his certification. (*Id.* ¶ 96.) As a result, Manalo was unemployed for several months and was eventually forced to accept a job for a substantially lower salary. (*Id.* ¶ 100.) Finally, Jordan Hospital revoked Murray's infectious disease privileges after she did not pass her MOC examination in 2009. (*Id.* ¶ 109.) This supposedly led to a loss in consulting income and reputational harm for Murray, despite passing the examination in 2012. (*Id.* ¶¶ 111–13.)

From this review, it is apparent that these potential injuries can be broken down into claims for "money spent," namely on MOC fees and associated costs[4] (though a sufficient tallying of such costs per individual is absent from the Amended Complaint), and "money lost," such as salary from diminished responsibilities or employment prospects. With respect to MOC

---

[4] Notably, this does not include Manalo, as he refused to purchase an MOC program. (Def.'s Mem. Law in Supp. Mot. to Dismiss 19; Am. Compl. P 93.)

fees, ABIM contends that those Plaintiffs that purchased MOC programs received the full benefit

of said programs and that Plaintiffs merely have "buyers' remorse." (Def.'s Mem. Law in Supp.

Mot. to Dismiss 24–25 (citing *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales*

*Practices & Liab. Litig.*, 903 F.3d 278, 281 (3d Cir. 2018)).) However, Plaintiffs attempt to

distinguish their injury by arguing that they were "forced to purchase MOC or have their

certification terminated by ABIM." (Pls.' Mem. Law in Opp'n Mot. to Dismiss 34–35.)

Plaintiffs insist that they either did not "want to buy MOC at all, or desire[d] to purchase it from

a provider other than ABIM, such as NBPAS." (*Id.* at 35.)

  Again, Plaintiffs' understanding of this issue is fundamentally flawed. First, as we have

repeatedly discussed above, it is impossible to maintain an ABIM certification through the use of

a non-ABIM maintenance program, as ABIM has the right to control who it is certifying and

what standards and requirements are necessary. Second, ABIM has not forced Plaintiffs to

purchase MOC. Instead, Plaintiffs purchased a product—certification—from ABIM for a period

of time. When it came time to renew the certification, Plaintiffs were clearly able to decline to

maintain their certifications knowing that their certifications will lapse. (*See, e.g.*, Am. Compl.

¶ 77 ("[Kenney's ABIM certification in gastroenterology] was scheduled to be terminated by

ABIM effective December 31, 2017. He had already decided by this time, however, not to take

the MOC examination again . . . .").) At no point did ABIM require or "force" Plaintiffs to

purchase MOC. To the extent Plaintiffs were required to purchase MOC, it was at the urging of

their employers or prospective employers.

  Similarly, it is clear that Plaintiffs' loss of employment opportunities or job

responsibilities were also a result of their employers' actions. The employers established ABIM-

certification as a performance requirement for their internists. Plaintiffs were either unable or

unwilling to meet that requirement and suffered adverse actions because of it. The Amended Complaint contains no allegations that ABIM had any control over internist-requirements at the Plaintiffs' employers. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. at 460 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

Therefore, because there are numerous reasons why Plaintiffs' employers would require internists to hold an ABIM certification beyond ABIM's marketing materials, ABIM's alleged fraudulent statements are too attenuated to substantiate a claim. ABIM's Motion to Dismiss the Amended Complaint is granted with respect to Plaintiffs' RICO claim. Count III of the Amended Complaint is dismissed without prejudice.

### D. Plaintiffs Fail to State a Claim for Unjust Enrichment

Finally, ABIM moves to dismiss Plaintiffs' claim for unjust enrichment. In order to state a claim for unjust enrichment, a plaintiff must show that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *See Global Ground Supp., LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008) (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (1985) ("[T]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.")).

ABIM argues, in part, that Plaintiffs received the benefit of their bargain because they have not shown that they failed to receive the MOC programs they purchased. (Def.'s Mem. Law in Supp. Mot. to Dismiss 30.) Contrarily, Plaintiffs allege that "they conferred a benefit on

ABIM (their MOC-related fees), that ABIM wrongfully obtained those fees by forcing Plaintiffs and other internists to purchase MOC or have their certifications terminated, and that it would be unjust for ABIM to retain MOC fees obtained as a result of its unlawful conduct." (Pls.' Mem. Law in Opp'n Mot. to Dismiss 37.)

Our analysis is again constrained by Plaintiffs' misunderstanding of the product they purchased. Clearly, the first two elements of unjust enrichment are met for Plaintiffs that purchased MOC. However, the third element is not met because it is not inequitable for ABIM to keep the benefit since it did not "force" Plaintiffs to purchase MOC. Plaintiffs were, of course, free to decide to no longer be certified by ABIM and to, therefore, not purchase MOC. In fact, it would be inequitable for Plaintiffs to demand ABIM continue to certify them without proving they are still able to meet ABIM standards and without paying ABIM for the MOC program.

Therefore, ABIM's Motion to Dismiss is granted with respect to Plaintiffs' claim of unjust enrichment. Count IV of the Amended Complaint is dismissed with prejudice.[5]

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Amended Complaint is granted. Plaintiffs' claims of illegal monopolization and monopoly maintenance under Section 2 of the Sherman Act in Count II and Section 1962(c) violations of the RICO Act in Count III are dismissed without prejudice. Plaintiffs' claims of unlawful tying under Section 1 of the Sherman Act in Count I and unjust enrichment in Count IV are dismissed with prejudice. Plaintiffs shall have fourteen days to file a Second Amended Complaint.

An appropriate Order follows.

---

[5] Allowing leave to amend this claim would be futile as the Amended Complaint makes apparent that Plaintiffs were not coerced or "forced" to buy MOC programs. *See Alvin*, 227 F.3d at 121.