UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMILY ELIZABETH LAZAROU and AAFAQUE AKHTER, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN BOARD OF PSYCHIATRY and NEUROLOGY, <br><br> Defendant. | Case No. 19-cv-01614 <br><br> Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter filed a complaint on behalf of themselves and as a class action against Defendant American Board of Psychiatry and Neurology ("ABPN"), alleging antitrust violations and unjust enrichment. ABPN moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [22]. For the reasons below, the court grants the motion to dismiss. ABPN also filed a related motion for judicial notice of a website [24]; as discussed below, that motion is denied.

**Background**

In considering a Rule 12(b)(6) motion, "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013). "The facts are set forth as favorably to [the plaintiff] as those materials allow. . . . In setting forth those facts at the pleading stage, the court does not vouch for their accuracy." *McWilliams v. Cook Cty.*, No. 15-cv-00053, 2018 WL 3970145, at *1 (N.D. Ill. Aug. 20, 2018) (citations omitted).

State medical licensing boards grant physicians licenses to practice medicine. Compl., [1] at 4 ¶ 15.[1] To receive a license, physicians must generally have a degree

---

[1] Bracketed numbers refer to entries on the district court docket and are followed by the page and / or paragraph number. Page numbers refer to the ECF page number.

(either Doctor of Medicine ("MD") or Doctor of Osteopathic Medicine ("DO")) and pass an examination. [1] at 4 ¶ 15.

Most states require physicians to periodically complete continuing medical education ("CME") courses to remain licensed. [1] at 5 ¶ 17. The Accreditation Council for Continuing Medical Education accredits organizations that offer CME. [1] at 5 ¶ 17.

Defendant ABPN (again, the American Board of Psychiatry and Neurology) is a nonprofit organization and offers certification that is separate from any state medical licensing requirement. ABPN is one of 24 member medical boards within the umbrella organization of the American Board of Medical Specialties ("ABMS"). [1] at 4 ¶ 14. ABMS's member boards, such as ABPN, certify physicians in 40 specialties and 87 subspecialties. [1] at 4 ¶ 14. ABPN certifies psychiatrists and neurologists in three primary specialties—psychiatry, neurology, and child neurology—and 14 subspecialties within the fields of psychiatry and neurology. [1] at 2 ¶ 3.

ABPN certification is not a requirement for obtaining a license in any state. [1] at 6 ¶ 20. However, many hospitals, insurance companies, medical corporations, related entities, and other employers require psychiatrists and neurologists to be ABPN-certified in order to receive hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements to practice medicine. [1] at 13–14 ¶ 48.

ABPN began selling certifications in 1935. [1] at 6 ¶ 19.[2] Originally, ABPN's certifications were lifelong, meaning there were no subsequent examinations or other requirements for psychiatrists and neurologists to remain certified. [1] at 6 ¶ 21.

In 1994, ABPN stopped issuing lifelong certifications. [1] at 6 ¶ 22. Instead, ABPN began offering ten-year certificates (initial certification) and requiring participation in a new maintenance of certification program ("MOC"). [1] at 6 ¶ 22.

---

[2] This and other instances in the complaint refer to "initial" certification. In this instance, for example, the complaint states that ABPN first began selling "initial" certifications in 1935—not merely "certifications." [1] at 6 ¶ 19. But the complaint also alleges that initially, ABPN's certifications were lifelong and lacked subsequent examinations or requirements. [1] at 6 ¶ 21. The court takes as true well-pleaded factual allegations, but in this instance the separate allegation that originally ABPN's certifications were lifelong suggests that to the extent "initial" connotes "time-limited," "initial" is not an appropriate descriptor for certifications ABPN issued before 1994.

According to the complaint, ABMS has described initial certification as an assessment of "medical knowledge, clinical knowledge, and diagnostic skills" that "demonstrates expertise in a medical specialty." [1] at 5–6 ¶ 18. "To obtain initial ABPN certification, a physician must, among other things, pass an ABPN-administered examination." [1] at 6 ¶ 19.

When announced, MOC required physicians to, among other things, "pass[ ] a secure, proctored, high-stakes, cognitive MOC examination every ten years; complet[e] a specified number of CME credits, including a certain number of Self-Assessment ('SA') CME activities pre-approved by ABPN; and fulfill[ ] . . . Improvement in Medical Practice ('PIP') requirements," which the complaint alleges were "burdensome and meritless." [1] at 6 ¶ 22.

