**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EMILY ELIZABETH LAZAROU** | | |
| **and AAFAQUE AKHTER, individually and** | ) | |
| **on behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-cv-01614** |
| | ) | |
| **AMERICAN BOARD OF PSYCHIATRY** | ) | |
| **AND NEUROLOGY,** | ) | **Honorable Martha M. Pacold** |
| | ) | |
| **Defendant.** | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter ("Plaintiffs"), for their First Amended Class Action Complaint against Defendant American Board of Psychiatry and Neurology ("ABPN" or "Defendant"), allege as follows:

**INTRODUCTION**

1.      Emily Elizabeth Lazarou ("Dr. Lazarou") and Aafaque Akhter ("Dr. Akhter") are medical doctors and psychiatrists. Psychiatrists assess, diagnose, and treat the mental and physical aspects of psychological problems and mental, emotional, and behavioral disorders through psychotherapy and the prescription of medical treatments and medications.

2.      Defendant ABPN sells certifications in psychiatry to new residency graduates. ABPN also sells certifications in neurology to new residency graduates. A neurologist diagnoses, treats, and manages disorders of the brain and nervous system including Alzheimer's disease, epilepsy, Parkinson's disease, concussions, migraines, and strokes.

3.      Certifications are an "early career event" sold by ABPN to candidates for entry into the specialized medical practices of psychiatry or neurology, and are a "one-time snapshot assessment" of postgraduate medical education and residency training. ABPN began selling certifications in 1935. Physicians who buy certifications are referred to as "diplomates."

4.      Because most hospitals, health systems, practice groups, medical corporations, and other medical organizations require psychiatrists and neurologists to be certified to hold hospital privileges and/or employment, a successful career for most psychiatrists and neurologists is impossible without ABPN certification. In addition, most insurance companies require physicians, including psychiatrists and neurologists, to be certified to be included in their networks and health insurance plans. Certification has other economic implications as well, including higher compensation, lower malpractice insurance rates, and election to membership in professional societies that can be pivotal to advancement both professionally and academically.

5.      Certification is an economic necessity and is not, as ABPN maintains, voluntary. Dr. Lazarou bought an ABPN certification in psychiatry in 2007, after completing her residency training. Dr. Akhter bought an ABPN certification in psychiatry in 2005, after completing his residency training.

6.      This case is about illegal tying by ABPN. Certification is the tying product. ABPN has long been the monopoly supplier of certifications for psychiatrists and neurologists.

7.      The tied product is ABPN's continuing professional development ("CPD") product. ABPN misleadingly brands its CPD product as "Maintenance of Certification" or "MOC." ABPN forces psychiatrists and neurologists to buy its CPD product by revoking the certifications of those who do not buy MOC.

8. CPD products like MOC promote individual, self-directed lifelong learning and the development of both medical and non-medical competencies after residency, including professionalism; interpersonal, managerial and communication skills; value-based delivery and cost reduction; clinical knowledge and skills; patient experience; practice improvement; diversity and inclusion; interprofessional practice; doctor wellness and burnout; patient safety; working in teams; and health care disparities and population health.

9. In addition to MOC, other CPD products sold to doctors include continuing medical education courses, symposia, and curricula ("CME") sold by CME providers, and similar offerings by other providers, including medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations. By the time ABPN began selling MOC other vendors had already been selling their own CPD products for several decades.

10. ABPN sells MOC to those who have already purchased certifications. As explained by ABPN, the purpose of MOC, like other CPD products, is to promote individual "involvement in lifelong learning." Certifications, on the other hand, are a uniform, standardized one-time evaluation of postgraduate medical education and residency training. MOC is no different than other CPD products that promote lifelong learning, except MOC is mandatory as ABPN revokes the certifications of those who do not buy its CPD product.

11. ABPN is a member of the American Board of Medical Specialties ("ABMS"), an umbrella organization including twenty-four specialty boards ("Member Boards") that sell certifications in approximately forty specialties and ninety subspecialties. Each Member Board sells a MOC product similar to ABPN's MOC product, designed to promote individual lifelong

3

learning in each Member Board's specialty or subspecialty. Like ABPN, each Member Board also revokes the certifications of doctors who do not buy its MOC product.

12.     There is separate consumer demand by psychiatrists and neurologists for ABPN's certification product and CPD products, demonstrating they are separate products. Because there is separate and sufficient consumer demand, it is efficient for vendors to sell certifications and CPD products separately. Reflecting this separate consumer demand, ABPN sold its certification product without selling any CPD product of its own for decades, even though other vendors were selling CPD products throughout that time. Also reflecting this separate consumer demand, other vendors have likewise sold CPD products for decades without selling a certification product.

13.     Between 1975 and 1984, before ABPN began selling its mandatory MOC product, ABPN sold another CPD product called "recertification." Unlike MOC, "recertification" was voluntary and ABPN did not revoke the certifications of those who chose to buy CPD products from other vendors. ABPN's "recertification" CPD product was unable to compete in the CPD marketplace, however, and failed due to a lack of sales. The failure foreshadowed that its successor MOC would also be unable to compete on its own merits, and could only be successful if it was mandatory and tied to certifications.

14.     No causal relationship has ever been established between MOC and a beneficial impact on doctors, patients, or the public. Numerous studies reflect that there is no causal connection between MOC and improved patient care.

15.     ABPN concedes there is "[i]nadequate evidence" of the validity of MOC.

16.     ABPN has used its monopoly power in certifications, which assess postgraduate medical education and residency training, as leverage over the entirely different metric addressed by CPD products, whether psychiatrists and neurologists engage in "lifetime learning" after

4

residency. ABPN enforces its illegal tie by, among other things, reporting the certifications of psychiatrists and neurologists as invalid or describing them as "Not Certified" if they do not buy ABPN's own CPD product, even though they previously purchased certifications. ABPN proclaims when it reports the status of psychiatrists and neurologists that: "Certification [is] contingent on meeting MOC requirements."

17.     Psychiatrists and neurologists who bought certifications before October 1, 1994, are exempted or "grandfathered" by ABPN from the requirement to buy MOC. "Grandfathers" are reported by ABPN as "Certified" and owning a "certificate valid indefinitely" even though they do not buy MOC. Even "grandfathers" who voluntarily buy MOC but fail to meet its requirements are reported by ABPN as having "Valid" certifications.

18.     In other words, unlike younger psychiatrists and neurologists, certifications of "grandfathers" are not revoked if they do not buy MOC, despite the fact their own residency training may have been completed decades earlier. This begs the question why, if MOC is about maintaining standards, as ABPN argues, thousands of doctors are excused from the requirement to buy MOC. As the head of the largest ABMS Member Board has admitted, "Grandfathering is a really vexing challenge. It's difficult to defend … ."

19.     By tying its certification and MOC products, ABPN gains an unwarranted and unlawful competitive advantage for its own CPD product. Psychiatrists and neurologists are forced to buy MOC, an inferior CPD product for which ABPN charges supra-competitive monopoly prices, or have their certifications revoked. And sellers of other CPD products are at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their certifications revoked by ABPN.

5

20.     MOC is not about maintaining standards as ABPN contends. It is a revenue-driven commercial endeavor, motivated by tens of millions of dollars in new MOC fees. As indicated by the failure of its earlier voluntary CPD product, MOC is financially successful only because it is mandatory and tied to certifications. ABPN's financial results amply document this. After the launch of MOC, from 2004 through 2018, ABPN's "Program service revenue" exceeded its total expenses by a yearly average of $4,448,338, as reported in its Forms 990 filed with the Internal Revenue Service ("IRS"). But for its reporting status as a supposed not-for-profit organization, this translates into almost $4,500,000 in average annual profits before investment and other income is taken into account.

21.     During the same time, ABPN "Net assets or fund balances" skyrocketed over 971%, from $12,610,227 at the beginning of 2004 to $122,470,594 in 2018. In other words, while it took ABPN almost seventy years to accumulate net assets (assets less liabilities) of $12,610,227 from selling certifications, ABPN net assets increased almost ten-fold to $122,470,594 as a result of selling MOC, including $97,169,079 in cash, savings, and securities on hand at year-end 2018.

22.     In addition to money damages, Plaintiffs ask that ABPN be enjoined from reporting certifications as invalid or describing psychiatrists and neurologists as "Not Certified" unless they buy MOC. Plaintiffs do not request that ABPN be prevented from determining its own criteria for certification, that ABPN be required to accept any other CPD product as a substitute for ABPN certification or its own MOC product, or that ABPN be compelled to recognize the validity of any other CPD product.

23.     Rather, Plaintiffs ask only that ABPN be restrained from revoking the certifications of those who do not buy MOC and instead purchase CPD products from others.

Severing its illegal tie will dismantle ABPN's captive MOC market, once again make ABPN's CPD product voluntary, and allow the marketplace to decide the merits of MOC.

24. Plaintiffs bring this Class Action on behalf of all psychiatrists and neurologists forced by ABPN to buy its MOC CPD product or have their certifications revoked.

## JURISDICTION AND VENUE

25. Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees arising from ABPN's violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

26. Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

27. ABPN sells its certification and CPD product in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABPN's certification and CPD products are sold in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABPN's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury therein by, among other things, tying its certification and CPD products, forcing Plaintiffs and other physicians to purchase its CPD product, and charging supra-competitive monopoly prices for MOC.

28. ABPN is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABPN is found in and transacts business herein.

29.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

U.S.C. § 1391, because ABPN resides in this judicial district, and a substantial part of the events

giving rise to Plaintiffs' claims occurred herein.

## PARTIES

30.     Plaintiff Emily Elizabeth Lazarou, MD ("Dr. Lazarou") is a graduate of the

University of Texas Medical School. She completed her residency in general adult psychiatry in

2006 at USF Health at University of South Florida in Tampa, Florida, where she also served as

Chief Resident of Psychiatry and in 2007 completed a fellowship in forensic psychiatry. She has

been a practicing psychiatrist since 2008. Dr. Lazarou is a resident of Florida.

31.     Plaintiff Aafaque Akhter, MD ("Dr. Akhter") finished medical school at Patna

Medical College in Bihar, India, and received his diploma in psychological medicine from the

Royal College of Surgeons in Ireland. He has also passed the MRCPsych (I) examination

conducted by the Royal College of Psychiatrists, London, United Kingdom. Dr. Akhter

completed his residency in general adult psychiatry in 2002 at Harvard Medical School. Dr.

Akhter has been a practicing physician since 2003 and is a resident of New York.

32.     Defendant ABPN is incorporated under the laws of the State of Delaware with its

principal place of business at 7 Parkway North, Deerfield, Illinois, and files with the Internal

Revenue Service as a Section 501(c)(6) not-for-profit organization.

## FACTS

33.     A license to practice medicine in the United States is granted by the medical

board of an individual State. To obtain a license a physician must, among other things, have

either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO")

and pass the United States Medical Licensing Examination ("USMLE"), a three-step

examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

34.     Most States require a doctor to periodically complete a required number of CME credits to remain licensed. CME is a CPD product. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits continuing medical education activities, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

35.     These are the same goals of CPD products sold by other vendors, including MOC.

36.     The practice of medicine in the United States in the early part of the 20th century included large numbers of proprietary physicians nationwide who had been "trained" through apprenticeships rather than formal education. Standards for medical education were largely nonexistent. Most care was delivered at the patient's home and doctors billed patients directly for their services.

37.     Even as medical schools began to grow in number, their curricula remained unregulated and inadequate, producing new doctors who often times were poorly prepared to practice medicine. In response, the American Medical Association ("AMA") in 1910 published the "Flexner Report," which became the blueprint for the standardization of medical school education in the United States.

38.     At about the same time and for the same reasons, doctors specializing in certain discrete areas of medicine began to form specialty boards. The purpose of the specialty boards

was to define and differentiate between the subject matter of medical specialties, ensure adequate postgraduate medical education and training in their areas of specialty, and then test those candidates who wished to practice in the relevant specialized area of medical practice. The first specialty board was the American Board of Ophthalmology formed in 1916.

39.     Dr. John A. Benson, the first President of the American Board of Internal Medicine ("ABIM"), the largest Member Board of ABMS with authority today over approximately 20 percent of all doctors in the United States, confirmed in a 1991 article in the *Annals of Internal Medicine* that specialty boards were organized, "for the purpose of providing a means by which scholarly consultants in internal medicine could voluntarily distinguish themselves [from other specialists] and be so identified. Such specialization needed definition. Another reason for establishing the Board was to standardize the variable quality and length of residencies at that time." Thus, unlike MOC, certifications measure the quality of residency programs.

## THE AMERICAN BOARD OF MEDICAL SPECIALTIES

40.     In June of 1933, the then-existing specialty boards formed the Advisory Board for Medical Specialties, later re-named the American Board of Medical Specialties ("ABMS"). The purpose of ABMS, identical to that of the specialty boards themselves, was described in a 2006 article in *Emergency Medicine Clinics of North America* as "[t]o stimulate improvement in postgraduate medical education."

41.     ABMS bylaws filed with the IRS with its Forms 990 have defined certifications and MOC separately. Certifications are awarded "to approved candidates who meet the requirements for certification in a specified field." MOC, on the other hand, is defined tautologically as a diplomate's "satisfaction of the requirements of the Maintenance of

10

Certification program." ABMS bylaws have also defined Member Boards as meeting ABMS "criteria for certification, recertification and/or maintenance of certification of licensed physicians." These examples reflect that the separate references to, nature of, and distinction between certification and MOC have been recognized historically by ABMS.

42.     The twenty-four ABMS Member Boards, including ABPN, have authority over approximately 900,000 doctors nationwide, approximately 90 percent of all doctors in the United States.

43.     Three classes of ABMS members are defined in its Bylaws: (1) the twenty-four Member Boards; (2) nine Associate Members, including the ACCME, the Accreditation Council for Graduate Medical Education ("ACGME"), the American Hospital Association ("AHA"); the American Medical Association ("AMA"), and the Federation of State Medical Boards; and (3) six Public Members.

44.     ABMS is governed by a 35-person Board of Directors, including one Director each from ABPN and the other Member Boards; six Public Members; the ABMS Chair, Chair-Elect, Immediate Past Chair, and Secretary-Treasurer; and the ABMS President and CEO.

