**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EMILY ELIZABETH LAZAROU** | ) | |
| and **AAFAQUE AKHTER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 1:19-cv-01614** |
| | ) | |
| **v.** | ) | **Hon. John Z. Lee** |
| | ) | |
| **AMERICAN BOARD OF PSYCHIATRY** | ) | |
| **AND NEUROLOGY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' OPPOSITION TO AMERICAN BOARD OF**
**PSYCHIATRY AND NEUROLOGY'S MOTION TO DISMISS**

C. Philip Curley
Cynthia H. Hyndman
Robert L. Margolis
Laura R. Feldman
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: (312) 663-3100
Fax: (312) 663-0303
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
rmargolis@robinsoncurley.com
lfeldman@robinsoncurley.com

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

*Attorneys for Emily Elizabeth Lazarou and Aafaque Akhter,*
*individually and on behalf of all others similarly situated*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.............................................................................................................i

TABLE OF AUTHORITIES ....................................................................................................ii

BACKGROUND ....................................................................................................................... 1

ARGUMENT ............................................................................................................................. 3

I.      Standard on This Motion .................................................................................................. 3

II.     Plaintiffs Plead All Required Elements of Their Tying Claims ....................................... 3

      A.     New, Strengthened Allegations in the FAC Plus the New *Viamedia*
            Decision Change the Landscape for Evaluating Plaintiffs' Claims...................... 3

      B.     Plaintiffs Plausibly Allege All of the *Jefferson Parish* Indicia of
            Separate Products, for Both the *Per Se* and Rule of Reason Tying Claims........... 7

            1.     Consumers Differentiate Between Certifications and MOC ................... 8

            2.     ABPN Has Always Sold Certifications and MOC Separately................ 10

            3.     ABPN and ABMS Distinguish Between Certifications and MOC.......... 11

            4.     ABPN Bills and Accounts for Certifications and MOC Separately ....... 12

            5.     Market Structure and Practices Demonstrate Separate Demand ............. 13

      C.     Plaintiffs Plausibly Allege Forcing.................................................................... 14

      D.     ABPN's Arguments That MOC Is a Component of Certification and Only
            MOC Can Maintain Certification Are Both Improper Functional Relation
            Arguments and Business Justification Affirmative Defenses That Should
            Not Be Considered on a Motion to Dismiss ....................................................... 15

      E.     Plaintiffs Plausibly Allege an Unreasonable Restraint of Trade ......................... 18

      F.     Plaintiffs Plausibly Allege ABPN's Market Power Over Certifications ............. 18

III.    Plaintiffs' Tying Claims Are Timely ............................................................................ 19

IV.    Plaintiffs State a Claim for Unjust Enrichment ............................................................. 21

CONCLUSION........................................................................................................................ 22

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Am. Council of Cert. Pod. Phys. and Surg. v. Am. Bd. of Pod. Surgery, Inc.*,
185 F. 3d 606 (6th Cir. 1999) ......................................................................................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................................3

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. Of Med. Specialties*,
No. 14-cv-02705, 2017 U.S. Dist. LEXIS 205845 (N.D. Ill. Dec. 13, 2017) ..............................18

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................................3

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .......................................................................................................19

*Burda v. Wendy's Int'l, Inc.*,
659 F. Supp. 2d 928 (S.D. Ohio 2009) ........................................................................................20

*Busse v. Am. Bd. of Anest., Inc.*,
No. 92 C 5613, 1992 U.S. Dist. LEXIS 18948 (N.D. Ill. Dec. 11, 1992) ...................................14

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ......................................................................................................................18

*DM Res., Inc. v. Coll. of Am. Pathol.*,
170 F.3d 53 (1st Cir. 1999) ..........................................................................................................18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ............................................................................................................. *passim*

*Gen. Cas. Co. of Wis. v. Techloss Cons. & Restor.*,
461 F. Supp. 3d 804 (N.D. Ill. 2020) ..........................................................................................22

*Gordon v. Ortho McNeil Pharma., Inc.*,
430 F. Supp. 2d 814 (N.D. Ill. 2006) ..........................................................................................21

*Gumwood HP Shop. Partners, L.P. v. Simon Prop. Grp., Inc.*,
No. 3:11-CV-268 JD, 2016 U.S. Dist. LEXIS 35759 (N.D. Ind. Mar. 18, 2016) .......................20

*In re Sulfuric Acid Antitrust Litig.*,
743 F. Supp. 2d 827 (N.D. Ill. 2019) ..........................................................................................18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ................................................................................................................. *passim*

*Kenney v. Am. Bd. Of Internal Med.,*
No. 20-1007, 2021 U.S. App. LEXIS 5595 (3d Cir. Feb. 25, 2021) ............................................14

*Kenney v. Am. Bd. Of Internal Med.,*
412 F. Supp. 3d 530 (E.D. Pa. 2019) .........................................................................................14

*Liberman v. Am. Ost. Ass'n,*
No. 13-15225, 2014 U.S. Dist. LEXIS 153012 (E.D. Mich. Oct. 29, 2014) ................................14

*Los Angeles Mem. Coliseum v. N.F.L.,*
726 F.2d 1381 (9th Cir. 1984) ...................................................................................................18

*McDonald v. Adamson,*
840 F.3d 343 (7th Cir. 2016) .....................................................................................................18

*Mozart Co. v. Mercedes-Benz of N.A., Inc.,*
833 F.2d 1342 (9th Cir. 1987) ...................................................................................................17

*Multistate Legal Studies, Inc. v.*
*Harcourt Brace Jovanovich Legal and Prof'l Publ., Inc.,*
63 F.3d 1540 (10th Cir. 1995) ..............................................................................................10, 13

*Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.,*
826 F.2d 712 (7th Cir. 1987) .....................................................................................................16

*Petrakopoulou v. DHR Int'l, Inc.,*
660 F. Supp. 2d 935 (N.D. Ill. 2009) ..........................................................................................22

*Poindexter v. Am. Bd. of Surgery, Inc.,*
911 F. Supp. 1510 (N.D. Ga. 1994) ............................................................................................18

*PSI Repair Services, Inc. v. Honeywell, Inc.,*
104 F.3d 811 (6th Cir. 1997) .....................................................................................................17

*Reed v. Palmer,*
906 F.3d 540 (7th Cir. 2018) .......................................................................................................3

*Richards v. Mitcheff,*
696 F.3d 635 (7th Cir. 2012) ..................................................................................................3, 19

