**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

EMILY ELIZABETH LAZAROU
and AAFAQUE AKHTER, individually and
on behalf of all others similarly situated,

                 Plaintiffs,

v.

AMERICAN BOARD OF PSYCHIATRY
AND NEUROLOGY,

                 Defendant.

Case No.: 1:19-cv-01614

Honorable Martha M. Pacold

**REPLY BRIEF OF DEFENDANT IN SUPPORT OF ITS MOTION TO DISMISS
PLANTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Defendant The American Board of Psychiatry and Neurology ("ABPN"), by and through

its counsel, submits this Reply Brief in Support of its Motion to Dismiss Plaintiffs' First Amended

Class Action Complaint ("FAC"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.

## **INTRODUCTION**

Plaintiffs' opposition (Dkt. No. 75, "Opp.") recycles the same arguments from their last

brief and repeats the same "facts" alleged in their Original Complaint. This time with a new,

invented moniker—"continuous professional development ('CPD') product"—Plaintiffs once

again allege that the ABPN's maintenance of certification program ("MOC") is a "separate

product" from initial certification. (Opp. at 1.) But whichever name Plaintiffs pick for the product,

nothing in their Amended Complaint or brief provides reason to doubt the Court's holding that the

"ABPN's initial certification and MOC are not distinct products, but just one—ABPN

certification." (Dkt. No. 60 at 8.) Yet stranger still is Plaintiffs' other "new" argument: that the

Seventh Circuit's opinion in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020),

somehow "reject[ed] the same single product arguments ABPN makes here." (Opp. at 4.) *Viamedia*, cited by the Court throughout its opinion dismissing Plaintiffs' Original Complaint, held nothing of the sort.

If anything has "change[d] the landscape for evaluating Plaintiffs' claims" (Opp. at 3), it is the Third Circuit's recent opinion in *Kenney v. American Board of Internal Medicine*, No. 20-1007, -- F. App'x --, 2021 WL 732715 (3d Cir. Feb. 25, 2021). Though briefed and argued by Plaintiffs' counsel here, they curiously relegate *Kenny* to a one-sentence footnote. But in that case, as here, the plaintiffs insisted that MOC is but another CPD program, which physicians would "prefer to purchase" from other vendors. *Id.* at *2. The Third Circuit, as this Court did, dismissed those allegations out of hand. At bottom, the claims ignored "the reality" that boards certify "a physician in recognition of their training and skills at one point in time and successful completion of MOC requirements allows a physician to continue to hold themselves out as certified by ABIM at a later point in time." *Id.* at *6. The same is true here.

Like their last pleading, Plaintiffs' Amended Complaint does not plausibly allege that MOC and initial certification are separate products. Nor have they plausibly alleged force, unreasonable restraint, substantial market power, or timeliness. Accordingly, Plaintiffs' Sherman Act claims should be dismissed with prejudice, and the unjust enrichment claim dismissed for lack of jurisdiction.

## **ARGUMENT**

### I.  **PLAINTIFFS' TYING CLAIMS STILL FAIL AS A MATTER OF LAW**

#### A. **Certification and MOC Are Not Separate Products**

Plaintiffs agree that both their "*per se* and rule of reason tying claims require that the tying arrangement involve two distinct products," which turns on the "character of the demand for two

items." (Opp. at 7 (citing *Jefferson Paris Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984)).) Plaintiffs also do not seriously disagree, as this Court and every other to consider the question has held, that "[i]t is not plausible that physicians holding an initial certification from the ABPN would, in order to maintain ABPN certification, seek out an assessment from a different certifying organization." (Dkt. No. 60 at 8.) Plaintiffs instead rehash the same "evidence" of separateness from their Original Complaint, but this time with a new acronym and a not-so-new Seventh Circuit opinion.

