**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

<div style="border:1px solid red; display:inline-block; padding:2px;">EXHIBIT 1</div>

| | | |
|---|---|---|
| **SADHISH K. SIVA, individually and** | ) | |
| **on behalf of all others similarly situated** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-cv-01407** |
| | ) | |
| **AMERICAN BOARD OF RADIOLOGY,** | ) | |
| | ) | **Honorable Jorge L. Alonso** |
| | ) | **Trial by Jury Demanded** |
| **Defendant.** | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

C. Philip Curley
Cynthia H. Hyndman
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: (312) 663-3100
Fax: (312) 663-0303
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn IL 60015
Tel: (224) 632-4500
mfreed@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

*Attorneys for Plaintiff Sadhish K. Siva,*
*individually and on behalf of all*
*others similarly situated*

Dated: January 24, 2020

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

JURISDICTION AND VENUE ....................................................................4

PARTIES .....................................................................................................5

FACTS .........................................................................................................6

THE AMERICAN BOARD OF MEDICAL SPECIALTIES .............................8

THE AMERICAN BOARD OF RADIOLOGY ................................................9

ABR CERTIFICATION IS A "ONE TIME" EVENT ......................................11

ABR CERTIFICATION IS NOT "VOLUNTARY" ..........................................13

    Hospitals And Other Medical Organizations Require Certification ......................14

    Insurance Companies Require Certification ........................................................17

    Certification Is An Economic Necessity ..............................................................19

OTHER CONTINUING PROFESSIONAL DEVELOPMENT PRODUCTS ................21

    Continuing Medical Education ............................................................................22

    Medical Schools ...................................................................................................25

    National Board Of Physicians And Surgeons ......................................................26

    Hospitals, Clinics, And Other Medical Organizations.........................................27

ABR'S SO-CALLED "MAINTENANCE OF CERTIFICATION" PRODUCT.............27

    ABR's MOC Product Is Separate And Distinct From Its Certification Product ...28

    ABR's MOC Product Is Not Voluntary................................................................31

    ABR "Grandfathers" Tens Of Thousands Of Radiologists ..................................32

i

ABR's Constantly Changing CPD Product ............................................................34

ABR MOC 2.0 ....................................................................................................36

ABR MOC 3.0 And The Online Longitudinal Assessment Tests .........................37

ABR Revokes Certifications Of Radiologists Who Do Not Buy MOC ...............40

ABR Has Forced Radiologists To Pay $90 Million In MOC Fees........................41

ABR Forces Other MOC Costs On Radiologists..................................................41

There Is No Evidence Of Any Benefit From ABR's MOC Product ....................42

Doctor Surveys Confirm MOC Is Burdensome And Ineffective..........................48

ABR CHARGES SUPRA-COMPETITIVE MONOPOLY PRICES FOR MOC............49

ABR'S MOC PRODUCT IS NOT SELF-REGULATION BY RADIOLOGISTS .........51

PLAINTIFF'S INDIVIDUAL ALLEGATIONS ...............................................53

CLASS ACTION ALLEGATIONS ..................................................................57

COUNT ONE.....................................................................................................58

*Per se* Illegal Tying in Violation of Section 1 of the Sherman Act......................58

    a.   ABR's Certification And CPD Products Are Separate.............................59

    b.   ABR's Tying of Its Certification Product to Its
        MOC Product is Coercive .......................................................................64

    c.   ABR Has Sufficient Market Power in the
        Tying Market to Restrain Free Competition.............................................67

    d.   ABR's Illegal Tie Affects a Not-Insubstantial
        Amount of Interstate Commerce................................................................67

    e.   ABR Has Some Economic Interest in the Sales of MOC .........................67

Antitrust Injury.....................................................................................................67

COUNT TWO ..................................................................................................68

    Alternative Rule of Reason Illegal Tying in Violation of
    Section 1 of the Sherman Act ...............................................................68

COUNT THREE ...............................................................................................71

    Unjust Enrichment ................................................................................71

PRAYER FOR RELIEF ...................................................................................71

JURY TRIAL DEMANDED ............................................................................73

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SADHISH K. SIVA, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:19-cv-01407 |
| AMERICAN BOARD OF RADIOLOGY, | ) ) | |
| | ) ) | Honorable Jorge L. Alonso Trial by Jury Demanded |
| Defendant. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Sadhish K. Siva ("Dr. Siva" or "Plaintiff"), for his First Amended Class Action Complaint against Defendant American Board of Radiology alleges as follows:

## INTRODUCTION

1.      Dr. Siva is a radiology physician ("radiologist"). A radiologist identifies and assesses abnormalities in imaging studies such as X-rays, computer tomography (CT) scans, and magnetic resonance imaging (MRI) scans, and provides therapeutic options.

2.      This case is about the illegal tying by Defendant American Board of Radiology ("ABR") of its certification product and its continuing professional development ("CPD") product, which ABR misleadingly promotes as "Maintenance of Certification" or MOC.

3.      Certification is the tying product. ABR has long been the monopoly supplier of certifications for radiologists. Certification is an "early career event" sold by ABR to candidates for entry into the specialized medical practice of radiology. It is a knowledge-based "one time, snapshot assessment" of a candidate's postgraduate medical education and training obtained through a residency program. ABR began selling certifications in 1934.

4.      The tied product is MOC, ABR's CPD product. ABR began selling MOC in or around 2006. Continuing (or Continuous) Professional Development products promote the development of both medical and non-medical competencies after residency, including value-based delivery and cost reduction, clinical knowledge and skills, patient experience, practice improvement, diversity and inclusion, interprofessional practice, doctor wellness and burnout, patient safety, working in teams, health care disparities, and population health.

5.      Except for those it has decided to exempt or "grandfather" from the requirement to buy MOC (discussed further below), ABR forces radiologists to buy its CPD product by revoking the certifications of those who do not buy MOC. Thus, ABR illegally ties its certification product to MOC, its CPD product.

6.      In addition to the MOC product sold by ABR, other CPD products available to radiologists include Continuing Medical Education ("CME") and other classes, symposia, and curricula sold by CME providers, medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations. As a CPD product, and unlike certification, MOC is not sold to candidates for entry into the specialized practice of radiology; nor is it a test of a candidate's knowledge at the end of their postgraduate medical education and training.

7.      Instead, like other CPD products, MOC is sold to radiologists who have already purchased certifications, and are later required by ABR to buy MOC throughout their careers or have those certifications revoked. As explained by ABR, the purpose of MOC is to promote "individual lifelong learning." Certification, on the other hand, is not individualized but a uniform test of entry qualifications. Similarly, certification is not lifelong learning but a "one

2

time" evaluation of a candidate's postgraduate medical education and training. Because all CPD products promote "individual lifelong learning" MOC is not different or unique.

8.     ABR by its anti-competitive conduct has manipulated certification from a singular training outcome evaluation into a device requiring radiologists to take ABR-administered examinations and tests and partake in other meaningless required activities throughout their careers, despite the fact that MOC has no documented validity. ABR's CPD product is wholly superfluous and simply superimposes MOC over other already-existing CPD products.

9.     ABR enforces its illegal tie by, among other things, reporting the certifications of radiologists as invalid or "Lapsed" if they do not later buy ABR's own CPD product, even though those radiologists previously purchased certifications. ABR proclaims when it reports the certification status of radiologists that: "Validity of certification is contingent upon participation in Maintenance of Certification [MOC]."

10.     Certification is not "voluntary" as ABR claims. It is an economic necessity without which a successful medical career is impossible. By tying certification and MOC together, ABR gains an unwarranted and unlawful competitive advantage for its own CPD product. Radiologists are forced to buy MOC, an inferior CPD product for which ABR charges supra-competitive monopoly prices, or have their certifications revoked. And sellers of other CPD products are at a competitive disadvantage because radiologists are disincentivized from buying those products given the substantial economic cost of having their certifications taken away by ABR.

11.     There is separate consumer demand by radiologists for ABR's certification product and CPD products. Because there is separate and sufficient consumer demand, it is efficient for vendors to sell certifications and CPD products separately. Reflecting this separate

3

consumer demand, ABR sold its certification product without selling any CPD product of its own for decades, even though other vendors were selling CPD products throughout that time. Also reflecting this separate consumer demand, other vendors have sold CPD products for decades without selling a certification product.

12.     Plaintiff seeks, in addition to money damages, that ABR be enjoined from reporting certifications as invalid or "Lapsed" unless radiologists also buy ABR's MOC product. Plaintiff does not request that ABR be prevented from determining its own criteria for ABR certification, that ABR be required to accept any other CPD product as a substitute for ABR certification or its own MOC product, or that ABR be compelled to recognize the validity of any other CPD product. Rather, Plaintiff asks only that ABR be prevented from revoking the certifications of radiologists who do not also buy MOC, and that ABR report, without any qualification, whether radiologists have purchased an ABR certification, regardless of whether they have also later bought MOC.

13.     Through 2017, the last year for which data is publicly available, ABR has forced tens of thousands of radiologists to buy its redundant, worthless, and superfluous CPD product or have their certifications revoked, realizing an estimated $90 million in MOC-related fees and revenue as a result.

14.     Plaintiff brings this Class Action on behalf of all radiologists who ABR forces to buy its CPD product by revoking the certifications of those who do not also buy MOC.

## JURISDICTION AND VENUE

15.     Plaintiff brings this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABR's violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

4

16.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

17.     ABR sells its certification and CPD product in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABR's certification and CPD products are sold in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABR's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury therein by, among other things, tying its certification and CPD products, forcing Plaintiff and other radiologists to purchase its CPD product, and charging supra-competitive monopoly prices for MOC, ABR's CPD product.

18.     ABR is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABR is found in and transacts business herein.

19.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because ABR maintains an office and testing center in Rosemont, Illinois and a substantial part of the events giving rise to Plaintiff's claims occurred herein.

## PARTIES

20.     Plaintiff Sadhish K. Siva, MD is a graduate of Temple University School of Medicine, where he also completed a cardiac rehabilitation internship. He completed his residency in radiology in 2003 at MetroHealth Medical Center in Cleveland, Ohio, and a fellowship in interventional radiology in 2004, also at MetroHealth Medical Center. MetroHealth Center is Cuyahoga County's public health system, the county's most experienced Level I Adult Trauma Center, and the only adult and pediatric burn center in the State of Ohio. Dr. Siva has

5

been a practicing radiology physician since 2004, and also held the position of Assistant Professor at Case Western Medical School from 2004 to 2006. Dr. Siva is a resident of Tennessee.

21.     Defendant ABR is incorporated under the laws of the District of Columbia and files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization. ABR maintains an office and testing center in Rosemont, Illinois. ABR is a member of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four Member Boards that today sell certifications in forty specialties and eighty-seven subspecialties.

## FACTS

22.     A license to practice medicine in the United States is granted by the medical board of an individual State. To obtain a license a physician must, among other things, have either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO") and pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

23.     Most States require a doctor to periodically complete continuing medical education ("CME") credits to remain licensed. CME is a CPD product. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits continuing medical education activities, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

6

24.     These are the same goals of MOC, ABR's CPD product, and other CPD products.

25.     The practice of medicine in the United States in the early part of the 20th century included large numbers of proprietary physicians nationwide who had been "trained" through apprenticeships rather than formal education. Standards for medical education were largely nonexistent. Most care was delivered at the patient's home and doctors billed patients directly for their services.

26.     Even as medical schools began to grow in number, their curricula remained unregulated and inadequate, producing new doctors who often times were poorly prepared to practice medicine. In response, the American Medical Association ("AMA") in 1910 published the "Flexner Report," which became the blueprint for the standardization of medical school education in the United States.

27.     At about the same time and for the same reasons, doctors specializing in certain discrete areas of medicine began to form specialty boards. The purpose of the specialty boards was to define and differentiate between the subject matter of medical specialties, ensure adequate postgraduate medical education and training in their areas of specialty, and then test those candidates who wished to practice in the relevant specialized area of medical practice. The first specialty board was the American Board of Ophthalmology formed in 1916.

28.     Dr. John A. Benson, the first President of the American Board of Internal Medicine ("ABIM"), the largest Member Board of ABMS with authority today over approximately 20 percent of all doctors in the United States, confirmed in a 1991 article in the *Annals of Internal Medicine* that specialty boards were organized, "for the purpose of providing a means by which scholarly consultants in internal medicine could voluntarily distinguish themselves [from other specialists] and be so identified. Such specialization needed definition.

7

Another reason for establishing the Board was to standardize the variable quality and length of residencies at that time."

