## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EMILY ELIZABETH LAZAROU and
AAFAQUE AKHTER,
           Plaintiffs

       v.

AMERICAN BOARD OF PSYCHIATRY
and NEUROLOGY,
           Defendant

No. 19 CV 01614

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter filed this class action against the American Board of Psychiatry and Neurology ("ABPN"), alleging that ABPN's maintenance of certification ("MOC") program violates the Clayton Act and the Sherman Antitrust Act. 15 U.S.C. §§ 1, 15, 16. Plaintiffs also allege unjust enrichment under Illinois law. The initial complaint was dismissed with leave to amend pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 60. Plaintiffs have now filed a First Amended Complaint, R. 63, and ABPN again moves to dismiss. R 68. For the reasons set forth below, we grant the motion with leave to amend.

## BACKGROUND

Defendant ABPN is a nonprofit organization that certifies psychiatrists and neurologists across the United States. R. 63 ¶¶ 49–57. Although ABPN certification is not a requirement for licensure as a neurologist or psychiatrist in any state, many practitioners consider it to be a prerequisite to success in their careers. *Id.* ¶¶ 67–69. For example, many hospitals will not employ psychiatrists or neurologists who do not

have an ABPN certification. *Id.* ¶¶ 4, 70–85. Insurance companies will often refuse to reimburse expenses or provide malpractice coverage to practitioners who are not ABPN-certified. *Id.* ¶¶ 4, 86–96. ABPN certification can also lead to higher compensation for those who obtain it. *Id.* ¶¶ 4, 97–103. For these reasons, "a successful career for most psychiatrists and neurologists is impossible without ABPN certification." *Id.* ¶ 4.

ABPN enjoys a monopoly in psychiatric and neurological certification, as no meaningful competition for its certification products exists. *Id.* ¶ 385. When ABPN began selling certifications in 1935, certificate holders (or "diplomates") were not required to perform any additional tasks to remain certified after completing an initial examination. *Id.* ¶¶ 3, 163. In or around 2006, however, ABPN began to require that diplomates complete ABPN's maintenance of certification program, or "MOC," in order to preserve their certification. *Id.* ¶¶ 13–18, 65. ABPN's MOC program requires physicians to take a "secured, proctored, full-day, high stakes, closed-book examination" every ten years, as well as complete a specified number of continuing education credits and activities from an approved product list (in addition to those required to maintain state licensure). *Id.* ¶¶ 186–90. Under a "grandfather" rule, psychologists and neurologists certified prior to 1994 are not required to participate in MOC to maintain their licensure. *Id.* ¶¶ 17, 175. All other ABPN-

certified physicians and neurologists must comply with MOC or else have their certification revoked. *Id.* ¶ 10.

Plaintiffs are psychiatrists who obtained ABPN certifications after 1994 (and are therefore not subject to the grandfather rule). *See id.* ¶¶ 264, 271, 295, 298. Plaintiff Aafaque Akhter was licensed as a psychiatrist in 2005 and purchased initial ABPN certification that same year. *Id.* ¶¶ 298, 316. After a 2018 audit revealed that Akhter had not complied with MOC's continuing education requirements, ABPN listed Akhter as "not meeting MOC requirements" on its website. *Id.* ¶¶ 307–313. Plaintiff Emily Elizabeth Lazarou is also a trained psychiatrist and a member of the Florida Medical Association. In 2017, ABPN revoked Lazarou's certification after she failed to complete the ten-year MOC examination. *Id.* ¶ 269, 276. The following year, ABPN listed Lazarou as "not certified" on its website. *Id.* ¶ 277.