In order to maintain ABPN certification, all ABPN-certified psychiatrists and neurologists who purchased initial certifications on or after October 1, 1994 must purchase MOC. [1] at 7 ¶ 25.

Physicians who purchased initial certifications before October 1, 1994 are "grandfathered," meaning exempt from MOC yet reported on ABPN's website as "Certified" and holding a "certificate valid indefinitely," even if they voluntarily took and failed MOC exams. [1] at 7 ¶ 25. The complaint alleges that "[u]pon information and belief, up to 50% of psychiatrists and neurologists who have obtained an initial ABPN certification have been 'grandfathered.'" [1] at 7 ¶ 28.

Physicians who obtained initial certifications but are ineligible to be "grandfathered" (*i.e.*, physicians who obtained initial certifications on or after October 1, 1994) and "who choose not to buy MOC, pay MOC fees, and complete MOC requirements are reported on the ABPN website as 'Not Certified,' even though they obtained initial ABPN certifications." [1] at 7 ¶ 25, 8 ¶ 32.

The complaint alleges that MOC has imposed substantial costs on physicians in both time and fees, but that there is no evidence that MOC actually meets the "stated goals of maintenance of certification of continuous and ongoing learning and improvement." [1] at 8 ¶ 33. The complaint also alleges that MOC requirements are "redundant of the CME credits already required for physicians to maintain their State license to practice medicine." [1] at 12 ¶ 43. The complaint further alleges that complying with MOC requirements requires physicians to "take countless hours away from their practice and family" and "takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care." [1] at 8 ¶ 30. MOC fees average as much as $212.50 annually per physician, not including subspecialty costs. [1] at 7 ¶ 29. According to the complaint, ABPN has realized tens of millions of dollars in MOC revenue, [1] at 8 ¶ 30, and "ABPN MOC is an ever-increasing revenue source and apparently immensely profitable for

ABPN" because it targets "more established doctors" rather than "[r]ecent residency program graduates." [1] at 17 ¶ 59.

The complaint characterizes MOC requirements as a "constantly moving target" that has undergone many iterations. [1] at 9 ¶ 35. In 2012, ABPN redesigned MOC and changed its name to Continuous Maintenance of Certification ("C-MOC"). [1] at 10 ¶ 37. This initiative scheduled a sunset of the original MOC in 2021, whereby physicians with certifications issued in 2012 and later must participate in the newly formed C-MOC. [1] at 10 ¶ 37. ABPN also changed the fee structure and frequency of compliance evaluations. [1] at 10 ¶¶ 37, 39. Most recently, in 2019, ABPN introduced an optional Pilot Project in place of the ten-year MOC examination. [1] at 11 ¶ 41. ABPN offered this feature only to physicians whose initial certifications expired between 2019 and 2021. [1] at 11 ¶ 41. The complaint alleges that both ABPN's constant changing of the MOC requirements without evaluating their efficacy and ABPN's grandfathering practice (allowing many thousands of physicians not to comply with MOC) show that "there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public." [1] at 15 ¶ 54.

The complaint alleges that "[a] recent ABMS publication explains that a maintenance of certification program such as ABPN MOC 'requires a different set of expectations and requirements' than initial certification, and 'clarif[ies] that initial certification and continuing certification have different purposes.'" [1] at 20 ¶ 71. The complaint alleges that "MOC serves substantially the same function as CME," but "differs from CME because psychiatrists and neurologists who do not see value in particular CME courses or classes are free to purchase other CME offerings; there is no such meaningful option regarding ABPN MOC." [1] at 20 ¶ 72.

The complaint alleges that "[a]s with initial ABPN certification, no State requires ABPN MOC for a psychiatrist or neurologist to be licensed," [1] at 15 ¶ 52, but that many hospitals have adopted by-laws mandating that physicians purchase MOC. [1] at 14 ¶ 49. In addition, certain Blue Cross Blue Shield companies require physicians to participate in MOC in order to participate in their networks. [1] at 14 ¶ 50.