45.     ABPN and the Member Boards control ABMS.

46.     ABMS bylaws state that its policies are "established collectively by the Member Boards." As such, ABMS policies, practices, and procedures are the policies, practices, and procedures of ABPN and the Member Boards, including those related to certification and CPD products, including MOC. When ABMS and its management and employees speak or write about certification and CPD products, they do so on behalf of ABPN and the Member Boards.

47.     There are twelve committees of the ABMS Board of Directors, including the Committee on Certification and the separate Committee on Continuing Certification.

11

48.     The Committee on Certification is tasked with overseeing policies and procedures related to certification. The Committee on Continuing Certification, on the other hand, is responsible for overseeing MOC. This separation of oversight roles between the two committees reflects the separateness of certifications and MOC.

## THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

49.     ABPN was formed in 1934 by the American Psychiatric Association ("APA"), the American Neurological Association ("ANA"), and the American Medical Association ("AMA") Section on Nervous and Mental Diseases.

50.     ABPN became an ABMS Member Board in 1935, the same year it sold its first certification, and has been a Member Board continuously since that time.

51.     In the banner that appears at the top of every page on its website, ABPN describes itself as "A Member Board of the American Board of Medical Specialties (ABMS)." ABPN also lists the ABMS website among its "Affiliate Websites," and includes active links on its Mission and History page to the ABMS website describing ABPN's membership in ABMS. This demonstrates the unity of interest of ABPN, ABMS, and the other Member Boards, especially with regard to certifications and CPD products. It also confirms that ABMS and other Member Boards speak for ABPN, and *vice versa*, about the purpose and goals of certification and CPD products.

52.     ABPN began selling certifications in 1935. ABPN currently sells certifications in Psychiatry, Neurology, and "Neurology with Special Qualification in Child Neurology." These are referred to as primary certifications. ABPN also sells separate certifications in the following fifteen subspecialties: addiction psychiatry, brain injury medicine, child and adolescent psychiatry, clinical neurophysiology, consultation-liaison psychiatry (formerly psychosomatic

12

medicine), epilepsy, forensic psychiatry, geriatric psychiatry, hospice and palliative medicine, neurocritical care, neurodevelopmental disabilities, neuromuscular medicine, pain medicine, sleep medicine, and vascular neurology.

53.     To purchase a certification a candidate must pass an ABPN uniform, standardized one-time evaluation of the candidate's postgraduate medical education and residency training. For the reasons detailed below, almost all psychiatrists and neurologists buy certifications. Those who do not may include researchers, teachers and other academics, and others who may not regularly treat patients.

54.     ABPN files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization as a "business league." As such, its purpose is to promote the common interests of those physicians over whom it has authority, rather than to benefit the public.

55.     ABPN has a Board of Directors with an Executive Committee and other committees. As of September 23, 2020, the Board of Directors was comprised of 18 members, all of whom have bought ABPN certifications. In total, the Directors own 38 ABPN certifications, including 17 subspecialty certifications. Of those, ten certifications are "grandfathered" and cannot be revoked for failure to purchase MOC.

56.     ABPN does not make its bylaws available to the public, but has disclosed some information about its Board of Directors on the ABPN website. From on or about January 31, 1998, until on or about March 19, 2015, ABPN disclosed on various pages of its website that the sixteen ABPN Directors are selected by "the Board itself." Thus, ABPN Directors are self-replacing and choose their own successors.

57.     The mission and objectives of ABPN are described on its website and in its annually published General Information and Board Policies. ABPN has consistently referred to

13

certification and MOC as two separate products in these statements. ABPN states its mission as establishing "standards and requirements for initial *and* continuing certification [MOC]," to "develop and provide . . . procedures for certification *and* maintenance of certification," and to develop "testing methods to evaluate [the pre-certification] candidate *and* [post-certification] diplomate competencies." (Emphasis added.) The objective of MOC, described as "[e]ncouraging and assessing diplomate involvement in lifelong learning," is a discrete part of ABPN's self-described mission, separate and apart from certification. This distinction of objectives and purposes reflects the separate references to, nature of, and distinction between certifications and MOC recognized historically by ABPN.

## ABPN CERTIFICATIONS ARE AN "EARLY CAREER" AND "ONE-TIME" EVENT

58. Certifications are sold to candidates for admission into the specialized medical practice of the particular Member Board selling the certification, here ABPN. Thus, certification is described as an "early career event" on the ABMS website.

59. The former President and CEO of ABMS in a 2006 medical journal article explained that certification is "used to assess the knowledge and, when possible, the relevant clinical skill" of candidates for "entry" into the specialized medical practice of the particular Member Board. He described certification as "a one-time, snapshot assessment."

60. Similarly, the former President and CEO of a Member Board wrote in the October 2016 issue of the *Mayo Clinic Proceedings* that the intent of certification is to assure that the candidate "has successfully completed an approved educational program and evaluation process" and that certifications "are issued after physicians successfully complete accredited training, pass a secure written examination, and for some member boards pass an oral examination."

14

61.     As another author put it in a 2013 medical journal article, "BC [board certification] originated as a means to establish national outcome criteria for excellence in residency training programs."

62.     After the formation of ABMS, certifications were referred to as "ABMS board certification." Over time, however, certifications became known simply as "board certification" or "certification."

63.     The ABPN website sets forth a uniform, standardized set of requirements for the purchase of certifications by candidates for entry into the fields of psychiatry and neurology, providing in full:

> "1. Be a graduate of an accredited medical school in the United States or Canada or of an international medical school listed by the World Health Organization.
>
> 2. Complete all training in either a U.S. program accredited by the ACGME or approved by the ABPN or in a Canadian program accredited by the Royal College of Physicians and Surgeons of Canada as well as meet the other requirements specified in the reciprocity agreement.
>
> 3. Have an active, full, unrestricted medical license in the U.S. or Canada as defined in the separate 2016 Board Policies Manual on this website. Applicants are required to submit copies of their active, full, unrestricted medical licenses, showing the expiration date with their applications OR update their medical licenses in their ABPN Physician Folios account.
>
> 4. Have satisfactorily completed the Board's specialized training requirements described on this website.
>
> 5. Apply online and submit an application through ABPN Physician Folios."

64. That certification assesses only postgraduate medical education and residency training is further confirmed by ABPN's requirement that candidates buy certifications within a limited period of time after completion of their residency programs.

65. For almost the entire time between the sale of the first certification by a specialty board in 1916 and today, certifications sold by ABMS Member Boards were called exactly that, *i.e.*, "certifications." In or around 2006, however, after ABPN and the other Member Boards forced doctors to purchase MOC or forfeit their certifications, their nomenclature changed. "Certification" became "initial certification."

66. This seemingly subtle change in terminology allows ABPN to deflect factual allegations (including in this litigation) that certification and MOC are separate products. At the same time, it supports the factually incorrect and conclusory assertion that "initial certification" and MOC together constitute a single product. Thus, while ABPN currently uses the new terminology "initial certification," that term should be understood to mean what it has meant since 1916, *viz.*, "certification."

## ABPN CERTIFICATIONS ARE NOT "VOLUNTARY"

67. While certification is called "voluntary" by ABPN the opposite is true. Beginning with the growth of hospital-based care, managed care networks, and the extension of insurance coverage to most Americans in the latter half of the 20th century, the number of psychiatrists, neurologists, and other doctors buying certifications increased due to its use as a proxy for hospital privileges, participation in managed care networks, and coverage by health insurance plans. Medical specialization became the norm and by the early 1970s seventy or eighty percent of doctors described themselves as specialists.

16

68.     In 1998, Rosemary A. Stevens, Ph. D., a medical historian, referred to specialization as "*the* fundamental theme for the organization of medicine in the twentieth century." (Emphasis in original). This is even more true in the twenty-first century. Certification, however, remains a "one-time, snapshot assessment" of a candidate's postgraduate medical education and residency training.

69.     Persuasive of the fact that ABPN certification is not "voluntary" is that in order to pursue a successful career in medicine, almost all psychiatrists and neurologists find it necessary to purchase ABPN certifications.

**Hospitals And Other Medical Organizations Require Certifications**

70.     Almost all hospitals, health systems, practice groups, medical corporations, and other medical organizations incorporate the requirement of certification into privileging and employment decisions. Most hospitals and other medical organizations are governed by bylaws or similar rules. As a result of the circumstances described above, those bylaws or rules typically require that affiliated doctors be certified by a Member Board such as ABPN in order to hold hospital privileges and/or to be employed and to enjoy other benefits necessary to pursuit of a successful medical career.

71.     Many such bylaws and rules requiring certification pre-date MOC. Thus, the certification requirement meant historically that doctors were only required to document successful completion of their postgraduate medical education and residency training. MOC did not yet exist and psychiatrists and neurologists were not required to buy MOC or have their certifications revoked by ABPN.

72.     The American Hospital Association has encouraged hospitals to use certification as a factor in making privileging decisions.

73.     Hospitals also limit categories of work to doctors with certifications, effectively excluding those who do not.

74.     Hospitals and other medical organizations require certification for other reasons as well. For example, there are approximately 850 institutions, including hundreds of the largest hospitals nationwide, that sponsor approximately 12,000 residency programs. Those programs provide postgraduate medical education and training for new specialists in 181 specialties and subspecialties ("residency" and "residency program" also include postgraduate fellowships). There are approximately 270 psychiatry residency programs and 160 neurology residency programs. A sponsoring institution's standing in the medical community and its prestige generally is enhanced by sponsoring residency programs.

75.     The Accreditation Council for Graduate Medical Education ("ACGME") identifies as one of its goals, "to educate physicians who seek and achieve board certification." To further that goal, ACGME uses board certification as a measure of eligibility for a sponsoring institution's residency program directors. Residency program directors' references of qualifications and character are an important element of eligibility for certification candidates.

76.     There are approximately 140,500 active full-time and part-time residents today, each of whom is charged by ACGME to "seek and achieve board certification."

77.     As part of maintaining ACGME accreditation, each residency program is also required to undertake an annual evaluation. The evaluation committee is mandated by ACGME to consider Board pass rates and certification rates of residents over a rolling 7-year period. The number of ACGME accredited residency programs has increased by almost a third between 2009 and 2019, reflecting the reality that certification is becoming increasingly more essential for new doctors.

18

78.     ABMS Member Boards contributed to the development of the ACGME accreditation system. The American Medical Association and other medical organizations also recommend residency, and implicitly certification, for new doctors.

79.     ABMS is a founding member of ACGME and remains a Member Organization today. ACGME, in turn, is an Associate Member of ABMS. When ACGME was founded in 1981, certification was a "one-time, snapshot assessment" of a candidate's postgraduate medical education and residency training. MOC did not yet exist and psychiatrists and neurologists were not required to buy MOC or have their certifications revoked by ABPN.

80.     ACGME has a history of working with the Member Boards, including through ABMS, to promote certification of doctors.

81.     In addition to increased prestige for institutions with ACGME-accredited residency programs, such programs are also financially lucrative for the sponsoring institutions. Residents are a primary resource for patient care and assist institutions, especially hospitals, with providing 24-hour, 365-day coverage for their patients. The more affiliated residency programs and residents, the more patients a hospital or other institution can treat and the more revenue it generates.

82.     Institutions that sponsor ACGME-accredited programs receive funding from Medicare, Medicaid, and other governmental sources to pay resident salaries and training costs, allowing the institutions to avoid those costs, thereby substantially increasing their profitability. Governments pay approximately $15 billion a year to support residency programs. One health policy expert has described this system of payments as "essentially a hospital subsidy cloaked as an educational expense." This entire "hospital subsidy" is dependent on the ACGME mandate that residents "seek and achieve certifications."

19

83.     The requirement of certification by hospitals is especially significant as today hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. This is magnified in highly concentrated hospital markets, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77 percent of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

84.     Because most hospitals, health systems, practice groups, medical corporations, and other medical organizations require psychiatrists and neurologists to be certified to obtain hospital privileges and/or employment, certification cannot be considered "voluntary."

85.     Other aspects of an economically successful medical career are also linked to the certification requirement of hospitals and other medical organizations. For example, doctors who are unable to obtain hospital privileges because they do not purchase certifications do not qualify for coverage under the hospital's malpractice policy and must purchase more expensive insurance with less advantageous terms elsewhere.

**Insurance Companies Require Certifications**

86.     Most medical care in the United States is paid for through either commercial or government health insurance plans that pair health insurance coverage and a cost-sharing structure, provider network, and service area. Health insurance plans are accredited by the National Committee for Quality Assurance ("NCQA").

87.     NCQA accredits health insurance plans using a metric referred to as Healthcare Effectiveness Data and Information Set ("HEDIS"), based on data collected from plans covering approximately 190 million people. Health insurance plan sponsors include commercial insurance companies, Medicare, Medicaid, and exchanges.

88.     Using a proprietary methodology, NCQA uses the HEDIS data to issue "Report Cards" assigning accreditation ratings to over 1,200 health insurance plans nationwide. The HEDIS metric has historically used the plan's number of doctors with certifications as a factor in its accreditation ratings. The more such doctors affiliated with an insurance plan, the higher accreditation rating reported by NCQA.

89.     NCQA has developed a separate HEDIS metric for certain Medicare plans that also has historically used the plan's number of doctors with certifications as a factor in its accreditation ratings. Health insurance plans receive a score from Medicare based on the HEDIS metric, with significant financial incentives for insurance companies if a score exceeds certain thresholds. Medicare uses a 5-star system to rate health insurance plans, with 1 star being "Poor" and 5 stars being "Excellent." Bonuses for high star ratings range from 1.5 percent to 5 percent.

90.     When NCQA began accrediting health insurance plans in 1991, certification was a "one-time, snapshot assessment" of a candidate's postgraduate medical education and residency training. MOC did not yet exist and psychiatrists and neurologists were not required to buy MOC or have their certifications revoked by ABPN.

91.     NCQA was formed in 1990 by Margaret E. O'Kane. Ms. O'Kane is not a physician, but was made a Public Member of the ABMS Board of Directors in 2006, served a second term beginning in 2011, and also served on the Executive Committee. As an ABMS Director, her role included promotion of certification.

92.     There have been other interlocking relationships between NCQA and ABMS and the Member Boards since the formation of NCQA. For example, Richard G. Battaglia, the current Chief Medical Officer of the largest Member Board, was previously employed by NCQA for ten years, including as Chairman of NCQA's accreditation decision-making body.

93.     NCQA has a history of working with the Member Boards, including through ABMS, to promote certification of doctors.