*Schachar v. Am. Acad. of Opthal., Inc.,*
870 F.2d 397 (7th Cir. 1989) .....................................................................................................18

*Service & Training, Inc. v. Data Gen. Corp.,*
963 F.2d 680 (4th Cir. 1992) .....................................................................................................16

*Siva v. Am. Bd. Of Radiology*,
No. 19-c-1407, 2021 U.S. Dist. LEXIS 3806 (N.D. Ill. Jan. 8, 2021) ................................. *passim*

*Smith v. Ebay Corp.*,
No. C 10-03825 JSW, 2012 U.S. Dist. LEXIS 1211 (N.D. Cal. Jan. 5, 2012) ............................ 20

*Stevens v. Interactive Fin. Advisors, Inc.*,
No. 11 C 2223, 2015 U.S. Dist. LEXIS 21518 (N.D. Ill. Feb. 24, 2015) .................................... 21

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) .................................................................................................. 3

*Turner v. McDonald's USA, LLC*,
No. 19-4425, 2020 U.S. Dist. LEXIS 78435 (N.D. Ill. April 24, 2020) ..................................... 20

*United States v. E.I. DuPont de Nemours & Co.*,
351 U.S. 377 (1956) ................................................................................................................ 19

*United States v. LaSalle Bank, N.A.*,
No. 07 C 6196, 2008 U.S. Dist. LEXIS 60756 (N.D. Ill. July 29, 2008) ..................................... 3

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................................................. 9, 19

*United States v. Microsoft Corp.*,
147 F.3d 935 (D.C. Cir. 1998) ................................................................................................. 9

*United States v. Spectrum Brands*,
No. 18-1785, 2019 U.S. App. LEXIS 13934 (7th Cir. May 9, 2019) ......................................... 20

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ............................................................................................. *passim*

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
372 F.3d 899 (7th Cir. 2004) ............................................................................................. 19, 20

## Statutes and Rules

Fed. Rule Civ. P. 8(c)(1) .......................................................................................................... 19

Fed. Rule Civ. P. 12(b)(6) .................................................................................................... 3, 19

## Other

Areeda & Herbert Hovenkamp, *Antitrust Law:*
*Analysis of Antitrust Principles and Their Application* (4th Ed. 2018) ................................. *passim*

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter ("Plaintiffs") submit this Response Brief in Opposition to American Board of Psychiatry and Neurology's ("ABPN") Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. 69). For the reasons set forth below—most notably (1) new allegations addressing the Court's prior concerns, including highlighting that the tied product, ABPN's maintenance of certification product ("MOC") is a continuous professional development ("CPD") product and ABPN sold its own CPD product separately in the past; and (2) a new Seventh Circuit decision supporting Plaintiffs' claims—ABPN's motion should be denied, giving Plaintiffs and the thousands of doctors they represent their day in court.

## BACKGROUND

Certifications assess postgraduate medical education of new residency graduates. (¶¶ 2-3, 10, 16). [1] ABPN has sold certifications to new doctors since 1935, and is the monopoly supplier of certifications. (¶¶ 3, 6). To buy certifications, residency graduates take a standardized exam within a limited time after completing residency. (¶¶ 10, 53). The American Board of Medical Specialties ("ABMS") [2] calls certification an "early career event" and a "one time, snapshot assessment." (¶¶ 3, 58, 59, 161). Certifications are the tying product in Plaintiffs' Sherman Act claims. (¶¶ 6, 333). Certifications are not voluntary, but an economic necessity, without which a successful medical career is impossible, as hospital privileges, participation in insurance networks, and employment, among other things, depend on it. (¶¶ 5, 79, 83-85, 90-96, 97-103, 168-170, 279, 323, 373, 382).

---

[1]     References to "¶ ___" are to paragraphs of the First Amended Class Action Complaint ("FAC"). (Dkt. 63).

[2]     ABMS is an umbrella organization of twenty-four boards ("Member Boards"), including ABPN, that sell certifications in approximately forty specialties and ninety subspecialties. (¶ 10).

The tied product is ABPN's maintenance of certification ("MOC"). (¶¶ 7, 333). ABPN began selling MOC in or around 1998 (¶¶ 148-150). ABPN forces psychiatrists and neurologists to purchase MOC throughout their careers or have their certifications revoked. (¶¶ 7, 10, 19, 150, 161, 164, 184, 214-217, 276, 333). MOC is a continuing professional development ("CPD") product. (¶¶ 7-10, 35, 104-107, 141-147, 148, 152, 159-162). CPD products such as MOC provide individual "lifelong learning" services to practicing doctors throughout their careers, beginning after certification. (¶¶ 10, 11, 57, 104-107, 152, 161, 354). MOC is no different than other CPD products that promote lifelong learning, except that practitioners who do not buy ABPN's CPD product have their certifications revoked. (¶¶ 7, 10, 161).

ABPN sold its own CPD product, which it called "recertification," separate from its certification product from the mid-1970s to the mid-1980s, without tying it to certifications. (¶¶ 13, 141-143). "Recertification" was not required to maintain certification, and as a result it failed due to lack of sales. (¶¶ 13, 141, 143). MOC is a repackaged "recertification" CPD product, which ABPN ties to certifications, as a multi-million dollar money-making venture. (¶¶ 13, 20-21, 147, 162, 164-165). ABPN uses its monopoly power in the certification market to tie its MOC product, charge supra-competitive prices for MOC, and injure competition in the CPD market. (¶¶ 19, 27, 191, 250-260, 383, 393, 409).

ABPN carves out an exception for "grandfathers" who bought certifications before ABPN sold MOC and are not required to purchase MOC to keep their certifications. (¶¶ 17, 175). Thousands of psychiatrists and neurologists have been "grandfathered" from being forced to buy MOC. (¶ 176). "Grandfathers" who are not forced to buy MOC overwhelmingly choose not to do so, proof that "grandfathers" consider MOC a separate product from certification. (¶¶ 179, 181).

This Class action is brought on behalf of psychiatrists and neurologists who, like

Plaintiffs, ABPN forces to buy MOC or have their certifications revoked. (¶ 24). In addition to money damages, Plaintiffs ask that ABPN be enjoined from revoking certifications from doctors who do not buy MOC. (¶¶ 22, 434). They do not contend ABPN should be prevented from determining its own standards or certification criteria, or be required to accept any other CPD product or services as a substitute for certifications or MOC (¶ 22).