### 1. The ABPN Has Not And Does Not Sell MOC Separately From Initial Certification

Plaintiffs' amended pleading and brief insist that initial certification and MOC are separate products, because the "ABPN itself sold certifications" and a "CPD product separately before 1994."[1] (Opp. at 4-5.) Even assuming the ABPN previously had provided CPD courses,[2] this Court already rejected that argument. Whether the ABPN previously provided educational courses before 1994, the ABPN certainly "never sold initial certification and MOC separately before 1994" because MOC did not exist exist before 1994. (Dkt. No. 60 at 10.) Were that not enough, the Court explained that the "only alleged attempted competition with MOC (by NBPAS) began recently, in 2015." *Id.*

Plaintiffs' attempt to shoehorn MOC as yet another educational product does not make the Court's prior holding any less true. (*See, e.g.*, FAC ¶¶ 7-12; Opp. at 4-5.) As the Third Circuit

---

[1] Plaintiffs repeat this argument throughout their brief. (*See, e.g.*, Opp. at 3-7, 10-12.) For the sake of brevity, the ABPN will respond to their contentions here.

[2] Plaintiffs admit that before MOC, the CPD product that the ABPN offered was different than MOC because it was voluntary and not required to maintain certification. (FAC ¶ 13.) In any event, Plaintiffs own Amended Complaint admits MOC is not akin to a run-of-the-mill continuing education class. Psychiatrists and Neurologists must perform patient safety activities, conduct self-assessments, and demonstrate improvement in medical practices. (FAC ¶¶ 201-13.)

explained in a Sherman Act challenge to the American Board of Internal Medicine's MOC program, Plaintiffs' allegations at best demonstrate that there was once "demand for" a "lifelong certification product." *Kenney*, 2021 WL 732715, at *4. But that "does not support Plaintiffs' separate demand argument because demand for lifelong certifications does not equal separate demand for time-limited certifications or MOC, especially in light of Plaintiffs' argument that [ABPN's] MOC is not a component of a single product." *Id.*

Nor do Plaintiffs seriously grapple with Judge Alonso's opinion, which considered the identical arguments raised here and the same conclusion. As here, the *Siva* plaintiffs' attempt to "[re]-characteriz[e] MOC as a CPD product" could not save their tying claim. *Siva v. Am. Bd. of Radiology*, No. 19 C 1407, 2021 WL 76824, at *3 (N.D. Ill. Jan. 8, 2021). Relying on this Court's order, Judge Alonso explained that "[t]o allege that" physicians "began to buy MOC alongside initial certification after [the certifying organization] imposed the MOC requirement, but they bought certification without MOC while ABR imposed no MOC requirement, suggests not that there is somehow separate demand for certification and MOC but, to the contrary, that the character of the demand for the initial certification and the MOC is the same: certification from" the ABPN. Or put differently, "the demand for maintenance of certification is generated by the demand for certification generally, given that MOC may be purchased only by [] certified [practitioners] who use it solely as an integral part of the ABR-certification method." *Id.* (cleaned up).

Plaintiffs respond that *Siva* failed to consider "*Viamedia*" and therefore "look[ed] at the world after ABPN imposed the tie, not before." (Opp. at 9.) Not so. Judge Alonso held that *Viamedia* involved a "section 2 monopolization case," and was "distinguishable for a number of reasons, including that there was evidence that" the defendant continued to sell "the products in question separately in certain markets." *Siva*, 2021 WL 76824, at *4 n. 4. The *Siva* court also

4

explained that even if MOC was a "CPD product like any other that was separately available on the market" before 1994, that "does not, by itself, make it a separate product now." *Id.* at *5 n.5. The fact that CPD products once were separately available "only suggests a tie if buyers were already 'putting the items together to operate in the same manner as the defendant's bundle.'" *Id.* (quoting Areeda & Herbert Hovenkamp, *Antitrust Law: Analysis of Antitrust Principles and Their Application* ¶ 1746a (4th ed. 2018).) That is not the case here, because the ABPN "bundled initial certification and MOC" to "operate together in a previously unattempted fashion." *Id.*

Nothing from *Viamedia*—already considered by the Court in its prior decision (*see* Dkt. No. 60 at 6-7, 12)—changes that result. Unlike here, the defendant in *Viamedia* offered two, distinct advertising services "separately" in some markets, but tied them in others. *Id.* at 569. And in *Viamedia*, the defendant and its competitors had "separate salespeople" marketing the tied and tying products, which is not the case here. *Id.* What's more, the plaintiff-competitor in *Viamedia* actually *offered the tied product*. *Id.* In contrast, the NBPAS's certification and the ABPN's MOC program do not "'maintain' the same certification and thus NBPAS does not actually offer the tied product." (Dkt. No. 60 at 11.)