<div align="center">

**THE AMERICAN BOARD OF MEDICAL SPECIALTIES**
</div>

29.     In June of 1933, the then-existing specialty boards formed the Advisory Board for Medical Specialties, later re-named the American Board of Medical Specialties ("ABMS"). The purpose of ABMS, identical to that of the specialty boards themselves, was described in a 2006 article in *Emergency Medicine Clinics of North America* as "[t]o stimulate improvement in postgraduate medical education."

30.     There are currently 24 ABMS specialty boards ("Member Boards"), including ABR, with authority over approximately 900,000 doctors nationwide, approximately 90 percent of all doctors in the United States..

31.     The members of ABMS are defined in its Bylaws as having three classes: (1) twenty-four Regular Members consisting of the 24 ABMS-approved specialty boards, including ABR; (2) nine Associate Members, including the Accreditation Council for Continuing Medical education ("ACCME"), the Accreditation Council for Graduate Medical Education ("ACGME"), the American Hospital Association ("AHA"); the American Medical Association ("AMA"), and the Federation of State Medical Boards; and (3) six Public Members.

32.     ABMS is governed by a 35-person Board of Directors, including one Director each from ABR and the other Member Boards, the six Public Members, the Chair, Chair-Elect, Immediate Past Chair, Secretary-Treasurer, and the ABMS President and CEO.

33.     ABR and the Member Boards control ABMS.

34.     The ABMS Bylaws state that its policies are "established collectively by the Member Boards." As such, ABMS policies, practices, and procedures are ABR's policies,

<div align="center">8</div>

practices, and procedures, including especially those related to certification and CPD products. When ABMS and its management and employees speak or write about certification and CPD products, they do so on behalf of ABR and the Member Boards.

35.     There are eight committees of the ABMS Board of Directors, including the Committee on Certification and the separate Committee on Continuing Certification.

36.     The Committee on Certification is tasked with overseeing policies and procedures related to certification. The Committee on Continuing Certification, on the other hand, is responsible for overseeing MOC. This separation of oversight roles between the two committees reflects the separateness of the certification product and the MOC product.

## THE AMERICAN BOARD OF RADIOLOGY

37.     ABR was formed in 1934 by four professional radiology societies (the American College of Radiology, the American Roentgen Ray Society, the Radiological Society of North America, and the American Radium Society) and the American Medical Association Section on Radiology.

38.     ABR became a Member Board in 1935, and has been a Member Board continuously since that time.

39.     The ABR website is linked to the ABMS website, and through the ABMS website to the websites of other Member Boards. This demonstrates the unity of interest of ABR, ABMS, and the other Member Boards, especially with regard to certification and CPD products. It also confirms that ABMS and other Member Boards speak for ABR, and *vice versa*, about the purpose and goals of certification and CPD products.

40.     ABR began selling certifications in 1934. ABR currently sells certifications in four radiology specialties: Diagnostic Radiology ("DR"), Interventional Radiology ("IR"),

Medical Physics ("MP"), and Radiation Oncology ("RO"). These are referred to as primary certifications. ABR also sells separate certifications in the following radiology subspecialties: hospice and palliative care, neuroradiology, nuclear radiology, pain medicine, pediatric radiology, and vascular and interventional radiology. ABR requires that candidates for subspecialty certifications also own a valid primary certification.

41.     To purchase a certification a candidate must pass a uniform ABR-administered examination. For the reasons discussed below, almost all clinical radiologists buy certifications. Those who do not may include researchers, teachers and other academics, and others who may not regularly treat patients.

42.     ABR files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization as a "business league." As such, its purpose is to promote the common interests of those radiologists over whom it has authority, rather than to benefit the public.

43.     The Board of Governors and Board of Trustees are the two governing bodies of ABR.

44.     The 27 Governors and Trustees own 33 ABR certifications, including 6 subspecialty certifications. Of those, 16 certifications are "grandfathered" and cannot be revoked for the failure to purchase MOC.

45.     ABR Governors and Trustees are self-replacing. In other words, they choose their own successors, with the sole exception that the Board of Governors may solicit an "appropriate professional organization" to submit a nominee for the Board of Governors "in writing." The Bylaws do not define "appropriate professional organization" thereby giving the Board of Governors unchecked discretion as to which organizations may submit nominees.

10

46.     The objectives and purposes of ABR are listed in its Bylaws. The objective, "To issue certificates to qualified and competent *candidates* [emphasis added] in the specialties and subspecialties of the ABR" is listed as a separate objective from, "To promote lifelong and continuous learning, professional growth, quality, and competence through its MOC programs." This distinction of objectives and purposes reflects the separate nature of ABR's certification product and MOC, its CPD product.

47.     ABR maintains relationships with and coordinates activities with several national professional radiology societies, including American College of Radiology, the American Roentgen Ray Society, and the Radiological Society of North America, as well as other national, regional, and local professional radiology societies.

## ABR CERTIFICATION IS A "ONE TIME" EVENT

48.     Certifications are sold to candidates for admission into the specialized medical practice of the particular Member Board selling the certification, here ABR. Thus, certification is described as an "early career event" on the ABMS website.

49.     After the formation of ABMS, certification was referred to as "ABMS board certification." Over time, however, certification became known simply as "board certification" or "certification." ABR began selling certifications to radiology candidates in 1934.

50.     For almost the entire time between the sale of the first certification by a specialty board in 1916 and today, certification was called exactly that: "certification." In or around 2000, however, after ABR and the other Member Boards required doctors to purchase MOC or forfeit their certifications, the nomenclature was changed. "Certification" dropped out of their lexicon and became "initial certification."

11

51.     This seemingly subtle change in terminology allows ABR to deflect factual allegations (including in this litigation) that certification and MOC are separate products. At the same time it supports the factually incorrect and conclusory assertion that "initial certification" and MOC together constitute a single product. Thus, while ABR has recently chosen to self-servingly use the new terminology "initial certification," that term should be understood to mean what it has meant since 1916, *viz.*, "certification."

52.     The former President and CEO of ABMS in a 2006 medical journal article explained that certification is "used to assess the knowledge and, when possible, the relevant clinical skill" of candidates for "entry" into the specialized medical practice of the particular Member Board, here ABR. The article described certification as "a one time, snapshot assessment."

53.     Similarly, the former President and CEO of a Member Board wrote in the October 2016 issue of the *Mayo Clinic Proceedings* that the intent of certification is to assure that the candidate "has successfully completed an approved educational program and evaluation process" and that certifications "are issued after physicians successfully complete accredited training, pass a secure written examination, and for some member boards pass an oral examination."

54.     ABR acknowledges the existence of separate standards for certification and MOC. Those standards confirm that certification consists of a uniform set of requirements, the purpose of which is to demonstrate that before entry into a specialized medical practice, a candidate has:

> "(1) completed an extended period of rigorous training in, and assessment of, the knowledge, skills, and professionalism required to practice in a particular specialty or subspecialty, usually via an ACGME residency program; and (2) passed additional evaluations of knowledge, skills, and professionalism. For all ABMS Member Boards this assessment includes a secure, comprehensive examination of knowledge; other commonly used evaluations include oral

examinations and simulation exercises as well as review of patient cases, operative records, and patient outcomes."

55.     As one author put it in a 2013 medical journal article, "BC [board certification] originated as a means to establish national outcome criteria for excellence in residency training programs."

56.     Thus, certification measures the adequacy of postgraduate medical education and training. That certification tests only the candidate's postgraduate medical education and training is confirmed by the fact that candidates are only permitted to buy certifications within a limited period of time after completion of their residency programs. Certification of candidates also measures the quality of postgraduate residency programs.

## ABR CERTIFICATION IS NOT "VOLUNTARY"

57.     While certification is sometimes termed "voluntary" by ABR, including in this litigation, the opposite is true. Beginning with the growth of hospital-based care, managed care networks, and the extension of insurance coverage to most Americans in the latter half of the 20th century, the number of radiologists and other doctors buying certifications increased due to its use as a proxy for hospital privileges, participation in managed care networks, and coverage by health insurance plans. Medical specialization became the norm and by the early 1970s seventy percent or eighty percent of doctors described themselves as specialists.

58.     In 1998, Rosemary A. Stevens, Ph. D., a medical historian, referred to specialization as "*the* fundamental theme for the organization of medicine in the twentieth century." (Emphasis in original). This is even more true in the twenty-first century. Certification, however, did not change and remains a "one time, snapshot assessment" of a candidate's postgraduate medical education and training before admission into a specialized medical practice.

13

59. Persuasive of the fact that ABR certification is not "voluntary" is that almost all radiologists today have found it necessary to purchase ABR certifications.

**Hospitals And Other Medical Organizations Require Certification**

60. Almost all hospitals, health systems, practice groups, medical corporations, and other medical organizations incorporate the requirement of certification into privileging and employment decisions. Most hospitals and other medical organizations are governed by bylaws or similar rules. As a result of the circumstances described above, those bylaws or rules typically require that affiliated doctors be certified by a Member Board such as ABR in order to hold hospital privileges and/or to be employed and enjoy other benefits necessary to pursuit of a successful medical career.

61. Many bylaws and rules requiring certification pre-date MOC. Thus, the certification requirement in those bylaws and rules meant historically that doctors only had to document successful completion of their postgraduate medical education and training. MOC did not exist at the time and radiologists were not required to buy MOC or have their certifications revoked.

62. The American Hospital Association has encouraged hospitals to use certification as a factor in making privileging decisions.

63. Hospitals also limit categories of work to doctors with certifications, effectively excluding those who do not.

64. Hospitals and other medical organizations require certification for other reasons as well. For example, there are approximately 850 institutions, including hundreds of the largest hospitals nationwide, that sponsor approximately 12,000 residency programs. Those programs provide postgraduate medical education and training for new specialists in 181 specialties and

14

subspecialties ("residency" and "residency program" also include postgraduate fellowships). There are approximately 650 radiology residency programs. A sponsoring institution's standing in the medical community and its prestige generally is enhanced by sponsoring residency programs.

65.     The Accreditation Council for Graduate Medical Education ("ACGME") identifies as one of its goals, "to educate physicians who seek and achieve board certification." Further to that goal, ACGME uses board certification as a measure of eligibility for a sponsoring institution's residency program directors. Residency program directors' references of qualifications and character are an important element of eligibility for certification candidates.

66.     There are approximately 140,500 active full-time and part-time residents today, each of whom is charged by ACGME to "seek and achieve board certification."

67.     As part of maintaining ACGME accreditation, each residency program is also required to undertake an annual evaluation. The evaluation committee is mandated by ACGME to consider board pass and certification rates of residents over a rolling 7-year period. The number of ACGME accredited residency programs has increased by almost a third between 2009 and 2019, reflecting the reality that certification is becoming increasingly more essential for new doctors.

68.     Member Boards contributed to the development of the ACGME accreditation system. The American Medical Association and other medical organizations also recommend residency, and implicitly certification, for new doctors.

69.     ABMS is a founding member of ACGME and remains a Member Organization today. ACGME, in turn, is an Associate Member of ABMS. When ACGME was founded in 1981, certification was a "one time, snapshot assessment" of a candidate's postgraduate medical

15

education and training. MOC did not exist and radiologists were not required to buy MOC or have their certifications revoked.

70.     ACGME has a history of working with the Member Boards, including through ABMS, to promote certification of doctors.

71.     In addition to increased prestige for institutions with ACGME-accredited residency programs, such programs are also financially lucrative for the sponsoring institutions. Residents are a primary resource for patient care and assist institutions, especially hospitals, provide 24-hour, 365-day coverage for their patients. The more affiliated residency programs and residents, the more patients a hospital or other institution can treat and the more revenue it generates.

72.     Institutions that sponsor ACGME-accredited programs receive funding from Medicare, Medicaid, and other governmental sources to pay resident salaries and training costs, allowing the institutions to avoid those costs, thereby substantially increasing their profitability. Governments pay approximately $15 billion a year to support residency programs. One health policy expert has described this system of payments as "essentially a hospital subsidy cloaked as an educational expense." This entire "hospital subsidy" is dependent on the ACGME mandate that residents "seek and achieve certifications."

73.     The requirement of certification by hospitals is especially significant as today hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. This is magnified in highly concentrated hospital markets, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77 percent of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

16

74. Because most hospitals, health systems, practice groups, medical corporations, and other medical organizations require radiologists to be certified to obtain hospital privileges and/or employment, certification cannot be considered "voluntary."

75. Other aspects of an economically successful medical career are also linked to the certification requirement of hospitals and other medical organizations. For example, doctors who are unable to obtain hospital privileges because they do not purchase certifications do not qualify for coverage under the hospital's malpractice policy and must purchase more expensive insurance with less advantageous terms elsewhere.

**Insurance Companies Require Certification**

76. Most medical care in the United States is paid for through either commercial or government health insurance plans that pair health insurance coverage and a cost-sharing structure, provider network, and service area. Health insurance plans are accredited by the National Committee for Quality Assurance ("NCQA").