Plaintiffs brought this suit under the Sherman Antitrust Act (15 U.S.C. § 1 *et seq.*) and the Clayton Act (15 U.S.C. §§ 15, 26) on behalf of themselves and others similarly situated, seeking treble damages, and injunctive relief, as well as costs and attorneys' fees. *Id.* ¶ 25.[1] They allege that ABPN's MOC requirement constitutes an illegal restraint of trade in violation of Section 1 of the Sherman Act. *Id.* ¶ 405. Specifically, they assert that ABPN's practice of requiring psychiatrists and neurologists to complete MOC in order to preserve their certification constitutes an illegal "tying" agreement whereby ABPN improperly exercises its monopoly power in certification (the "tying product") to force consumers to buy MOC (the "tied" product).

---

[1] Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1337.

3

*Id.* ¶¶ 6, 19. According to Plaintiffs, MOC is a separate product that occupies a different product market than certification, namely, the product market for continuing professional development products, or "CPD." *Id.* ¶¶ 6–7. Plaintiffs also assert a claim for unjust enrichment under Illinois law. *See* R. 1. ¶¶ 425–430.[2]

Plaintiffs' initial complaint was dismissed with leave to amend due to failure to allege a separate product market for MOC apart from initial certification. R. 60. Plaintiffs filed a First Amended Complaint, R. 63, and ABPN moved to dismiss. R. 68. We now address the merits of that motion.

## LEGAL STANDARD

In evaluating ABPN's motion to dismiss under Rule 12(b)(6), we must construe the complaint in the light most favorable to Plaintiffs, accept as true all well-pleaded facts, and draw all possible inferences in their favor. *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1038 (7th Cir. 2021) (citing *Tamayo v. Blagojevich*, 526 F.ed 1074, 1081 (7th Cir. 2008)). The burden is on the movant to establish the complaint's insufficiency. *Gunn v. Cont'l Cas. Co.,* 968 F.3d 802, 806 (7th Cir. 2020). However, we need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). We may grant the motion if the complaint lacks sufficient facts "to 'state a claim to relief that is plausible on its face,'" in other words, to permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556, 570). It is

---

[2] Subject matter jurisdiction is proper pursuant to 28 U.S.C § 1367.

Plaintiffs' burden to allege facts "giving rise to a plausible inference that, after discovery [they] will be able to prove each element of [their] [] claim." *Siva v. Am. Bd. Radiology*, 38 F.4th 569, 575 (7th Cir. 2022). In antitrust cases like this one, "ensuring compliance with [the motion to dismiss] standard is particularly important . . . so as to avoid 'the potentially enormous expense of antitrust discovery in cases with no reasonably founded hope' of success." *Id.* (citing *Twombly*, 550 U.S. at 559).

## ANALYSIS

### I. PLAINTIFFS' SHERMAN ACT CLAIMS

#### A. Statute of Limitations

Before addressing whether Plaintiffs have plausibly alleged Sherman Act claims, we first consider ABPN's contention that these claims are barred by the applicable statute of limitations. *See* R. 69 at 12–13. Federal Rule of Civil Procedure 8(c) provides that statute of limitations is an affirmative defense. Fed. R. Civ. P 8(c). "[B]ecause complaints need not anticipate defenses," a statute of limitations defense is usually improper in the context of a Rule 12(b)(6) motion. *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). Nonetheless, a complaint may be barred based on statute of limitations if "it is clear the from the face of the [] complaint" that the claim "is hopelessly time-barred." *Cancer Found. Inc. v. Cerberus Cap. Mgmt. L.P.*, 559 F.3d 671, 675 (7th Cir. 2009).

A civil antitrust action is barred unless it is "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971). Plaintiffs filed this action on March 6, 2019, R. 1, so Plaintiffs' claims are barred if they accrued prior to March 6, 2015. "Generally, an

antitrust 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). ABPN characterizes the alleged injury as Plaintiffs' initial purchase of ABPN certification. On this theory, Plaintiffs' claims accrued during the mid-2000s, when "they were certified by ABPN, became subject to ABPN's MOC, and began paying MOC fees to ABPN." R.69 at 13. Plaintiffs allege that Akhter became certified in 2005 and Lazarou became certified in 2007. R. 63 ¶ 5. Because these dates are well outside of the limitations period, ABPN argues that Plaintiffs' claims are barred.