According to the complaint, another organization, the National Board of Physicians and Surgeons ("NBPAS"), offers a product that competes with ABPN's MOC. The complaint alleges that NBPAS "was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including psychiatry and neurology. NBPAS does not offer initial certifications to psychiatrists, neurologists, or any other physicians, but only maintenance of certification." [1] at 20 ¶ 75. "To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from

4

an ABMS member board, hold a valid State license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an initial certification has lapsed)." [1] at 20 ¶ 76. The complaint does not allege that NBPAS requires physicians to pass any examination.

The complaint alleges that "NBPAS fees are vastly lower than those charged by ABPN for its MOC product, and NBPAS maintenance of certification requires vastly less physician time. For example, in 2019, the average annual cost of NBPAS maintenance of certification is $84.50 ($94.50 for a DO), while ABPN charges an annual fee of $175 under C-MOC." [1] at 20–21 ¶ 76.

"ABPN does not recognize NBPAS maintenance of certification." [1] at 21 ¶ 78. According to the complaint, "NBPAS has had very limited success. . . . According to the NBPAS website, as of February 26, 2019, only 108 hospitals, approximately one percent of hospitals nationwide, accept NBPAS maintenance of certification and not a single insurance company is known to accept NBPAS maintenance of certification." [1] at 21 ¶ 78.

The named plaintiffs, Dr. Lazarou and Dr. Akhter, are psychiatrists who obtained ABPN certification after 1994 (and thus were not grandfathered) but have not completed subsequent MOC or C-MOC requirements (at least according to ABPN) and are thus reported on ABPN's website as "Not Certified" or "Not Meeting MOC requirements." [1] at 24–30 ¶¶ 93–110.

In 2019, plaintiffs filed a complaint against ABPN on behalf of themselves and members of a class of "all physicians required by ABPN to purchase MOC from ABPN to maintain their initial ABPN certifications," alleging violations of Sections 1 and 2 of the Sherman Antitrust Act and a claim of unjust enrichment. [1]. ABPN moves to dismiss the complaint. [22].

## Discussion

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

5

### I. Unlawful Tying (Count 1)

Plaintiffs claim that ABPN violates Section 1 of the Sherman Act by tying initial certification and MOC.

Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11–12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020).

"It is clear . . . that every refusal to sell two products separately cannot be said to restrain competition. . . . Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act. . . . [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 11–12; *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 (7th Cir. 1985); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703–05 (7th Cir. 1984). "The purpose of the rule against certain tying arrangements is to stop the extension of market power from one product to another." *Will*, 776 F.2d at 671.

Plaintiffs bring a *per se* tying claim and in the alternative a rule of reason tying claim. [1] at 32 ¶¶ 119–120.

"In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected. . . . In addition, this circuit has held that an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in." *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006) (citations omitted) (quoting *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985)).

6

"[A] plaintiff's failure to state a *per se* illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason." *Carl Sandburg*, 758 F.2d at 210 (citations omitted).

But both *per se* and rule of reason tying claims require that the tying arrangement involve two distinct products. *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 271 n.1 (N.D. Ill. 2019).

The parties dispute whether ABPN's initial certification and MOC are separate products. Plaintiffs contend that ABPN sells two distinct products: the tying product, initial certification, and the tied product, MOC. [1] at 2 ¶¶ 3–4. ABPN argues that it offers only one product, ABPN certification. [23] at 4–8.

"[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19 (footnote omitted); *Viamedia*, 951 F.3d at 469. "[A] tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish*, 466 U.S. at 21. "The requirement that two distinguishable product markets be involved follows from the underlying rationale of the rule against tying," *i.e.*, that the defendant "ha[s] foreclosed competition on the merits in a product market distinct from the market for the tying item." *Id.* (footnote omitted). *Jefferson Parish* held that "[t]hus, in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiology services separately from hospital services." *Id.* at 21–22 (footnote omitted); *see also Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."); *Jack Walters*, 737 F.2d at 703 ("if there are not separate markets, this is evidence that the economies of joint provision are overwhelming").

Two district courts, including one in this district, have recently considered tying claims involving maintenance of certification programs that resemble ABPN's MOC. In *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530 (E.D. Pa. 2019), the court dismissed a tying claim, holding that the American Board of Internal Medicine's ("ABIM") initial certification and maintenance of certification constituted a single product, ABIM certification. *Id.* at 545. Similarly, in *Siva*, the court dismissed a tying claim against the American Board of Radiology ("ABR"), holding that ABR's initial certification and maintenance of certification constituted a single product, ABR certification. 418 F. Supp. 3d at 274 (noting the case was "all but identical" to *Kenney*). The court finds *Siva* and *Kenney* persuasive.