94.     As a result of the above, for example, most (if not all) Blue Cross Blue Shield Companies ("BCBS") require that psychiatrists and neurologists buy ABPN certifications to be included in their networks and health insurance plans. Patients whose physicians are not certified must either pay the cost of treatment themselves, or pay a higher "out of network" coinsurance rate (for example, 10 percent in network versus 30 percent out of network) to the financial detriment of both the patient, who must pay higher out-of-pocket costs, and the physician, who has a substantially smaller patient base due to the inability to offer insurance coverage.

95.     Nationwide approximately 96 percent of hospitals and 92 percent of physicians are in-network with BCBS. Since most (if not all) health insurance companies require certification, hospitals and other medical organizations faced with loss of coverage by health insurance plans, in turn, require certification.

96.     Because insurance companies require physicians, including psychiatrists and neurologists, to be certified to be included in their networks and health insurance plans, certification cannot be considered "voluntary."

## ABPN Certifications Are An Economic Necessity

97.     Certification has other practical implications as well. These include higher compensation, lower malpractice insurance rates, and election to membership in professional societies that can be pivotal to advancement both professionally and academically.

98.     One Member Board defends MOC on the basis that "Board certified doctors earn a higher salary," and specifically an "18% higher salary."

99.     Candidates certified by ABPN enjoy the economic advantage of being listed in

ABMSdirectory.com, a fully searchable electronic database that serves as an important online

reference to locate doctors based on specialty or subspecialty, geographic area, and other criteria,

and also includes a detailed physician profile and "professional information that could be helpful

in choosing a specialist." Psychiatrists and neurologists cannot be listed in the directory unless

they have purchased ABPN certifications.

100.     Because hospitals and other medical organizations and insurance companies

require psychiatrists and neurologists to be certified, and for the other reasons described above, a

successful medical career for most psychiatrists and neurologists is impossible without ABPN

certification. Despite protestations that certification is "voluntary," ABPN and the other Member

Boards advocate strongly, including through ABMS, for hospitals and other medical

organizations, insurance companies, and government programs to require certification.

101.     As long ago as 1991, Dr. Benson wrote in the *Annals of Internal Medicine* that

certification "is no longer an option for the physician entering the marketplace." A later ABIM

President and CEO agreed, writing in a medical journal article in 2008 that "many physicians

really feel that board certification is not optional," specifically noting its "significant impact in

the marketplace." Other medical industry sources confirm that certification is necessary to the

pursuit of a successful medical career.

102.     In a lecture delivered in 2011, medical historian Dr. Stevens referred to

certification as "blossoming over time into a 'voluntary' system of approved medical specialty

boards, which eventually carved up the entire field of American medicine, becoming less

voluntary and more 'regulatory' in the process." (Quotation marks in original.) Thus, ABPN and

23

the other Member Boards are more properly viewed as quasi-governmental in nature rather than as private bodies.

103.    Similarly, a 2019 article about certification and MOC published in *Arthritis Care & Research*, the peer-reviewed official journal of the American College of Rheumatology and the Association of Rheumatology Professionals, concluded in no uncertain terms: "Board certification, which started as a voluntary achievement and remains so in theory has become involuntary in practice, making participation in MOC programs mandatory for many if not most physicians in order to maintain employment and clinical privileges, or receive reimbursement."

## CONTINUING PROFESSIONAL DEVELOPMENT PRODUCTS

104.    CPD products, including MOC, promote life-long learning and the development of both medical and non-medical competencies after residency, including professionalism; interpersonal, managerial and communication skills; value-based delivery and cost reduction; clinical knowledge and skills; patient experience; practice improvement; diversity and inclusion; interprofessional practice; doctor wellness and burnout; patient safety; working in teams; and health care disparities and population health.

105.    Like MOC, the ultimate goal of other CPD products is to enhance physician quality and patient care.

106.    As the name itself indicates, CPD products, including MOC, are sold to doctors after their residency training and specialist qualifications have already been completed. Thus, while certification measures only postgraduate medical education and residency training, CPD products address the many other competencies required to practice medicine.

107.    As with MOC, other CPD products are based on the precepts of "lifelong learning and self-assessment," also referred to as "self-directed learning."

24

108.    Continuing professional development has long been recognized as an important segment of the medical industry. In the early part of the 20th century medical and professional societies offered lectures and other activities focused on continuing medical education. In the 1940s and 1950s medical schools began to create offices and departments for continuing professional development after graduation, providing lecture-based updates both to doctors in their own academic communities (*e.g.*, faculty members) and to practicing doctors in the broader medical community. CPD products proliferated in the ensuing years, especially as they became required for State medical licensure, which typically requires 40-50 hours of CME credit every two years.

109.    There are at least two professional associations devoted to the field of continuing professional development in the medical industry: the Society for Academic Continuing Medical Education founded in 1976, and the Alliance for Continuing Education in the Health Professions. *The Journal of Continuing Education in the Health Professions*, established in 1980, consolidates scholarship and best practices in continuing professional development in the medical industry.

110.    Offerings by CPD vendors include products addressing value-based delivery and cost reduction, clinical knowledge and skills, patient experience, practice improvement, diversity and inclusion, interprofessional practice, doctor wellness and burnout, patient safety, working in teams, and health care disparities and population health. These are also encompassed by MOC, ABPN's CPD product.

111.    Methods and tools used by CPD vendors include courses, lectures, clinical case conferences, morbidity and mortality conferences, panel discussions, audience response systems, team-based learning, video or digital presentations, small group or paired interactions, online

learning, coaching and mentoring, self-reflection and self-assessment, peer observation and feedback, patient-led activities, debate formats, and simulations. All or many of these formats are utilized in connection with MOC. Performance (*i.e.*, outcome or effectiveness of the CPD product) is usually measured by examinations and simulations, as is the case with MOC.

### Continuing Medical Education

112.    The Accreditation Council for Continuing Medical Education ("ACCME") accredits CME vendors and activities. ACCME describes itself as being "responsible for setting standards to ensure that CME is effective, relevant, responsive to the changing healthcare environment, independent, free from commercial bias, and designed to promote healthcare improvement. Our goal is to leverage the power of education to improve clinician performance and patient care."

113.    CME extends to all areas of continuing professional development, encompassing both medical and non-medical competencies, including professionalism, and interpersonal, managerial, and communication skills. The terms CME and CPD are sometimes used interchangeably or in tandem, for example as "CPD/CME." CME vendors typically use a lecture, classroom, or online format, while other CPD vendors may use those same formats, but also utilize the other methods and tools described above.

114.    The ACCME explains that CME "represents that body of knowledge and skills generally recognized and accepted by the profession as within the basic medical sciences, the discipline of clinical medicine, and the provision of health care to the public."

115.    According to an article describing the history of CME, "the genesis of CME in the United States is largely the result of efforts of the Mayo brothers," who created a Surgeons Club, which "partook in vigorous daily discourse regarding new techniques being

advanced." This evolved into the "Clinical Week" in 1927, which was described as the "prototype of the modern CME course." In 1934, the American Urological Association started what has been described as the first "CME program."

116.    CME "credits" is the system by which doctors document their participation in CME activities. Physicians use these CME credits to meet requirements for, among other things, State medical licensure, hospital privileging and other credentialing, membership in professional societies, and other professional purposes. Required CME credits are determined by the organization mandating the specific credit system.

117.    The AMA published its first set of CME guidelines in 1957. In 1968, the AMA created two discrete categories of continuing education, Category 1 and Category 2, describing the required types of activities that qualify doctors for AMA's Physician's Recognition Award ("PRA"). The AMA PRA recognizes physicians who, by participating in CME activities, demonstrate their commitment to staying current with advances in medicine.

118.    Doctors earn Category 1 CME credit by participating in activities sponsored by CME providers accredited by either the ACCME or ACCME-recognized State or local medical societies; by participating in activities recognized by the AMA as valid educational activities; and by participating in certain international activities recognized by the AMA through its International Conference Recognition Program.

119.    Category 2 CME credit is self-claimed and self-documented by physicians who participate in activities they individually determine comply with the AMA definition of CME, that comply with the relevant AMA ethical opinions, are not promotional, and are found by physicians to be a worthwhile learning experience related to their practice.

120.    ACCME follows the two categories of CME established by the AMA. In 2018,

ACCME recognized 1,763 accredited CME vendors, 628 accredited directly by ACCME and 1,060 accredited by State and local medical societies.

121.    CME products often include "self-assessment activities" such as multiple choice examinations or case studies, referred to as SA-CME. An SA-CME product includes a post-activity evaluation component assessing the doctor's performance. It consists of a minimum passing standard or threshold and requires timely feedback to the doctor.

122.    "Self-assessment activities" are required by ABPN as part of MOC, and were offered by CME providers and other CPD vendors for decades before ABPN began selling its own CPD product.

123.    CME products also include practice improvement projects. These are structured as a three-stage process by which physicians learn specific performance measures, assess their practice using the selected performance measures, implement interventions to improve performance related to these measures over a useful interval of time, and then reassess their practice using the same performance measures.

124.    Practice improvement projects are required by ABPN as part of MOC, and were offered by CME providers and other CPD vendors for decades before ABPN began selling its own CPD product.

125.    ABMS was a founding organization of ACCME and has been a Member Organization continuously since that time. According to ACCME, ABMS and other ACCME Member Organizations "collaborate" on CME activities.

126.    No CME vendor sells a certification product to psychiatrists or neurologists.

**Medical Schools**

127.    According to a 2018 survey conducted by the Society for Academic Continuing

Medical Education, over 87 percent of United States medical schools responding (a total of 104 schools) sell accredited CPD products. These include self-assessment activities and practice improvement projects required by ABPN as part of MOC that have been offered by medical schools for decades before ABPN began selling its own CPD product.

128.　For example, the University of Chicago medical school sells an online CPD product to neurologists embracing three different CPD competencies: patient care and procedural skills, medical knowledge, and practice-based learning and improvement.

129.　No medical school sells a certification product to psychiatrists or neurologists.

**National Board of Physicians and Surgeons**

130.　The National Board of Physicians and Surgeons ("NBPAS") was established in or around January 2015. It offers products demonstrating continuing professional development to doctors practicing in many specialties, including psychiatry and neurology. Like ABPN, NBPAS calls its CPD product maintenance of certification.

131.　To buy the NBPAS CPD product, a physician must have already bought a certification from an ABMS Member Board; hold a valid State medical license; complete at least fifty hours of accredited CME within the past twenty-four months; for some specialties, hold active hospital privileges; and be a medical staff member.

132.　The CME required by NBPAS must be in the doctor's specialty or specialties. NBPAS also requires CME for "grandfathers." Active hospital privileges and medical staff membership are significant indicia of professional development, as doctors typically must submit to interviews and peer review processes before obtaining hospital privileges or medical staff membership. And once hospitals privileges or and medical staff membership are obtained, each typically has peer review, continuing education, and practice improvement requirements.

133.    NBPAS fees are vastly lower than those charged by ABPN for MOC, and NBPAS requires vastly less physician time. For example, in 2019, the average yearly cost of NBPAS was $84.50 ($94.50 for a DO), while the MOC annual fee charged by ABPN was $175.

134.    As of September 21, 2020, just 136 hospitals, approximately one percent of hospitals nationwide, recognized the NBPAS CPD product, and no insurance company accepted the NBPAS CPD product.

135.    NBPAS is an innovative competitor in the market for CPD products.

136.    NBPAS does not sell a certification product to psychiatrists or neurologists.

### Hospitals, Clinics, and Other Medical Organizations

137.    Many other medical organizations sell CPD products.

138.    These include the American Medical Association, professional societies and colleges, hospitals, clinics, physician groups, health systems, and local medical associations.

139.    For example, the Mayo Clinic operates a School of Continuous Professional Development for practicing physicians. It sells over 200 CPD products annually, including in all areas of psychiatry and neurology.

140.    No other medical organization sells a certification product to psychiatrists or neurologists.

### ABPN'S SO-CALLED "MAINTENANCE OF CERTIFICATION" PRODUCT

### Voluntary CPD Products Sold By ABPN and Other Member Boards

141.    In the 1970s, ABPN and other Member Boards began selling CPD products called "recertifications." Unlike its successor MOC, these CPD product were voluntary. In other words, certifications of those who did not buy "recertifications" were not revoked.

142.    One Member Board confirmed in its *Newsletter* that the CPD product was

voluntary, and that doctors who did not purchase it would not have their certifications "withdrawn, rescinded, or revoked." The Member Boards who sold "recertification" CPD products did so as standalone products separate from certifications.

143.     ABPN sold its own voluntary "recertification" CPD product from 1974-1985, before it abandoned the product. ABPN sold its "recertification" CPD product as a standalone product and continued to sell its certification product separately both during and after this time.

144.     In or about 1974, a Member Board offered another CPD product, calling it a "Continuous Professional Development Program." Again, certifications of doctors who did not buy the CPD product were not revoked.

145.     Only 3,355 doctors bought the Continuous Professional Development Program CPD product when it was first sold; 2,240 doctors bought it when it was offered again in 1977; just 1,947 doctors bought the CPD product when it was offered for a third time in 1980; and only 1,403 doctors purchased it when it was offered the final time in 1986, fewer than 4 percent of the doctors who had previously bought certifications.

146.     This limited and declining interest, reflected in the almost 60 percent drop in doctors purchasing the CPD product over the twelve years it was offered, demonstrated the minimal value the medical community placed on the CPD product. The Member Board abandoned its voluntary CPD product in or around 1986, but continued thereafter selling its separate certification product.

147.     As detailed below, these voluntary CPD products were later re-introduced as MOC. Their sale as standalone products confirms that, but for MOC being made mandatory and ABPN's resulting illegal tie, MOC and certifications are separate products fueled by separate

demand, and that psychiatrists and neurologists, when allowed freedom of choice, do not consider MOC to be a component or element of certifications.

## MOC Is Separate And Distinct From Certification

148.    In or around 1998, Member Boards began selling yet another CPD product, which later became known as MOC.

149.    ABPN explained MOC in its Spring 2002 newsletter *ABPN Diplomate*, as a reaction to a concern that "many players" had entered "the arena of assessment," that ABPN "will continue to be challenged from the outside," and that MOC would "eliminate the need for such [outside] intervention." No mention was made of any expectation that MOC would improve physician quality or patient care. Twenty years later, ABPN still cannot establish a causal relationship between MOC and a beneficial impact on doctors, patients, or the public.