## ARGUMENT

### I.      Standard on This Motion.

On a Rule 12(b)(6) motion, allegations are to be "taken as true and considered in the light most favorable" to plaintiff. *Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018). The Court must also draw "all possible inferences in [plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). A complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "[J]udges must not make findings of fact at the pleading stage ... [and] cannot reject a complaint's plausible allegations by calling them 'unpersuasive.' Only a trier of fact can do that, after a trial." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). When, as here, a "motion to dismiss is premised on factual assertions," the motion "must be denied." *United States v. LaSalle Bank, N.A.*, No. 07 C 6196, 2008 U.S. Dist. LEXIS 60756, *9 (N.D. Ill. July 29, 2008).

### II.      Plaintiffs Plead All Required Elements of Their Tying Claims.

#### A.      New, Strengthened Allegations in the FAC Plus the New *Viamedia* Decision Change the Landscape for Evaluating Plaintiffs' Claims.

Plaintiffs took to heart this Court's Memorandum Opinion and Order granting ABPN's motion to dismiss the initial Complaint (the "Dismissal Order"), and granting Plaintiffs leave to amend. Dkt. 60. The FAC's additional allegations now make clear that:

- MOC is a CPD product that, like other CPD products and as described by ABPN itself, promotes "individual lifelong learning" and does not assess the postgraduate medical education of new residency graduates. (¶¶ 7-10, 34-35, 57, 104-111, 113, 121-124, 127-128, 152-159, 186-188, 354).

- The demand for CPD products, including MOC and its ABPN predecessor, has always been separate from the demand for certification. (¶¶ 12, 147, 178, 180-182, 337-338, 343-344, 352-354).

- CPD products, such as MOC, have been sold separately from certification for decades. (¶¶ 10, 12, 126, 129, 136, 140-143, 270, 279, 292, 298, 301, 343, 344, 353-354).

- In fact, ABPN sold its own CPD product, which it called "recertification," separately from certification between about 1975-1984. MOC is simply a repackaging of ABPN's prior, unsuccessful "recertification" product. (¶¶ 13, 141-143, 147, 159, 162, 164-165, 345, 347).

- ABPN's and ABMS's public statements reflect that practitioners consider certification and MOC to be separate products. (¶¶ 41, 47-48, 57, 152-155, 157, 353).

- Because they care about the quality of their continuing education and the resulting improvement to patient outcomes, psychiatrists and neurologists certified by ABPN, if given the choice, would choose to purchase their CPD products from other vendors than ABPN, and this is plausible because they know ABPN's products *do not* match those of other vendors in quality or in improving health outcomes. (¶¶ 179, 223-224, 230-237, 242, 245-249, 285, 290-291, 316-322, 418).

- ABPN's MOC product in its most recent incarnation does not require rigorous testing, but rather open-book "mini-exams," making it plausible that psychiatrists and neurologists would not see it as a valuable CPD alternative. (¶¶ 203-212, 320-21).

- Plaintiffs do not seek to compel ABPN's "endorsement" of other CPD products, but only to prevent ABPN from revoking certifications of psychiatrists and neurologists who do not buy ABPN's own CPD product. (¶¶ 22-23).

These allegations, along with those discussed *infra*, establish all indicia of separate demand that the Supreme Court has identified as relevant to the separate products determination. Nothing more is required to survive this motion. But there is more.

Since this Court entered its Dismissal Order, the Seventh Circuit issued a new tying opinion, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), in which it reversed summary judgment for defendant, rejecting the same single product arguments ABPN makes

4

here. Importantly, the Seventh Circuit's analysis also supports a different analytical approach to the separate demand question than this Court took in its Dismissal Order and ABPN again takes in this Motion.

*Viamedia* holds that whether there is separate demand must be assessed before the tie is imposed, not after. 951 F.3d at 469 ("the market must be 'assessed at the pre-contract rather than post-contract stage'") (quoting Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: Analysis of Antitrust Principles and Their Application*, ¶ 1802d6, at 89 (4th Ed. 2018) ("Areeda & Hovenkamp")). That is particularly important here, where the Court previously deemed pre-1994 history irrelevant, since "[p]re-1994, ABPN certifications were lifelong certifications, not time-limited initial certifications, and they lacked subsequent examinations or other recertification requirements." Dkt. 60, p. 10. The Court focused instead on certification and MOC after ABPN's decision to tie them together had already skewed demand.

But *Viamedia* teaches that just because ABPN's illegal tie has succeeded does not disprove separate demand. As alleged, doctors buy MOC not because they conflate certifications and MOC or otherwise see only one product, "ongoing certification" (Dkt. 60, p. 11), but because ABPN now forces them to buy MOC by revoking certifications if they do not. Under *Viamedia*, demand must be assessed before MOC was imposed, when CPD and certification were sold separately. 951 F.3d at 469 (consumers "viewed the services as separate prior to entering into their present [tying] contracts with Comcast"). And importantly, as noted above, the FAC now includes specific allegations that ABPN itself sold certifications and a voluntary "recertification" CPD product separately before 1994.

The *Viamedia* imperative to assess demand *before* the tie makes sense because focusing on demand *after* the tie is forced on consumers inevitably rewards the defendant whose tie has

already successfully reduced competition, the very goal of the illegal tie. ABPN sold lifelong certifications for almost sixty years because certification demonstrated successful completion of a candidate's postgraduate residency, an accomplishment that cannot later be undone or revoked. (¶¶ 2-3, 10, 16, 71, 163). ABPN launched its "recertification" CPD product much later, made it voluntary (keeping one's certification did not depend on purchasing a "recertification"), and sold it separately from certifications. (¶¶ 13, 141-143). Only after its "recertification" CPD product *failed* did ABPN decide to change certification to a time-limited product, repackage its CPD product as MOC, and then require the purchase of MOC to "maintain" the newly time-limited certifications. (¶¶ 13, 20-21, 147, 159, 162-165). That scheme is the very touchstone of this case, and has allowed ABPN to swell its coffers to the tune of tens of millions of dollars, and its officers' salaries to balloon, while reducing competition. (¶¶ 20-21, 254, 257-260).