Equally baseless is Plaintiffs' assertion that *Viamedia* established, for the first time, that "separate demand must be assessed before the tie is imposed." (Opp. at 5.) This Court has already considered "evidence" of the alleged tied product being "sold separately in the past," (Dkt. No. 60 at 10), and properly found that "neither initial certifications (in the sense of time-limited certifications) nor MOC existed before 1994." *Id.*

In the end, the ABPN provides only one product: board certification of physicians in specific medical specialties. (FAC ¶ 2.) Whether or not the ABPN previously had CPD offerings, Plaintiffs have not and cannot claim that the ABPN has ever sold initial certification and MOC

5

separately.  And even if the ABPN had, that does not make MOC a separate product now. Plaintiffs' latest moniker for MOC cannot change that fact.

### 2. Physicians Do Not Differentiate Between Initial Certification And MOC

Plaintiffs next insist that "psychiatrists and neurologists" differentiate between initial certification" and "MOC," repeating the same alleged facts the Court previously found insufficient.  (Opp. at 8-10.)  Plaintiffs point out that MOC is offered to doctors "*after* residency" and initial certification, but the Court already explained that the name "'*maintenance* of certification itself'" implies a "continuing assessment by the original certifying organization." (Dkt. No. 60 at 8.)  Plaintiffs next claim that doctors have bought CPD products from "other vendors," (Opp. at 8), but concede none offered a "competing maintenance product" without "the tying product (initial certification)."  (Dkt. No. 60 at 11.)  *See also Siva*, 2021 WL 76824, at *5 ("Plaintiff may characterize MOC as a kind of CPD product, but the fact remains that plaintiff alleges that radiologists buy it to maintain ABR certification, and therefore it is not 'fungible' with CPD products that do not serve that purpose.").  Plaintiffs' argument that some doctors might buy "CPD products" separate from ABPN certification fares no better.  As the Court explained, those alternative providers "do not 'maintain' the same certification and thus [do] not actually offer the tied product," and so there is no foreclosure of competition.  (Dkt. No. 60 at 11.)

The rest of Plaintiffs arguments on this point—that the ABPN previously provided other types of CPD products—simply repeat the same "facts" from earlier in their brief.  They do not become any better with additional repetition.  (*Compare* Opp. at 8 *with id.* at 4-6.)

### 3. The ABPN Does Not "Distinguish" Between Initial Certification and MOCs

Plaintiffs' assertion that the ABPN "concede[s]" that "certifications and MOC are different" goes yet further afield.  (Opp. at 11-12.)  As explained in the Opening Brief, and as

6

Plaintiffs concede in their Amended Complaint, for the past twenty-five years the ABPN has offered only time-limited certifications. And to maintain that certification, practitioners must conduct additional, professional activities on an ongoing basis. (Motion ("Mot."), Dkt. No. 69 at 7 (citing FAC ¶¶ 2, 160-217).)

The new "facts" Plaintiffs tout as evidence that the ABPN differentiates initial certification from MOC were already rejected by the Court. For example, Plaintiffs insist that MOC's purpose, unlike initial certification, is "lifelong learning." But the relevant inquiry, as the Court explained, is "consumer demand," not the "seller's purpose" in providing two items. (Dkt. No. 60 at 12.) Plaintiffs' other complaint about the grandfathering process suffers the same defect—that the ABPN at one time did not require MOC to maintain certification does not magically make it a separate product. (*Id.*)