77. NCQA accredits health insurance plans using a metric referred to as Healthcare Effectiveness Data and Information Set ("HEDIS"), based on data collected from plans covering approximately 190 million people. Health insurance plan sponsors include commercial insurance companies, Medicare, Medicaid, and exchanges.

78. Using a proprietary methodology, NCQA uses the HEDIS data to issue "Report Cards" assigning accreditation ratings to over 1,200 health insurance plans nationwide. The HEDIS metric has historically used the plan's number of doctors with certifications as a factor in its accreditation ratings. The more such doctors affiliated with an insurance plan, the higher accreditation rating reported by NCQA.

17

79.     NCQA has developed a separate HEDIS metric for certain Medicare plans that also has historically used the plan's number of doctors with certifications as a factor in its accreditation ratings. Health insurance plans receive a score from Medicare based on the HEDIS metric, with significant financial incentives for insurance companies if a score exceeds certain thresholds. Medicare uses a 5-star system to rate health insurance plans, with 1 star being "Poor" and 5 stars being "Excellent." Bonuses for high star ratings range from 1.5 percent to 5 percent.

80.     When NCQA began accrediting health insurance plans in 1991, certification was a "one time, snapshot assessment" of a candidate's postgraduate medical education and training. MOC did not exist and doctors were not required to buy MOC or have their certifications revoked.

81.     NCQA was formed in 1990 by Margaret E. O'Kane. Ms. O'Kane is not a doctor, but was made a Public Member of the ABMS Board of Directors in 2006, served a second term beginning in 2011, and also served on the Executive Committee. As an ABMS Director, her role included promotion of certification.

82.     There have been other interlocking relationships between NCQA and ABMS and the Member Boards since the formation of NCQA. For example, Richard G. Battaglia, the current Chief Medical Officer of the largest Member Board, was previously employed by NCQA for ten years, including as Chairman of NCQA's accreditation decision-making body.

83.     NCQA has a history of working with the Member Boards, including through ABMS, to promote certification of doctors.

84.     As a result of the above, for example, most (if not all) Blue Cross Blue Shield Companies ("BCBS") require that radiologists buy ABR certifications to be included in their networks and health insurance plans. Patients whose radiologists are not certified must either pay

18

the entire cost of treatment themselves, or pay a higher "out of network" coinsurance rate (for example, 10 percent in network versus 30 percent out of network) to the financial detriment of both the patient, who must pay higher out-of-pocket costs, and the radiologist, who has a substantially smaller patient base due to the inability to offer insurance coverage.

85.     Nationwide 96 percent of hospitals and 92 percent of physicians are in-network with BCBS. Since most (if not all) health insurance companies require certification, hospitals and other medical organizations, faced with loss of coverage by health insurance plans, in turn, require certification.

86.     Because insurance companies require radiologists to be certified to be included in their networks and health insurance plans, certification cannot be considered "voluntary."

<div align="center">

**Certification Is An Economic Necessity**

</div>

87.     Certification has other practical implications as well. These include higher compensation, lower malpractice insurance rates, and election to membership in professional societies that can be pivotal to advancement both professionally and academically.

88.     One Member Board defends MOC on the basis that "Board certified doctors earn a higher salary," and specifically an "18% higher salary."

89.     Candidates certified by ABR enjoy the economic advantage of being listed in *ABMSdirectory.com*, a fully searchable electronic database that serves as an important on-line reference to locate doctors based on specialty or subspecialty, geographic area, and other criteria, and also includes a detailed physician profile and "professional information that could be helpful in choosing a specialist." Radiologists cannot be listed in the directory unless they have purchased ABR certifications.

90.     Because hospitals and other medical organizations and insurance companies
require radiologists to be certified, and for the other reasons described above, a successful career
for most radiologists is impossible without ABR certification. Despite protestations that
certification is "voluntary," ABR and the other Member Boards advocate strongly, including
through ABMS, for hospitals and other medical organizations, insurance companies, and
government programs to require certification.

91.     As long ago as 1991, Dr. Benson wrote in the *Annals of Internal Medicine* that
certification "is no longer an option for the physician entering the marketplace." A later ABIM
President and CEO agreed, writing in a medical journal article in 2008 that "many physicians
really feel that board certification is not optional," specifically noting its "significant impact in
the marketplace." Other medical industry sources confirm that certification is necessary to the
pursuit of a successful medical career.

92.     In a lecture delivered in 2011, medical historian Dr. Stevens referred to
certification as "blossoming over time into a 'voluntary' system of approved medical specialty
boards, which eventually carved up the entire field of American medicine, becoming less
voluntary and more "regulatory' in the process." (Quotation marks in original). Thus, ABR and
the other Member Boards are more properly viewed as quasi-governmental in nature rather than
as private bodies.

93.     Similarly, a 2019 article about certification and MOC published in *Arthritis Care
& Research*, the peer-reviewed official journal of the American College of Rheumatology and
the Association of Rheumatology Professionals, concluded in no uncertain terms: "Board
certification, which started as a voluntary achievement and remains so in theory has become

involuntary in practice, making participation in MOC programs mandatory for many if not most physicians in order to maintain employment and clinical privileges, or receive reimbursement."

## OTHER CONTINUING PROFESSIONAL DEVELOPMENT PRODUCTS

94.     CPD products promote the development of both medical and non-medical competencies, including professionalism, and interpersonal, managerial and communication skills. CPD encompasses multiple educational and developmental activities that enhance knowledge, skills, performance and relationships in the provision of medical care. The ultimate goal of CPD is to enhance the quality and safety of patient care and to enhance health outcomes.

95.     As the name itself indicates, and like ABR's MOC product, all CPD products are sold to doctors after their postgraduate medical education and training and specialist qualification has been completed. Thus, while certification measures only postgraduate training in medical and clinical expertise, CPD products recognize the many other competencies required to practice medicine.

96.     As with ABR's MOC product, other CPD products are based on the precepts of "lifelong learning and self-assessment," also referred to as "self-directed learning."

97.     Continuing professional development has long been recognized as an important segment of the medical industry. In the early part of the 20th century medical and professional societies offered lectures and other activities focused on continuing medical education. In the 1940s and 1950s medical schools began to create offices and departments for continuing professional development after graduation, providing lecture-based updates both to doctors in their own academic communities (*e.g.*, faculty members) and to practicing doctors in the broader medical community. CPD products proliferated in the ensuing years, especially as they became

required for State medical licensure, which typically requires 40-50 hours of CME credit every two years.

98.     There are at least two professional associations devoted to the field of continuing professional development in the medical industry: the Society for Academic Continuing Medical Education founded in 1976, and the Alliance for Continuing Education in the Health Professions. *The Journal of Continuing Education in the Health Professions*, established in 1980, consolidates scholarship and best practices in continuing professional development in the medical industry.

99.     Offerings by CPD vendors include products addressing value-based delivery and cost reduction, clinical knowledge and skills, patient experience, practice improvement, diversity and inclusion, interprofessional practice, doctor wellness and burnout, patient safety, working in teams, health care disparities, and population health. These are also encompassed by MOC, ABR's CPD product.

100.     Methods and tools used by CPD vendors include, lectures, clinical case conferences, morbidity and mortality conferences, panel discussions, audience response systems, team-based learning, video or digital presentations, small group or paired interactions, online learning, coaching and mentoring, self-reflection and self-assessment, peer observation and feedback, patient-led activities, debate formats, and simulations. All or many of these formats are utilized in connection with MOC. Performance (*i.e.*, outcome or effectiveness of the CPD product) is usually measured by examinations and simulations, as is the case with MOC.

### Continuing Medical Education

101.     The Accreditation Council for Continuing Medical Education ("ACCME") accredits CME vendors and activities. ACCME describes itself as being "responsible for

22

setting standards to ensure that CME is effective, relevant, responsive to the changing healthcare environment, independent, free from commercial bias, and designed to promote healthcare improvement. Our goal is to leverage the power of education to improve clinician performance and patient care."

102.     CME extends to all areas of continuing professional development, encompassing both medical and non-medical competencies, including professionalism, and interpersonal, managerial, and communication skills. The terms CME and CPD are sometimes used interchangeably or in tandem, for example as "CPD/CME." CME vendors typically use a lecture, classroom, or online format, while other CPD vendors may use those same formats, but also utilize the other methods and tools described above.

103.     CME is defined by ACCME as: "The educational activities that serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships a physician uses to provide services for patients, the public, or the profession. CME represents that body of knowledge and skills generally recognized and accepted by the profession as within the basic medical sciences, the discipline of clinical medicine, and the provision of health care to the public."

104.     According to an article describing the history of CME, "the genesis of CME in the United States is largely the result of efforts of the Mayo brothers," who created a Surgeons Club, which "partook in vigorous daily discourse regarding new techniques being advanced." This evolved into the "Clinical Week" in 1927, which was described as the "prototype of the modern CME course." In 1934, the American Urological Association started what has been described as the first "CME program."

23

105.    CME "credits" is the system by which doctors document their participation in CME activities. Physicians use these CME credits to meet requirements for, among other things, State medical licensure, hospital privileging and other credentialing, membership in professional societies, and other professional purposes. Required CME credits are determined by the organization mandating the specific credit system.

106.    The AMA published its first set of CME guidelines in 1957. In 1968, the AMA created two discrete categories of continuing education, Category 1 and Category 2, describing the required types of activities that qualify doctors for AMA's Physician's Recognition Award ("PRA"). The AMA PRA recognizes physicians who, by participating in CME activities, demonstrate their commitment to staying current with advances in medicine.

107.    Doctors earn Category 1 CME credit by participating in activities sponsored by CME providers accredited by either the ACCME or ACCME-recognized State or local medical societies; by participating in activities recognized by the AMA as valid educational activities; and by participating in certain international activities recognized by the AMA through its International Conference Recognition Program.

108.    Category 2 CME credit is self-claimed and self-documented by physicians who participate in activities they individually determine comply with the AMA definition of CME, that comply with the relevant AMA ethical opinions, are not promotional, and are found by physicians to be a worthwhile learning experience related to their practice.

109.    ACCME applies the two categories of CME established by the AMA. In 2018, ACCME recognized 1,763 accredited CME vendors, 628 accredited directly by ACCME and 1,060 accredited by State and local medical societies.

24

110.    CME products include self-assessment activities, referred to as SA-CME. An SA-CME product includes a post-activity evaluation component assessing the doctor's performance. It consists of a minimum passing standard or threshold and requires timely feedback to the doctor.

111.    SA-CME activities are part of ABR's MOC requirements, and were offered by CME providers and other CPD vendors for decades before ABR began selling its own CPD product.

112.    CME products also include practice improvement projects. These are structured as a three-stage process by which physicians learn specific performance measures, assess their practice using the selected performance measures, implement interventions to improve performance related to these measures over a useful interval of time, and then reassess their practice using the same performance measures.

113.    Practice improvement projects are part of ABR's MOC requirements, and were offered by CME providers and other CPD vendors for decades before ABR began selling its own CPD product.

114.    ABMS was a founding organization of ACCME and has been a Member Organization continuously since that time. According to ACCME, ABMS and ACCME's other Member Organizations "collaborate" on CME activities.

115.    No CME vendor sells a certification product to radiologists.

**Medical Schools**

116.    According to a 2018 survey conducted by the Society for Academic Continuing Medical Education, over 87 percent of United States medical schools responding (a total of 90

25

schools) sell accredited CPD products now required by ABR's own MOC product, including self-assessment activities and practice improvement projects.

117. For example, the University of Chicago medical school sells a CPD product to practicing radiologists called the University of Chicago Radiology Review. The product embraces four different CPD competencies: patient care and procedural skills, medical knowledge, practice-based learning and improvement, and systems-based practice.

118. No medical school sells a certification product to radiologists.

### National Board Of Physicians And Surgeons

119. The National Board of Physicians and Surgeons ("NBPAS") was established in or around January 2015. It offers products demonstrating continuing professional development to doctors practicing in many specialties, including radiology. Like ABR, NBPAS calls its CPD product maintenance of certification.

120. To buy the NBPAS CPD product, a physician must have a previous certification from an ABMS Member Board; a valid State medical license; complete at least fifty hours of accredited CME within the past twenty-four months; for some specialties, hold active hospital privileges; and be a medical staff member.

121. The CME required by NBPAS must be in the doctor's specialty or specialties. NBPAS also requires CME for "grandfathers." Active hospital privileges and medical staff membership are significant indicia of professional development, as doctors typically must submit to interviews and peer review processes before obtaining hospital privileges or medical staff membership. And once hospitals privileges or and medical staff membership are obtained, each typically has peer review, continuing education, and other practice improvement requirements.