In response, Plaintiffs argue that their claims are timely due to the "continuing violations" doctrine. R. 75 19–21. Pursuant to this rule, "[t]he period of limitations for antitrust actions runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Meyers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004); *see also Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) ("[I]f a continuing violation extends into the statute period, the victim is entitled to complain about the whole violation, no matter how long ago it began.").

To satisfy the continuing violation doctrine, Plaintiffs need only allege "a discrete act with fresh adverse consequences." *Xechem*, 372 F.3d at 902. Such an act must be 'a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.'" *Gumwood*

*HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 8292207, at *9 (N.D. Ind. Mar. 18, 2016) (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)).

To show a continuing violation, Plaintiffs allege, among other things, that ABPN revoked Lazarou's certification in 2017 after she failed to take the 10-year MOC examination. R.63 ¶¶ 276–280. Similarly, Plaintiffs allege that ABPN listed Akhter as "not meeting MOC requirements" in 2018 after an audit revealed that his continuing professional development programs were not MOC-compliant. *Id.* ¶¶ 307–315. Plaintiffs also allege that they were harmed by these adverse actions. *Id.* ¶¶ 16, 150, 161–164, 214–217. At this preliminary stage, we find it plausible that ABPN's enforcement of the alleged tying agreement by altering Plaintiffs' certification status constitutes "a discrete act with fresh adverse consequences" warranting application of the continuing violations rule. *Xechem*, 372 F.3d at 902. Because ABPN's adverse actions took place within four years prior to filing their complaint, Plaintiffs' claims are therefore timely.

ABPN argues, nonetheless, that the continuing violations doctrine is inapplicable because ABPN's adjustment of Plaintiffs' certification was merely the "reaffirmation of a previous act,"—namely the provision in their initial certification agreement requiring ABPN-certified individuals to comply with MOC. R. 69 at 13. ABPN cites *Witt Co. v. RISO, Inc.*, a District of Oregon case that held that a defendant's enforcement of an alleged tying agreement was not a continuing violation because the challenged contract had been executed outside of the limitations period.

7

948 F. Supp. 2d 1227 (D. Or. 2013). The District Court found that the plaintiff's claims accrued on the date that the contract was signed rather than on the date that the defendant attempted to compel performance. *See id.* at 1236 ("[P]erformance of an alleged illegal contractual tie-in provision does not satisfy the continuing violation requirements."). The plaintiff's antitrust claims were therefore time-barred. *Id.*

*Witt Co.* is inapposite to the case at bar. In *Witt*, the plaintiff attached a declaration with the tying contract as an exhibit to its complaint. *See id.* at 1232. The parties did not contest the validity of this document. *Id.* It was therefore clear from the face of the complaint when the contract in question had been executed. Here, by contrast, it is unclear from the face of the First Amended Complaint exactly when Plaintiffs executed agreements with ABPN or made payments on account of the MOC program. Plaintiffs did not attach their contracts or payment history to the First Amended Complaint. ABPN's argument that its enforcement of the tie was merely the "reaffirmation" of specific contract provisions is therefore premature. Because untimeliness is not "clear the from the face of the complaint," we decline to dismiss Plaintiffs' Sherman Act claims based on statute of limitations. *Cancer Found. Inc.*, 559 F.3d at 675.

### B. Plaintiffs' Tying Claims

We next consider whether Plaintiffs' allegations are sufficient to state a claim under Rule 12(b)(6). Plaintiffs allege two counts under Section 1 of the Sherman Act: (1) *per se* illegal tying and (2) violation of the rule of reason. R.63 ¶¶ 332–403, 404–424. Because *per se* and rule of reason tying claims must satisfy common elements, we consider them together. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468

(7th Cir. 2020) ("The factual elements that must be proven for a tying claim capture much of what must be demonstrated in a rule of reason case").

Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1. "A tying arrangement" that violates Section 1 "is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Siva*, 38 F.4th at 573 (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)). "The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 n.31 (1984).

To successfully plead a tying claim, a plaintiff must allege four elements: (1) two separate products or services; (2) sufficient economic power in the tying product market to restrain free competition in the tied product market; (3) a substantial amount of interstate commerce affected by the tie; and (4) some economic interest in the sales of the tied product on the part of the defendant. *Siva* 38 F.4th at 574 (citing *Reifert v. S Cent. Wis. MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006)).

Plaintiffs allege that ABPN is using its monopoly power in the certification market to force consumers to purchase MOC, which it characterizes as an unrelated good in the continuing professional development or "CPD" market. R.63 ¶ 8. ABPN argues in response that this claim fails as a matter of law. R. 69 at 4. It asserts that

9

Plaintiffs have failed to demonstrate the first element of a tying claim because certification and MOC are not separate products. *Id.* at 5–9. Alternatively, it argues that Plaintiffs fail to allege actual force or coercion, unreasonable restraint of trade, or substantial market power. *Id.* at 10–12. We address these arguments in turn.

### 1. Separate Products

We begin by considering whether Plaintiffs have plausibly alleged that initial certification and MOC are separate products. We must "look through labels to substance," to make this determination, since "[a] savvy lawyer can describe any product as a tie of its components, and any tie as a single product." *Siva*, 38 F.4th at 572, 575. Products are considered separate for the purpose of a tying claim only where "there is a sufficient demand for the purchase" of the tied product separate from the tying product "to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]." *Jefferson Parrish*, 466 U.S. at 21–22. The question of whether a distinct product market for the tied product exists must be assessed at the "pre-contract stage," before the challenged agreement went into effect. *Viamedia*, 951 F.3d at 469. While various factors may be considered, "the mere fact that two items are complements, or that one is useless without the other does not make them a single product." *Siva*, 38 F.4th at 576 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001)) (cleaned up).

On this point, Plaintiffs allege that MOC is not a certification product but instead a "CPD" or continuing professional development product—part of a family of goods that includes "continuing medical education courses, symposia and curricula." R.63 ¶ 9. Plaintiffs further allege that the purpose of CPD products like MOC is to

promote "individual lifelong learning," not to assess the competency of new graduates and practitioners. *Id.* ¶ 11.

Plaintiffs' assertion that certification products and CPD products comprise two separate product markets is not controversial. *See Siva*, 38 F.4th 576–77. Indeed, ABPN concedes this fact. *See generally* R. 69, 79. But the parties dispute whether Plaintiffs have plausibly alleged that *MOC* is a CPD product. Although the First Amended Complaint analogizes MOC to a recertification product that ABPN sold in the 1980s, R. 63 ¶¶ 13, 141, 143, Plaintiffs do not allege that ABPN ever sold MOC separately from certification. *See generally id.*

As the Seventh Circuit recently recognized, merely stating that MOC competes in the CPD market "is not enough" at the pleading stage. *Siva*, 38 F.4th at 578. Plaintiffs "must plead facts making it plausible that MOC is a substitute for other CPD products." *Id.* This requires plausible allegations of "cross-price elasticity," i.e., that MOC and other CPD products would be "reasonably interchangeable in the minds of relevant consumers." *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

We conclude that Plaintiffs have failed to plausibly allege that MOC and other CPD products are reasonably interchangeable in the minds of psychiatrists and neurologists such that they are part of the same product market. *See Siva*, 38 F.4th at 579. At best, Plaintiffs allege that MOC places "sellers of other CPD products at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their

certifications revoked by ABPN." R.63 ¶ 19. Even accepting this allegation as true, it does not follow that MOC and CPD products are reasonably interchangeable or that consumers would perceive them as such. Instead, Plaintiffs' allegations link the value of MOC to ABPN certification—the very product that they contend MOC is distinguishable from. And appealing to a product's "substantial economic cost" is not enough because "at a high enough price even poor substitutes look good to the consumer." *3M v. Pribyl*, 259 F.3d 587, 603 (7th Cir. 2001) (quoting *Richard A. Posner, Antitrust Law: An Economic Perspective 128* (1976)).