7

ABPN's initial certification and MOC are not distinct products, but just one—ABPN certification. Plaintiffs have not plausibly alleged that "the character of the demand" for initial certification differs from the demand for MOC. *Jefferson Parish*, 466 U.S. at 19.

Physicians obtain ABPN certification in order to demonstrate their qualifications and knowledge to patients, hospitals, insurance companies, and others. Put another way, certification is information that ABPN (or any would-be competitor) provides to a physician (and to patients, hospitals, insurance companies, and the rest of the health care market) about that physician's qualifications and knowledge.

The name "*maintenance* of certification" itself implies a continuing assessment by the original certifying organization, ABPN. It is not plausible that physicians holding an initial certification from ABPN would, in order to maintain the ABPN certification, seek out an assessment from a different certifying organization applying standards that differ from ABPN's standards in significant ways, such as not administering an exam. Another organization's "maintenance" of ABPN certification would be at best an imperfect substitute for ABPN's maintenance of ABPN certification, both in the eyes of plaintiffs and in the eyes of the other individuals and entities whose demand allegedly drives plaintiffs' demand. Plaintiffs' complaint itself acknowledges this point when it describes the source of plaintiffs' demand as follows:

> Plaintiffs and other psychiatrists and neurologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be *ABPN*-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

[1] at 13–14 ¶ 48 (emphasis added). The allegation is that hospitals, insurance companies, medical corporations, related entities, and other employers require *ABPN certification*, not initial certification or MOC independently. This strongly suggests that initial certification and MOC share the same character of demand.

Plaintiffs do allege that many hospitals and some Blue Cross Blue Shield companies require that physicians purchase MOC (as opposed to ABPN certification). [1] at 14 ¶¶ 49–50. But plaintiffs do not plausibly allege that those entities require MOC for any specific reason other than the fact that it maintains ABPN certification. Nor do plaintiffs plausibly allege that hospitals, insurance companies, or others that ultimately rely on the information certification provides would find it helpful or efficient for a physician to switch certifying organizations,

or that there is any reason plaintiffs seek certification other than to provide the information to these third parties. Plaintiffs thus do not plausibly allege that initial certification and MOC are "distinguishable in the eyes of buyers"—that is, psychiatrists and neurologists. *Jefferson Parish*, 466 U.S. at 19; *Kenney*, 412 F. Supp. 3d at 545 (citing *Jefferson Parish* and noting that based on the complaint's allegations, "the character of the demand" for initial certification and maintenance of certification was the same). Nor does the complaint plausibly allege that offering MOC in a separate market from initial certification would be efficient. *Jefferson Parish*, 466 U.S. at 21–22; *Eastman Kodak*, 504 U.S. at 462.

As *Siva* put it, "[w]hat plaintiff describes is demand for the single product of certification, and adding a new component to the product that will cause customers to incur ongoing costs does not make the component a new product." *Siva*, 418 F. Supp. 3d at 274. "'Almost every product can be viewed as a package of component products. . . .'" *Id.* at 273 (quoting *Jack Walters*, 737 F.2d at 703). "But under *Jefferson Parish*, a product's aggregation of separate components into a whole is only a tie-in "if there are separate markets for each product." *Siva*, 418 F. Supp. 3d at 273 (citation and internal quotation marks omitted). In this regard, *Siva* and *Kenney* found the franchise model an instructive analogy. *See Siva*, 418 F. Supp. 3d at 274; *Kenney*, 412 F. Supp. 3d at 545 n.2. A franchise, which is a "method of doing business," is "not sold separately from the ingredients that go into [it]." *Siva*, 418 F. Supp. 3d at 274 (quoting *Will*, 776 F.2d at 670 n.1). Thus, "where the McDonald's restaurant chain sold its franchisee a proven and comprehensive business method, its franchise agreement and its lease of restaurant premises to the franchisee were not separate products for purposes of the Sherman Act." *Siva*, 418 F. Supp. 3d at 274 (describing *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980)). Similarly, plaintiffs here attempt to "isolate [two] components of what is essentially a business method—in this case, for assessing whether a physician has acquired the requisite standard of knowledge, skill, and understanding essential in her particular specialty or subspecialty—and declare them to be a tie-in." *Siva*, 418 F. Supp. 3d at 274 (internal quotations and citation omitted). Without separate consumer demand for those components, plaintiffs have not stated a tying claim.