150.    By 2006, ABPN had fully implemented its mandatory MOC product, requiring psychiatrists and neurologists to purchase MOC or have their certifications revoked.

151.    Like the voluntary "recertification" CPD product, MOC is referred to by ABPN as a standalone product distinct from certifications, and is sold separately by ABPN.

152.    ABPN explained in the Spring 2001 *ABPN Update,* that MOC assesses "commitment to lifelong learning through continuing medical education and other educational programs, and some assessment of practice-based performance." This confirms MOC is a CPD product distinct from certifications sold in competition with CME and similar educational programs sold by other CPD vendors, including self-assessment activities and practice improvement projects.

153.    More recently, the ABPN 2011 Annual Report describes MOC as reflecting a "commitment to lifelong learning."

154.    And today, the ABMS CertificationMatters.org website describes MOC as "ongoing learning and assessment" and "lifelong learning and self-assessment."

155.    Consistent with its own distinction between certifications and MOC, ABPN Forms 990 since 2011 have described its mission as two-fold, "to develop and provide . . . procedures for certifications *and* maintenance of certification in psychiatry and neurology." (Emphasis added.) Since at least 2013 ABPN has reported MOC fees as a separate program revenue category on its Forms 990.

156.    ABPN has always charged psychiatrists and neurologists separately for its certification and MOC products.

157.    According to a medical journal article written by three ABMS employees in 2016, "underlying the creation" of MOC was its emphasis, unlike certification, on "performance in preference to knowledge," with its "focus on improvement rather than on elimination of candidates" for entry into a specialized practice of medicine.

158.    The former President and CEO of ABMS wrote in a medical journal article in 2005 that MOC "is a much broader program in scope, in depth, and in range" than certification and "is an overall comprehensive evaluation of practice involving multiple areas." He wrote in another medical journal article a year later that MOC was intended to focus on each individual doctor's "self-directed learning."

159.    MOC is the same type of CPD product offered by ABPN and other Member Boards previously on a voluntary basis. MOC is still referred to today on the ABMS website by the same terminology as the earlier voluntary CPD products: "Continuous Professional Development." There are, however, two significant differences between MOC and the earlier voluntary CPD products.

33

160.    First, ABPN calls its CPD product "Maintenance of Certification" instead of "Continuous Professional Development." As discussed further below, this new label is strategic and not simply a change in packaging. And second, MOC is mandatory.

161.    Thus, while certification is an "early career event" that candidates buy to enter the specialized medical practices of psychiatry or neurology, MOC is purchased by older, more experienced physicians after residency and certification. While certification is a "one-time snapshot assessment" of a candidate, psychiatrists and neurologists must purchase MOC throughout their careers or have their certifications revoked. While certification is an assessment of postgraduate medical education and residency training, MOC's focus is on "lifetime learning and self-assessment" and "self-directed learning." While certification uses a uniform, standardized set of requirements to test a psychiatry or neurology candidate, MOC is purported to be individualized and self-directed.

162.    Two important goals were accomplished by re-branding ABPN's CPD product as MOC instead of "Continuous Professional Development." First, by introducing the concept of "*maintenance* of certification," ABPN could more plausibly make MOC mandatory. ABPN accomplished this by, for the first time, restricting certifications to a limited time period.

163.    ABPN first sold its certification product in 1935, and had never before included an expiration date. This is because certification is a test of a candidate's qualifications to enter the specialized medical practices of psychiatry or neurology. Successful postgraduate medical education and residency training cannot be invalidated or revoked.

164.    Learning from the earlier failed voluntary "recertification" CPD product, ABPN well understood that its new MOC CPD product would never be successful on its own merits. The only way it could succeed was to force physicians to buy MOC, and the only way to force

34

physicians to buy MOC was to use certifications as leverage. Psychiatrists and neurologists who refused to buy MOC had their certifications revoked, and along with it the ability to pursue a successful medical career.

165. The second goal of repackaging the new CPD product as MOC is strategic. Referring to "maintenance of *certification*" allows ABPN to argue (wrongly) that a single product exists, and that simply by including "certification" in its name MOC is a component of certification.

166. MOC serves no function in evaluating postgraduate medical education and residency training, and therefore cannot be a component of certifications which assess exactly that.

167. If instead of the ABPN-contrived labels "initial certification" and "maintenance of certification" the original and accurate terminology of "certification" and "Continuous Professional Development" is substituted, ABPN's tying, forcing, and other anti-competitive conduct becomes clear. Creative product labeling cannot insulate ABPN from the truth that certification and MOC are separate and distinct.

## **ABPN's MOC Product Is Not Voluntary**

168. ABPN claims that, like certifications, MOC is "voluntary." But for the same reasons certifications are not "voluntary" neither is MOC, because due to ABPN's illegal tie psychiatrists and neurologists are forced to buy MOC or have their certifications revoked.

169. ABPN's 2014 Annual Report confirmed that, "To remain certified, [physicians] must fulfill all . . . MOC requirements."

170. Per the ABPN website, psychiatrists and neurologists who do not buy MOC and meet its requirements "are no longer certified."

171.    The Federation of State Medical Boards ("FSMB") is an umbrella organization of State medical licensing boards. In or around 2009, FSMB established an Advisory Group that in 2010 proposed a national framework for State medical licenses. The new framework, termed Maintenance of Licensure ("MOL"), bears an uncanny similarity to MOC. One of the twelve members of the FSMB Advisory Group was Richard E. Hawkins, the current President and CEO of ABMS.

172.    ABPN's goal is that MOC becomes a proxy for State medical licensure. According to ABPN's website: "The ABPN strongly recommends to state medical boards, however, that if diplomates do complete the requirements of MOC then that accomplishment should suffice for MOL."

173.    The American College of Emergency Physicians revealed that ABMS has "developed a tool kit to advance the state medical boards' adoption of the FSMB policy encouraging the state medical boards to accept MOC participation as meeting a state's requirements for license renewal." The FSMB CEO wrote in a medical journal "that meeting the requirements for MOL could be as simple as providing an attestation of their ongoing participation" in MOC. This would further entrench ABPN and the other Member Boards' monopoly in the certification market, and at the same time give them a virtual stranglehold over CPD products, including CME activities.

174.    When ABMS and FSMB as part of a so-called pilot project lobbied the State Medical Board of Ohio to mandate MOC for State medical licensure, the Ohio State Medical Association successfully prevented such an outcome. Certification is already a proxy for hospital privileges, employment by medical organizations, participation in managed care networks, and

coverage by insurance companies. ABPN, the other Member Boards, and ABMS seek no less than to make MOC a proxy for State medical licensure.

### ABPN "Grandfathers" Thousands of Psychiatrists and Neurologists

175.     Psychiatrists and neurologists who purchased certifications before October 1, 1994, are not required by ABPN to purchase MOC. In other words, unlike younger psychiatrists and neurologists, certifications of "grandfathers" are not revoked if they do not buy MOC, even though their own residency training may have been completed decades earlier. This belies ABPN's litigation position that MOC is necessary to ensure that psychiatrists and neurologists stay current.

176.     Thousands of psychiatrists and neurologists are "grandfathered" by ABPN and reported as "Certified" and owning a "certificate valid indefinitely" even though they do not buy MOC. Even "grandfathers" who voluntarily buy MOC but fail to meet its requirements are reported by ABPN as having "Valid" certifications.

177.     Thus, ABPN holds "grandfathers" to a different standard, despite the fact they are many more years removed from their postgraduate medical education and residency training than younger physicians who are forced to purchase MOC. "Grandfathering" discriminates against younger doctors, including women and persons of color, who are under-represented in the group of psychiatrists and neurologists "grandfathered" by ABPN.

178.     "Grandfathers" demonstrate the separate demand for certifications and MOC and that they are separate products.

179.     "Grandfathered" psychiatrists and neurologists who are not forced to buy MOC overwhelmingly choose not to do so. ABPN Annual Reports reveal that between 2011 and 2014, "grandfathers" represented fewer than 1.3% of the psychiatrists and neurologists who bought

MOC. ABPN stopped publicly reporting the number of "grandfathers" who voluntarily bought MOC in 2015.

180.    "Grandfathers" who do not purchase MOC satisfy State medical licensure requirements by purchasing CME and similar CPD products from other vendors, reaffirming that a demand for CPD products, including MOC, exists separate from certifications.

181.    "Grandfathers" do not buy MOC because they know it is a separate product unrelated to certification. In other words, as consumers, "grandfathers" would buy MOC if they considered certifications and MOC a single product. The fact that so few "grandfathers" buy MOC is also a strong indication they consider it an inferior CPD product for which ABPN charges supra-competitive monopoly prices.

182.    "Grandfathered" ABPN Directors for many years did not buy MOC and did not have their certifications revoked. This hypocrisy became so embarrassing that ABPN now requires these "grandfathers" to buy MOC for public relations purposes.

183.    Depending on the primary certification, up to 22 percent of psychiatrists and neurologists are "grandfathered" by ABPN.

**ABPN's Changing and Ineffective MOC Product**

184.    ABPN forces psychiatrists and neurologists who bought certifications after October 1, 1994, to buy MOC or have their certifications revoked. MOC requirements have been a constantly moving target varying wildly in substantial ways depending upon, among other things, when psychiatrists and neurologists bought their certifications.

185.    As shown below, no causal relationship has been established between MOC and any beneficial impact on doctors, patients, or the public. ABPN itself has conceded there is "[i]nadequate evidence" of the validity of MOC.

38

186. MOC requirements include completing a required number of CME credits, participating in SA-CME or other self-assessment activities, passing an ABPN MOC examination, and participating in practice improvement projects (also referred to as improvement in medical practice activities). As originally implemented, psychiatrists and neurologists were forced by ABPN to buy MOC and meet its requirements every ten years.

187. CME credits have been available from other CPD providers for decades.

188. SA-CME products have also been available from other CPD providers for decades. Physicians, however, only receive ABPN MOC credit for SA-CME activities on the ABPN "Approved Products List," thereby excluding other CPD providers.

189. Practice improvement projects have also been available from other CPD providers for decades. Psychiatrists and neurologists, however, are required to participate in practice improvement projects on the ABPN "Approved Products List" or alternate activities listed on the ABPN website, thereby excluding other CPD providers.

190. The ABPN ten-year MOC examination is a secured, proctored, full-day, high stakes, closed-book examination. ABPN has long defended the highly onerous requirement of a secured, proctored, closed-book examination as necessary to prevent cheating.

191. ABPN charges psychiatrists and neurologists a supra-competitive monopoly price for superimposing the MOC examination over CPD products that have been sold by other vendors for decades.

192. Thus, MOC is nothing more than a device to force psychiatrists and neurologists to pay tens of millions of dollars in MOC fees for a redundant, worthless, and superfluous CPD product.

193.    ABPN President and CEO Dr. Larry R. Faulkner ("Dr. Faulkner"), conceded in 2013: "Much more information is needed about the effect of MOC on quality patient care." ABPN admitted again in its 2019 Crucial Issues Forum Report that there was "[i]nadequate evidence of the validity of certification and [MOC]." Thus, ABPN has long-known that the stated goals of MOC have not been met. Nonetheless, ABPN continues to require psychiatrists and neurologists to buy MOC.

194.    Dr. Faulkner also admitted in 2014 that the ABPN ten-year MOC examination, "might be modified to more closely resemble what happens during diplomates' professional activities, including the possibility for diplomates to have access to relevant reference material during MOC examinations." ABPN, however, continued to require the secured, proctored, closed-book MOC examination for certain psychiatrists and neurologists.

195.    The MOC requirement of burdensome and meritless practice improvement projects has also been met with resistance, including by the American Academy of Neurology and the American Psychiatric Association, two of ABPN's founding societies, albeit to no avail.

196.    Today, psychiatrists and neurologists are automatically enrolled in MOC by ABPN after they buy certifications and ABPN issues the physical certificates.

197.    By 2010, eight different sets of MOC requirements were mandated depending on when between 2001 and 2009 certifications were purchased. There is no available evidence suggesting ABPN evaluated whether any of these requirements actually met the stated goals of MOC before they were imposed or whether the different sets of requirements would yield comparative results. In other words, no meaningful analysis could be made whether ABPN MOC had met its stated goals before the requirements were abruptly changed, and due to the ever-shifting MOC requirements, there was no uniform standard against which to assess and compare,

40

for example, a psychiatrist or neurologist with a 2003 certification and one with a 2008 certification.

198.    In 2012, just two years later, ABPN announced additional changes to MOC, re-designing the product completely and re-branding it as "continuous."

199.    Under the new "continuous" MOC, psychiatrists and neurologists who purchased certifications after January 1, 2012, were forced to meet certain MOC requirements more frequently (every three years rather than every ten years), but were still required to take the ten-year MOC examination. Thus, ABPN continued to sell different MOC products depending on when certifications were purchased. ABPN also continued to revoke certifications of those who did not buy MOC, except for "grandfathers."

200.    There is no available evidence suggesting ABPN evaluated whether the new "continuous" product actually met the stated goals of MOC before it was unilaterally imposed.

## ABPN Imposes Additional MOC Requirements

201.    In 2017, ABPN's continuously evolving MOC product was changed yet again, requiring a new, so-called "patient safety activity" for those who purchased certifications in 2016 and after.

202.    There is no available evidence suggesting ABPN evaluated whether this new requirement actually met the stated goals of MOC before it was unilaterally imposed.

## ABPN Adds Yet Another MOC Product

203.    In January 2019, after just another two years, ABPN, re-invented MOC yet again, introducing what it referred to as "mini-exams" as an alternative to the ten-year MOC examination. Only a select number of psychiatrists and neurologists were initially invited to participate in the "mini-exams."

41

204.    While ABPN eliminated the ten-year MOC examination for those invited to

participate in the "mini-exams," all other psychiatrists and neurologists were still required to take

the ten-year MOC examination. Those participating in the "mini-exams" but who did not then

meet its requirements were also still required to take the ten-year MOC examination or have their

certifications revoked.

205.    The "mini-exams" are online and open-book. Participating psychiatrists and

neurologists select and read within a three-year period, at least thirty but no more than forty

medical journal articles from a group of articles pre-selected by ABPN, and must correctly

answer four out of five multiple-choice questions for at least 30 "mini-exams." In other words, a

physician could correctly answer 120 out of a possible 200 questions, just 60%, and still pass.