*Viamedia* makes clear that a defendant like ABPN who reconfigures two previously separate products and forces consumers to purchase both cannot parlay its own coercion into evidence of lack of separate demand for a product that the victimized consumers would rather not purchase. This distinction is particularly significant here, where all of ABPN's arguments are based on what the world looks like after the tie. *See*, *e.g.*, Dkt. 69 at 6 (rejecting allegations that MOC is a CPD product because after the "recertification" product failed, MOC was "essentially integrated into the certification product" unlike other CPD products); Dkt. 69 at 7 ("While, in the past, ABPN offered lifelong certifications, for the past twenty-five years or so it has only offered time-limited certifications requiring additional activities to maintain that certification on an ongoing basis"). [3]

As *Viamedia* makes clear, not only should the analysis consider the relevant markets and

---

[3]     ABPN's use of the wording "additional activities" to describe MOC is a giveaway that MOC is separate from certification. A single product cannot be "additional" to itself.

demand before introduction of the tie, "[t]he fact that buyers may wish to purchase and use two complementary products together does not, in and of itself, convert the two separate products into a single product." *Viamedia*, 951 F.3d at 469. That ABPN has repackaged its own separately-sold "recertification" CPD product to function in a complementary way with certifications may be new (¶¶ 13, 147, 162, 164-165), but that repackaging *is* the illegal tie and "does not, in and of itself," magically convert certifications and MOC into a single product. Areeda & Hovenkamp, ¶ 1746, at 231 ("[I]nnovation need not always take the form of building a better mousetrap. Instead, the 'innovation' may be an anticompetitive tie that no one has tried before.").

### B. Plaintiffs Plausibly Allege All of the *Jefferson Parish* Indicia of Separate Products, for Both the *Per Se* and Rule of Reason Tying Claims.

"Whether one or two products are involved turns ... on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). In assessing whether separate demand exists, courts look at whether the products are "distinguishable in the eyes of buyers" and "separately priced and purchased from the buyer's perspective." *Id*. at 19-20. As discussed below, the Supreme Court has identified several indicia for courts to examine consumer demand, including "more readily observed facts [such] as actual consumer requests and market practices." Areeda & Hovenkamp, ¶ 1745c, at 202. Plaintiffs plead all of those factors.

Courts should not, as ABPN urges here, disregard such "readily observed facts" in favor of self-serving arguments about the "nature" of the products. Areeda & Hovenkamp, ¶ 1741a, at 170 ("Courts often decide whether two allegedly tied items 'really' constitute a single product as if the question involved natural law, intuition, or some other inquiry divorced from the aims of tying law ... Such metaphysical or intuitive inquiries are inherently uncertain and are typically

useless for analyzing ties."). ABPN avoids engaging Plaintiff's well-pled allegations of the indicia of separate demand, resting its argument instead on partisan characterizations of certification and MOC as "components" of a single certification product. When the relevant factors are properly analyzed, Plaintiffs have pled facts sufficient to state a plausible claim.

### 1. Consumers Differentiate Between Certifications and MOC.

Separate demand exists when consumers "differentiate between" the tying and tied products. *Jefferson Parish*, 466 U.S. at 22-23 ("patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia"). *See also Viamedia,* 951 F.3d at 469 (buyers "viewed the services as separate"). The FAC alleges numerous facts showing consumers (psychiatrists and neurologists) differentiate between certifications and CPD products such as MOC, including: (1) CPD products including MOC are designed to provide "individual lifelong learning" services to doctors *after* residency graduation and certification (¶¶ 7-10, 34-35, 57, 104-111, 113, 121-124, 127-128, 152-159, 186-188, 354); (2) doctors bought CPD products and services from other vendors for decades before ABPN sold MOC (¶¶ 10, 12, 126, 129, 136, 140-143, 270, 279, 292, 298, 301, 343, 344, 353-354); (3) APBN, governed by psychiatrists and neurologists (¶¶ 55-56), sold certifications for decades without selling its own CPD product (¶¶ 3, 12, 343); (4) ABPN sold its voluntary "recertification" CPD product separately from certifications for ten years, from approximately 1975 to 1984 (¶¶ 13, 141-143, 147, 159, 345, 347); and (5) since ABPN began selling MOC, "grandfathers" and other doctors have continued to buy other CPD products separate from certifications to meet licensure requirements and other professional commitments (¶¶ 17-18, 175-183, 216, 367).

ABPN does not specifically address this factor, thus effectively conceding it. Instead, it argues generally, based on *Siva v. Am. Bd. of Radiology*, No. 19-c-1407, 2021 U.S. Dist. LEXIS

3806, *15 (N.D. Ill. Jan. 8, 2021), that MOC and certification are not separate products because the two have been "integrated" into one product, and no other CPD product is "fungible" with MOC because only MOC "maintains" certification. *See*, *e.g.*, Dkt. 69, p. 6, 9. This argument has several failings. First, contrary to *Viamedia*, it looks at the world after ABPN imposed the tie, not before. Second, it ignores allegations of how *psychiatrists and neurologists* view the products, *see supra*, instead relying on ABPN's own self-serving characterizations of the two products. [4]

Third, products that have been "integrated" can still be separate. Indeed, the very concept of "integration" presumes joining two products, as courts have recognized. *See e.g. United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001) ("[W]e do not find that Microsoft's integration [of computer operating systems and internet browsers] is welfare-enhancing or that it should be absolved of tying liability"); *United States v. Microsoft Corp.*, 147 F.3d 935, 949 (D.C. Cir. 1998) ("[t]he concept of integration should exclude a case where the manufacturer has done nothing more than to metaphorically 'bolt' two products together").

The FAC has fully addressed any prior concern over the pleading of consumer differentiation. For example, allegations concerning "grandfathers" now specifically set out both that ABPN (itself governed by psychiatrists and neurologists) considers certifications and MOC to be separate products, and that the very existence of "grandfathers" confirms MOC and certifications are not, in fact, integrated for the tens of thousands of doctors who are "grandfathered." (¶¶ 55-56, 178, 179, 181). And while this Court found earlier allegations about CPD products focused primarily on NBPAS to be insufficient, the FAC's broader allegations

---

[4]     Though it devotes substantial portions of its brief to the notion that this Court should follow *Siva*, ABPN fails to acknowledge the determinative difference between the two. Judge Alonso found it significant that the defendant in that case had never sold its own CPD product separate from certification. *Siva*, 2021 U.S. Dist. LEXIS 3806, *10-11 ("Most critically … Plaintiff has still not alleged that ABR ever actually sold initial certification and MOC separately"). Here ABPN sold its own voluntary "recertification" CPD product separate from certification for ten years.

showing the wide range of ABPN's competitors for CPD products and how practitioners have historically distinguished between certification and CPD products changes the calculus. *Supra*, pp. 4, 8. The well-pled and plausible allegations that practitioners have always considered the two products separate must be taken as true, and establish this factor.