### 4. Plaintiffs' "Billing Structure Argument" Does Not Show Tying

Plaintiffs, as in their previous round of briefing, complain that the ABPN bills separately for MOC. (Opp. at 12-13.) That does not move the needle. As the Court already explained, a separate billing practice is "one relevant but non-dispositive factor among many." (Dkt. No. 60 at 11). And the "circumstances as a whole" still "point toward one product rather than two." (*Id.*) In any event, as the Court held, "initial certification and MOC confer the same benefit of certification, suggesting" that "consumer differentiation" is far from substantial. (*Id.* at 12.) *See also Kenney*, 2021 WL 732715, at *6 ("[T]he relationship between initial certifications and MOC is vastly different than the relationship between anesthesiological services and healthcare services [in *Jefferson Parish*], which were delivered at the same time and billed separately.").

### 5. The "Market Structure" Does Not Suggest Separate Demand

Plaintiffs finally jumble together their prior arguments as "evidence" that the "market structure" demonstrates separate demand. (Opp. at 13-14.) Their theories are no better with a new tagline. Plaintiffs note that "other vendors" sell certifications, but that argument "is premised on the assumption that" these vendors' products are "actually effective in maintaining initial certification." (Dkt. No. 60 at 11.) And the ABPN responded above to Plaintiffs' recurring claim that it previously offered lifetime certification: But once more, as the Court explained, before 1994 "ABPN certifications were lifelong certifications, not time-limited initial certifications, and they lacked subsequent examinations or other recertification requirements." (*Id.* at 10.)

Equally unpersuasive is Plaintiffs' quibbling with this Court's prior holding that there is no demand for maintenance products other than those provided by the ABPN. (*See* Opp. at 17.) Plaintiffs argue (yet again) that MOC is akin to "repair parts" or "computer maintenance services." (Opp. at 18.) But Plaintiffs have not alleged the entities that "rely on information certification provides would find it helpful or efficient for a physician to switch certifying organizations," or that "offering MOC in a separate market from initial certification would be efficient." (Dkt. No. 60 at 8-9.) The correct analogy, the Court held, is not "repair parts" but the "franchise model." (*Id.* at 9.) There, as here, the franchisor's method of "doing business is not sold separately from the ingredients that go into it." (*Id.*)

The Third Circuit reached a similar result in *Kenney*. The panel explained that unlike cases involving physical parts of a component product, "initial certifications and MOC are earned and reflect a physician's initial training and his or her staying current with knowledge and practice in his[ or ]her discipline." 2021 WL 732715, at *5. Accordingly, the "context in which initial

8

certifications and MOC are purchased is not the same as the consumer and commercial transactions involving the products and services" cited by Plaintiffs. *Id.*

In the end, Plaintiffs' Amended Complaint repackages the same allegations as the Original Complaint, but this time with a new label for the ABPN's maintenance product. It is the same old wine in a new bottle, and it should be discarded accordingly.

### B. Plaintiffs Still Fail To Allege Facts Demonstrating Coercion Or Force

As the Court previously held, tying occurs "*only* on the condition that the buyer also purchases a different (or tied) product." (Dkt. No. 60 at 12 (quoting *Viamedia*, 951 F.3d at 468).) Plaintiffs cannot clear that high hurdle because they "remain free to purchase initial certification from ABPN without ever buying MOC." (*Id.*) For their part, Plaintiffs respond with the same claim that the Court considered and rejected last time: that "hospitals and insurers" often require physicians to maintain ABPN certification. (Opp. at 12-13.)

The only new argument Plaintiffs proffer to support their claim is that *Viamedia* supposedly endorsed their "economic reality" theory. Hardly so. There, the Seventh Circuit explained that the *defendant* "explicitly used its control over the Interconnects" (the tying product) to "deny access to its competitor[s] or their argent" to force consumers to use the defendant's "ad rep services for all spot avails" (the tied product). 951 F.3d at 471. Comcast (the defendant), *not a third party*, left consumers with "no practical choice but to obtain [the tying product] from Comcast." *Id.* at 471 n.17. Nothing in *Viamedia* purported to overrule *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989), or *Lawline v. American Bar Association*, 956 F.2d 1378, 1383 (7th Cir. 1989), which both made clear that a certifying organization does not "violate antitrust laws" by "giving its seal of approval."