122. NBPAS fees are vastly lower than those charged by ABR for MOC, and NBPAS

requires vastly less physician time. For example, in 2019, the average yearly cost of NBPAS was $84.50 ($94.50 for a DO), while the ABR MOC annual fee was $340 ($205 for medical physics).

123.     As of January 22, 2020, just 119 hospitals, approximately one percent of hospitals nationwide, recognized the NBPAS CPD product, and no insurance company accepted it.

124.     NBPAS is an innovative competitor in the market for CPD products.

125.     NBPAS does not sell a certification product to radiologists.

### Hospitals, Clinics, And Other Medical Organizations

126.     Many other medical organizations sell CPD products.

127.     These include the American Medical Association, professional societies and colleges, hospitals, clinics, physician groups, health systems, and local medical associations.

128.     For example, the Mayo Clinic operates a School of Continuous Professional Development for practicing physicians. It sells over 200 CPD products annually, including in all areas of radiology.

129.     No other medical organization sells a certification product to radiologists.

### ABR'S SO-CALLED "MAINTENANCE OF CERTIFICATION" PRODUCT

130.     In 1973 and again in 1978, ABR and the other Member Boards through ABMS, adopted a policy referred to as "recertification." ABR confirmed in its *Newsletter* to radiologists that this CPD product would be voluntary, and that radiologists who did not pass recertification would not have their certifications "withdrawn, rescinded, or revoked."

131.     In or about 1974, one Member Board offered such a CPD product, calling it exactly that: "Continuous Professional Development." Importantly, certifications of doctors who did not buy the CPD product were not revoked.

132.    Only 3,355 doctors bought the other Member Board's CPD product when it was first sold; 2,240 doctors bought it when it was offered again in 1977; just 1,947 doctors bought the CPD product when it was offered for a third time in 1980; and only 1,403 doctors purchased it when it was offered the final time in 1986, fewer than 4 percent of the doctors who owned the relevant certification.

133.    This limited and declining interest, reflected in the almost 60 percent drop in doctors purchasing the CPD product over the twelve years it was offered, demonstrated the minimal value the medical community placed on the CPD product. The Member Board abandoned its efforts to sell its voluntary CPD product in or around 1986, but continued thereafter selling its separate certification product.

134.    In 1993, ABR and the other Member Boards through ABMS, reaffirmed a policy requiring all Member Boards to establish a plan for recertification. ABR confirmed in its *Newsletter* to radiologists that each Member Board could decide whether this newest iteration of a CPD product would be voluntary or mandatory, but reassured radiologists that ABR could not rescind certifications "by recertification procedures unless a date of expiration" was a condition of certification. ABR's certification product contained no such "date of expiration" or other condition or limitation.

**ABR's MOC Product Is Separate And Distinct From Its Certification Product**

135.    In March 1998, ABR and the other Member Boards through ABMS, formed a task force to develop yet another CPD product. By 2006, ABR and the other Member Boards were each offering their own CPD products under the name "Maintenance of Certification" or MOC.

136.    MOC serves no function in assessing postgraduate residency programs.

28

137.    According to a medical journal article written by three ABMS employees in 2016, "underlying the creation" of this new product was its emphasis, unlike certification, on "performance in preference to knowledge" with its "focus on improvement rather than on elimination of candidates" for entry into a specialized practice of medicine.

138.    The former President and CEO of ABMS wrote in a medical journal article in 2005 that MOC "is a much broader program in scope, in depth, and in range" than certification and "is an overall comprehensive evaluation of practice involving multiple areas." He wrote in another medical journal article a year later that MOC was intended to focus on each individual doctor's "self-directed learning."

139.    MOC is the same type of CPD product considered by ABR and the other Member Boards previously on a voluntary basis. In fact, MOC is referred to today on the ABMS website by the same terminology as the voluntary CPD product that failed in the 1970s and 1980s: "Continuous Professional Development." There are, however, two significant differences between MOC and the earlier voluntary CPD product.

140.    First, it is called "Maintenance of Certification" or "MOC" instead of "Continuous Professional Development." As discussed further below, this new name is strategic and no mere change in packaging. The other significant difference is that MOC is mandatory. Doctors are required to purchase MOC continuously throughout their careers or have their certifications revoked.

141.    Thus, while certification is an "early career event" that candidates buy to enter the specialized medical practice of radiology, MOC is purchased by older and experienced radiologists after certification. While certification is a "one time snapshot" of a candidate, radiologists must purchase MOC throughout their careers or have their certifications revoked.

29

While certification is a knowledge-based assessment of postgraduate medical education and training, MOC's focus is on "lifetime learning and self-assessment" and "self-directed learning." While certification uses a uniform set of requirements to test a radiology candidate, MOC is individualized and examines how each individual radiologist practices medicine.

142.    Two important goals were accomplished by re-branding this new product as MOC instead of "Continuous Professional Development." First, by introducing the concept of "maintenance," ABR was able to make MOC mandatory. ABR accomplished this by, for the first time, restricting certifications to a limited time period.

143.    ABR first sold its certification product in 1934, and had never before included an expiration date. This is because certification is a test of a candidate's qualifications to enter the specialized medical practice of radiology. Successful postgraduate medical education and training cannot be invalidated or revoked.

144.    Learning from the earlier failed voluntary CPD product, ABR well understood that its new CPD product would never be successful on its own merits. The only way it could succeed was to force radiologists to buy MOC, and the only way to force radiologists to buy MOC was to use ABR's certification product as leverage. Radiologists who refused to buy MOC had their certifications revoked, and along with it the ability to pursue a successful medical career.

145.    The second goal of re-packaging the new CPD product as MOC was strategic. Referring to "maintenance" of certification rather than continuing professional development, gives ABR the wiggle room to argue that only one product exists, that MOC is not a separate product, and that there is no forcing of doctors to buy MOC because it is simply a component of certification.

30

146.    If instead of the labels "initial certification" and "maintenance of certification" the original and accurate terminology of "certification" and "continuous professional development" is substituted, ABR's tying, forcing, and other anti-competitive conduct becomes clear. Creative product labeling cannot insulate ABR from the truth that certification and MOC are separate and distinct.

## ABR's MOC Product Is Not Voluntary

147.    ABR claims that MOC, like certification, is "voluntary." But for the same reasons that certification is not "voluntary" neither is MOC, due to doctors being forced to buy MOC or have their certifications revoked.

148.    In fact, one goal of MOC is that it become a device for State medical licensure.

149.    The Federation of State Medical Boards ("FSMB") is an umbrella organization of State medical licensing boards. In or around 2009, FSMB established an Advisory Group that led in 2010 to a proposed national framework for State medical licenses. The new framework, termed Maintenance of Licensure or MOL, bears an uncanny similarity to MOC. One of the twelve members of the FSMB Advisory Group was Richard E. Hawkins, the current President and CEO of ABMS.

150.    According to the American College of Emergency Physicians, ABMS "developed a tool kit to advance the state medical boards' adoption of the FSMB policy, encouraging the state medical boards to accept MOC participation as meeting a state's requirements for license renewal." The FSMB CEO wrote in a medical journal "that meeting the requirements for MOL could be as simple as providing an attestation of their ongoing participation" in MOC. This would further entrench ABR and the other Member Boards' monopoly in the certification

market, and at the same time give them a virtual stranglehold over CPD products, including CME activities.

151.    When ABMS and FSMB as part of a so-called pilot project lobbied the State Medical Board of Ohio to mandate MOC for State medical licensure, the Ohio State Medical Association successfully prevented such an outcome. Certification is already a proxy for hospital privileges, employment by medical organizations, participation in managed care networks, and coverage by insurance companies. ABR, ABMS, and the other Member Boards seek no less than to make MOC a proxy for State medical licensure.

### ABR "Grandfathers" Tens Of Thousands Of Radiologists

152.    Tellingly in light of ABR's litigation position that certification and MOC are a single product, radiologists who purchased certifications before the advent of MOC are not required to purchase MOC. In other words, unlike younger radiologists, certifications of "grandfathered" radiologists are not revoked if they fail to buy MOC.

153.    Tens of thousands of radiologists are "grandfathered" today and reported by ABR as owning "Valid" certifications even though they have not purchased MOC. Upon information and belief, even "grandfathered" radiologists who voluntarily take and fail MOC examinations are reported by ABR as having "Valid" certifications.

154.    Thus, ABR holds "grandfathered" radiologists to a different standard, despite the fact they are many more years removed from their postgraduate medical education and training than younger radiologists who are forced to purchase MOC.

155.    By "grandfathering" older radiologists, ABR has also discriminated against younger physicians, including women and persons of color, who are under-represented in the group of radiologists "grandfathered" by ABR.

156.    In December 2019, just last month, a study of diagnostic radiologists and ABR's MOC product was published in the *American Journal of Roentgenology* ("*Journal of Roentgenology* study"). The study involved a total of 20,354 radiologists. It is believed to be the largest such study of radiologists ever conducted, including more than half of all diagnostic radiologists nationwide who have purchased ABR's certification product.

157.    The authors found that radiologists "mandated" to buy MOC in order not to have their certifications revoked, did so on a "nearly universal basis." This finding confirms that MOC is no sense "voluntary" for radiologists.

158.    The study also found that only 14 percent of "grandfathers" bought MOC. As the authors noted, however, not even those "grandfathers" necessarily did so voluntarily. That is because ABR now requires all radiologists who hold leadership and other volunteer positions within ABR, even "grandfathers," to buy MOC, as do academic radiology department chairs who "unilaterally" require all department members to buy MOC. The authors concluded that for these and other reasons, "our calculated rates of voluntary MOC participation likely are overestimates of truly voluntary participation."

159.    But even assuming 14 percent of "grandfathers" do buy MOC voluntarily, the question remains why only such a small number do so. It is at the very least, a strong indication that "grandfathers" do not buy ABR's CPD product because they know it to be separate from and unrelated to certification. In other words, as consumers, they do not consider certification and MOC to be a single product.

160.    And since most of the "grandfathers" likely need to buy other CPD products for State medical licensure and other professional purposes, the fact that so few buy MOC is also a

strong indication that "grandfathers" see MOC is an inferior CPD product for which ABR charges supra-competitive monopoly prices.

161.    For many years "grandfathered" ABR Governors and Trustees who were forcing other radiologists to buy MOC or forfeit their certifications, did not buy MOC themselves. This hypocrisy became so embarrassing that ABR now requires "grandfathered" Governors and Trustees to buy MOC for public relations purposes.

162.    Depending on the primary certification, up to 50 percent of radiologists are "grandfathered" by ABR.

### ABR's Constantly Changing CPD Product

163.    MOC, ABR's CPD product, includes CME and SA-CME credits, ABR-administered examinations or tests, and practice improvement activities (also referred to by ABR as quality improvement activities).

164.    Radiologists typically purchase the MOC-required CME and SA-CME credits from third party CME providers. These CPD products have been available from those CME providers for decades. The MOC-required CME and SA-CME credits can be redundant of other CME obligations radiologists already have for State medical licensure and other professional purposes.

165.    Practice improvement projects are also available from other CPD vendors, and have been for decades.

166.    ABR's CPD product simply superimposes ABR-administered MOC examinations or tests over other already-existing CPD products that have been sold by other CPD vendors for decades. As shown below, no causal relationship has ever been established between MOC and a

beneficial impact on radiologists, patient care, or the public, the supposed hallmarks of ABR's MOC product.

167.    Thus, MOC is nothing more than a device to force radiologists to pay tens of millions of dollars in MOC-related fees for a redundant, worthless, and superfluous CPD product.

168.    According to ABR's 2016 Form 990 filed with the Internal Revenue Service, certification "determine[s] if *candidates* [emphasis added] have acquired [the] requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics."

169.    MOC, on the other hand, is something different. As explained by ABR in a white paper dated June 10, 2004: "The intent of the [MOC] examinations is to reinforce the process of individual lifelong learning, rather than to serve as recertification examinations."

170.    Consistent with ABR's distinction between the two products, it has identified certification and MOC as separate programs on its Form 990s.

171.    ABR laid the groundwork for its CPD product in 1995, when it began selling time limited, 10-year certifications to some radiology candidates. By 2002, ABR sold only 10-year certifications to candidates. By 2006, ABR required all radiologists who owned 10-year certifications to purchase MOC. This included onerous, full-day, high stakes, closed book examinations every ten years.

172.    ABR required radiologists to pay annual MOC fees beginning in or around 2006. It also charged radiologists additional fees for the 10-year MOC examinations, adding to the financial burden of the annual MOC fees.