Plaintiffs' allegations also ignore a critical distinction between MOC and other CPD products: while CPD products are often required for maintaining state licensure, *see* R. 63 ¶ 34; *see also Siva*, 38 F.4th at 579 (finding that the demand for CPD content "seems to be driven largely by state licensure requirements"), MOC is not. *Cf.* R. 63 ¶ 316 (alleging that CPD courses required to fulfill the state of Kentucky's licensure requirements do not appear on ABPN's "approved products list" for MOC). The First Amended Complaint does not allege that MOC would satisfy Plaintiffs' continuing education requirements for practicing as licensed psychiatrists in their respective states. *See generally id.* To the contrary, Plaintiffs object to MOC on the grounds that it is duplicative of state requirements. *Id.* ¶ 290 ("ABPN's MOC requirements are redundant of other obligations that Dr. Lazarou must already meet for State medical

licensure"); ¶ 321 ("Dr. Akhter views MOC as 'totally duplicative' of State licensure requirements.").

Because CPD products are required to maintain state licensure, but MOC is generally not, it is implausible that any physician or neurologist would view MOC as a substitute for CPD products. *See id.* 38 F.4th at 579–80. Plaintiffs underscore this point by insisting that MOC is of no value whatsoever. *See* R.63 ¶ 291 ("Dr. Lazarou considers MOC a 'waste of time' that does not make her a better or more effective psychiatrist"), ¶ 320 ("In Dr. Akhter's opinion, MOC is a waste of time, is 'make work' and does not foster lifelong learning."). These allegations "confirm" the "conclusion that no [psychiatrist or neurologist] shopping for CPD products would voluntarily purchase MOC if given the option." *Siva*, 38 F.4th at 580. "If MOC is truly useless as a CPD product . . . then forcing [psychiatrists and neurologists] to buy it poses no threat to competition in the CPD market." *Id.* Rather than a legitimate substitute for CPD offerings, the allegations in the First Amended Complaint support the conclusion that MOC's value is tied to initial certification.

*Siva v. American Board of Radiology* is instructive. 38 F.4th 569. There, the Seventh Circuit affirmed the dismissal of nearly identical tying claims based on allegations that the American Board of Radiology's MOC program violated the Sherman Act. *Id.* at 579–81. The plaintiffs alleged, as here, that the MOC was a CPD product and therefore distinguishable from certification. *Id.* at 574. The District Court rejected this analogy and dismissed the case, concluding that initial certification and MOC were the same product. *Id.* at 575. The Seventh Circuit

13

affirmed, finding that the plaintiffs had failed to plausibly allege cross-price elasticity between MOC and other CPD products. *Id.* at 580.

Among the facts that the Seventh Circuit found to be significant was that the MOC program required radiologists to purchase continuing educational products from other providers. *See id.* at 57–80. "No radiologist looking to fulfill his state [continuing education] obligations . . . would do so by purchasing MOC, because MOC simply imposes a redundant obligation that he purchase those credits elsewhere." *Id.* at 580. The Seventh Circuit also found that other aspects of the program, such as the practice improvement projects and examinations, also made it implausible that MOC competed with other CPD products. *Id.* ("[The] complaint gives us no reason to think that radiologists would view these tests and activities as viable CPD products in their own right.").

Here, too, ABPN's MOC program requires that participants "complet[e] a required number of [continuing education] credits" from an "approved products list." R. 63 ¶¶ 186–88. The First Amended Complaint contains no allegation that purchasing MOC alone would satisfy state licensure requirements. Nor is there any allegation that ABPN has any financial interest in the items that appear on the "approved products list." *See Siva*, 38 F.4th at 579 ("[T]here is no indication . . . that the Board itself actually produces, offers, or otherwise has a financial stake in any accredited [continuing education] products."). While Plaintiffs allege that their preferred CPD products do not appear on the approved products list, *see, e.g.*, R. 63 ¶ 319, this does not make it plausible that MOC is a substitute for those separate

14

products. Plaintiffs' allegations also fall short of explaining how MOC's other components (like the practice improvement projects and examinations discussed in *Siva*) constitute viable CPD products in their own right.