Plaintiffs make a number of arguments similar to those in *Kenney* for why ABPN's initial certification and MOC are distinct products. *Kenney*, 412 F. Supp. 3d at 544–45 (E.D. Pa. 2019). First, initial certification and MOC have been sold separately. [38] at 13–14. Second, NBPAS, a competing seller of a certification product, does not sell initial certifications. [38] at 14. Third, psychiatrists and neurologists differentiate between ABPN's initial certification and MOC. [38] at 14–15. Fourth, ABPN charges separately for MOC. [38] at 15. Finally, ABPN employs a practice of grandfathering. [38] at 15.

Plaintiffs' first argument, about sales history, is unpersuasive. Evidence of separate sales does bear on whether separate markets are efficient and thus

9

on whether there are separate products. *See Eastman Kodak*, 504 U.S. at 462 ("Evidence in the record indicates that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners. Indeed, the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service.") (footnotes omitted). But here, ABPN never sold initial certifications and MOC separately before 1994 because neither initial certifications (in the sense of time-limited certifications) nor MOC existed before 1994. Pre-1994, ABPN certifications were lifelong certifications, not time-limited initial certifications, and they lacked subsequent examinations or other recertification requirements. [1] at 6 ¶ 21. *See Siva*, 418 F. Supp. 3d at 272–73 (rejecting a similar sales history argument: "ABR sold certification without any MOC component, and now ABR sells certification with an MOC component. But ultimately ABR sells only one product: certification of radiologists. . . . [T]he fact that the MOC component was only added relatively recently does not make it a separate product."). As to the post-1994 period, even considering those approximately 26 years as some evidence of separate sales, that is still shorter than the period from 1935 to 1994.[3] And the only alleged attempted competition with MOC (by NBPAS) began recently, in 2015. Thus, the sales history does not suggest distinct demand for, or efficiency in, buying MOC from other providers.

Plaintiffs' second argument is that "NBPAS offers maintenance of certification but not initial certification," and that this is evidence of separate markets. [1] at 21 ¶ 77. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 462 (considering whether other sellers offer the tied product without the tying product).

ABPN disputes this and contends that NBPAS actually provides a competing *certification* product (as opposed to a *maintenance* of certification product). [39] at 4. In support, ABPN moves for the court to take judicial notice of NBPAS's website. [24]. The court declines to do so. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). But the NBPAS website is a nongovernmental website the accuracy of which may reasonably be questioned. *See, e.g.*, *Felty v. Driver Sols., LLC*, No. 13-cv-02818, 2013 WL 5835712, at *3 (N.D. Ill. Oct. 30, 2013); *Islamic Ctr. of W. Suburbs v. Cty. of DuPage*, No. 12-cv-06132, 2012 WL 6605011, at *6 n.2.

---

[3] The relevant time period in which ABPN actually sold MOC could be shorter than 26 years. Physicians purchasing ABPN initial certification from 1994 on would have the initial certification until at least 2004 (later for physicians purchasing ABPN initial certification after 1994) and thus would have no need to complete compliance with MOC requirements until at least 2004. According to the complaint, ABPN began selling MOC "[b]y no later than 2002." [1] at 19 ¶ 67.

10

Even so, the complaint does not plausibly allege that NBPAS offers the tied product (MOC or a competing maintenance product) without the tying product (initial certification). The argument that NBPAS offers the tied product is premised on the assumption that NBPAS's product is actually effective in maintaining initial certification, just as the service and parts in *Eastman Kodak*, or the anesthesiological services and hospital services in *Jefferson Parish*, did in fact work together. But on the face of the complaint, ABPN is the only provider of initial certification and earning NBPAS certification does *not* maintain ABPN certification. *See Kenney*, 412 F. Supp. 3d at 546–547. ABPN "does not recognize NBPAS maintenance of certification," [1] at 21 ¶ 78, and Dr. Lazarou's ABPN certification lapsed although she maintained a NBPAS certification, [1] at 26–27 ¶ 99. Approximately one percent of hospitals nationwide accept NBPAS maintenance of certification; not a single insurance company does. [1] at 21 ¶ 78. NBPAS's certification and MOC do not "maintain" the same certification and thus NBPAS does not actually offer the tied product. Nor can plaintiffs proceed on a theory that would effectively require ABPN to recognize NBPAS's product as maintaining ABPN certification. *See Siva*, 418 F. Supp. 3d at 276 ("[N]o one can provide certification in ABR's name but ABR."); *cf. Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) ("Antitrust law does not compel your competitor to praise your product or sponsor your work.").