206.    There is no available evidence suggesting ABPN evaluated whether the new

"mini-exams" actually met the stated goals of MOC before they were imposed. It is highly

questionable whether the "mini-exams" any more than its many antecedents has "guaranteed"

that psychiatrists and neurologists are "current" as ABPN promises on its website.

207.    Just a few weeks ago, on October 1, 2020, ABPN announced the "mini-exams"

will become "a permanent alternative to the secure, proctored 10-year exam." ABPN re-labeled

the "mini-exams" as the "Article Assessment Pathway," and according to Dr. Faulkner it was

now "easier than ever . . . to meet [MOC] requirements."

208.    While presumably less burdensome for ABPN to implement and administer,

psychiatrists and neurologists must still "pay the full exam fee" of $175 per year that ABPN

charges for the 10-year MOC examination.

209.    In adopting the online and open-book "Article Assessment Pathway" for all

psychiatrists and neurologists, ABPN contradicted its longstanding and primary rationale for the

ten-year MOC examination format: that a secured, proctored, closed-book examination was necessary to prevent cheating.

210.    The "Article Assessment Pathway" MOC has no application to normal clinical practice. Nor does it represent the actual workflow or environment of real world psychiatrists and neurologists, whose job is to identify and carefully assess individual psychiatric and neurologic conditions.

211.    Psychiatrists and neurologists need only read, on average, less than one article per month (that may not even be relevant to their practice) and correctly answer just four multiple choice questions. The "Article Assessment Pathway" by definition does not require preparation or studying, and ABPN concedes it makes MOC "easier than ever."

212.    Because the "Article Assessment Pathway" is designed so that psychiatrists and neurologists pass, it serves no demonstrable medical or clinical purpose. Rather, it simply further corroborates ABPN's use of its monopoly power in certifications to force psychiatrists and neurologists to buy MOC and continue charging supra-competitive monopoly prices.

213.    ABPN's different iterations of MOC have been confusing to psychiatrists and neurologists and have also been implemented unfairly, with physicians required to meet arbitrary MOC requirements depending on when they purchased their certifications. The constant changes have made it impossible to determine whether ABPN's CPD product has ever met the stated goals of MOC, and have prevented psychiatrists and neurologists from calculating the true lifecycle cost of ABPN's CPD product.

## ABPN Revokes Certifications Of Physicians Who Do Not Buy MOC

214.    If physicians do not pay the annual MOC fee or do not meet other MOC requirements, ABPN reports them as "Not Meeting" MOC requirements.

43

215.    After a grace period, ABPN reports these physicians as being "Not Certified" by ABPN even though they previously have purchased certifications.

216.    "Grandfathered" physicians who are not required to buy MOC are reported by ABPN as "Certified" and owning a "certificate valid indefinitely." Even "grandfathers" who voluntarily buy MOC but fail to meet its requirements are reported by ABPN as having "Valid" certifications.

217.    But for their certifications being revoked, psychiatrists and neurologists would buy CPD products other than MOC from different CPD providers, including CPD products that are less expensive, more meaningful, and relevant to their practice. ABPN's illegal tying, however, makes it impossible or economically infeasible to do so.

### ABPN Has Forced Physicians To Pay Tens of Millions of Dollars In MOC Fees

218.    Since it has mandated MOC, ABPN has required psychiatrists and neurologists to pay MOC-related application and examination fees as well as annual MOC fees.

219.    ABPN has collected to date tens of millions of dollars in annual MOC fees and other MOC-related fees from psychiatrists and neurologists forced to buy MOC.

### ABPN Forces Other MOC Costs on Psychiatrists and Neurologists

220.    Psychiatrists and neurologists, to their substantial financial and personal detriment, have also been required to take countless hours away from their practice and families in order to prepare for and take required examinations and tests and meet other MOC requirements.

221.    MOC also takes time away from patients and detracts from patient services, to the detriment of ongoing patient care.

222.    Doctors have made their feelings known about the cost and burdensomeness of

MOC. In one survey of 998 doctors conducted by the Mayo Clinic, more than 80 percent agreed that "MOC is a burden to me." A survey of 515 rheumatologists reported that 88.5 percent believed MOC imposes a financial burden without proven benefits to patients, and 75 percent said MOC took time away from patient care.

223.    The not-for-profit organization Practicing Physicians of America conducted an online survey in early 2018. When asked whether certification "should be a life-long credential, using CME credits for continuing education," 90 percent responded "yes." When asked about physician burnout, 95 percent responded MOC contributed significantly or very significantly to physician burnout; and another 90 percent responded MOC was not "voluntary." A total of 7,007 doctors responded to the survey.

224.    As the authors of a study published in 2019 in the *Journal of Roentgenology* put it: "If radiologists believed that MOC's benefits exceeded its costs, one would hypothesize high participation rates, even among those whose participation is not mandated by ABR." The hypothesis, however, did not prove out, as only a very small percentage of those "whose participation is not mandated" (*e.g.*, "grandfathers") bought MOC.

**There Is No Evidence of Any Benefit From ABPN's MOC Product**

225.    No causal relationship has ever been established between MOC and a beneficial impact on doctors, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today, that optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research, which as shown below is notably lacking with regard to MOC.

226.    MOC has been the subject of many articles and accompanying clinical studies published in medical journals. Synopses of some of these articles as well as summaries of the

medical scholarship concerning MOC follows. To understand them it is helpful first to consider the difference between "correlation" and "causation."

227.    Correlation is concerned with association and examines any two measured concepts, or variables, and compares their relationships. Causation is the capacity of one variable to influence another. Causation is often confused with correlation, which only indicates the extent to which two variables tend to increase or decrease in parallel. Correlation does not imply causation.

228.    This distinction is well-recognized in field of medical scholarship. A 2017 article in the *Postgraduate Medical Journal* warned that, "Misinterpretation of correlation is generally related to a lack of understanding of what a statistical test can or cannot do, as well as lacking knowledge in proper research design." The authors noted: "[C]ausal inference will be premature if relying purely on correlational statistics, no matter how many studies report the correlational finding."

229.    The *Journal of the American Medical Association* in its Instructions for Authors likewise cautions that "methods and results should be described in terms of association and correlation and should avoid cause and effect wording."

230.    While ABPN touts the benefits of MOC, as one author concluded in a 2019 article in the *American Journal of Medicine*, "there is a paucity of high-quality data" supporting the "assertion that maintenance of certification [MOC] improves quality of care."

231.    For example, a 2018 study of 356 interventional cardiologists in New York during the years 2011-2013, examined their attributes, including certification, MOC, whether the medical school attended was based in the United States, the ranking of the medical school, and length of practice. The study examined whether these attributes were associated with better

patient outcomes, measured by a risk-standardized mortality rate after a percutaneous coronary intervention. The study found that MOC was "not associated with any difference in 30-day risk-standardized mortality."

232.    Thus, not only did the study find no evidence that MOC improved patient care, it failed to find even a correlation between the two. Physicians commenting online noted that the study made "an important contribution to a growing evidence base that questions whether certification or participation in MOC translates into what matters most -- better patient outcomes."

233.    Other studies also fail to support a causal connection between MOC and any alleged benefits. As an example, a six-year study published in *the Journal of the American Medical Association* ("*JAMA*") compared two cohorts of Medicare beneficiaries treated by two groups of physicians: one required to purchase MOC, and a second "grandfathered" group that did not have to buy MOC. The study measured the association between MOC and changes in ambulatory care–sensitive hospitalizations (ACSH) and health care costs, to test "the hypotheses that the MOC requirement was associated with higher-quality and more efficient care." ACSH was defined as "hospitalizations triggered by conditions thought to be preventable through better access to and quality of outpatient care."

234.    Emergency Department visits were found to be lower (a better patient outcome) for patients cared for by physicians who did *not* buy MOC. The association between those required to purchase MOC and those who were not, was "nonsignificant for annual incidence of hospital admission or emergency department visits." There was also "no statistically significant association" between treatment by doctors who bought MOC and those who did not.

47

235.    In fact, MOC was found to be negatively associated with specialty office visits, non-specialty office visits, laboratory testing, and imaging (radiological) costs. Finally, there was no statistical significance associated with MOC for major or minor procedure costs. This study is wholly consistent with the finding that MOC does not cause better patient outcomes. One doctor discussing the study in *JAMA*, confirmed that it found "MOC participation had no effect on the primary end point, ambulatory care-sensitive hospitalizations among Medicare beneficiaries."

236.    A similar study analyzed the clinical outcomes for 213 patients treated by 71 doctors required to purchase MOC, and a second group of 34 "grandfathered" doctors in four Veterans Affairs ("VA") hospitals. The authors found no significant differences in any of the ten different outcome measures for patients treated by doctors required to buy MOC. They concluded: "To whatever extent a goal of MOC is to improve the quality of patient care, this study raises a question of whether that goal is being achieved, at least among internists at these VA hospitals."

237.    Physician commentators have observed that evidence-based medicine does not appear to be present in the designs of the studies relied upon by ABPN and other advocates of MOC. "The internal medicine community has embraced the principle of evidence-based medicine in clinical practice; expensive policy interventions such as MOC should be held to the same evidentiary standards," noted Dr. Dhruv Kazi in *The Hospitalist* in 2015. Dr. Kazi, a cardiologist and health economist who studies optimization of health care expenditures, also observed: "Instead of piecemeal evaluations, the entire MOC program should be compared head-to-head with other policy interventions or health systems interventions that improve healthcare quality, thus providing an empirical basis for choosing MOC over alternative strategies for quality improvement [*i.e.*, other CPD products]."

48

238.    Ignoring the lack of evidence of a causal connection between MOC and better patient outcomes, much has been made by advocates of MOC of another recent study. A description of the study is introduced on a Member Board website by a headline in twenty-point font: "Women Are More Likely to Get Breast Cancer Screenings They Need When They See Internists Who Maintain Board Certification." The description goes on to claim that, "[n]ew research indicates that physicians who participate in MOC, a lifelong learning and assessment program, screen women appropriately for breast cancer, potentially saving lives every year." At the end, however, is the concession that "other factors" could be influencing doctors and that more "research is needed to understand how MOC might impact the quality of care that patients receive."

239.    Advocates of MOC such as ABPN also point to a recent study whose five authors were either employed by or received other financial support from a Member Board. The objective of the study was to "assess whether physician MOC status is associated with performance on selected Healthcare Effectiveness Data and Information Set (HEDIS) process measures." The HEDIS metrics included hemoglobin screenings, diabetes screenings, eye examinations, mammograms, and cholesterol tests. The study compared 786 doctors who purchased MOC and 474 who did not.

240.    While the data reflected statistical differences between the two groups of doctors ranging between 4.2 percent and 2 percent for four of the five HEDIS metrics measured, the authors conceded there were "several possible explanations" for the findings, including that doctors may "follow [HEDIS] guidelines more diligently regardless of their knowledge." The authors also observed that doctors may adopt "practice capabilities and systems that support meeting our physician performance measures (for example, use of electronic patient

reminders.).” The study concluded that “the results should be considered to reflect associations and not definitive indicators of causal relationships.”

241.    A 2019 article in the *Annals of Internal Medicine* by Dr. Lee Goldman, Dean of Health Sciences and Medicine at the Vagelos College of Physicians and Surgeons at Columbia University, confirmed the study’s failure to establish a causal connection and identified flaws that could explain the statistical differences noted, such as, for example, that the study did not analyze how other factors, including measures of qualifications other than MOC, influenced the outcomes.

242.    Dr. Goldman warned that the statistical differences reported in the study were associated “with unimpressive differences in medical practice” and described the findings as “disturbing,” emphasizing that the rate of meeting HEDIS metrics was low for both groups of doctors and only minimally higher for those who purchased MOC. He concluded: “If maintenance of certification simply takes my doctor from a low F to a slightly higher F, or even from D+ to C-, on metrics that may or may not be worth grading, then I don’t find it helpful at all.”

243.    A 2018 article in the medical journal *Anesthesiology* from the Department of Anesthesiology, Virginia Commonwealth University School of Medicine, titled “Has MOC Gone Amok,” criticized a study examining the relationship between MOC and a lower likelihood of adverse state licensure actions. It noted MOC has “been imposed without any evidence that confirms [its] value to doctors or patients,” and that none of the study’s findings “indicate that [MOC] in anesthesiology *per se* has value as a strategy to improve patient care.”

244.    The authors went on to discuss the difference between required learning by children and effective professional adult learning, noting that “mandating an adult to do

something (learn) can actually increase resistance to doing what is being mandated," and that "the available evidence across multiple fields shows" that compulsory learning schemes like MOC produce "scant learning, . . . [when] imposed on adults, no matter how complete or well designed the curriculum. It is simply not the way to stimulate effective learning in adults." The authors also expressed concern "whether mandated [MOC] may actually decrease what we are trying to create: an internally motivated, capable practitioner, who perceives him- or herself as responsible for performing their societal role as a competent physician."

### Doctor Surveys Confirm MOC Is Burdensome and Ineffective

245.    In a recent ABMS survey, only 12 percent of doctors responded that they valued MOC. When asked what alternatives should be considered in place of MOC, 84 percent answered CME. The online survey was taken by 34,616 physicians, 1,373 non-physician providers and stakeholders working in health care, and 403 members of the general public.

246.    The Mayo Clinic conducted a survey in 2016 published in the *Mayo Clinic Proceedings*. Its findings are consistent with the ABMS survey. In response to the query whether "MOC is worth the time and effort required of me," only 14.9 percent of physicians answered "yes." Even fewer, only 9.1 percent of those surveyed, felt that patients cared about their MOC status. The Mayo Clinic authors observed that "evidence is presently lacking about how current formal programs of *maintenance* of certification contribute to lifelong learning beyond what physicians would spontaneously do (*e.g.*, learning while caring for patients) … ." (Emphasis in original). They also found that "physicians perceived that current MOC activities have little relevance or value and are neither well-supported nor well-integrated in their clinical practice." A total of 998 doctors participated in the survey.

247.     In a survey of 515 rheumatologists published in *Arthritis Care & Research*, 75 percent agreed there was no "significant value in MOC, beyond what is already achieved from continuing medical education" and 63.5 percent of rheumatologists did not believe MOC was valuable in terms of improving patient care.