### 2. ABPN Has Always Sold Certifications and MOC Separately.

Separateness is also demonstrated by evidence that the two products "have been sold separately in the past and still are sold separately." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). *See also Viamedia*, 951 F.3d at 470; *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ., Inc.*, 63 F.3d 1540, 1547 (10th Cir. 1995) (products marketed separately "for over a decade" and still sold separately).

The FAC contains abundant well-pled facts showing that ABPN has always sold certifications and CPD products separately: In addition to items (3), (4), and (5) from the previously discussed factor, *supra* p. 8: (1) ABPN sells certifications and MOC to psychiatrists and neurologists at different times in their careers (¶¶ 10, 58-64, 359, 368, 421); (2) certifications must be purchased from ABPN within a limited time after residency (¶¶ 58-64); (3) MOC can only be bought after purchase of a certification (¶¶ 10, 11, 53, 57, 106, 346); (4) new residency graduates pay a one-time certification fee upon graduation, after which ABPN then charges practitioners separately for MOC throughout the remainder of their careers (¶¶ 156, 272, 298-299, 369); (5) "grandfathers" who previously purchased certifications overwhelmingly have not purchased MOC (¶¶ 175-183); (6) ABPN's decades-long monopoly in certifications before it sold MOC shows MOC is separate and not essential to its certification product (¶¶ 3, 6, 370); and (7) it is efficient for certifications and MOC to be sold separately because there is separate and sufficient demand (¶¶ 312, 339-340).

ABPN dismisses historical evidence of separate sales as irrelevant, instead wanting to focus on its products post-tie. *See*, *e.g.*, Dkt. 69, p. 8 ("despite adding allegations regarding ABPN's prior CPD offerings in the 1970s and 1980s, Plaintiffs have not, and cannot, alleged that ABPN has ever sold initial certification and MOC separately"). But this argument fails to take Plaintiffs' allegations as true – MOC is alleged to be a merely repackaged "recertification" CPD product that *was* sold separately from certifications. (¶¶ 13, 147, 159, 162-165). Moreover, ABPN's argument is incorrect under *Viamedia* for the reasons already explained. Otherwise, ABPN merely labels Plaintiffs' allegations "conclusory" without engaging substantively. But there is nothing "conclusory" about specific allegations of ABPN's own sale of its voluntary "recertification" product and certifications separately.

This Court found Plaintiffs' prior allegations about separate sales history "unpersuasive," calling this element a proxy for "efficiency," and reasoning that because ABPN did not require CPD products to "maintain certification" before 1994, the history of separate sales does not show it is efficient to produce the products separately. Dkt. 60, 9-10. But Plaintiffs now specifically allege CPD products were sold separately from certifications for decades (including by ABPN before 1994), showing that it was, indeed, efficient to do so. *See*, *supra*. Not only does *Viamedia* require looking at this pre-tie history, it also counsels that the efficiency inquiry is a factual one that cannot be decided on a motion to dismiss. 951 F.3d at 460-61 (district court erred in deciding issue on motion to dismiss). Indeed, the *Eastman Kodak* case on which this Court relied was decided on summary judgment. 504 U.S. at 462.

### 3. ABPN and ABMS Distinguish Between Certifications and MOC.

ABPN's own recognition that certifications and MOC are different further demonstrates that doctors, including those in charge of ABPN, differentiate between the two products. (¶¶ 41,

47-48, 55, 57, 152-155, 157, 353). Certifications are sold to new residency graduates to assess knowledge and clinical skill of candidates for "entry" into the field at the beginning of their careers, and as such are "a one-time snapshot assessment." (¶ 3, 58-59, 161). MOC's purpose, on the other hand, is "[e]ncouraging and addressing diplomate involvement in lifelong learning." (¶ 57). ABMS, whose policies, practices and procedures related to certifications and MOC are established by ABPN and the other Member Boards (¶¶ 40, 44-46), also considers certifications and MOC to be separate, including by identifying them as separate programs in its bylaws. (¶¶ 41, 48, 158). ABPN's exemption of tens of thousands of "grandfathers" who bought certifications from the requirement of buying MOC also concedes certifications and MOC are separate. (¶¶ 17-18, 175-183, 210). Finally, ABPN's separate sales of certification and its "recertification" CPD product show it recognizes the separateness of the products. *See Viamedia*, 951 F.3d at 474 (defendant's sale of tying product alone shows there "are indeed separate products").

ABPN, again, does not address this factor, effectively conceding it. In its Dismissal Order, the Court focused on the "grandfather" allegations and found them irrelevant because Plaintiffs did not cite cases finding the seller's "purposes" to be relevant. Dkt. 60, p. 12. *Viamedia* has since instructed that how the seller views the product is very relevant. 951 F.3d at 474. Moreover, the existence of "grandfathers" not only reflects how ABPN itself sees certification and MOC as separate products, but also how MOC's consumers, practicing doctors, see them as separate. (¶¶ 55-56, 178, 179, 181).

### 4.    ABPN Bills and Accounts for Certifications and MOC Separately.

Courts also consider whether the consumer is billed or charged separately for the tied product. *Jefferson Parish*, 466 U.S. at 22 ("anesthesiological [sic] services are billed

separately"); *Multistate Legal Studies,* 63 F.3d at 1547 (separate fees). ABPN has always

charged doctors separately for certifications and MOC. (¶ 156, 360). ABPN also accounts for

them separately. (¶ 360). ABPN does not dispute these facts, instead arguing they "lack merit"

because these separate payments for MOC and certification are "allow[ing] payment as the buyer

goes," without explaining how that matters. Dkt. 69, p. 8. The Court acknowledged that this

indication of separate demand was pleaded in the initial Complaint. Dkt. 60, p.11 (finding it to be

"one indication to be considered among all the circumstances"). It remains well-pled in the FAC.

### 5. Market Structure and Practices Demonstrate Separate Demand.

Courts also examine market structure and practices as an indication whether there are

efficiencies to offering the tied and tying products separately, thus supporting separate demand.