The rest of Plaintiffs' argument is a thinly veiled re-argument motion. (Opp. at 15.) They insist the Court's prior opinion got it wrong, because the ABPN "revok[es] the tying product (certifications) when MOC is not bought." (*Id.*) But even assuming that were true, as the Court held, Plaintiffs still miss the mark: If "it was true that ABPN revoked the certification, that would mean that certification in the permanent, ongoing sense—not 'initial' certification—is the relevant product." (Dkt. No. 60 at 13.) And that just "brings the claim back to the separate products problem." (*Id.*)

### C. Plaintiffs Fail To Allege An Unreasonable Restraint Of Trade

As explained in the Opening Brief, Plaintiffs' rule-of-reason claim should also be dismissed because they did not identify any *unreasonable* restraints of trade. (Mot. at 10-11.) Plaintiffs respond by block quoting their Complaint, which only proves the point. (Opp. at 18.) The paragraph rotely asserts that an "illegal tie" raises the "cost of medicine" and "inhibits entry to the market." (*Id.*)

That naked allegation has "not generally been enough to condemn" a defendant's practices as "unreasonable" under the Sherman Act. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-cv-02705, 2017 WL 6821094, at *5 (N.D. Ill. Dec. 13, 2017). Plaintiffs instead need factual allegations that the ABPN uses its standards "as a predatory device" to "injure others," through "lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosures." *Id.* (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57 (1st Cir. 1999)). The Amended Complaint makes no such allegations.

And Plaintiffs' protestation notwithstanding, courts routinely dismiss rule-of-reason claims at the pleading stage for failure to plausibly allege an unreasonable restrain. *See id.*; *see also Kling*

*v. St. Paul Fire & Marine Ins. Co.*, 626 F. Supp. 1285, 1291 (C.D. Ill. 1986) (allegations that restraint "increase[s] the cost of health care" and "diminish[es] the quality of health care services" due to "increased cost of physicians" were insufficient). The same result should follow here.

### D. Plaintiffs Fail To Plausibly Allege Substantial Market Power

Plaintiffs' Sherman Act claims should finally be dismissed because they fail to plausibly allege substantial market power. Plaintiffs do not dispute that, as a "threshold requirement," they must show the defendant "can raises prices above a competitive level without losing its business." *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002). Nor do they disagree that their Amended Complaint fails to allege that the ABPN is capable of controlling prices without going out of business, let alone that the ABPN has driven out competitors. (*See* Mot. at 12.) *See also 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405–06 (7th Cir. 2002) ("Just because a retailer raises prices doesn't mean competition has been harmed.").

Plaintiffs instead retort that the ABPN has a substantial "market share." (Opp. at 19.) That does not save their claim. "Market share" demonstrates "market power *only* when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (emphasis added). Plaintiffs' standalone allegation of a "large market share," without "more" is not "sufficient to demonstrate monopoly power, which is the power to restrict output and raise prices." *Indiana Telcom Corp., Inc.*, No. 97-cv-1532, 2001 WL 1168169, at *9 (S.D. Ind. Sept. 25, 2001) (Hamilton, J.).

## II.  PLAINTIFFS' CLAIMS ARE UNTIMELY

Plaintiffs' Sherman Act and unjust enrichment claims should also be dismissed as untimely.[3]  There is little in dispute on this front.  Plaintiffs agree the Sherman Act claims are subject to a four-year limitations period, and the unjust enrichment claim to a five-year period.  (Opp. at 19-20.)  They also concede that, since the early 2000s, the ABPN has automatically enrolled physicians in MOC, who will lose their certification if they do not meet the program's requirements.  (FAC ¶¶ 196-200).  Nor do they dispute these two Plaintiffs were certified by the ABPN over fourteen years ago, and were then subject to the MOC requirements.  And finally, the parties agree that for the statute of limitations to begin anew, Plaintiffs must allege new "overt acts" by the ABPN.  (Opp. at 20.).