173.    ABR knew from the outset that its 10-year MOC examination was ineffective. In a webinar posted to YouTube, ABR's David Laszakovits, who had MOC oversight responsibility from 2005 to 2016, disclosed that ABR "immediately began evaluating the efficacy of the [MOC] program" and that it "became pretty apparent, pretty quickly" that the 10-year examination "did not meet the aims of maintenance of certification" and had no "formative aspects to aid in continuous learning and continuous improvement." [1]

174.    In other words, ABR knew from the outset that the stated goals of MOC were not being met. Nonetheless, ABR continued to require radiologists to take the 10-year MOC examination.

175.    ABR also required radiologists to engage in burdensome and meritless practice improvement projects as part of MOC.

176.    Radiologists are today automatically "enrolled" in MOC by ABR after they purchase their certifications.

177.    ABR has always charged radiologists separately for its certification and MOC products.

## ABR MOC 2.0

178.    In 2013, ABR stopped selling 10-year certifications to candidates, and returned to selling certifications without an expiration date. ABR continued to revoke certifications of radiologists who did not buy MOC, however, except for "grandfathers."

---

[1] OLA Webinar, The American Board of Radiology, https://youtu.be/zCeWCAoGAzo (published December 4, 2018).

179.   ABR called this MOC 2.0, which according to ABR was intended to "link the ongoing validity of certificates to meeting the requirements of MOC," an admission there had been no prior link.

180.   In fact, ABR admitted in its Annual Report for 2012-2013 that it still had "significant work ahead to establish [the] evidence base" that MOC is "associated with superior quality of care, efficiency, and better outcomes." There is no indication that ABR has since then even begun the "significant work" it acknowledges is necessary to validate its CPD product.

181.   A main feature of MOC 2.0 was that rather than every ten years, radiologists were reviewed annually as to whether they have paid the required MOC fees and met ABR's other MOC requirements. ABR advised radiologists in an email blast that "their MOC requirements will not change but will be evaluated on a more frequent basis." ABR continued to require the admittedly ineffective 10-year MOC examination and burdensome and meritless practice improvement projects.

182.   There is no available evidence that ABR tested in advance whether MOC 2.0 would meet MOC's stated goals before it was unilaterally imposed.

183.   ABR increased the annual MOC fee as part of MOC 2.0. For example, it increased the annual MOC fee by almost 30 percent for radiologists with certifications in diagnostic radiology.

### ABR MOC 3.0 And The Online Longitudinal Assessment Tests

184.   In January 2019, ABR changed its MOC product yet again. Referred to as MOC 3.0, ABR finally dropped the admittedly ineffective 10-year MOC examination for some radiologists in 2019, and for most of the remaining radiologists in 2020.

185.    The 10-year MOC examination, however, has been replaced with a new MOC testing process, no less onerous and ineffective, referred to by ABR as Online Longitudinal Assessment tests ("OLA").

186.    Under OLA, ABR sends 104 questions (two per week) to radiologists, 52 of which must be correctly answered annually. ABR allows one minute to answer each question, although some questions allow up to three minutes to answer. Radiologists after seeing the question may decline to answer up to ten questions a year. Presumably, these would be questions for which the radiologist does not know the answer.

187.    The *Journal of Roentgenology* study commented on the new OLA tests as follows: "Although the ABR MOC examination occurring every ten years has been replaced by the new Online Longitudinal Assessment (OLA) program, both programs are based on multiple choice testing and have comparable concerns regarding validity and relevance to clinical practice."

188.    Even radiologists who had timely taken and passed 10-year MOC examinations are required to take the OLA tests. One radiologist who took and passed the 10-year MOC examination in 2016 was told by ABR just months later that his examination result would be disregarded and he would be required to take the OLA tests. Thus, while ABR had previously "grandfathered" tens of thousands of older radiologists from participating in MOC entirely, when it implemented OLA, ABR refused to "grandfather" younger radiologists who had passed the 10-year MOC examination, even though the ten-year period had not expired.

189.    Little information has been made available by ABR about how radiologists will know whether they are "passing" OLA, other than that the "passing standard" will "vary slightly" among radiologists, without an explanation of what "slightly" means.

38

190.   ABR has made other conflicting and ambiguous statements about OLA. For example, according to ABR, radiologists have been promised "a dashboard showing … performance against the passing standard well in advance of answering 200 questions." While the dashboard is now available, there still is no mention on the ABR website of what the passing standard is or how it is determined.

191.   Once again, there is no available evidence that ABR tested in advance whether OLA would meet MOC's stated goals before it was unilaterally imposed. In fact, like its predecessor 10-year MOC examination, OLA simulates poor clinical practices that could have a detrimental impact on patient care. First, competent radiologists would not limit themselves to one to three minutes when making a medical decision. Yet OLA promotes just that by encouraging and rewarding speed, which in actual clinical practice could result in more subtle radiological findings and therapeutic options being overlooked.

192.   Nor does OLA represent the actual workflow or environment of real world radiologists, whose job is to identify and carefully assess abnormalities in X-rays, CT scans, MRI scans, and other imaging studies. No radiologist commits to memory every potential diagnosis for every potential abnormality. Often times, a radiologist may recognize an abnormality but is faced with multiple possible diagnoses, which are then researched through online medical databases and other means, or by consultation with colleagues. None of these are available to radiologists within the framework of OLA. In fact, ABR prohibits and punishes any collaboration between radiologists in answering questions in the OLA tests.

193.   In the same webinar referred to above, ABR admits that no studying will be necessary for OLA. ABR also confirms on its website that "[t]he goal with all OLA content is that diplomates won't have to study." ABR's boast that studying is not required for OLA is

directly contrary to a major rationale cited by advocates of MOC, that "lifelong learning and self-assessment" is driven by "preparing for the [MOC] examination."

194.   ABR admits in its webinar that it "doesn't anticipate" incorrect answers "will happen often" with OLA. Unsurprisingly, ABR also admits it does "not anticipate a high failure rate."

195.   In short, radiologists need spend as few as 52 minutes per year (one minute for each of 52 questions) answering only those questions they choose to answer, that are designed so as not to require studying, and for which ABR anticipates neither incorrect answers nor a high failure rate. Because OLA has been designed so that all radiologists pass, it validates only ABR's ability to force radiologists to purchase MOC and continue charging supra-competitive monopoly prices for MOC.

196.   Under MOC 3.0, radiologists are still reviewed annually as to whether they have paid the required MOC fees and met ABR's other MOC requirements, including the OLA tests and the burdensome and meritless practice improvement projects.

197.   ABR's unrelenting changes to MOC have not only been confusing to radiologists, its different iterations have been implemented unfairly, made it impossible to determine whether ABR's CPD product has ever met the stated goals of MOC, and have prevented radiologists from calculating the lifecycle cost of ABR's CPD product.

## ABR Revokes Certifications Of Radiologists Who Do Not Buy MOC

198.   If radiologists do not pay the annual MOC fee or have not met ABR's other MOC requirements (for example, not taking the OLA tests), ABR reports them as "Not Meeting" MOC requirements, noting specifically that: "Validity of certification is contingent upon participation in Maintenance of Certification."

40

199.    After a grace period, ABR reports the certifications of these radiologists as "Lapsed" even though they previously have purchased certifications.

200.    "Grandfathered" radiologists who have not purchased MOC nonetheless are reported by ABR as owning a "Valid" certification.

201.    Rather than MOC and but for their certifications being revoked, radiologists would buy different CPD products more relevant to their individual practice from other CPD vendors.

### ABR Has Forced Radiologists To Pay $90 Million In MOC Fees

202.    Since it has mandated MOC, ABR has required radiologists to pay annual MOC fees of up to $340 or more per year, as well as other MOC-related fees.

203.    ABR has collected to date approximately $90 million in MOC annual fees and other MOC-related fees from radiologists forced to buy MOC.

### ABR Forces Other MOC Costs On Radiologists

204.    Radiologists, to their substantial financial and personal detriment, have also been required to take countless hours away from their practice and families in order to prepare for and take required examinations and tests and other requirements of ABR's MOC product.

205.    MOC also takes time away from patients and detracts from patient services, to the detriment of ongoing patient care.

206.    Doctors have made their feelings known about the cost and burdensomeness of MOC. In one survey of 998 doctors conducted by the Mayo Clinic, more than 80 percent agreed that "MOC is a burden to me." A survey of 515 rheumatologists reported that 88.5 percent believed MOC imposes a financial burden without proven benefits to patients, and 75 percent said MOC took time away from patient care.

41

207. The not-for-profit organization Practicing Physicians of America conducted an online survey in early 2018. When asked whether certification "should be a life-long credential, using CME credits for continuing education," 90 percent responded "yes." When asked about physician burnout, 95 percent responded MOC (or the osteopathic physicians' equivalent, OCC) contributed significantly or very significantly to physician burnout; and another 90 percent responded MOC or OCC was not "voluntary." The study reported on 7,007 doctors who responded to the survey.

208. As the authors of the *Journal of Roentgenology* study put it: "If radiologists believed that MOC's benefits exceeded its costs, one would hypothesize high participation rates, even among those whose participation is not mandated by ABR." The hypothesis, however, did not prove out, as only a very small percentage of those "whose participation is not mandated by ABR" bought MOC.

### There Is No Evidence Of Any Benefit From ABR's MOC Product

209. No causal relationship has ever been established between MOC and a beneficial impact on doctors, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today, that optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research, which as shown below is notably lacking with regard to MOC.

210. MOC has been the subject of many articles and accompanying clinical studies published in medical journals. Synopses of some of these articles as well as summaries of the medical scholarship concerning MOC follows. To understand them it is helpful first to consider the difference between "correlation" and "causation."

211.   Correlation is concerned with association and examines any two measured concepts, or variables, and compares their relationships. Causation is the capacity of one variable to influence another. Causation is often confused with correlation, which only indicates the extent to which two variables tend to increase or decrease in parallel. Correlation does not imply causation.

212.   This distinction is well-recognized in field of medical scholarship. A 2017 article in the *Postgraduate Medical Journal* warned that, "Misinterpretation of correlation is generally related to a lack of understanding of what a statistical test can or cannot do, as well as lacking knowledge in proper research design." The authors noted: "[C]ausal inference will be premature if relying purely on correlational statistics, no matter how many studies report the correlational finding."

213.   The *Journal of the American Medical Association* in its Instructions for Authors likewise cautions that "methods and results should be described in terms of association and correlation and should avoid cause and effect wording."

214.   While ABR touts the benefits of MOC, as one author concluded in a 2019 article in the *American Journal of Medicine*, "there is a paucity of high-quality data" supporting the "assertion that maintenance of certification [MOC] improves quality of care."

215.   For example, a 2018 study of 356 interventional cardiologists in New York during the years 2011-2013, examined their attributes, including certification, MOC, whether the medical school attended was based in the United States, the ranking of the medical school, and length of practice. The study examined whether these attributes were associated with better patient outcomes, measured by a risk-standardized mortality rate after a percutaneous coronary

43

intervention. The study found that MOC was "not associated with any difference in 30-day risk-standardized mortality."

216.    Thus, not only did the study find no evidence that MOC improved patient care, it failed to find even a correlation between the two. Physicians commenting online noted that the study made "an important contribution to a growing evidence base that questions whether certification or participation in MOC translates into what matters most -- better patient outcomes."

217.    Other studies also fail to support a causal connection between MOC and any alleged benefits. As an example, a six-year study published in *the Journal of the American Medical Association* ("*JAMA*") compared two cohorts of Medicare beneficiaries treated by two groups of physicians: one required to purchase MOC, and a second "grandfathered" group that did not have to buy MOC. The study measured the association between MOC and changes in ambulatory care–sensitive hospitalizations (ACSH) and health care costs, to test "the hypotheses that the MOC requirement was associated with higher-quality and more efficient care." ACSH was defined as "hospitalizations triggered by conditions thought to be preventable through better access to and quality of outpatient care."

218.    Emergency Department visits were found to be lower (a better patient outcome) for patients cared by physicians who did *not* buy MOC. The association between those required to purchase MOC and those who were not, was "nonsignificant for annual incidence of hospital admission or emergency department visits." There was also "no statistically significant association" between treatment by doctors who bought MOC and those who did not.

219.    In fact, MOC was found to be negatively associated with specialty office visits, non-specialty office visits, laboratory testing, and imaging (radiological) costs. Finally, there was

no statistical significance associated with MOC for major or minor procedure costs. This study is wholly consistent with the finding that MOC does not cause better patient outcomes. One doctor discussing the study in *JAMA*, confirmed that it found "MOC participation had no effect on the primary end point, ambulatory care-sensitive hospitalizations among Medicare beneficiaries."