In sum, Plaintiffs' argument that certification and MOC are separate products rests entirely on the allegation that MOC is part of the CPD product market rather than the certification product market. But Plaintiffs fail to plausibly allege that consumers would willingly substitute MOC for other CPD products. Absent plausible allegations of this kind, the assertion that MOC is part of the CPD product market collapses. We therefore conclude, as have other federal courts that have considered this issue, that Plaintiffs have failed to allege that MOC and certification are separate products. *Siva*, 38 F.4th at 581 (affirming *Siva v. Am. Bd. of Radiology*, 512 F. Supp. 3d 864 (N.D. Ill. 2021)); *accord Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530 (E.D. Pa. 2019), *aff'd*, 847 F. App'x 137 (3d Cir. 2021).

Plaintiffs raise several additional arguments in opposition which we now briefly address. First, Plaintiffs argue that consumers differentiate between MOC and initial certification. *See* R. 75 at 8–10. But to support this argument, they appeal to the fact that there is a separate demand for CPD and certification products. *See id.* at 8. This argument cannot withstand scrutiny in light of the Seventh Circuit's holding in *Siva*. The fact that there is a separate demand for CPD products apart

from initial certification does not make it plausible that MOC is a CPD product. *See Siva*, 38 F.4th at 580 ("The products are not substitutes.").

Next, citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992), Plaintiffs point to the fact that initial certifications and MOC are sold separately as evidence of product differentiation. *Eastman Kodak Co.* involved allegations that Kodak used its monopoly power in the market for replacement parts for micrographic and copying machines to force consumers to purchase its repair services. *See id.* The challenged policy involved selling replacement parts only to buyers of Kodak equipment who used Kodak's repair services or repaired their own machines. *Id.*

We agree with the Third Circuit that there are important differences between the "services" and "replacement parts" product categories at issue in *Eastman Kodak Co.* and the MOC and initial certification product categories at issue here. *See Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 143 (3d Cir. 2021) (unpublished). Unlike initial certification and MOC, services and replacement parts can be purchased wholly independently of each other. For example, a consumer might need repair services without needing to purchase replacement parts (and vice versa). By contrast, MOC and initial certification "are earned and reflect a physician's initial training and his or her staying current with knowledge and practice in his or her discipline." *Id.* (quotation marks omitted). Plaintiffs' own allegations describe MOC as a product that one obtains only after acquiring an initial certification. *See* R. 63 ¶¶ 106, 355. Because MOC and initial certification measure similar professional

competencies at different points in an individual's career, it is not plausible that one would voluntarily purchase MOC without first having obtained initial certification.[3] For this reason, the mere fact that initial certification and MOC are purchased in separate transactions years apart does not entail that they are separate products. *Kenney*, 847 F. App'x at 143.

Third, Plaintiffs appeal to certain statements in ABPN's bylaws, organizational structure, and publications that appear to classify certification and MOC as separate products. R. 75 at 11–12. ABPN's own classifications, however, are not dispositive. *See Siva*, 38 F.4th at 572. We must "look through labels to substance" in assessing whether Plaintiffs have plausibly alleged that two products are separate. *Id.* As explained in the previous dismissal order, the relevant inquiry is not the "seller's purpose" but rather consumer demand. R. 60 at 12. Plaintiffs resist this conclusion, arguing that the Seventh Circuit's *Viamedia* opinion compels that we look at "how the seller views the product." R. 75 at 12. But Plaintiffs do not explain how *Viamedia* (which was considered extensively by the court in the first dismissal order), compels this conclusion. *Viamedia* was a summary judgment case where the plaintiff presented evidence that the defendant had sold the tied product separately from the tying product in distinct geographic markets. *See generally* 951 F.3d 429. It is of