Third, plaintiffs argue that psychiatrists and neurologists differentiate between ABPN's initial certification, on the one hand, and ABPN MOC (or NBPAS's competing maintenance product), on the other. *See Jefferson Parish*, 466 U.S. at 23 (considering whether consumers differentiate between the tying and tied product). Plaintiffs allege that certain physicians wish "to maintain their initial ABPN certification by purchasing maintenance of certification from other providers." [1] at 20 ¶ 73. Again, providers such as NBPAS cannot "maintain" ABPN's certification. Plaintiffs' allegations simply reinforce that there is consumer demand for ABPN's ongoing certification.

Plaintiffs' fourth argument is that ABPN charges separately for initial certification and MOC. Plaintiffs cite *Jefferson Parish* and *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991). In *Jefferson Parish*, the Supreme Court noted among other things that the defendant hospital billed its hospital services separately from its anesthesiology services. 466 U.S. at 22. In *Thompson*, the Eleventh Circuit cited separate billing practices as one relevant but non-dispositive factor among many. 934 F.2d at 1575. Like evidence of separate sales, this is one indication to be considered among all the circumstances; as discussed already, here the circumstances taken as a whole point toward one product rather than two.

Plaintiffs' fifth argument rests on ABPN's grandfathering practice. As discussed above, ABPN "grandfathers"—or exempts from MOC—all physicians who

11

purchased their ABPN certifications before October 1, 1994. [1] at 7 ¶ 25. Plaintiffs argue that "[i]f ABPN thought initial certification and MOC were a single product, it would not have freed half of psychiatrists and neurologists from buying MOC." [38] at 15. They argue the grandfathering suggests that MOC has "different purposes" from initial certification and that ABPN itself differentiates between initial certification and MOC. [38] at 15. Plaintiffs, however, have not cited any cases in which the seller's "purposes" played a role in determining whether two items occupy distinct markets. *See Kenney*, 412 F. Supp. 3d at 547 (rejecting a similar grandfathering argument). Again, the relevant inquiry is consumer demand. *See Jefferson Parish*, 466 U.S. at 19 ("[T]he question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items."); *Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts.").

Finally, plaintiffs rely on *Talone v. Am. Ost. Ass'n*, No. 16-cv-04644, 2017 WL 2539394, at *6 (D.N.J. June 12, 2017) (holding American Osteopathic Association ("AOA") membership and board certification were two distinct products). *Talone* is easily distinguishable. Unlike here, *Talone* involved an alleged tie between certification by AOA and membership in AOA. AOA membership conferred benefits such as continuing CME courses, networking opportunities, information about advances in medicine, billing resources, and volume discount arrangements. *Id.* at *1 n.2. The benefits of AOA certification, conversely, related solely to certification's function, to "demonstrate their [DOs'] mastery of their skills in a particular specialty." *Id.* at *3. Here, initial certification and MOC confer the same benefit of certification, suggesting far less consumer differentiation than in *Talone*.

In sum, plaintiffs have not plausibly alleged that ABPN's initial certification and MOC are distinct products. Thus, the Section 1 tying claim cannot proceed.

Even assuming that initial certification and MOC are indeed separate products, plaintiffs' tying claim runs into an entirely different problem. Tying occurs when a firm sells the tying product "only on the condition that the buyer also purchases a different (or tied) product." *Viamedia*, 951 F.3d at 468 (quoting *Northern Pacific*, 356 U.S. at 5–6); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) ("In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from . . . the seller."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016) ("If . . . the buyer is free to decline the tied product . . . , then by definition there is no unlawful tying."). Plaintiffs do not plausibly allege conditioning in this case. Plaintiffs remain free to purchase initial certification from ABPN without ever buying MOC. *See Kenney*, 412 F. Supp. 3d at 545 ("Nowhere in the Amended Complaint do Plaintiffs allege that they were forced to buy MOC products in order