248.     The survey authors, who were not funded by or employed by ABMS or any Member Board, concluded that while doctors "are committed to life-long learning and appreciate the importance of keeping up to date with recent knowledge and developments in the field to provide the best patient care," the "majority believe that MOC programs do not add significant value to participation in CME activities, which are already required to maintain and renew state medical licensure." The authors continued that, "CME activities can be more flexible and allow individual rheumatologists to participate in educational activities that are most relevant to their individual practices or the patient populations they manage" and "can be achieved at a fraction" of MOC's costs. One commentator summarized the survey findings as showing that: "rheumatologists favor lifelong learning, but in a format that they can control and with a focus on education."

249.     The prestigious *New England Journal of Medicine* surveyed physicians in 2010 about whether "grandfathers" should voluntarily buy MOC. Almost two-thirds (63 percent) responded against voluntarily enrolling in MOC. A total of 2,512 doctors participated. A *JAMA* article in 2015 reported that more than 22,000 doctors signed an online petition to end a Member Board's MOC requirement.

## ABPN CHARGES SUPRA-COMPETITIVE MONOPOLY PRICES FOR MOC

250.     As a result of its monopoly power in the certification market and forcing psychiatrists and neurologists to buy MOC or have their certifications revoked, ABPN is able to

charge supra-competitive monopoly prices for its MOC product.

251.    In 2002, ABPN charged total MOC fees of $1,275 payable on or about the taking of the ten-year MOC examination, for an annual average cost of $127.50. A few years later, ABPN raised total MOC fees by almost 18 percent to $1,500, for an annual average cost of $150.

252.    When "continuous" MOC was announced in 2012, ABPN seized the opportunity to raise fees again. ABPN now mandated payment of annual MOC fees in the amount of $175, an increase of over 37 percent in just ten years. ABPN's financial results amply document the extraordinary financial benefit of MOC.

253.    After the launch of MOC, from 2004 through 2018, ABPN's "Program service revenue" exceeded its total expenses by a yearly average of $4,448,338, as reported in its Forms 990. But for its reporting status as a supposed not-for-profit organization, this translates into almost $4,500,000 in average annual profits before investment and other income is taken into account.

254.    During the same time, ABPN "Net assets or fund balances" skyrocketed over 971%, from $12,610,227 at the beginning of 2004 to $122,470,594 in 2018. In other words, while it took ABPN almost seventy years to accumulate net assets (assets less liabilities) of $12,610,227 from selling certifications, ABPN net assets increased almost ten-fold to $122,470,594 as a result of selling MOC, including $97,169,079 in cash, savings, and securities on hand at year-end 2018.

255.    According to its Forms 990 for 2013 through 2018 (the only years ABPN disclosed MOC data separately), after ABPN announced "continuous" MOC and again raised MOC fees, MOC revenue increased approximately 604%, from $761,650 in 2013 to $4,606,280

in 2018. ABPN certification revenue was stagnant during the same time, increasing a mere one percent.

256.    These data demonstrate that MOC is an increasing revenue source for ABPN. This is not surprising. New residency graduates pay certification fees. They are compensated at a fraction of what more experienced doctors earn and are also burdened with substantial debt payments. There is only so much in fees that can be extracted from new residency graduates as they launch their medical careers. MOC, on the other hand, is imposed by ABPN on established psychiatrists and neurologists who have been practicing for as long as several decades, and have the financial wherewithal to pay inflated MOC fees.

257.    ABPN has created a lucrative new revenue source by imposing MOC on more experienced psychiatrists and neurologists. This is confirmed by the fact that MOC revenue has increased at a much faster rate than certification revenue, and, based on the latest publicly available data, is at least a quarter of ABPN program revenue.

258.    MOC has facilitated, among other things, overly generous compensation to Dr. Faulkner, who was hired by ABPN in 2006 as Executive Vice President, its then most senior staff position. In 2007, Dr. Faulkner was paid total compensation of $500,726. He took the newly-created title of ABPN President and CEO in 2009. His compensation peaked in 2017 at $2,872,861, including a bonus of $1,884,920. In 2018, the last year for which data could be located, his total compensation was $1,011,001.

259.    Compensation for other ABPN key employees has also increased since the advent of MOC. Total compensation for ABPN key employees in 2007 was $1,614,708. By 2018, it had ballooned to $3,610,160, a nearly 224 percent increase.

260.     MOC fees have also allowed ABPN to make lavish pension plan accruals and contributions, which between 2008 and 2018 averaged 9.0 percent. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5 percent, half of ABPN's contributions.

## ABPN MOC IS NOT SELF-REGULATION

261.     ABPN has arrogated to itself the mantle of self-regulation of psychiatrists and neurologists. For example, former ABMS President and CEO and "grandfathered" ABPN neurologist Dr. Lois Margaret Nora spoke at the ABPN Crucial Issues Forum 2016. An ABPN publication summarized her remarks as including a description of the medical profession "as a social compact" and "how board certification, at its core, is service to others through professional self-regulation in the past, today and in the future." This and similar statements provide an unwarranted veneer of respectability and integrity to ABPN MOC when, as alleged herein, the facts are to the contrary.

262.     ABPN MOC is not self-regulation for at least two reasons. First, not meeting MOC requirements is not grounds for revocation or suspension of a physician's license to practice medicine or to undertake any other disciplinary action. Those self-regulatory functions are mandated and implemented by the medical licensing boards of the individual States, the only relevant self-regulatory bodies. As alleged above, however, physicians who do not comply with ABPN MOC requirements and who are not "grandfathered" face the loss of hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice

of medicine. In substance, ABPN seeks nothing less than to usurp the medical licensing boards of the individual States as the self-regulatory bodies of the medical profession.

263.     Second, ABPN is not a "self"-regulatory body in any meaningful sense for, among other reasons, its complete lack of accountability. Unlike the medical licensing boards of the individual States, for example, ABPN is a revenue-driven entity beholden to its own financial interests, including those of its Directors and staff. ABPN itself is not subject to legislative, regulatory, administrative, or other oversight by any other persons, entity, or organization. It answers to no one, much less to the psychiatrist and neurologist community which it brazenly claims to self-regulate.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### Emily Elizabeth Lazarou, MD

264.     Dr. Lazarou began practicing as a psychiatrist in 2008 as Associate Medical Director for Behavioral Health at Health Integrated in Tampa, Florida.

265.     Dr. Lazarou served as Medical Director of Health Integrated until January 2019.

266.     Since 2008, Dr. Lazarou has also maintained a private psychiatry practice dedicated to providing comprehensive individualized psychiatric medical care, including psychotherapy and medication management.

267.     Dr. Lazarou also practices telepsychiatry. In general, telepsychiatry is the delivery of psychiatric assessment and care via telecommunications technology such as teleconferencing. Access to proper psychiatric care, especially in rural and economically underdeveloped areas, is one of the biggest challenges of the American health care system. Telepsychiatry provides patient-centered, affordable, and effective interventions for individuals needing psychiatric care and decreases the cost by providing a more affordable framework for delivering psychiatric

services, including making quality mental health care available in any clinic with an internet connection.

268.     Dr. Lazarou also maintains a practice in forensic psychiatry. A forensic psychiatrist examines aspects of human behavior related to the legal process. As a forensic psychiatrist, Dr. Lazarou consults with both plaintiff and defense counsel in the civil arena, including in the areas of medical malpractice, worker's compensation, psychiatric disability determination, sexual harassment, and testamentary capacity. She consults in the criminal arena with counsel for both the prosecution and defense, including competency, sanity, and prediction of dangerousness. Dr. Lazarou's areas of expertise include PTSD, battered spouse syndrome, personality disorders, and malingering. Forensic psychiatric engagements typically involve formulating expert opinions and providing expert testimony related to those opinions.

269.     Dr. Lazarou is active in the medical community and is a member of the Florida Medical Association and the American Academy of Psychiatry and the Law.

270.     Dr. Lazarou bought an ABPN certification in psychiatry in 2007. She understood the certification to be an evaluation of her postgraduate medical education and residency training, including the quality of her residency program in psychiatry.

271.     Her certification is not "grandfathered" because it was bought after October 1, 1994.

272.     Dr. Lazarou believes ABPN automatically enrolled her in MOC after she bought her certification. She paid the MOC fees required by ABPN and began meeting the other MOC requirements.

273.     Dr. Lazarou understood she would be reported by ABPN as "Certified" for a ten year period following the purchase of her certification.

274.    After experiencing a high-risk pregnancy, Dr. Lazarou gave birth to her second set of twins in December 2017. Because she was breast-feeding and pumping milk for 45 minutes every three hours, she asked for a private room for her required ten-year MOC examination. Dr. Lazarou was told in an email from ABPN that "[t]he board does not make accommodations for nursing mothers who need to pump during an exam."

275.    ABPN did, however, "as a professional courtesy" treat the request "as a comfort aid," which nonetheless would have required Dr. Lazarou to travel several hours back and forth to a different test center with private rooms, requiring her to be away from her newborn twins and unable to provide them breast milk.

276.    Under those circumstances, Dr. Lazarou was unable to take the MOC examination. As a consequence, ABPN revoked her certification and reports her as "Not Certified" on its website.

277.    Similarly, in 2018, ABPN began reporting Dr. Lazarou as "Not Certified" in her forensic psychiatry subspecialty, even though that certification remained valid through December 31, 2019, as confirmed on the ABPN website.

278.    An ABPN representative told Dr. Lazarou that because her psychiatry certification was not valid, she could no longer be reported as certified in forensic psychiatry, even though her forensic psychiatry certificate was valid through December 31, 2019.

279.    Because ABPN reports Dr. Lazarou as "Not Certified," she is no longer able to practice telepsychiatry, with a resulting loss of income and to the detriment of patients in need of telepsychiatric care.

280.    Dr. Lazarou's opportunities for forensic psychiatry assignments have also diminished because ABPN reports her as "Not Certified," with a resulting loss of income.

281.    Since the onset of COVID, Dr. Lazarou's forensic psychiatry practice has all but vanished due to repeated postponements of judicial proceedings. Dr. Lazarou was scheduled to provide expert forensic psychiatric testimony in several proceedings in 2020, all of which have been delayed indefinitely.

282.    In the interim, Dr. Lazarou sought other employment opportunities. A recruiter told Dr. Lazarou she is ineligible for many job opportunities, despite her extensive qualifications, because ABPN reports her as "Not Certified."

283.    Dr. Lazarou finally found employment at a local hospital, contingent on ABPN reporting her as "Certified."

284.    Although Dr. Lazarou does not believe MOC contributes to lifelong learning or adds value to her practice, she has been forced by ABPN to buy MOC in order to restore her certification. Dr. Lazarou is scheduled to sit for the required ABPN MOC exam in 2021. Dr. Lazarou would strongly prefer to buy other CPD products.

285.    Dr. Lazarou prefers to buy other CPD products from different suppliers that allow her to choose what CPD products to purchase, enabling her to pursue lifelong learning relevant her practice and patients.

286.    SA-CME products that Dr. Lazarou prefers to buy to stay current are not on the ABPN "Approved Products List" even though they are highly relevant to her practice and in her opinion meet the ABPN SA-CME requirements. Likewise, many of the products on the ABPN "Approved Products List" are not relevant to her practice or patients.

287.    Dr. Lazarou has already made a substantial investment of time, money, and effort in her ABPN certification. This includes her residency program, fellowship program,

certification fees paid to ABPN, time studying for the certification examination, the time and expense of traveling to take the written and oral examinations, and the cost of study aids.

288.    Dr. Lazarou has been forced to invest a significant amount of time, money, and effort to restore her revoked ABPN certification, detracting from the time and effort she would otherwise devote to her patients and clients. She has also been prevented from utilizing other CPD products more relevant to her forensic and other specialized practices that are not on the ABPN "Approved Products List."

289.    ABPN forced Dr. Lazarou to pay $2,375 to restore her revoked certification. She has also spent over $800 in examination preparation courses and to purchase SA-CME products on the ABPN "Approved Products List."

290.    ABPN's MOC requirements are redundant of other obligations that Dr. Lazarou must already meet for State medical licensure. MOC's practice improvement projects are busy work with no value, especially in light of the administrative time and expense required, and in her experience actually have a negative impact.

291.    Dr. Lazarou has found that MOC superimposes wholly superfluous examinations and other ABPN requirements onto CPD products already sold by different vendors, Dr. Lazarou considers MOC a "waste of time" that does not make her a better or more effective psychiatrist.

292.    Dr. Lazarou will be required to pay tens of thousands of dollars in wasted and useless MOC fees during her career as a result of ABPN forcing her to buy MOC or have her certification revoked.

293.    ABPN has already cost Dr. Lazarou substantial MOC-related fees and costs and valuable time complying with ABPN's burdensome bureaucratic and administrative paperwork,

to the detriment of her practice, patients, clients, and professional career, as well as her personal life.

294.    Dr. Lazarou has not realized any improvement in her medical knowledge or clinical skills as a psychiatrist as a result of being forced to buy ABPN's CPD product. Nor has her patients' care been enhanced by ABPN forcing her to buy MOC.

**Aafaque Akhter, MD**

295.    Plaintiff Aafaque Akhter completed his residency at Harvard Medical School and was the founder and Medical Director of Norton Health Care, where he practiced addiction psychiatry.

296.    Dr. Akhter was among the first physicians to prescribe Suboxone as a drug dependency treatment modality. Suboxone has become the leading medication used to treat opioid addiction. Suboxone is associated with increased sobriety, reduced painkiller abuse, and mitigates withdrawal symptoms.

297.    Dr. Akhter is active in the medical and psychiatric communities. He is a member of the American Medical Association, American Psychiatric Association, American Society of Addiction Medicine, the Massachusetts Medical Society, and the Massachusetts Psychiatric Society. His work with these communities and organizations helps keep Dr. Akhter current on the latest trends in medicine.

298.    Dr. Akhter bought an ABPN certification in psychiatry in 2005. He was not "grandfathered" because he bought his certification after October 1, 1994.

299.    Dr. Akhter was automatically enrolled in ABPN MOC upon purchasing his certification. Dr. Akhter paid ABPN the required MOC annual fees.

300.    Even before his participation in MOC, Dr. Akhter had already made a substantial

investment of time, money, and effort in obtaining the ABPN certification product. This includes his medical and residency training, certification fees paid to ABPN, time studying for the certification examination, time and expense of traveling to written and oral examinations, and the cost of study aids.

301.     Dr. Akhter completed all ABPN MOC requirements and took the ten-year MOC examination in 2014. This included significant payments to ABPN, purchase of study aids, travel to the examination, and hiring another physician to cover his work while taking the examination. Dr. Akhter invested significant time and effort to prepare for the examination, which detracted from time with patients and family.