*See Eastman Kodak*, 504 U.S. at 462 ("service and parts have been sold separately in the past [by

others] and are still sold separately"); *Jefferson Parish*, 466 U.S. at 23 n. 39 ("other hospitals

often permit anesthesiological services to be purchased separately"); *Viamedia*, 951 F.3d at 469

(competitor offered only the tied product "for almost two decades"). The FAC contains many

fact allegations of market structure and practices demonstrating separate demand, including (1)

the above-described history of ABPN and other vendors selling certifications separate from CPD

products (*see*, *supra*, pp. 8, 10); (2) ABPN's decades-long monopoly in certifications before it

sold its "recertification" CPD product and then MOC demonstrates MOC is separate and not

essential to ABPN's certification product (¶ 370); (3) the long history of doctors buying CPD

products from other vendors for decades before ABPN sold MOC (¶¶ 10, 12, 126, 129, 136, 140-

143, 270, 279, 292, 298, 301, 343, 344, 353-354); and (4) it is efficient for certifications and

MOC to be sold separately because there is separate and sufficient demand (¶¶ 12, 339-340).

For the reasons discussed elsewhere herein, ABPN's outright rejection of the relevance of

market structure and practices before it implemented the illegal tie is unavailing under *Viamedia*, and leaves Plaintiffs' allegations and analysis of the pre-tie, two-products environment unrebutted. The Court also relied only on post-1994 market structures in its Dismissal Order. Dkt. 60, p. 10.

For all of the foregoing reasons, Plaintiffs have plausibly pled sufficient facts to satisfy the separate products element of their tying claims. [5]

**C.     Plaintiffs Plausibly Allege Forcing.**

Plaintiffs allege certification is an economic necessity for practicing psychiatrists and neurologists, because *inter alia*, it is necessary for participation in insurance networks, hospital privileges, and employment. *See*, *e.g.*, ¶¶ 5, 79, 83-85, 90-96, 97-103, 168-170, 279-282, 323. [6] Because ABPN revokes certifications of practitioners who do not purchase MOC, the economic reality of the need for practitioners to remain certified forces them to purchase MOC when they would prefer other CPD products. Courts recognize that economic reality dictates whether a purchase is forced.

In *Viamedia*, the Seventh Circuit specifically found the purported option of retail cable providers bringing the tied product (ad rep services) in-house was "not a practical option," and it "cannot affirm summary judgment by overlooking [the] evidence about the realities of the

---

[5]     ABPN also cites *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530 (E.D. Pa. 2019). Since ABPN filed its brief, that ruling has been affirmed. *Kenney v. American Bd. of Internal Med.*, No. 20-1007, 2021 U.S. App. LEXIS 5595 (3d Cir. Feb. 25, 2021). The Third Circuit, however, designated its opinion "Not Precedential." It did not even acknowledge *Viamedia*, with which it is in conflict regarding both the separate products and "forcing" analyses.

[6]     Courts have found certification to be an economic necessity when hospital privileges or insurance payments hang in the balance for doctors. *Busse v. Am. Bd. of Anest., Inc.*, No. 92 C 5613, 1992 U.S. Dist. LEXIS 18948, *8 (N.D. Ill. Dec. 11, 1992) (certification an economic necessity when necessary to access area hospitals); *Liberman v. Am. Ost. Ass'n*, No. 13-15225, 2014 U.S. Dist. LEXIS 153012, *16-17 (E.D. Mich. Oct. 29, 2014) (same for insurance coverage).

parties' dealings and the economic realities of the market." *Id.* at 471 n. 17, 473. Similarly, the

purported option ABPN offers here, that practitioners simply not buy certifications and MOC

(Dkt. 69, p. 10), defies economic reality and is "not a practical option." *See also* Areeda &

Hovenkamp, ¶ 1752e, at 295 (tying present when defendant uses a consumer's desire (here,

doctors' desire not to have their certifications revoked) to "constrain improperly their choice"

between products).

It is irrelevant whether hospitals or insurers are "independent" of ABPN. Dkt. 69, p. 10.

What matters is that ABPN takes advantage of the decisions of these and other industry

participants to leverage its monopoly power and force doctors to purchase MOC by tying

certifications to MOC. At the very least, under *Viamedia* "forcing" raises fact questions that

cannot be decided on this motion. 951 F.3d at 470-74. [7]

This Court previously reasoned that tying can only occur when the sale of the tying

product is conditioned on also purchasing the tied product, and since Plaintiffs can (theoretically)

purchase certifications without buying MOC, there is no "conditioning." Dkt. 60, p. 12. But an

illegal tie is "clearly present" when "the seller ... continues to supply the tying product only to

those who purchase its tied product." Areeda & Hovenkamp, ¶ 1700i, at 13. Plaintiffs allege

exactly that. By revoking the tying product (certifications) when MOC is not bought, ABPN

"continues to supply" it "only" to those doctors who "purchase its tied product" (MOC).

**D.    ABPN's Arguments That MOC Is a Component of Certification and Only MOC Can Maintain Certification Are Both Improper Functional Relation Arguments and Business Justification Affirmative Defenses that Should Not Be Considered on a Motion to Dismiss.**

ABPN's main argument is the repeated refrain that MOC and certification are

---

[7]    ABPN finds it significant that Plaintiffs knew of the tie when they purchased certifications. Dkt. 69, p. 7. It is not. Awareness of a tie when buying the tying product does not make the tie less coercive. *Viamedia*, 951 F.3d at 446-449 (consumers signed with Comcast for ad rep services knowing of the tie).

"components" of a single product. *Id.*, p. 8. This is a paradigm functional relationship argument rejected by *Jefferson Parish*, 466 U.S. at 19 n. 30 (whether products are "functionally linked … is not in itself sufficient" to determine if they are separate). In an analogous case, involving electric motors and repair parts necessary to maintain those motors, the Seventh Circuit found the products to be separate. "Even functionally related products, one of which is useless without the other, have been held to be the subject of illegal tying arrangements." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 (7th Cir. 1987). *See also*, *id.* ("Repair parts and finished goods have been expressly held to be separate products capable of being tied.").