The only dispute is whether Plaintiffs have alleged an overt act, and on that issue, they say it is enough to claim that the ABPN "continu[ed] to maintain" the tie.  (Opp. at 20.)  Even Plaintiffs' authorities have not adopted that rule.  In *Gumwood HP Shopping Partners, L.P. v. Simon Property Group*, the court found a continuing violation because there was no "formalized agreement that" the defendant "could enforce against" the plaintiff, and therefore "the tying arrangement required continuing action."  No. 11-cv-268, 2016 WL 8292207, at *11 (N.D. Ind. Mar. 18, 2016).  Similarly, in *Smith v. eBay Corp.*, the plaintiffs identified "changes" to the tying agreement that "inflicted new and accumulating harm" on them.  No. 10-cv-03825, 2012 WL 27718, at *5 (N.D. Cal. Jan. 5, 2012).

---

[3] Plaintiff' assertion that "Rule 12(b)(6) is not designed" to dismiss untimely claims (Opp. at 19) is demonstrably wrong.  *See, e.g.*, *Brooks v. Ros*s, 578 F.3d 574, 579 (7th Cir. 2009) ("[T]he statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.").

In contrast, the acts here that supposedly hurt Plaintiffs have not changed: mandatory MOC and payment of MOC fees. And the mere "performance of the allege anticompetitive contracts during the limitations period" or the "enforcement of the initial contract" is "not sufficient to restart the [limitations] period." *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) (citing *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989)).[4]

## II. THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED

As a threshold matter, Plaintiffs do not dispute that if the Court dismisses the Sherman Act claims, it should again decline to exercise supplemental jurisdiction over the state-law claim. (Dkt. No. 60 at 15 (citing 28 U.S.C. § 1367(c).) On the merits, Plaintiffs' arguments are contradictory at best. In one breath, they insist they "claim they received nothing of value," (Opp. at 22), but earlier insist that MOC "is necessary for participation in insurance networks, hospital privileges, and employment." (Opp. at 14). They cannot have it both ways.

## <u>CONCLUSION</u>

For the above reasons, Plaintiffs' First Amended Complaint should be dismissed in its entirety and with prejudice for failure to state a claim upon which relief can be granted.

---

[4] Plaintiffs do not argue that their unjust enrichment claims were timely brought. And for good reason. Plaintiffs "reasonably should [have] know[n]" of the alleged tying arrangement when they first sought certification. *See Tartan Constr., LLC v. New Equip. Servs. Corp.*, No. 17-cv-5950, 2018 WL 4563079, at *2 (N.D. Ill. Sept. 24, 2018) (accrual standard for unjust enrichment claims).

Dated: April 19, 2021                    Respectfully submitted,


/s/ *Christopher Sullivan*
Christopher B. Sullivan
MITCHELL BARLOW & MANSFIELD, P.C.
9 Exchange Pl., STE 600
Salt Lake City, Utah 8411
Tel: (801) 998-8888
csullivan@mbmlawyers.com

Anne I-Pin Shaw
Darryl Tom
SHAW LEGAL SERVICES, LTD.
540 W. Briar Place, Unit B
Chicago, Illinois 60657
ashaw@shawattorneys.com
dtom@shawattorneys.com

*Attorneys for Defendant American Board of*
*Psychiatry and Neurology*

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2021, the foregoing Reply Brief Of

Defendant In Support Of Its Motion To Dismiss Plaintiffs' First Amended Class Action

Complaint was electronically filed with the Clerk of the Court using the CM/ECF system which

automatically sent notification of such filing by email to the following:

C. Philip Curley (pcurley@robinsoncurley.com)
Cynthia H. Hyndman (chyndman@robinsoncurley.com)
Laura R. Feldman (lfeldman@robinsoncurley.com)
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606

Katrina Carroll (kcarroll@carlosnlynch.com)
CARLSON LYNCH, LLP
111 West Washington, Suite 1240
Chicago, IL 60602

 */s/ Christopher Sullivan*