220.    A similar study analyzed the clinical outcomes for 213 patients treated by 71 doctors required to purchase MOC, and a second group of 34 "grandfathered" doctors in four Veterans Affairs ("VA") hospitals. The authors found no significant differences in any of the ten different outcome measures for patients treated by doctors required to buy MOC. They concluded: "To whatever extent a goal of MOC is to improve the quality of patient care, this study raises a question of whether that goal is being achieved, at least among internists at these VA hospitals."

221.    Physician commentators have observed that evidence-based medicine does not appear to be present in the designs of the studies relied upon by ABR and other advocates of MOC. "The internal medicine community has embraced the principle of evidence-based medicine in clinical practice; expensive policy interventions such as MOC should be held to the same evidentiary standards," noted Dr. Dhruv Kazi in *The Hospitalist* in 2015. Dr. Kazi, a cardiologist and health economist who studies optimization of health care expenditures, also observed: "Instead of piecemeal evaluations, the entire MOC program should be compared head-to-head with other policy interventions or health systems interventions that improve healthcare quality, thus providing an empirical basis for choosing MOC over alternative strategies for quality improvement [*i.e.*, other CPD products]."

222.    Ignoring the lack of evidence of a causal connection between MOC and better patient outcomes, much has been made by advocates of MOC of another recent study. A

45

description of the study is introduced on a Member Board website by a headline in twenty-point font: "Women Are More Likely to Get Breast Cancer Screenings They Need When They See Internists Who Maintain Board Certification." The description goes on to claim that, "[n]ew research indicates that physicians who participate in MOC, a lifelong learning and assessment program, screen women appropriately for breast cancer, potentially saving lives every year." At the end, however, is the concession that "other factors" could be influencing doctors and that more "research is needed to understand how MOC might impact the quality of care that patients receive."

223.   Advocates of MOC such as ABR also point to a recent study whose five authors were either employed by or received other financial support from a Member Board. The objective of the study was to "assess whether physician MOC status is associated with performance on selected Healthcare Effectiveness Data and Information Set (HEDIS) process measures." The HEDIS metrics included hemoglobin screenings, diabetes screenings, eye examinations, mammograms, and cholesterol tests. The study compared 786 doctors who purchased MOC and 474 who did not.

224.   While the data reflected statistical differences between the two groups of doctors ranging between 4.2 percent and 2 percent for four of the five HEDIS metrics measured, the authors conceded there were "several possible explanations" for the findings, including that doctors may "follow [HEDIS] guidelines more diligently regardless of their knowledge."  The authors also observed that doctors may adopt "practice capabilities and systems that support meeting our physician performance measures (for example, use of electronic patient reminders.)." The study concluded that "the results should be considered to reflect associations and not definitive indicators of causal relationships."

225.   A 2019 article in the *Annals of Internal Medicine* by Dr. Lee Goldman, Dean of Health Sciences and Medicine at the Vagelos College of Physicians and Surgeons at Columbia University, confirmed the study's failure to establish a causal connection and identified flaws that could explain the statistical differences noted, such as, for example, that the study did not analyze how other factors, including measures of qualifications other than MOC, influenced the outcomes.

226.   Dr. Goldman warned that the statistical differences reported in the study were associated "with unimpressive differences in medical practice" and described the findings as "disturbing," emphasizing that the rate of meeting HEDIS metrics was low for both groups of doctors and only minimally higher for those who purchased MOC. He concluded: "If maintenance of certification simply takes my doctor from a low F to a slightly higher F, or even from D+ to C-, on metrics that may or may not be worth grading, then I don't find it helpful at all."

227.   With respect to OLA in particular, ABR's most current iteration of MOC, Dr. David W. Price, Senior Vice President of an ABMS-related entity, co-authored a 2018 article in *Medical Teacher*, admitting that evaluating the association (much less causation) between longitudinal assessments "and outcomes of care [and] quality of care" will be "most challenging and time consuming to investigate due to the many factors beyond knowledge that influence the process and outcomes of care." Again, there is no indication that any such investigation is even underway by ABR, ABMS, or other Member Boards.

228.   The *Journal of Roentgenology* study confirms the lack of evidence of any benefit from MOC: "An ideal program validating lifelong learning would create sufficient value to justify the time, effort, and money required to voluntarily participate. In other ABMS specialties,

47

however, there is only scant or equivocal evidence of MOC in terms of patient outcomes. [footnote omitted] We are aware of no such studies in radiology."

**Doctor Surveys Confirm MOC Is Burdensome And Ineffective**

229.    In a recent ABMS survey, only 12 percent of doctors responded that they valued MOC. When asked what alternatives should be considered in place of MOC, 84 percent answered CME. The online survey was taken by 34,616 physicians, 1,373 non-physician providers and stakeholders working in health care, and 403 members of the general public.

230.    The Mayo Clinic conducted a survey in 2016 published in the *Mayo Clinic Proceedings*. Its findings are consistent with the ABMS survey. In response to the query whether "MOC is worth the time and effort required of me," only 14.9 percent of physicians answered "yes." Even fewer, only 9.1 percent of those surveyed, felt that patients cared about their MOC status. The Mayo Clinic authors observed that "evidence is presently lacking about how current formal programs of *maintenance* of certification contribute to lifelong learning beyond what physicians would spontaneously do (*e.g.*, learning while caring for patients) … ." (Emphasis in original). They also found that "physicians perceived that current MOC activities have little relevance or value and are neither well-supported nor well-integrated in their clinical practice." A total of 998 doctors participated in the survey.

231.    In a survey of 515 rheumatologists published in *Arthritis Care & Research*, 75 percent agreed there was no "significant value in MOC, beyond what is already achieved from continuing medical education" and 63.5 percent of rheumatologists did not believe MOC was valuable in terms of improving patient care.

232.    The survey authors, who were not funded by or employed by ABMS or any Member Board, concluded that while doctors "are committed to life-long learning and appreciate

48

the importance of keeping up to date with recent knowledge and developments in the field to provide the best patient care," the "majority believe that MOC programs do not add significant value to participation in CME activities, which are already required to maintain and renew state medical licensure." The authors continued that, "CME activities can be more flexible and allow individual rheumatologists to participate in educational activities that are most relevant to their individual practices or the patient populations they manage" and "can be achieved at a fraction" of MOC's costs. One commentator summarized the survey findings as showing that: "rheumatologists favor lifelong learning, but in a format that they can control and with a focus on education."

233.   The *New England Journal of Medicine* surveyed physicians in 2010 about whether "grandfathers" should voluntarily buy MOC. Almost two-thirds (63 percent) responded against voluntarily enrolling in MOC. A total of 2,512 doctors participated. And while not a survey, a *JAMA* article in 2015 reported that more than 22,000 doctors signed an on-line petition to end a Member Board's MOC requirement.

### ABR CHARGES SUPRA-COMPETITIVE MONOPOLY PRICES FOR MOC

234.   As a result of its monopoly power in the certification market and forcing radiologists to buy MOC or have their certifications revoked, ABR is able to charge supra-competitive monopoly prices for its MOC product.

235.   Between 2004, when ABR first began collecting MOC-related fees, and 2017, ABR's "Program service revenue" account almost tripled, from $6,072,290 to $16,291,444, as reported in its Form 990 for the fiscal years ending March 31, 2005 and 2017, respectively. During that same period of time, ABR's "Net assets or fund balances" account more than tripled, from $12,906,311 to $38,956,788.

236. According to its Form 990s for the fiscal years ending March 31, 2009, through 2013 (the only years ABR disclosed revenue and expenses for certification and MOC separately), ABR's MOC-related fees account increased approximately 30 percent from $5,099,722 to $6,539,395. During that same time, MOC revenue exceeded MOC expenses by an average of about $2.2 million. For fiscal years ending March 31, 2012 and 2013, however, certification expenses exceeded certification revenue. Thus, ABR's MOC product was subsidizing its certification product.

237. These data demonstrate that MOC is an increasing revenue source for ABR. This is not surprising. Residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay the certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABR on older radiologists who have been practicing for as long as several decades, and have more financial wherewithal to pay ABR's MOC fees.

238. ABR has created a lucrative new revenue source by imposing MOC on older radiologists. This is confirmed by the fact that MOC revenue has increased at a much faster rate than certification revenue, and, based on the latest publicly available data, is at least half of ABR's total program revenue.

239. The fact that MOC is a necessary and lucrative revenue source is especially noteworthy considering that ABR's "Total functional expenses" account as reported on its Form 990s increased from $4 million for the fiscal year ending March 31, 2005, to over $15 million for the fiscal year ending March 31, 2017, an increase of 375 percent.

240. A large part of this expense is overhead, including overly generous compensation to ABR Executive Directors. For the fiscal year ending March 31, 2005, Dr. Robert R. Hattery,

ABR's former Executive Director, was paid total compensation of $443,563. When he retired just three years later in 2008, by which time ABR was realizing increasing millions of dollars in MOC revenue, his total annual compensation had jumped to $788,910. The next ABR Executive Director, Dr. Gary J. Becker, was likewise paid between $612,357 and $821,439 annually between 2009 and 2014.

241. Dr. Valerie P. Jackson, current ABR Executive Director, was paid total compensation of $751,307 for fiscal year ending March 31, 2016. ABR stopped disclosing MOC revenue and MOC expenses on its Form 990 when Dr. Jackson became Executive Director, after ABR increased its MOC annual fees by approximately 30 percent.

242. Compensation for other ABR key employees has also increased since the advent of MOC. For fiscal year ending March 31, 2005, only compensation for the ABR Executive Director ($443,563) was included in the Form 990 in the "List of Officers, Directors, Trustees and Key Employees." By fiscal year ending March 31, 2017, the account for "Compensation of current officers, directors, trustees and key employees" had almost quadrupled to $1,714,448, reaching a high of $2,075,865 for fiscal year ending March 31, 2015.

243. Also included in overhead are ABR's lavish pension plan accruals and contributions, which between fiscal years ending March 31, 2015 and 2017 averaged 10.3 percent. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5 percent.

## ABR'S MOC PRODUCT IS NOT SELF-REGULATION BY RADIOLOGISTS

244. ABR claims that MOC is a part of a "social contract" and constitutes self-regulation. For example, former ABR Executive Director Dr. Becker in the ABR Annual Report

2012-2013 stressed "the social contract that defines our relationship with the public. Through this contract, the pubic grants [ABR] the privilege to self-regulate." This and numerous similar statements provide an unwarranted veneer of respectability and integrity to MOC when, as alleged herein, the facts are to the contrary. ABR makes it appear that MOC is accepted by radiologists as self-regulation, which is misleading and untrue.

245. ABR's statement that MOC constitutes self-regulation is misleading and untrue for at least two reasons. First, not meeting MOC requirements is not grounds for revocation or suspension of a radiologist's license to practice medicine or to undertake any other disciplinary action. Those self-regulatory functions are mandated and implemented by the medical boards of the individual States, the only relevant self-regulatory bodies. As alleged above, however, radiologists who do not comply with MOC requirements face the loss of hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. ABR seeks nothing less than to usurp the medical boards of the individual States as the self-regulatory bodies of the medical profession.

246. Second, ABR is not a "self"-regulatory body in any meaningful sense for, among other reasons, its complete lack of accountability. Unlike the medical boards of the individual States, for example, as alleged above, ABR is a revenue-driven entity beholden to its own financial interests and those of its Governors, Trustees, management, officers, and employees. ABR itself is not subject to legislative, regulatory, administrative, or other oversight by any other person, entity, or organization. It answers to no one, much less to the radiologist community which it brazenly claims to self-regulate.

52

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

247.   Dr. Siva began practicing in 2004 as a diagnostic and interventional radiologist at MetroHealth Medical Center. He relocated to Tennessee in 2006 and has practiced since then at the Murfreesboro Medical Clinic. Dr. Siva's areas of expertise include digital and 3D mammography, ultrasound, Doppler ultrasound, breast MRI, GI studies, MRI breast biopsies, CT scans, and nuclear medicine. He is a member of the American Roentgen Ray Society.

248.   When he graduated medical school, Dr. Siva understood ABR certification was required to pursue a successful medical career as a radiologist, and enrolled in a residency program to pursue the goal of certification. He does not consider certification to be any more "voluntary" today than it was then.

249.   When Dr. Siva began his radiology residency program on July 1, 1999, ABR sold only a certification product, and did not sell a CPD product. In the second year of his residency, ABR announced it would sell only time-limited, ten-year certifications.

250.   Dr. Siva submitted his certification application and fee to ABR on September 14, 2000. The ABR application did not refer to an "initial certification." The application also did not mention or refer to MOC or any other ABR CPD product.

251.   ABR sold Dr. Siva a certification in diagnostic radiology on June 4, 2003. He was not "grandfathered" because he bought his certification after 2001.