---

[3] Although Plaintiffs allege that certain "grandfathers" who were certified prior to 1994 and are not subject to the maintenance of certification requirement purchase MOC voluntarily, R. 63 ¶ 17, they do not allege that any licensed psychiatrists who are *not* ABPN-certified voluntarily purchase MOC. *See generally id.* Moreover, Plaintiffs' allegations indicate that fewer than 1.3% of the certified psychiatrists and neurologists who were not required to purchase MOC to maintain their certification chose to do so. *Id.* ¶¶ 179, 366.

limited relevance in determining whether Plaintiffs have alleged separate products to survive a motion to dismiss.

Citing *Jefferson Parish*, Plaintiffs also assert that MOC and certification are separate products because they are billed and accounted for separately. R. 75 at 12–13. Although allegations of separate billing are indicative of separate products, they are not dispositive. *See, e.g.*, *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991). In contrast to the anesthesiology services at issue in *Jefferson Parish* that were "bundled" with unrelated healthcare products and sold contemporaneously, Plaintiffs' allegations indicate that initial certification is generally purchased prior to MOC and the transactions often occur years apart. *See, e.g.*, R. 63 ¶ 106 ("MOC [is] sold to doctors after their residency training and specialist qualifications have already been completed"), ¶ 355 ("While certification is an 'early career event' that candidates buy to enter the specialized medical practices of psychiatry or neurology, MOC is purchased by older, more experienced physicians after residency and certification"). Because Plaintiffs allege that initial certification and MOC are usually purchased at different points in time, the fact that they are separately billed does not compel the conclusion that they are separate products.

Finally, in supplemental briefing, Plaintiffs attempt to distinguish this case from *Siva* by identifying certain allegations in the First Amended Complaint that were not present in that case. R. 85 at 7–8. For example, Plaintiffs point to a statement made by ABPN's parent organization that MOC is intended to "eliminate the need for [] intervention" of outside CPD providers and allege that ABPN "seek[s]

18

no less than to make MOC a proxy for State medical licensure." R. 63 ¶¶ 149, 172,

174. Again, allegations concerning ABPN's purposes with respect to MOC are not

relevant to whether consumers plausibly view MOC and CPD as reasonably

interchangeable. *See* R. 60 at 12. Likewise, allegations that ABPN-certified

physicians and neurologists would prefer to spend money on CPD products alone, *see,

e.g.*, R. 63 ¶ 9, does not make it plausible that MOC is foreclosing competition in the

CPD market. *See Jefferson Parish*, 466 U.S. at 16 ("[W]hen a purchaser is 'forced' to

buy a product he would not have otherwise bought even from another seller in the

tied product market, there can be no adverse impact on competition because no

portion of the market which would otherwise have been available to other sellers has

been foreclosed"). In sum, Plaintiffs have failed to identify any allegations in the First

Amended Complaint that meaningfully distinguish their case from *Siva*. Because

Plaintiffs have failed to plausibly allege that MOC and certification are separate

products, their tying claims fail.

### 2. Forced Purchase

Because the First Amended Complaint lacks plausible allegations of product

separation, we need not address whether Plaintiffs have adequately alleged the other

elements of a tying claim. We note, however, that the First Amended Complaint has

not cured another defect that was previously identified with Plaintiffs' initial

complaint: the absence of plausible allegations of a "forced purchase" forbidden by

antitrust law. *See* R. 60; *see also Jefferson Parish*, 466 U.S. at 21 n.31 ("The common

core of . . . unlawful tying arrangements is the forced purchase of a second distinct commodity").