12

to purchase the initial certification."). Plaintiffs allege de facto forcing, but those requirements are attributable to third parties, not ABPN.[4]

Similarly, if "initial certification" is a separate product, it has a fixed duration; plaintiffs' allegations confirm that their certifications were time-limited at the time of purchase. *See* [1] at 6 ¶ 22, 25 ¶ 94, 28 ¶ 104. MOC would then be a separate certification product that plaintiffs could purchase after the initial certification runs its course. The thrust of plaintiffs' argument appears to be that they are forced to buy MOC because if they do not, ABPN revokes their initial certification. *See* [38] at 19 ("MOC is not voluntary for doctors who want to or must (as discussed below) keep their previously purchased initial certification."). But since the certifications were time-limited at the time of purchase, it is not plausible that ABPN revoked the initial certification; rather, the initial certification expired by its terms (terms of which plaintiffs were aware when they obtained initial certification, *see Siva*, 418 F. Supp. 3d at 276). And if it was true that ABPN revoked the certification, that would mean that certification in the permanent, ongoing sense—not "initial" certification—is the relevant product. That brings the claim back to the separate products problem.

In addition, to the extent plaintiffs may be contending that they prefer not to purchase any certification maintenance product at all (whether MOC or another product), such a claim cannot proceed. *See Jefferson Parish*, 466 U.S. at 16 ("when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed"); *Siva*, 418 F. Supp. 3d at 275.

No matter how ABPN's products are conceptualized, the tying claim cannot proceed. Count 1 is dismissed with leave to amend.[5]

---

[4] *Cf. Schachar*, 870 F.2d at 399 ("[W]hen a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws.") (citation omitted); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992) ("'[W]hen a trade association provides information' (by giving its approval in that case, its disapproval in this case) 'but does not constrain others to follow its recommendations, it does not violate the antitrust laws.'") (quoting *Schachar*, 870 F.2d at 399); *United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 906 (N.D. Ill. 2019) ("If the certifying entity lacks the power to prevent (or has not prevented) the professional from practicing without a certification, there has been no antitrust violation.").

[5] In light of this conclusion, the court does not reach Defendant's remaining arguments, including whether plaintiffs have sufficiently pleaded an unreasonable restraint of trade or substantial market power, or whether plaintiffs' claims are timely. [23] at 10–14.

13

## II. Monopolization (Count 2)

Plaintiffs also bring a claim under Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. To state a claim, Plaintiffs must plead facts that plausibly suggest (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *See Paramount Media Grp., Inc. v. Vill. of Bellwood*, 929 F.3d 914, 921–922 (7th Cir. 2019).

As in *Kenney* and *Siva*, Plaintiffs' allegations do not satisfy the first of these requirements. Plaintiffs allege illegal monopolization in what they describe as the "market for maintenance of certification." [1] at 1, 32–33 ¶¶ 2, 124–126. Plaintiffs' brief repeats: "Plaintiffs' Sherman Act, Section 2 claim alleges illegal monopolization in the separate market for maintenance of certification." [38] at 22. As discussed above, there is no separate maintenance of certification market, but one certification market. ABPN "cannot have a monopoly in a market that does not exist." *Kenney*, 412 F. Supp. 3d at 548 (dismissing Section 2 claim); *see also Siva*, 418 F. Supp. 3d at 277 (same). Plaintiffs' Section 2 claim (Count 2) is dismissed with leave to amend.

## III. Unjust Enrichment (Count 3)

Last, Plaintiffs assert an unjust enrichment claim. The parties appear to agree that the unjust enrichment claim arises under Illinois law. [23] at 14; [38] at 26. Having determined that Plaintiffs fail to state a federal claim, the court declines to exercise supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("only in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction" once federal claims have fallen out of the case before trial); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). Count 3 is dismissed without prejudice.

## Conclusion

ABPN's motion for judicial notice [24] is denied. ABPN's motion to dismiss the complaint [22] is granted. Plaintiffs' claims of unlawful tying under Section 1,

14

monopolization under Section 2, and unjust enrichment are dismissed without prejudice to plaintiffs' filing an amended complaint by October 26, 2020.

Date: September 11, 2020 /s/ Martha M. Pacold