302.     After passing the ABPN ten-year MOC examination and satisfying his other MOC requirements, Dr. Akhter understood based on previously published ABPN policy that he would not be required to meet MOC requirements for another ten years, until 2024, and would be reported by ABPN as "Certified" until 2024.

303.     On January 1, 2018, Dr. Akhter obtained a subspecialty certification in addiction medicine from another ABMS Board Member, the American Board of Preventive Medicine ("ABPM").

304.     Contrary to Dr. Akhter's understanding that he had ten years to meet his next set of MOC requirements, ABPN as part of it "continuous" MOC product later required him to meet his MOC requirements on a three-year cycle rather than every ten years. Thus, Dr. Akhter was now required to complete ninety CME credits, including twenty-four SA-CME credits by 2017.

305.     ABPN defines SA-CME activities as "a specific type of CME activity that assists physicians in recognizing their current knowledge base in order to identify specific topics for gaining further knowledge." The 2019 ABPN MOC Booklet states that "Diplomates of the

ABPN are required to participate in ABPN-approved Self-Assessment activities relevant to either their specialty and/or subspecialty."

306. Dr. Akhter completed the newly-imposed three-year MOC cycle in 2017. He believed he had met the ABPN SA-CME requirement by, among other things, obtaining his addiction medicine subspecialty certification from ABPM, as well as completing other Medscape SA-CME credits. Consistent with the 2019 ABPN MOC Booklet, Dr. Akhter had participated in an addiction medicine activity relevant to his "specialty and/or subspecialty" by taking the ABPM certification examination and obtaining a certification in addiction medicine.

307. On August 2, 2018, ABPN advised Dr. Akhter he had been selected for a MOC audit. He learned, to his surprise, that ABPN was not accepting his SA-CME activities.

308. The ABPN MOC audit process allows those being audited ninety days to submit documentation of their MOC activities. Physicians who do not provide such documentation to ABPN's satisfaction are reported on its website as "Certified, not meeting MOC requirements." Physicians who do not provide documentation to ABPN's satisfaction by the end of the following three-year MOC cycle are then reported as "Not Certified," even though, like Dr. Akhter, they hold valid ABPN certifications.

309. Dr. Akhter asked ABPN to either recognize his ABPM certification as satisfying his SA-CME requirement, or alternatively to at least give him SA-CME credits for passing the ABMS-approved, high stakes ABPM examination.

310. ABPN provides scant information on how it "approves" SA-CME credits and does not make available the criteria that it uses to make those determinations.

311. ABPN provides no avenue for individual psychiatrists or neurologists to seek ABPN approval for SA-CME credits that do not appear on the ABPN "Approved Products List."

312.    ABPN, however, does allow vendors to petition ABPN to add their SA-CME activities to the ABPN "Approved Products List."

313.    Because ABPN refuses to accept Dr. Akhter's ABPM certification or examination as meeting his SA-CME requirements, he is listed on ABPN's website as "Not Meeting MOC Requirements."

314.    Dr. Akhter was not invited to participate in the ABPN "mini-exams." Because sixteen SA-CME credits are satisfied by successful completion of the "mini-exams," had he been allowed to participate (and assuming successful completion), Dr. Akhter would have met the ABPN MOC SA-CME requirements under the original terms of his certification.

315.    Dr. Akhter has paid the required fees for both ABPN MOC and ABPM MOC. He also pays fees for multiple State medical licenses and fees for federal and State controlled substance licenses.

316.    Dr. Akhter fulfills CME requirements for State medical licensure. For example, Dr. Akhter is licensed in Kentucky. The Kentucky Board of Medical Licensure requires sixty CME credits every three years, with at least 30 credits being AMA PRA Category 1 credits. For his Kentucky license, Dr. Akhter was able to select CME courses highly relevant to his practice, including a course on opioids for treatment of pain and strategies for minimizing opioid abuse. This CME course also appears to meet the ABPN definition of SA-CME requirements since it provides six case studies with questions for the physician to answer, in addition to a twenty question multiple choice quiz. The vendor that provides this CPD product, InforMed, however, is not on the ABPN "Approved Products List."

317.    Another CME course Dr. Akhter has taken for Kentucky licensure is "Suicide Assessment & Prevention," for which he was required to answer fifty multiple choice questions

on a "Self-Assessment" examination and answer additional case study questions. This CME

course was also not on the ABPN "Approved Products List."

318.    While these CME courses contributed to Dr. Akhter's lifelong learning, aided him

in his practice, and appear to meet the ABPN definition for SA-CME activities, ABPN did not

include them on the "Approved Products List."

319.    Dr. Akhter has taken other CME courses he believes should be recognized as

meeting ABPN's SA-CME requirements but are not on the ABPN "Approved Products List."

For example, Dr. Akhter participated in the New England Journal of Medicine CME course

"Pain Management and Opioids." This course aided his practice with its case-based questions on

pain, opioid prescribing, opioid pharmacology, and an examination of opioid use disorder.

ABPN, however, does not include the course on the "Approved Products List."

320.    SA-CME activities on the ABPN "Approved Products List" are often not tailored

to Dr. Akhter's practice, and he does not view ABPN's CPD product as aiding him in any way in

serving his patients or the general public. In Dr. Akhter's opinion, MOC is a waste of time, is

"make work," and does not foster lifelong learning.

321.    Dr. Akhter believes ABPN certification tests general knowledge in psychiatry and

neurology and is designed to assess residency training. On the other hand, MOC does not "test"

anything, it simply requires Dr. Akhter to print out materials and "check things off." Dr. Akhter

views MOC as "totally duplicative" of State licensure requirements.

322.    In Dr. Akhter's experience, MOC detracts from his own lifelong learning because

meeting ABPN's MOC requirements burns through time and resources he could more fruitfully

devote to utilizing other CPD products from different suppliers that are more relevant to his

practice and patients.

323.     Dr. Akhter has recently sought new employment and has been confronted by limited opportunities due to ABPN reporting on its website that he is "Not Meeting MOC Requirements." He was advised by a recruiter that his MOC status as reported by ABPN would preclude him from several employment opportunities.

324.     Dr. Akhter is confident he is engaging in lifelong learning by, among other things, fulfilling State licensure requirements, using other CPD products such as CME not "approved" by ABPN, and participating in the several medical societies and professional organizations to which he belongs. Dr. Akhter, however, is being prevented from obtaining employment because ABPN reports him as "Not Meeting MOC Requirements."

## CLASS ACTION ALLEGATIONS

325.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiffs Class: All psychiatrists and neurologists forced by ABPN to buy its MOC CPD product or have their certifications revoked. Specifically excluded from this Class are ABPN Directors; officers and employees of ABPN or of any entity in which ABPN has a controlling interest; and any affiliate, legal representative, or assign of ABPN. Also excluded from this Class are any judicial officers presiding over this action and members of their immediate families, judicial staff, and any juror assigned to this action.

326.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 physicians.

327.     Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not

limited to: (1) whether ABPN is engaging in illegal tying; (2) whether the unlawful conduct of

ABPN causes injury to the business or property of Plaintiffs and other Class Members;

(3) whether ABPN is unjustly enriched as a result of the conduct alleged herein; (4) the

appropriate injunctive and related equitable relief; and (5) the appropriate class-wide measure of

damages.

328.    Plaintiffs' claims are typical of the claims of other Class Members. Plaintiffs and

other Class Members are similarly affected by ABPN's wrongful conduct in that they were

forced to buy ABPN's CPD product or have their certifications revoked. Plaintiffs' interests are

coincident with and not antagonistic, or in conflict with, the interests of other Class Members.

Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the

other Class Members. Plaintiffs will fairly and adequately protect the interests of other Class

Members.

329.    Plaintiffs have retained competent counsel experienced in class action and

complex litigation to prosecute this action vigorously.

330.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Among other things, such treatment will permit a large number

of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that

numerous individual actions would engender. The benefits of proceeding through the class

mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any

difficulties that may arise in management of this class action. The prosecution of separate actions

by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

331.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE
### *Per se* Illegal Tying in Violation of Section 1 of the Sherman Act

332.    Plaintiffs incorporate by reference all of the above allegations.

333.    ABPN has created a tie between its certification product (the tying product) and its CPD product (the tied MOC product). ABPN forces physicians to buy its CPD product by revoking the certifications of those who do not buy MOC.

334.    ABPN enforces its illegal tie by, among other things, reporting the certifications of psychiatrists and neurologists as invalid or describing them as "Not Certified" if they do not buy ABPN's own CPD product, even though they previously purchased certifications. ABPN proclaims when it reports the status of psychiatrists and neurologists that: "Certification [is] contingent on meeting MOC requirements."

335.    ABPN's illegal tie of its certification product and its CPD product is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### ABPN's Certification Product and CPD Product Are Separate

336.    The facts demonstrating that ABPN's certification product and its MOC CPD product are separate and distinct products include the following.

337.    There is separate consumer demand by psychiatrists and neurologists for both a certification product and CPD products.

338.    There is a separate market for both a certification product and CPD products, including MOC.

339.     Because there is separate and sufficient consumer demand by psychiatrists and neurologists for both a certification product and CPD products, it is efficient for vendors to sell certifications and CPD products separately.

340.     In fact, ABPN sells its certification product separately from MOC, its CPD product, and other vendors sell CPD products without selling a certification product.

341.     Plaintiffs and other psychiatrists and neurologists prefer to obtain certifications and CPD products from different vendors.

342.     But for their certifications being revoked, Dr. Lazarou, Dr. Akhter, and other psychiatrists and neurologists would not buy ABPN's CPD product and instead buy other CPD products from different vendors.

343.     Reflecting separate consumer demand, ABPN sold certifications without selling any CPD product of its own for decades, even though other vendors were selling CPD products throughout all or most of that time.

344.     Also reflecting separate consumer demand, different vendors, including CME providers, medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations have sold CPD products for decades without selling a certification product.

345.     Even when ABPN sold CPD products, it continued to sell its certification product separately.

346.     ABPN sells MOC to psychiatrists and neurologists only after they have purchased certifications, and will not sell MOC to a physician who has not previously bought its certification product.

347.    ABPN sold CPD products as early as the 1970s. Those CPD products, however, were voluntary and psychiatrists and neurologists who did not buy them did not have their certifications revoked. ABPN continued selling its separate certification product during the time it sold voluntary CPD products.

348.    Certifications and CPD products are separate and distinct markets and are not interchangeable or a component of one another. For example, psychiatrists and neurologists may purchase ABPN's certification product without buying MOC or other CPD products.

349.    Psychiatrists and neurologists may also purchase CPD products (other than MOC) without buying certifications.

350.    That ABPN sold a certification product for more than forty years before it started selling its own CPD products demonstrates that ABPN itself understands the two products are separate and distinct.

351.    Certifications and CPD products have different purposes.

352.    Certifications and CPD products satisfy different consumer demands of psychiatrists and neurologists.

353.    Certifications are an "early career event" sold by ABPN to candidates for entry into the specialized medical practices of psychiatry or neurology, and only within a limited period of time after completion of their residency programs. They are a "one-time, snapshot assessment" of a candidate's postgraduate medical education and residency training.

354.    CPD products like MOC, on the other hand, promote individual, self-directed lifelong learning and the development of both medical and non-medical competencies after residency, including professionalism; interpersonal, managerial and communication skills; value-based delivery and cost reduction; clinical knowledge and skills; patient experience; practice

improvement; diversity and inclusion; interprofessional practice; doctor wellness and burnout; patient safety; working in teams; and health care disparities and population health.

355.    While certification is an "early career event" that candidates buy to enter the specialized medical practices of psychiatry or neurology, MOC is purchased by older, more experienced physicians after residency and certification. While certification is a "one-time snapshot assessment" of a candidate, psychiatrists and neurologists must purchase MOC throughout their careers or have their certifications revoked. While certification is an assessment of postgraduate medical education and residency training, MOC's focus is on "lifetime learning and self-assessment" and "self-directed learning." While certification uses a uniform, standardized set of requirements to test a psychiatry or neurology candidate, MOC is purported to be individualized and self-directed.

356.    Certification and MOC are no more a single method of evaluating psychiatrists and neurologists than an undergraduate and graduate degree are a single method of evaluating, for example, a biologist. Prospective biologists first purchase undergraduate degrees in biology. To further develop their careers as biologists, they then separately purchase graduate degrees in biology, such as a Ph.D., typically from a different institution. Unlike ABPN which revokes certifications if psychiatrists or neurologists do not purchase its own CPD product, no institution revokes its undergraduate degree in biology because its graduate later purchases a Ph.D. degree from a different institution.

357.    Similarly, the biologist might then pursue a post-doctoral fellowship at a third institution. Again, no institution revokes its Ph.D. degree because its graduate student later pursues a post-doctoral fellowship at a different institution. And by this time, many years into their careers, biologists will likely concentrate in a particular field within biology, for example,

molecular biology. Because they are all separate products, no undergraduate institution, graduate institution, or post-doctoral institution administers examinations or tests that their former students are required to take or forfeit their degrees.

358.    Unlike certifications whose purpose is the "elimination of candidates" seeking entry into the specialized practices of psychiatry or neurology, MOC emphasizes "lifelong learning and self-assessment" throughout a physician's career. Because all CPD products promote "lifelong learning and self-assessment" MOC is not unique or different from other CPD products.

359.    Dr. Lazarou and Dr. Akhter each paid for ABPN's certification product and its MOC product separately and at different times.

360.    ABPN has separately charged for and separately accounted for certifications and MOC.

361.    ABPN has published separate standards for its certification product and its MOC CPD product.

362.    Certifications and MOC have separate sections on ABPN's website, describing the different processes, schedules and requirements for each.

363.    The mission and objectives of ABPN are described on its website and in its annually published General Information and Board Policies. ABPN has consistently referred to certification and MOC as two separate products in these statements. ABPN states its mission as establishing "standards and requirements for initial *and* continuing certification [MOC]," to "develop and provide . . . procedures for certification *and* maintenance of certification," and to develop "testing methods to evaluate [the pre-certification] candidate *and* [post-certification] diplomate competencies." (Emphasis added.) The objective of MOC, described as

72

"[e]ncouraging and assessing diplomate involvement in lifelong learning," is a discrete part of ABPN's self-described mission, separate and apart from certification. This distinction of objectives and purposes reflects the separate references to, nature of, and distinction between certification and MOC recognized historically by ABPN.