This is consistent with other cases rejecting similar arguments about "maintenance" products where the *Jefferson Parish* indicia of separateness were present. In *Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992), plaintiff alleged Data General tied a diagnostic product to computer maintenance services. The district court concluded that the diagnostic product was "merely one feature" of the unified "computer servicing" product, which it decided was the product consumers truly desired (analogous to ABPN's "certification" argument here). It also found that the "only ... legitimate purpose" for the tied product was to "maintain and repair computer systems," and that since the two products "are inextricably bound together," they cannot be considered separate. *Id.* at 684. The Fourth Circuit reversed, calling "[t]his inquiry into purpose and use" by the district court "indistinguishable from the inquiry into the 'functional relationship' between products that was rejected in *Jefferson Parish*." *Id. See also* Areeda & Hovenkamp, ¶ 1751a2, at 280, 281 (asking whether buyer "needs both items to produce the system result the buyer really values" is misguided and "departs greatly from precedent ... [t]he more accurate question is not whether the buyer 'needs both' products, but rather whether it 'needs both' from the same seller").

16

In any event, even functionally linked products can be separate products. *Jefferson Parish*, 466 U.S. at 19 n. 30 ("[w]e have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices") (collecting cases); *Viamedia,* 951 F.3d at 469 ("[t]he fact that buyers may wish to purchase and use two complementary products together does not, in and of itself, convert the two separate products into a single product"). *Jefferson Parish* forcefully rejects ABPN's argument that it is dispositive that practitioners do not buy MOC without having bought certification. A patient does not buy standalone anesthesiologist services without other hospital services, yet *Jefferson Parish* found the two to be separate products. [8]

ABPN also argues, contrary to Plaintiffs' allegations of separate demand, that because only MOC can "maintain" ABPN certification, there can be no demand for other "maintenance" products. *See*, *e.g.*, Dkt. 69, p. 6-7, 9. This Court previously found this argument persuasive. *See*, *e.g.*, Dkt. 60, pp. 10-11. But in addition to also being a purely functional relationship argument, this is a classic business justification excuse for a tie, an affirmative defense not properly considered on a motion to dismiss. *Jefferson Parish*, 466 U.S. at 25 n. 42 ("goodwill" justification for tie and similar arguments are "defenses"); *Viamedia*, 951 F.3d at 460 ("business justifications" a "defense" that "depends on evidence and is not amenable to resolution on the pleadings"); *Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342, 1349 (9th Cir. 1987) (quality control justification an "affirmative defense"); Areeda & Hovenkamp, ¶ 1741, at 175 ("Justifications can be considered as a defense to a tying claim, and normally are now so

---

[8] ABPN fails to advise that it stifles demand post-tie by *refusing* to sell MOC to doctors unless they first buy certifications. (¶ 346). But for ABPN's refusal to sell MOC unless certifications are bought first, it is plausible that some doctors without certifications would consider buying MOC, which according to ABPN at least would help them stay current. *See PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817 (6th Cir. 1997) (defendant's "own restrictive policy [] assured the absence of a component market").

considered by courts."). Because a plaintiff need not anticipate and plead around affirmative defenses, the Court should not consider ABPN's business justification arguments. *McDonald v. Adamson*, 840 F.3d 343, 347 (7th Cir. 2016).

### E. Plaintiffs Plausibly Allege an Unreasonable Restraint of Trade.

ABPN's challenge to the allegations of unreasonable restraint of trade goes only to the rule of reason tying claim, since for a *per se* claim this is presumed. *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 864 (N.D. Ill. 2019) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). As to the rule of reason claim, Plaintiffs allege the following unreasonable harm to competition from ABPN's unlawful conduct:

> ABPN's illegal tie raises the cost of the practice of medicine for physicians; restricts the supply of psychiatrists and neurologists, thereby harming competition; increases the cost of medical services to patients; creates or increases barriers to patient care; and inhibits entry to the market for psychiatrists' and neurologists' services.

¶ 400. *See also* ¶¶ 385-387, 395-399, 401.

"The reasonableness of a restraint is a paradigm fact question." *Los Angeles Mem. Coliseum Com'n v. N.F.L.*, 726 F.2d 1381, 1401 (9th Cir. 1984). Indeed, ABPN's cases were resolved on summary judgment or after trial. *Am. Council of Cert. Pod. Phys. and Surg. v. Am. Bd. of Pod. Surgery, Inc.*, 185 F. 3d 606, 612 (6th Cir. 1999) (summary judgment); *Schachar v. Am. Acad. of Opthal., Inc.*, 870 F.2d 397, 398 (7th Cir. 1989) (trial); *Poindexter v. Am. Bd. of Surgery, Inc.*, 911 F. Supp. 1510, 1514 (N.D. Ga. 1994) (summary judgment). [9]

### F. Plaintiffs Plausibly Allege ABPN's Market Power Over Certifications.

Plaintiffs properly plead possession of monopoly power (and hence market power) by

---

[9]     ABPN's remaining cases are inapposite. There were no allegations of illegal tying in *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. Of Med. Specialties*, No. 14-cv-02705, 2017 U.S. Dist. LEXIS 205845 (N.D. Ill. Dec. 13, 2017). And in *DM Res., Inc. v. Coll. of Am. Pathol.*, 170 F.3d 53 (1st Cir. 1999), the alleged conspiracy was deemed implausible, precluding an unreasonable restraint of trade.

ABPN over certifications. (¶ 6). They further allege: "[N]o other organization or entity provides meaningful competition to ABPN in the certification market for psychiatrists and neurologists" and "[t]here are high barriers to entry in the certification market for psychiatrists and neurologists, including technical, economic, organizational, and historical barriers, as demonstrated by the fact that no other organization or entity has ever sold certifications to psychiatrists or neurologists in successful competition with ABPN." (¶¶ 385, 386).

ABPN has long enjoyed a 100 percent market share in the certification market and the monopoly power that goes with it. *See*, *e.g.*, *Eastman Kodak*, 504 U.S. at 481 (monopoly power inferred from 80 to 95 percent market share); *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956); *Microsoft*, 253 F.3d at 51. Thus, Plaintiffs allege more than the requisite ABPN market power over certifications to sustain their illegal tying claims.

## III. Plaintiffs' Tying Claims Are Timely.

Statute of limitations is an affirmative defense governed by Rule 8(c)(1), and "because complaints need not anticipate defenses, Rule 12(b)(6) is not designed for motions under Rule 8(c)(1)." *Richards,* 696 F.3d at 637. ABPN, however, asserts Plaintiffs' claims are time-barred on their face, claiming the clock starts when Plaintiffs first purchased MOC. Dkt. 69 at 12-13. Not so. The discovery rule does not apply here. Instead, the four-year limitations period for antitrust claims "runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). [10]

---

[10]    In an antitrust case, "if a continuing violation extends into the statutory period, the victim is entitled to complain about the whole violation, no matter how long ago it began." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984).