252.   Dr. Siva's certification reads in pertinent part:

> "Sadhish Kumar Siva, MD has pursued an accepted course of graduate study and clinical work, has met certain standards and qualifications and has passed the examinations conducted under the authority of the American Board of Radiology [o]n this fourth day of June, 2003 thereby demonstrating to the satisfaction of the Board that he is qualified to practice the specialty of Diagnostic Radiology."

53

253.    The wording does not refer to an "initial certification." It confirms certification is a knowledge-based "one time, snapshot assessment" of a candidate's postgraduate medical education and training, sold by ABR to candidates for entry into the specialized medical practice of radiology.

254.    A letter sent by ABR to Dr. Siva on June 2, 2003, with his certification examination results likewise refers to ABR "grant[ing] you its Certificate in Diagnostic Radiology." It does not refer to an "initial certification." The letter also informed Dr. Siva that he would be receiving information about MOC, ABR's CPD product, "in the near future."

255.    Dr. Siva became enrolled in MOC after he purchased his certification. He believes he was automatically enrolled by ABR. He paid a $400 MOC enrollment fee and began paying the required MOC annual fees. Dr. Siva has since signed a MOC Data Form, Application Forms, Fee Schedules, Registrations, and other MOC-related documents sent by ABR over the years that he was required to sign in order to purchase MOC so as not to have his certification revoked.

256.    Dr. Siva took his first (and only) 10-year MOC examination in 2012 at an ABR testing facility in the Chicago area. He estimates spending at least 100 hours studying for the examination, incurred travel and hotel costs, lost income as a result of taking time off from work, and paid another radiologist $3,000 to cover for him while he was required to be in Chicago.

257.    Dr. Siva passed the 10-year MOC examination with the well-informed belief that he would not be subjected to any additional ABR examinations or tests for the next ten years.

258.    In 2018, however, he learned ABR was changing MOC and that he would be required to take the OLA tests, even though his 10-year MOC examination result was valid until 2022. ABR refused his request to honor the full ten-year length of the examination result and Dr.

Siva began taking the OLA tests in January 2019 as required by ABR. In effect, Dr. Siva was allowed to use only 60 percent of the ten-year MOC examination result.

259.   Dr. Siva has paid all required ABR MOC-related fees through the filing of this First Amended Class Action Complaint.

260.   ABR currently reports Dr. Siva's certification as "contingent upon participation in Maintenance of Certification." He is forced to purchase MOC as a result of this qualification placed by ABR on his certification.

261.   Dr. Siva has made a substantial investment of time, money, and effort in ABR's certification product. This includes his residency program, the certification fee paid to ABR, the time studying for the certification examination, the time and expense of traveling to take his written and oral examinations, and the cost of study aids.

262.   Since buying his certification, ABR has forced him to increase his investment in its certification product by charging thousands of dollars in MOC-related fees, taking the 10-year MOC examination (as described above) and the OLA tests, and satisfying other MOC requirements.

263.   Given these substantial sunk costs in ABR's certification product, MOC has never been "voluntary" for Dr. Siva.

264.   But for his certification being revoked, Dr. Siva would not buy ABR's CPD product. Instead, he would exercise the option of buying different CPD products more relevant to his practice from other CPD vendors. Dr. Siva has spoken personally to numerous radiologists and communicated online with others who would do the same thing.

265.   MOC's CME and SA-CME requirements are redundant of CME obligations Dr. Siva already has for State medical license and the American College of Radiology. MOC's

55

practice improvement projects are make-work with no value, especially in light of the administrative time and expense required, and, in his experience, can actually have a negative impact. Dr. Siva has found both the 10-year MOC examination and the OLA tests to be onerous and ineffective, serving no purpose beyond those already provided by CME and other CPD products.

266.    In his experience with ABR's CPD product, Dr. Siva has found that MOC superimposes wholly superfluous examinations, tests, and other ABR requirements onto CPD products already sold by other CPD vendors, including CME providers, medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations.

267.    This allows ABR to charge radiologists like Dr. Siva, MOC-related fees throughout their entire career. Dr. Siva and other radiologists are forced to pay these fees even though they receive nothing of benefit in return, because if they do not buy MOC ABR will revoke their certifications.

268.    ABR's superfluous MOC product has cost Dr. Siva substantial MOC-related fees, valuable time complying with ABR's associated bureaucratic and administrative paperwork, and, of course, significant amounts of time just complying with MOC, all to the detriment of his radiology practice, patients, and other aspects of his professional career, as well as his personal life.

269.    In short, there has been no improvement in Dr. Siva's medical knowledge or clinical skills as a radiologist as a result of being forced to buy ABR's CPD product. Nor have patient care or patient outcomes been enhanced by being forced to buy MOC.

## CLASS ACTION ALLEGATIONS

270.   Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: All radiologists who ABR forces to buy its CPD product by revoking the certifications of those who do not also buy MOC. Specifically excluded from this Class are Governors, Trustees, officers, and employees of ABR, or of any entity in which ABR has a controlling interest, or any affiliate, legal representative, or assign of ABR. Also excluded from this Class are any judicial officers presiding over this action and members of their immediate families, judicial staff, and any juror assigned to this action.

271.   The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 radiologists.

272.   Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABR is engaging in illegal tying, (2) whether the conduct of ABR caused injury to the business or property of Plaintiff and other Class members; (3) whether ABR was unjustly enriched as a result of the conduct alleged herein; (4) the appropriate injunctive and related equitable relief; and (5) the appropriate class-wide measure of damages.

273.   Plaintiff's claims are typical of the claims of other Class members. Plaintiff and other Class members are similarly affected by ABR's wrongful conduct in that they were forced to buy ABR's CPD product or have their certifications revoked. Plaintiff's interests are coincident with and not antagonistic, or in conflict with, the interests of other Class members. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the

other Class members. Plaintiff will fairly and adequately protect the interests of other Class members.

274.    Plaintiff has retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

275.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

276.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### *Per se* Illegal Tying in Violation of Section 1 of the Sherman Act

277.    Plaintiff incorporates by reference all of the above allegations.

278.    ABR has created a tie between its certification product (the tying product) and MOC, ABR's CPD product (the tied product). ABR forces radiologists to buy its CPD product by revoking the certifications of those who do not buy MOC.

279.    ABR enforces its illegal tie by, among other things, reporting the certifications of radiologists as invalid or "Lapsed" if they do not later buy ABR's own CPD product, even

though those radiologists previously purchased certifications. ABR confirms when it reports the

certification status of radiologists that: "Validity of certification is contingent upon participation

in Maintenance of Certification [MOC]."

280. ABR's illegal tie of its certification product and its CPD product is a *per se*

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### a. ABR's Certification And CPD Products Are Separate.

281. The facts demonstrating that ABR's certification product and MOC, ABR's CPD

product, are separate products include the following.

282. There is separate consumer demand by radiologists for certification products and

CPD products.

283. There is a separate market for certification products and CPD products, including

MOC.

284. Because there is separate and sufficient consumer demand by radiologists for both

a certification product and CPD products, it is efficient for vendors to sell certifications and CPD

products separately.

285. In fact, ABR sells its certification product separately from MOC, its CPD product,

and other vendors sell CPD products without selling a certification product.

286. Plaintiff and other radiologists prefer to obtain certification and CPD products

from different vendors.

287. But for their certifications being revoked, Dr. Siva and other radiologists would

not buy ABR's CPD product and instead by other CPD products from different vendors.

288.   Reflecting separate consumer demand, ABR sold certifications without selling any CPD product of its own for decades, even though other vendors were selling CPD products throughout all or most of that time.

289.   Also reflecting separate consumer demand, different vendors, including CME providers, medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations have sold CPD products for decades without selling a certification product.

290.   Even after ABR began selling its CPD product, it continued to sell its certification product separately from MOC.

291.   ABR sells MOC to radiologists only after they have purchased certifications, and will not sell MOC to a radiologist who has not previously bought its certification product.

292.   ABR considered selling CPD products separately from its certification product as early as the 1970s. Those CPD products, however, were voluntary and radiologists who did not buy them would not have their certifications revoked. ABR continued selling its separate certification product for another thirty years before it finally sold MOC, its own CPD product.

293.   Vendors, including ABR, have always sold certification and CPD products separately.

294.   Certification and CPD products are separate and distinct markets and are not interchangeable or a component of one another. For example, radiologists may purchase ABR's certification product without buying MOC or other CPD products.

295.   Radiologists may also purchase CPD products without buying certifications.

60

296.   That ABR sold a certification product for more than sixty years before it started selling its own CPD product demonstrates that ABR itself understands the two products are separate and distinct.

297.   Certification and CPD products have different purposes.

298.   Certification and CPD products satisfy different consumer demands of radiologists.

299.   Certification is an "early career event" sold by ABR to candidates for entry into the specialized medical practice of radiology, and only within a limited period of time after completion of their residency programs. It is a knowledge-based "one time, snapshot assessment" of a candidate's postgraduate medical education and training.

300.   CPD products such as MOC, on the other hand, promote the development of both medical and non-medical competencies after residency, including value-based delivery and cost reduction, clinical knowledge and skills, patient experience, practice improvement, diversity and inclusion, interprofessional practice, doctor wellness and burnout, patient safety, working in teams, health care disparities, and population health. CPD products are based on the precepts of "lifelong learning and self-assessment," also referred to as "self-directed learning."

301.   Thus, while certification is an "early career event" that candidates buy to enter the specialized medical practice of radiology, MOC is purchased by older and experienced radiologists after certification. While certification is a "one time snapshot" of a candidate, radiologists must purchase MOC throughout their careers or have their certifications revoked. While certification is a knowledge-based assessment of postgraduate medical education and training, MOC's focus is on "lifetime learning and self-assessment" and "self-directed learning."

While certification uses a uniform set of requirements to test a radiology candidate, MOC is individualized and seeks to evaluate how each individual radiologist practices medicine.

302.    Certification and MOC are no more a single method of evaluating radiologists than an undergraduate and graduate degree are a single method of evaluating, for example, a biologist. Prospective biologists first purchase undergraduate degrees in biology. To further develop their careers as biologists, they then separately purchase graduate degrees in biology, such as a Ph.D., typically from a different institution. Unlike ABR which revokes certifications if radiologists do not purchase its own CPD product, no institution revokes its undergraduate degree in biology because its graduate later purchases a Ph.D. degree from a different institution.

303.    Similarly, the biologist might then pursue a post-doctoral fellowship at a third institution. Again, no institution revokes its Ph.D. degree because its graduate student later pursues a post-doctoral fellowship at a different institution. And by this time, many years into their careers, biologists will likely concentrate in a particular field within biology, for example, molecular biology. Because they are all separate products, no undergraduate institution, graduate institution, or post-doctoral institution administers examinations or tests that their former students are required to take or forfeit their degrees.

304.    Unlike certification whose purpose is the "elimination of candidates" seeking entry into the practice of radiology, MOC emphasizes "lifelong learning and self-assessment" throughout a radiologist's career. Because all CPD products promote "lifelong learning and self-assessment" MOC is not unique or different from other CPD products.

305.    Dr. Siva's certification application did not mention or refer to MOC or any other ABR CPD product. He bought MOC only after he purchased his certification. Dr. Siva paid for ABR's certification product and MOC separately and at different times.

62

306.    ABR has always charged radiologists separately for certifications and MOC, and accounts for revenue from its certification product and its CPD product separately.

307.    There are separate published standards for ABR's certification and CPD products.

308.    Certification and MOC each have a separate section on ABR's website, describing the different processes, schedules and requirements for each.

309.    The objectives and purposes of ABR are listed in its Bylaws. The objective, "To issue certificates to qualified and competent *candidates* [emphasis added] in the specialties and subspecialties of the ABR" is listed as a separate objective from, "To promote lifelong and continuous learning, professional growth, quality, and competence through its MOC programs." This distinction of objectives and purposes reflects the separate nature of ABR's certification product and its CPD product.

310.    That certification and MOC are not components of a single product, is further demonstrated by "grandfathered" radiologists. These radiologists are "grandfathers" due merely to the serendipity of when they purchased certifications and when ABR imposed MOC and are not required to buy MOC. In other words, their certifications are not revoked by ABR even though they do not purchase MOC, severely undermining ABR's litigation position that MOC is an essential component of certification.

311.    In the same vein, almost no "grandfathered" radiologists purchase ABR's CPD product, for the simple reason that MOC has nothing to do with and is separate from ABR's certification product. And "grandfathered" radiologists who purchase MOC but then fail to satisfy its requirements are still reported by ABR as owning "Valid" certifications.