As stated in the prior dismissal order, to state a claim for tying a plaintiff must allege that the offending firm sells the tying product "only on the condition that the buyer also purchases a different (or tied) product." *Viamedia*, 951 F.3d at 468 (quoting *Northern Pacific*, 356 U.S. at 5–6); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) ("In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from . . . the seller."); *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 669 (7th Cir. 1985) ("[T]he substantive theory of tying law depends on coercion to take two products as a package").

Even if Plaintiffs had plausibly alleged that certification and MOC are separate products, the First Amended Complaint indicates that Plaintiffs are free to purchase initial certification from ABPN without ever buying MOC. R. 63 ¶ 348 ("[P]sychiatrists and neurologists may purchase ABPN's certification product without buying MOC"). Plaintiffs allege that ABPN-certified psychiatrists and neurologists are compelled to purchase MOC because of the adverse economic consequences that would result from a revocation of their certification. *Id.* ¶¶ 97–103. But, as noted in the prior dismissal order, these consequences are imposed by third parties (like hospitals and insurance companies) and not ABPN itself. *See* R. 60 at 13. "'[W]hen a trade association" like ABPN "provides information . . . but does not constrain others to follow its recommendations, it does not violate the antitrust laws.'" *Lawline v. Am.*

*Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992) (quoting *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989)); *United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 906 (N.D. Ill. 2019) ("If the certifying entity lacks the power to prevent (or has not prevented) the professional from practicing without a certification, there has been no antitrust violation.").

Plaintiffs do not allege that ABPN has the power to prevent them from practicing psychiatry or to constrain hospitals and insurance companies to follow its recommendations. *See generally* R. 63; *Dental Specialties*, 390 F. Supp at 906. Stated differently, even if Plaintiffs were able to plausibly allege that initial certification and MOC are separate products, the First Amended Complaint does not plausibly allege that ABPN's MOC requirement constitutes a "forced purchase" forbidden by antitrust law. For this reason as well, Plaintiffs' tying claims fail.

## II. PLAINTIFFS' UNJUST ENRICHMENT CLAIM

Next, we consider Plaintiffs' unjust enrichment claim. The parties agree that this claim is governed by Illinois law. *See, e.g.*, R. 69, 75. Having dismissed Plaintiffs' antitrust claims, there are no federal claims remaining in this action. "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Because all of Plaintiffs' federal claims have been dismissed, we decline to exercise supplemental jurisdiction over Plaintiffs' unjust enrichment claim. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the

district court has dismissed all claims over which it has original jurisdiction."). Plaintiffs' unjust enrichment claim is therefore dismissed.

### III. LEAVE TO AMEND

Finally, Plaintiffs request 30 days to amend their complaint. R.85 9–10. Federal Rule of Civil Procedure 15 provides that "a party may amend its pleading once as a matter of course," otherwise they must have consent from the opposing party or leave from the court. Fed. R. Civ. P. 15(b). Leave to amend shall be freely given absent undue delay or prejudice to the opposing party. *Id.* However, we may grant dismissal with prejudice if an amendment would be futile. *Villars v. Kubiatowski*, 128 F. Supp. 3d 1039, 1043 (N.D. Ill. 2015) (citing *Moore v. Indiana*, 999 F.2d 1125, 1128 (7th Cir. 1993)).

Because Plaintiffs have already filed an amended complaint, they do not have the ability to amend as of right. Nonetheless, we find that it is appropriate to give Plaintiffs one last chance to replead their claims. ABPN does not argue that granting leave to amend would be futile or would cause undue delay or prejudice. Moreover, Plaintiffs have represented that they may add additional allegations that are consistent with the Seventh Circuit's decision in *Siva*. Based on these

representations, we find it appropriate to give Plaintiffs one final opportunity to amend their complaint.

## CONCLUSION

Defendant ABPN's motion to dismiss, R. 68, is granted. Plaintiff's First Amended Complaint, R. 63, is dismissed without prejudice. Plaintiffs may file an amended complaint by November 3, 2023.

Date: <u>10/4/2023</u>

JEREMY C. DANIEL
United States District Judge

23