364. Consistent with its own distinction between certifications and MOC, ABPN Forms 990 since 2011 have described its mission as two-fold, "to develop and provide . . . procedures for certifications *and* maintenance of certification in psychiatry and neurology." (Emphasis added.) Since at least 2013 ABPN has reported MOC fees as a separate program revenue category on its Forms 990.

365. That certification and MOC are not components of a single product, is further demonstrated by ABPN's "grandfathers." These psychiatrists and neurologists are not required to buy MOC due simply to the serendipity of when they purchased certifications. Their certifications are not revoked by ABPN even though they do not purchase MOC, severely undermining ABPN's litigation positions that MOC is an essential component of certifications and is necessary to maintain standards.

366. In the same vein, almost no "grandfathers" buy MOC for the simple reason that it has nothing to do with and is separate from ABPN's certification product. And "grandfathered" physicians who purchase MOC but then fail to satisfy its requirements are still reported by ABPN as "Certified."

367. "Grandfathers" who do not buy MOC because they are not required to do so, still buy other CPD products (for example CME) from different CPD vendors in order to satisfy State licensure requirements and other professional commitments. This choice by "grandfathers" not to buy MOC demonstrates that: (1) there are other viable CPD products in competition with MOC

available to physicians from other vendors, (2) "grandfathers" know full well that MOC is an inferior CPD product for which ABPN charges supra-competitive monopoly prices (otherwise they would purchase MOC), and (3) confirms that but for their certifications being revoked, psychiatrists and neurologists who are not "grandfathered" would buy other CPD products more relevant to their practice from different CPD vendors.

368.    Dr. Lazarou, Dr. Akhter, and other psychiatrists and neurologists differentiate between certifications and MOC. They recognize the two products are purchased at different times and for different purposes.

369.    Physicians pay ABPN a one-time fee for certification, then afterwards pay MOC fees throughout their careers.

370.    The fact that ABPN maintained a monopoly in the certifications of psychiatrists and neurologists for decades before it sold MOC, demonstrates MOC is a separate product and not essential to the success of ABPN's certification product.

### ABPN's Tying of Certification to MOC is Coercive

371.    ABPN's requirement that Dr. Lazarou, Dr. Akhter, and other psychiatrists and neurologists purchase ABPN's CPD product or have their certifications revoked is coercive.

372.    ABPN claims MOC is "voluntary." But for the same reasons that certifications are not "voluntary" neither is MOC due to physicians being forced to buy MOC or have their certifications revoked.

373.    Because it is required by hospitals and other medical organizations and insurance companies, certifications are economic necessity for a successful career for psychiatrists and neurologists. Neither certifications nor MOC can be considered "voluntary."

374.    Despite protestations that certifications are "voluntary," ABPN and the other Member Boards advocate strongly, including through ABMS, for hospitals and other medical organizations, insurance companies, and government programs to require certifications.

375.    Dr. Lazarou, Dr. Akhter, and other psychiatrists and neurologists have made substantial investments of time, money, and effort in ABPN's certification product. This includes residency programs, certification fees paid to ABPN, time studying for certification examinations, time and expense of traveling to take the written and oral examinations, and the cost of study aids.

376.    MOC cannot be considered "voluntary" because those sunk costs are forfeited when ABPN revokes the certifications of those who do not buy MOC and instead purchase other CPD products from different vendors.

377.    Learning from the voluntary CPD products ABPN and the other Member Boards sold beginning in the 1970s and 1980s, ABPN well understood that its new MOC CPD product would never be successful on its own merits. The only way it could succeed was to force psychiatrists and neurologists to buy MOC, and the only way to do that was for ABPN to use its monopoly power in certifications as leverage to tie MOC to certifications. Psychiatrists and neurologists who refused to buy MOC had their certifications revoked, and along with it the ability to pursue a successful medical career.

378.    The failed voluntary CPD products had a fraction of the sales of MOC, the new CPD product. The only reasonable explanation for this is that psychiatrists and neurologists are forced to buy the new CPD product because ABPN has illegally tied MOC and its certification product.

379.    ABPN implemented the tie to coerce the purchase of its MOC CPD product.

380.    Members of the medical community and medical journal articles confirm that neither certifications nor MOC, on which certifications depend, are "voluntary."

381.    Doctor surveys also confirm that neither certifications nor MOC, on which certifications depend, are "voluntary."

382.    ABPN's certification and MOC products are not "voluntary" as ABPN claims. They are an economic necessity without which a successful medical career is impossible.

383.    By tying its certification and MOC products, ABPN gains an unwarranted and unlawful competitive advantage for its own CPD product. Psychiatrists and neurologists are forced to buy MOC, an inferior CPD product for which ABPN charges supra-competitive monopoly prices, or have their certifications revoked. And sellers of other CPD products are at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their certifications revoked by ABPN.

384.    But for their certifications being revoked, psychiatrists and neurologists would buy CPD products other than MOC from different CPD providers, including CPD products that are less expensive and more relevant to their practice. ABPN's illegal tying, however, makes it impossible or economically infeasible to do so.

### ABPN's Monopoly Power in the Tying Market Restrains Free Competition

385.    ABPN has long been the monopoly supplier of certifications for psychiatrists and neurologists. No other organization or entity provides meaningful competition to ABPN in the certification market for psychiatrists and neurologists.

386.    There are high barriers to entry in the certification market for psychiatrists and neurologists, including technical, economic, organizational, and historical barriers, as

76

demonstrated by the fact that no other organization or entity has ever sold certifications to psychiatrists or neurologists in successful competition with ABPN.

387.    Due to its monopoly power, ABPN controls the market in certifications for psychiatrists and neurologists, and has sufficient economic power to restrain free competition in the CPD market.

### ABPN's Illegal Tie Affects a Not-Insubstantial Amount of Interstate Commerce

388.    ABPN has realized tens of millions of dollars in MOC-related fees paid by Plaintiffs and other Class Members.

389.    ABPN's illegal tie affects a not insubstantial amount of interstate commerce.

### ABPN Has an Economic Interest in the Sales of MOC

390.    That ABPN has realized tens of millions of dollars in MOC fees also demonstrates ABPN's economic interest in MOC.

### Antitrust Injury

391.    ABPN's illegal tie causes antitrust injury in numerous ways, including the following.

392.    The illegal tie forces psychiatrists and neurologists to buy MOC at substantial cost in money, time, and effort, or suffer the substantial economic consequences of having their certifications revoked.

393.    ABPN's illegal tie allows ABPN to charge supra-competitive monopoly prices for MOC.

394.    The illegal tie thwarts competition in the CPD market.

395.    ABPN's illegal tie effectively shuts out NBPAS, and upon information and belief others currently unknown, from substantial portions of the CPD market.

396. The illegal tie results in diminishing the quality of CPD products and inhibits innovation in the contents and delivery of CPD products to psychiatrists and neurologists.

397. ABPN's illegal tie excludes current and potential entrants into the CPD market.

398. The illegal tie entrenches ABPN's monopoly position in the market for certification of psychiatrists and neurologists.

399. As a result of ABPN leveraging its monopoly power in certifications to tie MOC and certifications, psychiatrists and neurologists are unable to negotiate the price and other MOC requirements unilaterally set by ABPN.

400. ABPN's illegal tie raises the cost of the practice of medicine for physicians; restricts the supply of psychiatrists and neurologists, thereby harming competition; increases the cost of medical services to patients; creates or increases barriers to patient care; and inhibits entry to the market for psychiatrists' and neurologists' services.

401. ABPN uses its monopoly power in certifications to create a captive market for its CPD product, leaving psychiatrists and neurologists with no choice but to buy MOC. This allows ABPN to set MOC's cost and other requirements without regard to normal competitive factors.

402. There is no supply inadequacy of CPD products to justify the captive MOC market created by ABPN.

403. Severing its illegal tie will dismantle ABPN's captive MOC market, once again make ABPN's CPD product voluntary, and allow the marketplace to decide the merits of MOC.

**COUNT TWO**
**Alternative Rule of Reason Illegal Tying in**
**Violation of Section 1 of the Sherman Act**

404. Plaintiffs incorporate by reference all of the above allegations.

405. ABPN's illegal tie of its certification product and its CPD product is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

406. ABPN's illegal tie has significant anti-competitive impact in the market for CPD products, including the following.

407. By forcing psychiatrists and neurologists to buy ABPN's CPD product or have their certifications revoked, ABPN coerces the abdication of psychiatrists' and neurologists' independent judgment concerning the merits of MOC, and insulates MOC from the benefits and stresses of an openly competitive market for CPD products. As a result, the number and quality of CPD products constituting realistic alternatives to MOC has been diminished.

408. ABPN's illegal tie thwarts competition in the CPD market.

409. The illegal tie limits the choices of psychiatrists and neurologists in the CPD market. ABPN charges supra-competitive monopoly prices for MOC, thus raising the cost of the practice of medicine for psychiatrists and neurologists, and their patients.

410. The illegal tie prevents current and potential participants in the CPD market from competing with ABPN on a level playing field.

411. ABPN's illegal tie raises the barriers for entry into the market for certification of psychiatrists and neurologists, thereby enhancing ABPN's control of the market for certification of psychiatrists and neurologists.

412. The illegal tie harms competition by diminishing innovation in the content and delivery of CPD products to psychiatrists and neurologists.

413. There are no cognizable pro-competitive benefits from the illegal tie that

outweigh the anti-competitive harms alleged herein. In fact, there are no pro-competitive benefits from ABPN's illegal tie.

414.    Because there is sufficient demand for certification without MOC, it is efficient for ABPN to sell its certification product alone. Indeed, ABPN has done so for many decades.

415.    ABPN's certification product and MOC do not operate more efficiently when tied by ABPN than they would if separated. This is demonstrated by the fact that ABPN was the monopoly supplier of certification for psychiatrists and neurologists for decades before it began selling MOC.

416.    ABPN will maintain its monopoly in the certification market without the illegal tie.

417.    There will be no decrease in demand for certifications without ABPN's illegal tie.

418.    There are no transactional efficiencies gained by the illegal tie. Psychiatrists and neurologists could just as easily purchase CPD products from a different vendor, and many would choose to do so, but for their certifications being revoked.

419.    The separate demand for certification and CPD products demonstrates the lack of cognizable pro-competitive efficiencies benefitting psychiatrists and neurologists from ABPN's illegal tie.

420.    The illegal tie does not result in production efficiencies. ABPN's sale of its certification product does not make it more efficient at providing MOC.

421.    ABPN's illegal tie does not save production costs since certification and MOC have different purposes and are sold to psychiatrists and neurologists at different times and at different stages in their careers.

422.    The fact that ABPN charges supra-competitive monopoly prices for MOC

establishes that there are no economies of scale that benefit psychiatrists and neurologists forced to buy MOC as a result of ABPN's illegal tie.

423.    The illegal tie does not improve the quality of ABPN's MOC product which is an inferior product with no demonstrated causal connection to improved patient care or patient outcomes, or any other benefits of MOC claimed by ABPN.

424.    There is no evidence in the medical literature or elsewhere that the illegal tie protects ABPN's reputation, either as a seller of certifications to candidates for entry to the specialized medical practices of psychiatry or neurology or in any other way.

## COUNT THREE
### Unjust Enrichment

425.    Plaintiffs incorporate by reference all of the above allegations.

426.    Plaintiffs and other psychiatrists and neurologists conferred a benefit on ABPN in the form of the money and property that ABPN wrongfully obtained as a result of ABPN forcing them pay MOC fees, as described in detail above.

427.    ABPN wrongfully obtained MOC fees not as a result of any bargain, but by forcing Plaintiffs and other psychiatrists and neurologists to purchase MOC or have their certifications revoked.

428.    ABPN has retained the benefits obtained by these inappropriate, unreasonable, and unlawful MOC fees. ABPN is aware of and appreciates these benefits.

429.    ABPN's conduct has caused it to be unjustly enriched at the expense of Plaintiffs and other psychiatrists and neurologists. As such, it would be unjust to permit retention of these moneys by ABPN under the circumstances of this case without the payment of restitution.

430.    ABPN should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against ABPN as follows:

431.    The Court determine that this action may be maintained as a Class Action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class.

432.    ABPN's illegal conduct alleged herein be adjudged and decreed to constitute:

    a.   A *per se* violation of Section 1 of the Sherman Act;

    b.   Alternatively, an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

    c.   Unjust enrichment.

433.    Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, including treble damages, and Defendant be required to disgorge the amounts by which it has been unjustly enriched.

434.    ABPN, its affiliates, successors, transferees, assignees, Directors, management, officers, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined from reporting certifications as invalid or describing the physicians as "Not Certified" unless physicians also buy ABPN's MOC product; from revoking the certifications of psychiatrists or neurologists who do not also buy MOC; and that ABPN report, without any qualification, whether physicians have purchased an ABPN certification, regardless of whether they have also later bought MOC.

435.    Plaintiffs and other Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the original Complaint.

436. Plaintiffs and other Class Members be awarded their costs of suit, including reasonable attorneys' fees, as provided by law.

437. Plaintiffs and other members of the Class be granted all such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: November 23, 2020                                    Respectfully submitted,


                                    By:          /s/ C. Philip Curley

                                          C. Philip Curley
                                          Cynthia H. Hyndman
                                          Laura R. Feldman
                                          Benjamin E. Schwab
                                          ROBINSON CURLEY P.C.
                                          300 South Wacker Drive, Suite 1700
                                          Chicago, IL 60606
                                          Tel: (312) 663-3100
                                          Fax: (312) 663-0303
                                          pcurley@robinsoncurley.com
                                          chyndman@robinsoncurley.com
                                          lfeldman@robinsoncurley.com
                                          bschwab@robinsoncurley.com

                                          Katrina Carroll
                                          CARLSON LYNCH LLP
                                          111 West Washington, Suite 1240
                                          Chicago, IL 60602
                                          Tel: (312) 750-1265
                                          kcarroll@carlsonlynch.com

Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn IL 60015
Tel: (224) 632-4500
mfreed@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Jagher
FREED KANNER LONDON &
MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

*Attorneys for Emily Elizabeth Lazarou
and Aafaque Akhter individually and
on behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 23, 2020, he caused

the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** to be filed with the Clerk

of the Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF

system, pursuant to which notification of such filing has been made to all counsel of record.


/s/ C. Philip Curley