Thus, "the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete." *United States v. Spectrum Brands*, No. 18-1785, 2019 U.S. App. LEXIS 13934, *26 (7th Cir. May 9, 2019) (emphasis in original). "Each discrete act with fresh adverse consequences starts its own period of limitations." *Xechem*, 372 F.3d at 902. Plaintiffs need only allege injuries coupled with "overt acts" by ABPN within the four-year limitations period. *Turner v. McDonald's USA, LLC,* No. 19-4425, 2020 U.S. Dist. LEXIS 78435, *9-11 (N.D. Ill. April 24, 2020).

While ABPN acknowledges that the continuing violations theory "may restart the antitrust statute of limitations," it insists the complaint fails to allege a new act to allow for a continuing violation. Dkt. 69 at 13. But in tying cases, so long as the defendant "enforce[d] the tie during the limitations period" the overt act requirement is met. *Gumwood HP Shop. Partners, L.P.* v. *Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 U.S. Dist. LEXIS 35759, *40 (N.D. Ind. Mar. 18, 2016). *See also Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928, 937 (S.D. Ohio 2009) (overt acts met by "continuing to maintain" the illegal tying). The overt act requirement can also be met by "continued modification" of the tying during the limitations period that "inflicts 'a new and accumulating' injury." *Smith v. Ebay Corp.*, No. C 10-03825 JSW, 2012 U.S. Dist. LEXIS 1211, *8, *13 (N.D. Cal. Jan. 5, 2012) (internal citation omitted).

Plaintiffs allege injuries and an abundance of overt acts within the limitations period. *See* ¶¶ 276-280, 282, (Dr. Lazarou); ¶¶ 313-315, 322-324 (Dr. Akhter); ¶ 375 (both); ¶¶ 27, 70, 385-87, 400; (harm to competition in the CPD market, affecting Drs. Lazarou and Akhter as market participants); ¶¶ 184, 197-199, 203-204, 207 (ABPN's continued modification of MOC); ¶¶ 67, 100, 150, 184 (ABPN enforced illegal tie throughout limitations period); ¶¶ 16, 150, 161, 164, 214-217, 308 (harm to Dr. Akhter and other physicians by revoking certifications even though

20

they purchased ABPN certification). At the very least, these allegations of injury and overt acts within the limitations period raise fact questions that cannot be resolved on this motion.

Similarly, ABPN's discovery rule argument rests on the assumption that Plaintiffs were injured only at the time they purchased certifications. Dkt. 69 at 13. First, Plaintiffs are not even challenging ABPN's certifications. Second, this is simply a reiteration of ABPN's argument that Plaintiffs' foreknowledge of MOC constituted some kind of consent (which it does not), an affirmative defense not properly considered on a motion to dismiss. Third, as just noted, *when* the injuries to Plaintiffs from being forced to buy MOC occurred raises material fact questions. The discovery rule is a fact-intensive inquiry not properly considered at this preliminary stage of the proceedings. *Gordon v. Ortho McNeil Pharma., Inc.*, 430 F. Supp. 2d 814, 818 (N.D. Ill. 2006).

## IV. Plaintiffs State a Claim for Unjust Enrichment.

Plaintiffs and thousands of psychiatrists and neurologists confer a benefit on ABPN as a result of being forced to purchase MOC (tens of millions of dollars in MOC fees), ABPN without question retains that benefit, and it is unjust for ABPN to keep that benefit resulting from its unlawful conduct. (¶¶ 270, 272, 288-89, 292-93, 298-302, 315, 325, 425-30). Nothing more is required to state a claim for unjust enrichment. *See Stevens v. Inter. Fin. Advs., Inc.*, No. 11 C 2223, 2015 U.S. Dist. LEXIS 21518, *50-51 (N.D. Ill. Feb. 24, 2015).

ABPN claims the "certifications and purchase of MOC are governed by contracts, which preclude their unjust enrichment claim under Illinois law." Dkt. 69 at 14. But ABPN does not identify any such contract or provide its terms. Moreover, Plaintiffs do not allege the existence of a contract, much less a contractual breach. ABPN's argument also fails to acknowledge that other fact issues, including mutuality and consideration, must be resolved before a Court can

determine whether a contract even exists. *See Gen. Cas. Co. of Wis. v. Techloss Cons. & Restor.*, 461 F. Supp. 3d 804, 809 (N.D. Ill. 2020) ("existence or non-existence of an agreement is a question of fact"). Finally, ABPN misstates Plaintiffs' allegations and argues "Plaintiffs do not allege that they received nothing of value for their MOC fees." Dkt. 69 at 14. In truth, Plaintiffs do claim they received nothing of value. *See*, *e.g.*, ¶ 291 (MOC was "a 'waste of time' that does not make [Lazarou] a better or more effective physiatrist"); ¶ 322 (MOC does not aid "[Akhter] in any way"). Whether Plaintiffs received anything of value when they were forced to buy MOC is at minimum a fact question. [11]

## CONCLUSION

For all of the foregoing reasons, ABPN's motion to dismiss should be denied, and Plaintiffs should be given the opportunity to prove their claims.

Date: March 22, 2021                              Respectfully submitted,

                                                  /s/  C. Philip Curley

                                                  C. Philip Curley
                                                  Cynthia H. Hyndman
                                                  Robert L. Margolis
                                                  Laura R. Feldman
                                                  ROBINSON CURLEY P.C.
                                                  300 South Wacker Drive, Suite 1700
                                                  Chicago, IL 60606
                                                  Tel: 312.663.3100
                                                  Fax: 312.663.0303
                                                  pcurley@robinsoncurley.com
                                                  chyndman@robinsoncurley.com
                                                  rmargolis@robinsoncurley.com
                                                  lfeldman@robinsoncurley.com

---

[11]    Even assuming *arguendo* a contract exists, it would not preclude unjust enrichment because ABPN's illegal tie necessarily falls outside the subject matter of any supposed contract. *See Petrakopoulou v. DHR Int'l, Inc.*, 660 F. Supp. 2d 935, 939-40 (N.D. Ill. 2009) (motion to dismiss denied where subject matter of contract was distinct from subject matter of the unjust enrichment claim).

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
Tel: 312.750.1265
Fax: 312.212.5919
kcarroll@carlsonlynch.com

*Attorneys for Plaintiffs Emily Elizabeth Lazarou
and Aafaque Akhter*