312.    "Grandfathers" who do not buy MOC because they are not required to do so, still buy other CPD products (for example CME) from other CPD vendors in order to satisfy State

medical licensure requirements and other professional commitments. This choice by "grandfathers" not to buy MOC demonstrates that: (1) there are other viable CPD products in competition with MOC available to radiologists from other vendors, (2) "grandfathers" know full well that MOC is an inferior CPD product for which ABR charges supra-competitive monopoly prices, otherwise they would purchase MOC, and (3) confirms Dr. Siva's assertion that but for their certifications being revoked, he and other radiologists would exercise the option of buying other CPD products more relevant to their practice from different CPD vendors.

313.   Dr. Siva and other radiologists differentiate between certification and MOC. They recognize the two products are purchased at different times and for different purposes.

314.   Radiologists pay ABR a one time fee for certification, then pay a separate MOC enrollment fee, and continue to pay MOC-related fees annually throughout their careers.

315.   Consistent with the fact that they are two separate products, certification and MOC have been identified as separate programs on ABR's Form 990s.

316.   The fact that ABR maintained a monopoly in the certification of radiologists for decades before it sold MOC, demonstrates MOC is a separate product and not essential to the success of ABR's certification product.

**b.** **ABR's Tying of Its Certification Product to Its MOC Product is Coercive.**

317.   ABR's requirement that Dr. Siva and other Class members purchase ABR's CPD product or have their certification revoked is coercive.

318.   ABR claims that MOC is "voluntary." But for the same reasons that certification is not "voluntary" neither is MOC due to radiologists being forced to buy MOC or have their certifications revoked.

319. Because hospitals and other medical organizations and insurance companies require radiologists to own a valid ABR certification, a successful career for radiologists is impossible without it. Neither certification nor MOC can be considered "voluntary."

320. Despite protestations that certification is "voluntary," ABR and the other Member Boards advocate strongly, including through ABMS, for hospitals and other medical organizations, insurance companies, and government programs to require certification.

321. Dr. Siva and other Class members have made substantial investments of time, money, and effort in ABR's certification product. This includes residency programs, certifications fees paid to ABR, time studying for certification examinations, time and expense of traveling to take the written and oral examinations, and the cost of study aids. Since buying their certifications, ABR has forced radiologists to increase their investments in its certification product by charging thousands of dollars in MOC-related fees, requiring radiologists to incur the substantial time and expense for the 10-year MOC examinations and the OLA tests, and satisfying other MOC requirements.

322. Given these substantial sunk costs in ABR's certification product, MOC cannot be considered "voluntary" since Plaintiff and other Class Members would not have bought MOC or purchased other CPD products from other vendors.

323. Learning from the voluntary CPD products that ABR and the other Member Boards were devising in the 1970s and 1980s, ABR well understood that its CPD product would never be successful on its own merits. The only way it could succeed was to force radiologists to buy MOC, and the only way to do that was to use its monopoly power in certifications as leverage. Radiologists who refused to buy MOC had their certifications invalidated, and along with it the ability to pursue a successful medical career.

324.    The failed voluntary CPD product also had a fraction of the sales of MOC, the new CPD product. The only reasonable explanation for this is that radiologists are forced to buy the new CPD product because ABR has illegally tied MOC to its certification product.

325.    ABR implemented the tie to coerce the purchase of its CPD product.

326.    Members of the medical community and medical journal articles confirm that neither certification nor MOC, on which certification depends, is "voluntary."

327.    Doctor surveys also confirm that neither certification nor MOC, on which certification depends, is "voluntary."

328.    ABR's certification and MOC products are not "voluntary" as ABR claims. They are an economic necessity without which a successful medical career is impossible.

329.    By tying its certification and MOC products together, ABR gains an unwarranted and unlawful competitive advantage for its own CPD product. Radiologists are forced to buy MOC, an inferior CPD product for which ABR charges supra-competitive monopoly prices, or have their certifications revoked. And sellers of other CPD products are at a competitive disadvantage because radiologists are disincentivized from buying their products given the substantial economic cost to radiologists of having their certifications taken away by ABR.

330.    But for their certifications being revoked, Dr. Siva and other Class members would not buy ABR's CPD product. Instead, they would exercise the option of buying different CPD products more relevant to their practice from other CPD vendors. ABR's illegal tying, however, makes it impossible or economically infeasible to do so.

c.     **ABR Has Sufficient Market Power in the
       <u>Tying Market to Restrain Free Competition.</u>**

331.    ABR has long been the monopoly supplier of certifications for radiologists. No other organization or entity provides meaningful competition to ABR in the certification market for radiologists.

332.    There are high barriers to entry in the certification market for radiologists, including technical, economic, organizational, and historical barriers, as demonstrated by the fact that no other organization or entity has ever sold certifications to radiologists in successful competition with ABR.

333.    Due to its monopoly position, ABR controls the certification market share in certifications for radiologists, and has sufficient economic power to restrain free competition in the CPD market.

d.     **<u>ABR's Illegal Tie Affects a Not-Insubstantial Amount of Interstate Commerce.</u>**

334.    ABR to date has realized approximately $90 million in MOC-related fees paid by Plaintiff and other Class members.

335.    Thus, ABR's illegal tie affects a not-insubstantial amount of interstate commerce.

e.     **<u>ABR Has Some Economic Interest in the Sales of MOC.</u>**

336.    That ABR to date has realized approximately $90 million in MOC-related fees paid by Plaintiff and other Class members also demonstrates ABR's economic interest in MOC.

<u>**Antitrust Injury**</u>

337.    ABR's illegal tie causes antitrust injury in numerous ways, including the following.

67

338.    The illegal tie forces radiologists to buy MOC, at substantial cost in money, time, and effort, or suffer the substantial economic consequences from having their certifications revoked.

339.    ABR's illegal tie allows ABR to charge supra-competitive monopoly prices for MOC.

340.    The illegal tie thwarts of competition in the CPD market.

341.    ABR's illegal tie effectively shuts out NBPAS, and upon information and belief others currently unknown, from substantial portions of the CPD market.

342.    The illegal tie results in diminishing the quality of CPD products and inhibits innovation in the contents and delivery of CPD products to radiologists.

343.    ABR's illegal tie excludes current and potential entrants into the CPD market.

344.    The illegal tie entrenches ABR's monopoly position in the market for certification of radiologists.

345.    ABR's illegal tie raises the cost of the practice of medicine for radiologists, restricts the supply of radiologists thereby harming competition, increases the cost of medical services to patients, creates or increases barriers to patient care, and inhibits entry to the market for radiologists' services.

**COUNT TWO**

**Alternative Rule of Reason Illegal Tying in Violation of Section 1 of the Sherman Act**

346.    Plaintiff incorporates by reference all of the above allegations.

347.    ABR's illegal tie of its certification product and its CPD product is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

348.    ABR's illegal tie has significant anti-competitive impact in the market for CPD products, including the following.

349.    By forcing radiologists to buy MOC, ABR's CPD product, or have their certifications revoked, ABR has coerced the abdication of radiologists' independent judgment concerning the merits of MOC and insulated MOC from the benefits and stresses of an openly competitive market for CPD products. As a result, the number and quality of CPD products constituting realistic alternatives to MOC has been diminished.

350.    ABR's illegal tie thwarts competition in the CPD market.

351.    The illegal tie limits radiologists' choices in the CPD market. ABR charges supra-competitive monopoly prices for MOC, thus raising the cost of the practice of medicine for radiologists and patients.

352.    The illegal tie prevents current and potential participants into the CPD market from competing with ABR on a level playing field.

353.    ABR's illegal tie raises the barriers for entry into the market for certification of radiologists, thereby enhancing ABR's control of the market for certification of radiologists.

354.    The illegal tie harms competition by diminishing innovation in the content and delivery of CPD products to radiologists.

355.    There are no cognizable pro-competitive benefits from the illegal tie that outweigh the anti-competitive harms alleged herein. In fact, there are no pro-competitive benefits from ABR's illegal tie.

356.    Because there is sufficient demand for certification without MOC, it is efficient for ABR to sell its certification product alone. Indeed, ABR has done so for many decades.

357. ABR's certification product and MOC do not operate more efficiently when tied by ABR than they would if separated. This is demonstrated by the fact that ABR was the monopoly supplier of certification for radiologists for decades before it began selling MOC.

358. ABR would still have a monopoly in the certification market without the illegal tie.

359. There will be no decrease in demand for certification without ABR's illegal tie.

360. There are no transactional efficiencies gained by the illegal tie. Radiologists could just as easily purchase CPD products from a different vendor, and many would choose to do so, but for their certifications being revoked.

361. The separate demand for certification and CPD products demonstrates the lack of cognizable pro-competitive efficiencies benefitting radiologists from ABR's illegal tie.

362. The illegal ties results in no production efficiencies. ABR's sale of its certification product does not make it more efficient at providing MOC.

363. ABR's illegal tie does not save production costs since certification and MOC have different purposes and are sold to radiologists at different times and at different stages in their careers.

364. The fact that ABR charges supra-competitive monopoly prices for MOC establishes that there are no economies of scale that benefit radiologists forced to buy MOC as a result of ABR's illegal tie.

365. The illegal tie does not improve the quality of ABR's MOC product which is an inferior product with no demonstrated causal connection to improved patient care or patient outcomes, or any other benefits of MOC claimed by ABR.

366. There is no evidence in the medical literature or elsewhere showing that the illegal tie protects ABR's reputation, either as a seller of certifications to candidates for entry to the specialized medical practice of radiology or in any other way.

## COUNT THREE

### Unjust Enrichment

367. Plaintiff incorporates by reference all of the above allegations.

368. Plaintiff and other Class members conferred a benefit on ABR in the form of the money and property ABR wrongfully obtained as a result of radiologists being forced to pay MOC-related fees, as described in detail above.

369. ABR wrongfully obtained MOC fees not as a result of any bargain, but by forcing Plaintiff and other Class members to purchase MOC or have their certifications terminated.

370. ABR has retained these benefits acquired from charging radiologists inappropriate, unreasonable, and unlawful MOC-related fees. ABR is aware of and appreciates these benefits.

371. ABR's conduct has caused it to be unjustly enriched at the expense of Plaintiff and other Class members. As such, it would be unjust to permit retention of these moneys by ABR under the circumstances of this case without the payment of restitution to Plaintiff and other Class members.

372. ABR should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against ABR as follows:

373. The Court determine that this action may be maintained as a Class Action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class.

374.    ABR's illegal conduct alleged herein be adjudged and decreed:

    a.    A *per se* violation of Section 1 of the Sherman Act;

    b.    Alternatively, an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

    c.    To constitute unjust enrichment.

375.    Plaintiff and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, including treble damages, and Defendant be required to disgorge the amounts by which it has been unjustly enriched.

376.    ABR, its affiliates, successors, transferees, assignees, Governors, Trustees, management, officers, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined from reporting certifications as invalid or "Lapsed" unless radiologists also buy ABR's MOC product; from revoking the certifications of radiologists who do not also buy MOC; and that ABR report, without any qualification, whether radiologists have purchased an ABR certification, regardless of whether they have also later bought MOC.

377.    Plaintiff and other Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

378.    Plaintiff and other Class members be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

379.    Plaintiff and other members of the Class be granted such other and further relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Date: January 24, 2020                                        Respectfully submitted,


                                        By:        /s/ C. Philip Curley
                                                 One of His Attorneys

                                                 C. Philip Curley
                                                 Cynthia H. Hyndman
                                                 Benjamin E. Schwab
                                                 ROBINSON CURLEY P.C.
                                                 300 South Wacker Drive, Suite 1700
                                                 Chicago, IL 60606
                                                 Tel: (312) 663-3100
                                                 Fax: (312) 663-0303
                                                 pcurley@robinsoncurley.com
                                                 chyndman@robinsoncurley.com
                                                 bschwab@robinsoncurley.com

                                                 Katrina Carroll
                                                 CARLSON LYNCH LLP
                                                 111 West Washington, Suite 1240
                                                 Chicago, IL 60602
                                                 Tel: (312) 750-1265
                                                 kcarroll@carlsonlynch.com

                                                 Michael J. Freed
                                                 Brian M. Hogan
                                                 FREED KANNER LONDON &
                                                 MILLEN LLC
                                                 2201 Waukegan Road, Suite 130
                                                 Bannockburn IL 60015
                                                 Tel: (224) 632-4500
                                                 mfreed@fklmlaw.com
                                                 bhogan@fklmlaw.com

Jonathan M. Jagher
FREED KANNER LONDON &
MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

*Attorneys for Plaintiff Sadhish K. Siva,
individually and on behalf of all
others similarly situated*

**<u>Certificate of Service</u>**

The undersigned attorney hereby certifies that on January 24, 2020, he caused

the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** to be filed with the Clerk

of the Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF

system, pursuant to which notification of such filings has been made to all counsel of record.


/s/ C. Philip Curley