**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EMILY ELIZABETH LAZAROU** | ) | |
| **and AAFAQUE AKHTER, individually and** | ) | |
| **on behalf of all others similarly situated** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-cv-01614** |
| | ) | |
| **AMERICAN BOARD OF PSYCHIATRY** | ) | **Honorable Jeremy C. Daniel** |
| **AND NEUROLOGY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
200 North LaSalle Street, Suite 1550
Chicago, Illinois 60601
Tel. (312) 663-3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** ............................................................................................... 1

**JURISDICTION AND VENUE** ........................................................................ 3

**PARTIES** ............................................................................................................ 4

**BACKGROUND** ................................................................................................ 4

**THE CERTIFICATION PRODUCT MARKET** ........................................... 7

    ABPN Certifications Are An "Early Career" And "One-Time" Event ...................... 9

    Doctors Are At A Significant Disadvantage Without Certifications .......................... 10

    ABPN Certifications Are An Economic Necessity ................................................... 14

**THE CME PRODUCT MARKET** .................................................................. 15

**ABPN'S CME MOC PRODUCT** ................................................................... 17

    ABPN's CME MOC Product Is Mandatory ............................................................ 22

    States Accept MOC In Place Of Other CME Products For Licensure ...................... 22

    ABPN "Grandfathers" Thousands Of Psychiatrists And Neurologists ...................... 24

    There Is No Evidence That MOC Improves Patient Care Or Physician
    Competence ............................................................................................................. 26

    ABPN Has Reaped Tens Of Millions Of Dollars In MOC Fees From Its
    Illegal Tie ................................................................................................................ 28

**PLAINTIFFS' INDIVIDUAL ALLEGATIONS** ........................................... 29

    Emily Elizabeth Lazarou, MD ................................................................................ 29

    Aafaque Akhter, MD ............................................................................................... 32

**CLASS ACTION ALLEGATIONS** ................................................................ 34

**COUNT ONE - *Per se* Illegal Tying In Violation Of Section 1 Of The Sherman Act** ........... 35

    ABPN's Certification And CME MOC Products Are Separate And Distinct ............. 36

i

MOC Is Interchangeable With Other Products In The CME Market ......................... 37

ABPN's Tying Of Certification And MOC Is Coercive .............................................. 39

ABPN's Monopoly Power In The Tying Market Restrains Free Competition ........... 40

ABPN's Illegal Tie Affects A Not-Insubstantial Amount Of Interstate Commerce.... 40

ABPN Has an Economic Interest In The Sales Of MOC ........................................... 41

Antitrust Injury........................................................................................................... 41

**COUNT TWO - Alternative Rule Of Reason Illegal Tying In Violation Of Section 1
Of The Sherman Act** ................................................................................................ 42

**COUNT THREE - Unjust Enrichment** .................................................................. 45

**PRAYER FOR RELIEF** .......................................................................................... 45

**JURY TRIAL DEMANDED** .................................................................................... 47

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter ("Plaintiffs"), for their Second Amended Class Action Complaint against Defendant American Board of Psychiatry and Neurology ("ABPN" or "Defendant"), allege as follows:

## INTRODUCTION

1. Emily Elizabeth Lazarou ("Dr. Lazarou") and Aafaque Akhter ("Dr. Akhter") are medical doctors and psychiatrists. Psychiatrists assess, diagnose, and treat the mental and physical aspects of psychological problems and mental, emotional, and behavioral disorders through psychotherapy and the prescription of medical treatments and medications.

2. Defendant ABPN sells certification products in psychiatry and neurology to new residency graduates. A neurologist diagnoses, treats, and manages disorders of the brain and nervous system including Alzheimer's disease, epilepsy, Parkinson's disease, concussions, migraines, and strokes.

3. There is a relevant nationwide antitrust market for certifications for psychiatrists and neurologists. ABPN has long been the monopoly supplier of certifications for psychiatrists and neurologists, and holds significant market power in the certification product market. There are no other providers of certifications in that product market, and no substitutes for ABPN certifications.

4. Certifications are an economic necessity for the practice of psychology and neurology, and doctors without certifications are at a major economic and career disadvantage.

5. There is also a relevant nationwide antitrust market for continuing medical education (CME) products for psychiatrists and neurologists. The American Medical Association (AMA) defines a CME product as "consisting of educational activities which serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships that a

1

physician uses to provide services to patients, the public or the profession." Participants in the CME product market include medical education companies, professional medical societies, medical schools, hospitals, clinics, physician groups, health systems, and state, regional, and local medical associations.

6. ABPN, separately from certifications, sells its own CME product to psychiatrists and neurologists that ABPN calls maintenance of certification, or MOC.

7. ABPN, parroting the AMA definition, describes its own CME MOC product as promoting "lifelong learning through continuing medical education and other educational programs, and some assessment of practice-based performance." MOC is a substitute for, and interchangeable with, other CME products within that product market.

8. ABPN has referred to its CME product by different names over the years. For consistency and ease of reference, Plaintiffs use the term MOC herein to refer to ABPN's CME product.

9. Over time, the AMA, ABPN, and others have sometimes referred to CME products as continuing professional development (CME) products, using the terms interchangeably. For consistency and ease of reference, Plaintiffs use the terms CME and CME product herein to refer to continuing medical education products.

10. ABPN illegally ties the sale of its certification product and its CME product. The tying product is ABPN's certification product. The tied product is ABPN's CME MOC product. ABPN uses its market power in the certification product market to extend that market power to the distinct CME product market.

11.     ABPN forces psychiatrists and neurologists to buy its CME product by revoking the certifications of those who do not buy MOC, thus leveraging doctors' need for certifications to unfairly compete in the CME product market.

12.     Plaintiffs bring this Class Action on behalf of all psychiatrists and neurologists who purchased ABPN certifications after October 1, 1994, and have been forced by ABPN to buy its CME MOC product or have their certifications revoked.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees arising from ABPN's violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

14.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

15.     ABPN sells its certification and CME MOC products in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABPN's certification and MOC products are sold in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABPN's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury therein by, among other things, tying its certification and CME MOC products, forcing Plaintiffs and other physicians to purchase MOC, and charging supra-competitive monopoly prices for MOC.

16.     ABPN is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABPN is found in and transacts business herein.

3

17.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because ABPN resides in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred herein.

## PARTIES

18.     Plaintiff Emily Elizabeth Lazarou, MD ("Dr. Lazarou") is a graduate of the University of Texas Medical School. She completed her residency in general adult psychiatry in 2006 at USF Health at University of South Florida in Tampa, Florida, where she also served as Chief Resident of Psychiatry and in 2007 completed a fellowship in forensic psychiatry. She has been a practicing psychiatrist since 2008. Dr. Lazarou is a resident of Florida.

19.     Plaintiff Aafaque Akhter, MD ("Dr. Akhter") finished medical school at Patna Medical College in Bihar, India, and received his diploma in psychological medicine from the Royal College of Surgeons in Ireland. He has also passed the MRCPsych (I) examination conducted by the Royal College of Psychiatrists, London, United Kingdom. Dr. Akhter completed his residency in general adult psychiatry in 2002 at Harvard Medical School. Dr. Akhter has been a practicing psychiatrist since 2003 and is a resident of New York.

20.     Defendant ABPN is incorporated under the laws of the State of Delaware with its principal place of business at 7 Parkway North, Deerfield, Illinois. It files with the Internal Revenue Service as a Section 501(c)(6) "business league" and as such its purpose is to promote the common interests of those physicians over whom it has authority, rather than to benefit the public

## BACKGROUND

21.     ABPN is a medical specialty board. Medical specialty boards ensure adequate postgraduate medical education and training in their areas of specialty and sell certifications in

those areas of specialty to doctors who successfully complete certification examinations.

22.     Dr. John A. Benson, the first President of the American Board of Internal Medicine (ABIM), the largest medical specialty board with authority today over approximately 20 percent of all doctors in the United States, confirmed in a 1991 article in the *Annals of Internal Medicine* that specialty boards were organized, "for the purpose of providing a means by which scholarly consultants in internal medicine could voluntarily distinguish themselves [from other specialists] and be so identified. Such specialization needed definition. Another reason for establishing the Board was to standardize the variable quality and length of residencies at that time."

23.     In June of 1933, the then-existing medical specialty boards formed the Advisory Board for Medical Specialties, now known as the American Board of Medical Specialties (ABMS). The purpose of ABMS, identical to that of its constituent medical specialty boards, is described in a 2006 article in *Emergency Medicine Clinics of North America* as "[t]o stimulate improvement in postgraduate medical education."

24.     ABMS is an umbrella organization comprised of twenty-four medical specialty boards ("ABMS Member Boards") that sell certifications in approximately forty specialties and ninety subspecialties. All ABMS Member Boards sell a CME MOC product. Like ABPN, each ABMS Member Board revokes the certifications of doctors who do not buy MOC.

25.     The ABMS Member Boards, including ABPN, have authority over approximately 900,000 doctors nationwide, approximately 90 percent of all doctors in the United States.

26.     ABMS is governed by a 35-person Board of Directors, including one Director each from ABPN and the other Member Boards; six Public Members; the ABMS Chair, Chair-Elect, Immediate Past Chair, and Secretary-Treasurer; and the ABMS President and CEO. ABPN and the Member Boards control ABMS. ABMS bylaws state that its policies are "established

collectively by the Member Boards." As such, ABMS policies, practices, and procedures are the policies, practices, and procedures of ABPN and the other Member Boards. When ABMS and its management and employees act, they do so on behalf of ABPN and the other Member Boards.

27.     There are twelve committees of the ABMS Board of Directors, including the Committee on Certification and the separate Committee on Continuing Certification. The Committee on Certification is tasked with overseeing policies and procedures related to certification. The Committee on Continuing Certification, on the other hand, is responsible for overseeing MOC. This separation of oversight roles between the two committees reflects the separateness of certifications and MOC.

28.     CME products like MOC promote life-long learning for doctors after residency and certification. The goal of MOC and other CME products is to enhance physician quality and patient care after completion of a doctor's formal medical education and throughout the doctor's career.

29.     Many different types of vendors in addition to ABPN sell CME products to psychiatrists and neurologists, including medical education companies, professional medical societies, medical schools, hospitals, clinics, physician groups, health systems, and state, regional, and local medical associations. None of these other vendors of CME products have ever sold certifications to psychiatrists and neurologists.

30.     The Accreditation Council for Continuing Medical Education (ACCME) accredits CME vendors and activities. ACCME describes itself as being "responsible for setting standards to ensure that CME is effective, relevant, responsive to the changing healthcare environment, independent, free from commercial bias, and designed to promote healthcare improvement."

31.     ABMS was a founding organization of ACCME and has been a Member Organization since that time. According to ACCME, it collaborates with ABMS Member Boards, including "to facilitate the integration of CME and MOC."

32.     ACCME has no role in ABPN's sales of certifications to psychiatrists and neurologists.

33.     A license to practice medicine in the United States is granted by the medical boards of the individual States. Doctors must be licensed in order to practice medicine lawfully.

34.     Virtually all States require doctors to purchase a certain number of CME hours to remain licensed.

35.     Importantly, as discussed more fully below, most States accept MOC as satisfying CME licensure requirements in whole or in part, and doctors use MOC as a substitute for other CME products for licensure purposes.

### THE CERTIFICATION PRODUCT MARKET

36.     Certifications are sold to candidates for admission into the specialized medical practice of the particular ABMS Member Board selling the certifications, here ABPN and the specialties of psychiatry and neurology.

37.     There is a relevant nationwide antitrust market for certifications for psychiatrists and neurologists. ABPN sells its certifications nationwide, and psychiatrists and neurologists nationwide purchase ABPN certifications.

38.     ABPN has long been the monopoly supplier of certifications for psychiatrists and neurologists, and holds significant market power in the certification product market. There are no other providers of certifications in that product market, and no substitutes for ABPN certifications.

39.     ABPN was formed in 1934 and began selling its certification products in 1935. ABPN currently sells certifications in Psychiatry, Neurology, and "Neurology with Special Qualification in Child Neurology." These are referred to as primary certifications. ABPN also sells separate certifications in at least the following fifteen subspecialties: addiction psychiatry, brain injury medicine, child and adolescent psychiatry, clinical neurophysiology, consultation-liaison psychiatry (formerly psychosomatic medicine), epilepsy, forensic psychiatry, geriatric psychiatry, hospice and palliative medicine, neurocritical care, neurodevelopmental disabilities, neuromuscular medicine, pain medicine, sleep medicine, and vascular neurology.

40.     To purchase an ABPN certification a candidate must pass an ABPN uniform, standardized one-time evaluation of the candidate's postgraduate medical education and residency training. For reasons detailed below, almost all psychiatrists and neurologists buy certifications. Those who do not may include researchers, teachers and academics, and others without a clinical practice. Doctors holding ABPN certificates are referred to as "diplomates."

41.     ABPN became an ABMS Member Board in 1935, the same year it sold its first certification, and has been an ABMS Member Board continuously since that time.

42.     In the banner that appears at the top of every page on its website, ABPN describes itself as "A Member Board of the American Board of Medical Specialties (ABMS)." ABPN also lists the ABMS website among its "Affiliate Websites," and includes active links on its Mission and History page to the ABMS website describing ABPN's membership in ABMS, demonstrating the common interests of ABPN, ABMS, and the other ABMS Member Boards, especially with regard to their certification and CME MOC products. It also confirms that ABMS and the other Member Boards speak for ABPN, and *vice versa*, about the purpose and goals of certification and their CME MOC products.

43.     ABPN has a Board of Directors with an Executive Committee and other committees. As of September 23, 2020, the Board of Directors was comprised of 18 members who, in total, owned 38 ABPN certifications, including 17 subspecialty certifications. Of those, ten certifications are "grandfathered" and as detailed below cannot be revoked for failure to purchase MOC.

44.     ABPN does not make its bylaws available to the public, but has disclosed some information about its Board of Directors on its website. ABPN Directors are selected by the Board itself, are self-replacing, and choose their own successors.

### ABPN Certifications Are An "Early Career" And "One-Time" Event

45.     Certification is described as an "early career event" on the ABMS website.

46.     The former President and CEO of ABMS in a 2006 medical journal article explained that certification is "used to assess the knowledge and, when possible, the relevant clinical skill" of candidates for "entry" into the specialized medical practice of the particular Member Board. He described certification as "a one-time, snapshot assessment."

47.     Similarly, the former President and CEO of a Member Board wrote in the October 2016 issue of the *Mayo Clinic Proceedings* that the intent of certification is to assure that the candidate "has successfully completed an approved educational program and evaluation process" and that certifications "are issued after physicians successfully complete accredited training, pass a secure written examination, and for some member boards pass an oral examination."

48.     As another author put it in a 2013 medical journal article, "BC [board certification] originated as a means to establish national outcome criteria for excellence in residency training programs."

49.     After the formation of ABMS, certifications were referred to as "ABMS board certification." Over time, however, certifications became known simply as "board certification" or "certification."

50.     The ABPN website sets forth a uniform, standardized set of requirements for the purchase of certifications by candidates for entry into the fields of psychiatry and neurology, providing in full:

> "1.     Be a graduate of an accredited medical school in the United States or Canada or of an international medical school listed by the World Health Organization.
>
> 2.     Have an active, full, unrestricted medical license as defined in the separate Board Policies. Applicants are required to update their active, full, unrestricted medical licenses in their ABPN Physician Portal account.
>
> 3.     Have completed the required number of clinical skills evaluations per specialty.
>
> 4.     Have satisfactorily completed the Board's specific training requirements, as  described in each specialty training selection.
>
> 5.     Submit a completed official online application including all required information and the appropriate examination fees by the specified deadlines. Applicants are required to apply online through their ABPN Physician Portal account at www.abpn.org/physicianportal."

51.     That certification assesses postgraduate medical education and residency training is further confirmed by ABPN's requirement that candidates buy certifications within a limited period of time after completion of their residency programs.

### Doctors Are At A Significant Disadvantage Without Certifications

52.     While certification may be called "voluntary" by ABPN, the opposite is true. Doctors face significant economic and career disadvantages without certifications.

53.     Beginning with the growth of hospital-based care, managed care networks, and the extension of insurance coverage to most Americans in the latter half of the 20th century, the

number of psychiatrists, neurologists, and other doctors buying certifications increased due to its use as a proxy for hospital privileges, participation in managed care networks, and coverage by health insurance plans. Medical specialization became the norm and by the early 1970s seventy or eighty percent of doctors described themselves as specialists.

54.     In 1998, Rosemary A. Stevens, Ph. D., a medical historian, referred to specialization as "*the* fundamental theme for the organization of medicine in the twentieth century." (Emphasis in original). This is even more true today.

55.     Persuasive of the fact that ABPN certification is not "voluntary" is that in order to pursue a successful career in medicine, most psychiatrists and neurologists find it necessary to purchase ABPN certifications.

56.     Almost all hospitals, health systems, practice groups, medical corporations, and other medical organizations incorporate the requirement of certification into privileging and employment decisions. The American Hospital Association encourages hospitals to use certification as a factor in making privileging decisions

57.     Most hospitals and other medical organizations are governed by bylaws or similar rules. Those bylaws or rules typically require that affiliated doctors be certified by an ABMS Member Board such as ABPN in order to hold hospital privileges and/or to be employed, and to enjoy other benefits necessary to the pursuit of a successful medical career.

58.     Many such bylaws and rules requiring certification pre-date MOC. Thus, the certification requirement meant historically that doctors were only required to document successful completion of their postgraduate medical education and residency training. MOC did not yet exist and psychiatrists and neurologists were not required to buy MOC or have their certifications revoked by ABPN.

11

59.     The Accreditation Council for Graduate Medical Education (ACGME) identifies as one of its goals, "to educate physicians who seek and achieve board certification." There are approximately 140,500 active full-time and part-time residents today, each of whom is charged by ACGME to "seek and achieve board certification."

60.     As part of maintaining ACGME accreditation, each residency program is required to undergo an annual evaluation. The evaluation committee is mandated by ACGME to consider Board pass rates and certification rates of residents over a rolling 7-year period. The number of ACGME accredited residency programs has increased by almost a third between 2009 and 2019, reflecting the reality that certification is becoming increasingly essential for new doctors.

61.     ABMS Member Boards contributed to the development of the ACGME accreditation system. The American Medical Association and other medical organizations also recommend residency, and hence certification, for new doctors.

62.     ABMS is a founding member of ACGME and remains a Member Organization today. ACGME, in turn, is an Associate Member of ABMS. When ACGME was founded in 1981, certification was a "one-time, snapshot assessment" of a candidate's postgraduate medical education and residency training. MOC did not yet exist and psychiatrists and neurologists were not required to buy MOC or have their certifications revoked by ABPN.

63.     ACGME has a history of working with the Member Boards, including through ABMS, to promote certification of doctors.

64.     The requirement of certification by hospitals is especially significant as today hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. This is magnified in highly concentrated hospital markets, *i.e.*, those

markets with fewer and typically larger hospitals. Approximately 77 percent of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

65.     Because most hospitals, health systems, practice groups, medical corporations, and other medical organizations require psychiatrists and neurologists to be certified to obtain hospital privileges and/or employment, doctors without certifications are at a significant disadvantage.

66.     Other aspects of an economically successful medical career are also linked to the certification requirement of hospitals and other medical organizations. For example, doctors who are unable to obtain hospital privileges because they do not purchase certifications do not qualify for coverage under the hospital's malpractice policy and must purchase more expensive insurance with less advantageous terms elsewhere.

67.     Most medical care in the United States is paid for through either commercial or government health insurance plans that pair health insurance coverage and a cost-sharing structure, provider network, and service area.

68.     Health insurance companies require certification for doctors to be included in networks and health insurance plans. For example, Blue Cross Blue Shield Companies (BCBS) require that psychiatrists and neurologists be ABPN-certified. Nationwide approximately 96 percent of hospitals and 92 percent of physicians are in-network with BCBS.

69.     Hospitals and other medical organizations faced with loss of coverage by health insurance plans require certification for this additional reason. Patients whose physicians are not ABPN-certified must either pay the cost of treatment themselves, or pay a higher "out of network" coinsurance rate to the financial detriment of both the patient, who must pay higher out-of-pocket costs, and the physician, who has a substantially smaller patient base due to the inability to offer insurance coverage.

13

70.    Because insurance companies require physicians, including psychiatrists and neurologists, to be certified for inclusion in their networks and health insurance plans, doctors are at a significant disadvantage without them.

### ABPN Certifications Are An Economic Necessity

71.    Certification has other practical ramifications. These include higher compensation, lower malpractice insurance rates, and election to membership in professional societies that can be pivotal to advancement both professionally and academically.

72.    Because hospitals and other medical organizations and insurance companies require psychiatrists and neurologists to be certified, and for the other reasons described above, a successful medical career for most psychiatrists and neurologists is impossible without ABPN certification. Despite protestations that certification is voluntary, ABPN and other ABMS Member Boards advocate strongly, including through ABMS, for hospitals and other medical organizations, insurance companies, and government programs to require certification.

73.    As long ago as 1991, Dr. Benson wrote in the *Annals of Internal Medicine* that certification "is no longer an option for the physician entering the marketplace." A later ABIM President and CEO agreed, writing in a medical journal article in 2008 that "many physicians really feel that board certification is not optional," specifically noting its "significant impact in the marketplace." Other medical industry sources confirm that certification is necessary to the pursuit of a successful medical career.

74.    Similarly, a 2019 article about certification and MOC published in *Arthritis Care & Research*, the peer-reviewed official journal of the American College of Rheumatology and the Association of Rheumatology Professionals, concluded in no uncertain terms: "Board certification, which started as a voluntary achievement and remains so in theory has become involuntary in

14

practice, making participation in MOC programs mandatory for many if not most physicians in order to maintain employment and clinical privileges, or receive reimbursement."

## THE CME PRODUCT MARKET

75. There is a relevant nationwide antitrust market for continuing medical education products. ABPN and other CME vendors sell their CME products nationwide, and psychiatrists and neurologists nationwide purchase CME products.

76. CME products, including MOC, promote individual, self-directed lifelong learning and the development of both medical and non-medical competencies after residency, including professionalism; interpersonal, managerial and communication skills; value-based delivery and cost reduction; clinical knowledge and skills; patient experience; practice improvement; diversity and inclusion; interprofessional practice; doctor wellness and burnout; patient safety; working in teams; and health care disparities and population health.

77. As the name itself confirms, CME products are sold to doctors after their residency training and specialist qualifications have already been completed. While certification measures postgraduate medical education and residency training, CME products address the many other ongoing and lifelong competencies required to practice medicine throughout a doctor's career.

78. There are at least two professional associations devoted to CME products: the Society for Academic Continuing Medical Education founded in 1976, and the Alliance for Continuing Education in the Health Professions. *The Journal of Continuing Education in the Health Professions*, established in 1980, consolidates scholarship and best practices in continuing professional development in the medical industry.

79. CME products originated and have developed separately from the sale of certifications. According to an article describing the history of CME, "the genesis of CME

15

in the United States is largely the result of efforts of the Mayo brothers," who created a Surgeons Club, which "partook in vigorous daily discourse regarding new techniques being advanced." This evolved into the "Clinical Week" in 1927, which was described as the "prototype of the modern CME course." In 1934, the American Urological Association started what has been described as the first "CME program."

80.     The American Medical Association has implemented a credit system for the purchase of CME products, recognizing a doctor's participation in continuing medical education activities and creating two discrete categories of continuing medical education credits, CME Category 1 and CME Category 2.

81.     Doctors earn CME Category 1 credits by purchasing products from CME vendors accredited by the ACCME or ACCME-recognized State or local medical societies.

82.     Doctors also earn CME Category 1 credits by completing other educational activities and applying to the AMA for "direct credit." The educational activities for which doctors can earn CME Category 1 credits include purchasing MOC from ABPN and other ABMS Member Boards.

83.     Almost all States require doctors to purchase a certain number of CME Category 1 credits to maintain their licenses. For example, Illinois requires doctors to purchase 60 hours of CME Category 1 credits every three years.

84.     Doctors earn CME Category 2 credits by, among other things, purchasing CME self-assessment products. Many States, in addition to CME Category 1 requirements, allow doctors to apply CME Category 2 credits toward licensing requirements. For example, New Jersey requires 100 CME hours every two years, 60 of which can be CME Category 2 credits.

16

## ABPN'S CME MOC PRODUCT

85.     In the 1970s, ABPN and other ABMS Member Boards began selling CME products called "recertifications." These CME products were voluntary. In other words, certifications of those who did not buy "recertifications" were **not** revoked.

86.     One ABMS Member Board confirmed in its *Newsletter* that this CME product was voluntary, and that doctors who did not purchase it would not have their certifications "withdrawn, rescinded, or revoked." The ABMS Member Boards who sold "recertification" CME products did so as standalone products separate from certifications.

87.     In or about 1974, one ABMS Member Board offered a voluntary CME product for sale, calling it a "Continuous Professional Development Program." Again, certifications of doctors who did not buy the voluntary CME product were not revoked.

88.     Only 3,355 doctors bought this voluntary CME product when it was first sold; 2,240 doctors bought it when it was offered again in 1977; just 1,947 doctors bought it when it was offered for a third time in 1980; and only 1,403 doctors purchased it when it was offered the final time in 1986, fewer than 4 percent of the doctors who had previously bought certifications.

89.     This limited and declining interest, reflected in the almost 60 percent drop in doctors purchasing the voluntary CME product over the twelve years it was offered, demonstrates the doctors' preference in purchasing other CME products from other CME vendors. The ABMS Member Board abandoned its voluntary CCME product in or around 1986, but continued thereafter selling its separate certification product.

90.     ABPN sold its own voluntary CME product from 1974 until it abandoned the product in or about 1985. The failure foreshadowed that its successor MOC would also be unable to compete on its own merits, and could only be successful if it was mandatory and tied to

certifications. ABPN sold its voluntary CME product as a standalone product and continued to sell its certification product separately both during and after this time.

91.     In or around 1998, ABMS Member Boards, including ABPN, began developing a new CME product, which later became known as maintenance of certification, or MOC. Unlike the previous voluntary CME products, however, MOC is mandatory. In other words, doctors who do not buy MOC have their certifications revoked.

92.     ABPN explained in the Spring 2001 *ABPN Update,* that MOC promotes "commitment to lifelong learning through continuing medical education and other educational programs, and some assessment of practice-based performance." ABPN explained MOC further in its Spring 2002 newsletter *ABPN Diplomate*, as a reaction to a concern that "many players" had entered "the arena of assessment," that ABPN "will continue to be challenged from the outside," and that MOC would "eliminate the need for such [outside] intervention." The ABPN 2011 Annual Report describes MOC as reflecting a "commitment to lifelong learning" further confirming that MOC is a CME product. And today, the ABMS CertificationMatters.org website describes MOC as "ongoing learning and assessment" and "lifelong learning and self-assessment."

93.     The former President and CEO of ABMS wrote in a medical journal article in 2005 that MOC "is a much broader program in scope, in depth, and in range" than certification and "is an overall comprehensive evaluation of practice involving multiple areas." He wrote in another medical journal article a year later that MOC was intended to focus on each individual doctor's "self-directed learning."

94.     As explained by ABPN, the purpose of MOC, like other CME products, is to promote individual "involvement in lifelong learning." This is in contrast to ABPN certifications

that are a uniform, standardized one-time evaluation of postgraduate medical education and residency training.

95.     According to a medical journal article written by three ABMS employees in 2016, "underlying the creation" of MOC was its emphasis, unlike certification, on "performance in preference to knowledge," with its "focus on improvement rather than on elimination of candidates" for entry into a specialized practice of medicine.

96.     MOC is a CME product and is no different than other CME products that promote lifelong learning, except MOC is mandatory as ABPN revokes the certifications of those psychiatrists and neurologists who do not buy MOC.

97.     ABPN sells its CME MOC product only to psychiatrists and neurologists who have already purchased ABPN certifications. ABPN refuses to sell MOC to others who may want to purchase it to earn CME Category 1 credits or for other educational purposes.

98.     By 2006, ABPN had fully implemented its own mandatory CME MOC product, requiring psychiatrists and neurologists to purchase MOC or have their certifications revoked. Learning from the previously-abandoned voluntary MOC product, ABPN well understood that its new CME MOC product would never be successful on its own merits. The only way it could succeed was to force physicians to buy MOC, and the only way to force physicians to buy MOC was to use certifications as leverage. Psychiatrists and neurologists who refused to buy MOC had their certifications revoked, and along with it the ability to pursue a successful medical career.

99.      Over the years, ABPN has used different names for its CME MOC product and changed its structure. ABPN currently requires doctors to pay a $175 annual MOC fee or forfeit their certifications.

19

100.    MOC requires completion of certain "Activity Requirements" every three years, consisting of a total of 90 CME credits, including 66 CME Category 1 credits, 24 CME self-assessment credits, and one Improvement in Medical Practice (PIP) activity. Each of these types of "Activity Requirements" has been offered by other CME vendors for decades, without any tie to certifications.

101.    As part of MOC, doctors must also complete an "Assessment" requirement by either: (1) successfully participating in an "Article-Based Pathway" assessment developed and administered by ABPN, described as "a set of article exams" every three years; or (2) passing a Recertification Examination every ten years.

102.    The "Article-Based Pathway" requires doctors to correctly answer four out of five questions directly associated with a medical journal or other article selected by ABPN. The doctor must pass 30 article exams every three years, and may take up to 40 exams during that time. Doctors who do not successfully complete the "Article-Based Pathway" must take the ten-year Recertification Examination.

103.    The Recertification Examination is a secured, proctored, full-day, high stakes, closed book examination developed and administered by ABPN.

104.    As a result of its monopoly power in the certification market and forcing psychiatrists and neurologists to buy MOC or have their certifications revoked, ABPN is able to charge a supra-competitive monopoly price for its CME MOC product by adding the $175 annual fee to the amounts already paid by doctors for the underlying CME products included in the "Activity Requirements." ABPN requires doctors to pay the $175 annual fee to it rather than to other CME vendors for other CME products.

105.    ABPN waives 16 of the 24 CME self-assessment credits required to meet the "Activity Requirements" for doctors who successfully complete the "Article-Based Pathway." For doctors who take the Recertification Examination, eight CME self-assessment credits are waived. As a result of these waived credits, doctors pay ABPN for its CME MOC product in place of purchasing other CME self-assessment products from other CME vendors.

106.    Only after passing the certification examination and buying ABPN's certification can psychiatrists and neurologists buy MOC.

107.    MOC serves no function in evaluating postgraduate medical education and residency training, and therefore cannot be a component of certifications.

108.    No CME vendor other than ABPN sells certification products to psychiatrists or neurologists.

109.    ABPN is the only CME vendor that also sells certification products to psychiatrists and neurologists.

110.    Since at least 2013, ABPN has reported MOC revenue as a separate program revenue category on its Forms 990.

111.    ABPN has always charged psychiatrists and neurologists separately for its certification and CME MOC products.

112.    The mission and objectives of ABPN are described on its website and in its annually published General Information and Board Policies. ABPN has consistently referred to certification and MOC as two separate products in these documents.

113.    ABPN states its mission as establishing "standards and requirements for initial *and* continuing certification [MOC]," to "develop and provide . . . procedures for certification *and* maintenance of certification," and to develop "testing methods to evaluate [the pre-certification]

candidate *and* [post-certification] diplomate competencies." (Emphasis added.) The objective of MOC, described as "[e]ncouraging and assessing diplomate involvement in lifelong learning," is a discrete part of ABPN's self-described mission, separate and apart from certification. The distinction of objectives and purposes reflects the separate references to, nature of, and distinction between certifications and MOC as recognized by ABPN.

## ABPN's CME MOC Product Is Mandatory

114.     ABPN concedes on its website that its CME MOC product is mandatory and required to maintain certifications.

115.     ABPN's 2014 Annual Report likewise confirmed that, "To remain certified, [physicians] must fulfill all . . . MOC requirements."

116.     Psychiatrists and neurologists who do not buy MOC are identified by ABPN on its website as "Not Certified."

117.     But for their certifications being revoked, psychiatrists and neurologists would buy CME products other than MOC from different CME providers, including CME products that are less expensive and more meaningful and relevant to their practice. ABPN's illegal tying, however, makes it impossible or economically infeasible to do so.

## States Accept MOC In Place Of Other CME Products For Licensure.

118.     Virtually all States require doctors to purchase a certain number of CME hours to remain licensed, including CME Category 1 credits and CME Category 2 credits. Doctors use MOC as a substitute for other CME products for licensure. As stated in a New England Journal of Medicine article, "MOC used as CME" is a "viable way" to "pick up bonus points" for a doctor's "licensure."

22

119. For example, some States accept a doctor's buying MOC in lieu of compliance with CME requirements for licensure altogether. Examples include Idaho, Minnesota, Oregon, New Hampshire, and West Virginia.

120. Many other States require a specified number of CME Category 1 credits. Examples include Washington and Massachusetts. As detailed above, doctors can earn CME Category 1 credits by buying MOC and then apply those credits toward State CME Category 1 requirements.

121. In other States, passing a MOC examination is a substitute for some or all of the State's CME credit requirements. Examples include California, Kentucky, and Michigan.

122. The foregoing are just some examples of States that recognize MOC is a commercial substitute for other CME products. Unsurprisingly then, MOC is viewed by psychiatrists and neurologists as reasonably interchangeable with those other CME products. That States accept MOC for licensure shows that others also recognize MOC is reasonably interchangeable with other CME products.

123. In addition, the Interstate Medical Licensure Compact offers an expedited pathway to licensure for doctors who practice in multiple States, allowing physicians licensed in one State to obtain licensure in other States by submitting a short application form and paying a fee to the Compact and the applicable State license fees. The States involved must each be a member of the Compact.

124. Doctors licensed in States that accept MOC in lieu of compliance with CME requirements, can utilize the Compact to practice medicine in other States that have joined the Compact regardless of what those other States' CME requirements might be. To date, 35 States have joined the Compact, including most of the States mentioned in the preceding paragraphs. Legislation to join the Compact is pending in eight other States.

**ABPN "Grandfathers" Thousands Of Psychiatrists And Neurologists**

125.　Psychiatrists and neurologists who purchased certifications before October 1, 1994, are not required by ABPN to purchase MOC. In other words, unlike younger psychiatrists and neurologists who completed residency training much more recently, certifications of "grandfathers" are not revoked if they do not buy MOC.

126.　This begs the question why, if MOC is about maintaining standards as ABPN asserts, "grandfathers" are excused from the requirement to buy MOC. As the head of the largest ABMS Member Board has admitted, "Grandfathering is a really vexing challenge. It's difficult to defend … ."

127.　Thousands of psychiatrists and neurologists are grandfathered by ABPN and reported as "Certified" even though they do not buy MOC. Even "grandfathers" who voluntarily purchase MOC but fail to meet its requirements are reported by ABPN as "Certified."

128.　Thus, ABPN holds "grandfathers" to a different standard, despite the fact they are many more years removed from their postgraduate medical education and residency training than younger physicians who are forced to purchase MOC. "Grandfathering" discriminates against younger doctors, including women and persons of color, who are under-represented in the group of psychiatrists and neurologists "grandfathered" by ABPN.

129.　"Grandfathers" demonstrate the separate demand for certifications and MOC and that they are separate products.

130.　"Grandfathered" psychiatrists and neurologists who are not forced to buy MOC overwhelmingly choose not to do so. ABPN Annual Reports reveal that between 2011 and 2014 "grandfathers" represented fewer than 1.3% of the psychiatrists and neurologists who bought MOC despite "grandfathers" representing as much as 22 percent of doctors with ABPN certifications.

24

ABPN stopped publicly reporting the number of "grandfathers" who voluntarily bought MOC in 2015.

131.    "Grandfathers" who do not purchase MOC satisfy State medical licensure requirements by purchasing other CME products from other CME vendors, reaffirming that a demand for CME products, including MOC, exists separate from certifications.

132.    "Grandfathers" do not buy MOC because they know it is a separate product unrelated to certification. In other words, as consumers, "grandfathers" would buy MOC if they considered certifications and MOC a single product. The fact that so few "grandfathers" buy MOC is also a strong indication they consider it an inferior CME product for which ABPN charges supra-competitive monopoly prices.

133.    The authors of a study published in 2019 in the *Journal of Roentgenology* concluded: "If radiologists believed that MOC's benefits exceeded its costs, one would hypothesize high participation rates, even among those whose participation is not mandated by [the American Board of Radiology]." The hypothesis, however, did not prove out, as only a very small percentage of those "whose participation is not mandated" (*i.e.*, "grandfathers") bought MOC.

134.    "Grandfathered" ABPN Directors for many years did not buy MOC and did not have their certifications revoked. This hypocrisy became so embarrassing that ABPN now requires these "grandfathers" to buy MOC for public relations purposes.

135.    Depending on the primary certification, up to 22 percent of psychiatrists and neurologists are "grandfathered" by ABPN.

**There Is No Evidence That MOC Improves Patient Care Or Physician Competence**

136.     Even though doctors have been forced to buy MOC for twenty years or more by ABPN and other ABMS Member Boards, no causal relationship has ever been established between MOC and any beneficial impact on doctors, patients, or the public. ABPN itself has conceded there is "[i]nadequate evidence" of the validity of MOC.

137.     While ABPN touts the benefits of MOC, as one author concluded in a 2019 article in the *American Journal of Medicine*, "there is a paucity of high-quality data" supporting the "assertion that maintenance of certification [MOC] improves quality of care."

138.     One study analyzed the clinical outcomes for 213 patients treated by 71 doctors required to purchase MOC, and a second group of 34 "grandfathered" doctors in four Veterans Affairs ("VA") hospitals. The authors found no significant differences in any of the ten different outcome measures for patients treated by doctors required to buy MOC. They concluded: "To whatever extent a goal of MOC is to improve the quality of patient care, this study raises a question of whether that goal is being achieved, at least among internists at these VA hospitals."

139.     A 2018 article in the medical journal *Anesthesiology* from the Department of Anesthesiology, Virginia Commonwealth University School of Medicine, titled "Has MOC Gone Amok," criticized a study examining the relationship between MOC and a lower likelihood of adverse state licensure actions. It noted MOC has "been imposed without any evidence that confirms [its] value to doctors or patients," and that none of the study's findings "indicate that [MOC] in anesthesiology *per se* has value as a strategy to improve patient care."

140.     In a recent ABMS survey, only 12 percent of doctors responded that they valued MOC. The online survey was taken by 34,616 physicians, 1,373 non-physician providers and stakeholders working in health care, and 403 members of the general public.

26

141. The Mayo Clinic conducted a survey in 2016 published in the *Mayo Clinic Proceedings*. In response to the query whether "MOC is worth the time and effort required of me," only 14.9 percent of physicians answered "yes." Even fewer, only 9.1 percent of those surveyed, felt that patients cared about their MOC status. More than 80 percent agreed that "MOC is a burden to me." The Mayo Clinic authors observed that "evidence is presently lacking about how current formal programs of *maintenance* of certification contribute to lifelong learning beyond what physicians would spontaneously do (*e.g.*, learning while caring for patients) … ." (Emphasis in original). A total of 998 doctors participated in the survey.

142. In a survey of 515 rheumatologists published in *Arthritis Care & Research*, 75 percent agreed there was no "significant value in MOC, beyond what is already achieved from continuing medical education" and 63.5 percent of rheumatologists did not believe MOC was valuable in terms of improving patient care. Another 88.5 percent believed MOC imposes a financial burden without proven benefits to patients, and 75 percent said MOC took time away from patient care

143. The prestigious *New England Journal of Medicine* surveyed physicians in 2010 about whether "grandfathers" should voluntarily buy MOC. Almost two-thirds (63 percent) responded against voluntarily purchasing MOC. A total of 2,512 doctors participated. A *JAMA* article in 2015 reported that more than 22,000 doctors signed an online petition to end a Member Board's MOC requirement.

144. The not-for-profit organization Practicing Physicians of America conducted an online survey in early 2018. When asked about physician burnout, 95 percent responded MOC contributed significantly or very significantly to physician burnout; and another 90 percent responded MOC was not voluntary. A total of 7,007 doctors responded to the survey.

27

**ABPN Has Reaped Tens Of Millions Of Dollars In MOC Fees From Its Illegal Tie**

145.    According to its Forms 990, ABPN reported net assets of $12,610,227 before the launch of MOC in 2004. In other words, it took ABPN almost seventy years to generate net assets of $12,610,227 from selling certifications. In the twenty years since ABPN began forcing doctors to buy MOC, its net assets have skyrocketed 1,344 percent to $169,554,844 in 2022, including more than $140,000,000 in holdings in cash, savings, and securities at year-end 2022. Most of the over $155,000,000 increase in net assets is attributable to MOC fees charged to psychiatrists and doctors.

146.    According to ABPN Forms 990, MOC revenue increased exponentially from $761,650 in 2013 to $9,580,374 in 2022 (the only years ABPN has publicly disclosed MOC data separately), or approximately 1,257 percent. In stark contrast, ABPN certification revenue was mostly stagnant during this time.

147.    These data demonstrate that MOC has been an increasingly lucrative and important  revenue source for ABPN. This is not surprising. New residency graduates pay certification fees. They are compensated at a fraction of what more experienced doctors earn and are also burdened with substantial debt payments. There is only so much in fees that can be extracted from new residency graduates as they launch their medical careers. MOC, on the other hand, is forced by ABPN on established psychiatrists and neurologists who have the financial wherewithal to pay inflated MOC fees. This is confirmed by the fact that MOC revenue has increased at a much faster rate than certification revenue, and, based on the latest publicly available data, is more than a third of ABPN program revenue.

148.    MOC has facilitated, among other things, overly generous compensation to Dr. Faulkner, who was hired by ABPN in 2006 as Executive Vice President, its then most senior

28

staff position. In 2007, Dr. Faulkner was paid total compensation of $500,726. He took the newly-created title of ABPN President and CEO in 2009. His compensation peaked in 2017 at $2,872,861, including a bonus of $1,884,920. His total compensation in 2022 was $1,177,986. Dr. Faulkner retired from ABPN effective December 31, 2022.

149.    Psychiatrists made a median salary of $250,814 in 2023. Neurologists made a median salary of $281,800 in 2023.

150.    Compensation of other ABPN key employees has also increased since the advent of MOC. Total compensation for ABPN key employees in 2007 was $1,614,708. By 2022, it had ballooned to $4,707,236, a nearly 292% increase.

151.    MOC fees have also allowed ABPN to make lavish pension plan accruals and contributions, which between 2008 and 2018 averaged 9.0 percent. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5 percent, half of ABPN's contributions.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### Emily Elizabeth Lazarou, MD

152.    Dr. Lazarou began practicing as a psychiatrist in 2008 as Associate Medical Director for Behavioral Health at Health Integrated in Tampa, Florida.

153.    Dr. Lazarou served as Medical Director of Health Integrated until January 2019.

154.    In addition, Dr. Lazarou has since 2008 maintained a private psychiatry practice dedicated to providing comprehensive individualized psychiatric medical care, including psychotherapy and medication management.

155.    Dr. Lazarou also practices telepsychiatry. In general, telepsychiatry is the delivery of psychiatric assessment and care via telecommunications technology such as teleconferencing.

Access to proper psychiatric care, especially in rural and economically underdeveloped areas, is one of the biggest challenges of the American health care system. Telepsychiatry provides patient-centered, affordable, and effective interventions for individuals needing psychiatric care and decreases the cost by providing a more affordable framework for delivering psychiatric services, including making quality mental health care available in any clinic with an internet connection.

156.    Dr. Lazarou also maintains a practice in forensic psychiatry. A forensic psychiatrist examines aspects of human behavior related to the legal process. As a forensic psychiatrist, Dr. Lazarou consults with both plaintiff and defense counsel in the civil arena, including in the areas of medical malpractice, worker's compensation, psychiatric disability determination, sexual harassment, and testamentary capacity. She consults in the criminal arena with counsel for both the prosecution and defense, including competency, sanity, and prediction of dangerousness. Dr. Lazarou's areas of expertise include PTSD, battered spouse syndrome, personality disorders, and malingering. Forensic psychiatric engagements typically involve formulating expert opinions and providing expert testimony related to those opinions.

157.    Dr. Lazarou is active in the medical community and is a member of the Florida Medical Association and the American Academy of Psychiatry and the Law. She is licensed to practice medicine in Florida, Texas, Mississippi, and Illinois.

158.    Dr. Lazarou bought an ABPN certification in psychiatry in 2007. She understood the certification to be an evaluation of her postgraduate medical education and residency training, including the quality of her residency program in psychiatry. She is not "grandfathered" because her certification was bought after October 1, 1994.

159.    Dr. Lazarou believes ABPN automatically enrolled her in MOC after she bought her certification. She paid the MOC fees required by ABPN and began meeting the MOC

30

requirements. Dr. Lazarou would have bought CME products other than MOC from different CME vendors, but bought MOC so as not to have her certification revoked by ABPN.

160.     Dr. Lazarou gave birth to her second set of twins in December 2017. Because she was breast-feeding and pumping milk for 45 minutes every three hours, she asked for a private room for her then-required ten-year MOC examination. Dr. Lazarou was told in an email from ABPN that "[t]he board does not make accommodations for nursing mothers who need to pump during an exam."

161.     ABPN did, however, "as a professional courtesy" treat the request "as a comfort aid," which nonetheless would have required Dr. Lazarou to travel several hours back and forth to a different test center with private rooms, requiring her to be away from her newborn twins and unable to provide them breast milk.

162.     Under those circumstances, Dr. Lazarou was unable to take the MOC examination. As a consequence, ABPN revoked her certification and has since reported her as "Not Certified."

163.     Similarly, in 2018, ABPN began reporting Dr. Lazarou as "Not Certified" in her forensic psychiatry subspecialty, even though that certification remained valid through December 31, 2019.

164.     An ABPN representative told Dr. Lazarou that because her psychiatry certification was not valid, she could no longer be reported as certified in forensic psychiatry, even though her forensic psychiatry certificate was valid through December 31, 2019.

165.     Because ABPN reports Dr. Lazarou as "Not Certified," she is no longer able to practice telepsychiatry, with a resulting loss of income and to the detriment of patients in need of telepsychiatric care.

166.    Dr. Lazarou's opportunities for forensic psychiatry assignments have also been reduced because ABPN reports her as "Not Certified."

167.    Dr. Lazarou has sought other employment opportunities. A recruiter told Dr. Lazarou she is ineligible for many job opportunities, despite her extensive qualifications, because ABPN reports her as "Not Certified."

168.    In addition to her payment of MOC fees and related expenses, Dr. Lazarou has made a substantial investment of time, money, and effort in obtaining her ABPN certifications. This includes her residency program, fellowship program, certification fees paid to ABPN, time studying for the certification examination, the time and expense of traveling to take the written and oral examinations, and the cost of study aids.

169.    Dr. Lazarou took steps to reinstate her unlawfully revoked certification in 2020, including paying MOC fees and examination costs of $2,375. Though Dr. Lazarou ultimately decided as a matter of principle not to pursue reinstatement and did not take the examination, ABPN has not refunded her fees and examination costs.

**Aafaque Akhter, MD**

170.    Plaintiff Aafaque Akhter completed his residency at Harvard Medical School and was the founder and Medical Director of Norton Health Care, where he practiced addiction psychiatry.

171.    Dr. Akhter was among the first physicians to prescribe Suboxone as a drug dependency treatment modality. Suboxone has become the leading medication used to treat opioid addiction. Suboxone is associated with increased sobriety, reduced painkiller abuse, and mitigates withdrawal symptoms.

172.     Dr. Akhter is active in the medical and psychiatric communities. He is a member of the American Medical Association, American Psychiatric Association, American Society of Addiction Medicine, the Massachusetts Medical Society, and the Massachusetts Psychiatric Society. His work with these communities and organizations helps keep Dr. Akhter current on the latest trends in medicine. He is licensed to practice medicine in Connecticut, Florida, Hawaii, Massachusetts, and New York.

173.     Dr. Akhter bought an ABPN certification in psychiatry in 2005. He is not "grandfathered" because he bought his certification after October 1, 1994.

174.     Dr. Akhter was automatically enrolled in MOC by ABPN after he purchased his certification. Dr. Akhter would buy CME products other than MOC from different CME vendors, but buys MOC so as not to have his certification revoked by ABPN. Dr. Akhter has met all MOC requirements, including the payments of all MOC fees, and is reported as "Certified" on ABPN's website.

175.     Even before his participation in MOC, Dr. Akhter had already made a substantial investment of time, money, and effort in obtaining the ABPN certification product. This includes his medical and residency training, certification fees paid to ABPN, time studying for the certification examination, time and expense of traveling to written and oral examinations, and the cost of study aids.

176.     Dr. Akhter took the ten-year MOC examination in 2014. This included significant payments to ABPN, purchase of study aids, travel to the examination, and hiring another physician to cover his work while taking the examination. Dr. Akhter invested significant time and effort to prepare for the examination, which detracted from time with patients and family.

177.     After passing the ten-year MOC examination Dr. Akhter applied for "direct credit" from the AMA for CME Category 1 credits and was given 60 additional hours of Category 1 credits over and above the credits he had already earned from his purchases of CME as part of his MOC "Activity Requirements." Dr. Akhter used these additional credits to meet State licensure requirements instead of buying different CME products from other CME vendors.

## CLASS ACTION ALLEGATIONS

178.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All psychiatrists and neurologists who purchased ABPN certifications after October 1, 1994, and have been forced by ABPN to buy its CME MOC product or have their certifications revoked. Specifically excluded from this Class are ABPN Directors; officers and employees of ABPN or of any entity in which ABPN has a controlling interest; and any affiliate, legal representative, or assign of ABPN. Also excluded from this Class are any judicial officers presiding over this action and members of their immediate families, judicial staff, and any juror assigned to this action.

179.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 physicians.

180.     Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABPN is engaging in illegal tying; (2) whether the unlawful conduct of ABPN causes injury to the business or property of Plaintiffs and other Class Members; (3) whether ABPN is unjustly enriched as a result of the conduct alleged herein; (4) the appropriate injunctive and related equitable relief; and (5) the appropriate class-wide measure of damages.

181.    Plaintiffs' claims are typical of the claims of other Class Members. Plaintiffs and other Class Members are similarly affected by ABPN's wrongful conduct in that they were forced to buy ABPN's CME MOC product or have their certifications revoked. Plaintiffs' interests are coincident with and not antagonistic, or in conflict with, the interests of other Class Members. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other Class Members. Plaintiffs will fairly and adequately protect the interests of other Class Members.

182.    Plaintiffs have retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

183.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable or cost-effective to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

184.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

**COUNT ONE**
***Per se* Illegal Tying In Violation Of Section 1 Of The Sherman Act**

185.    Plaintiffs incorporate by reference all of the above allegations.

186.    ABPN ties its certification product (the tying product) and its CME MOC product (the tied product). ABPN forces physicians to buy its CME product by leveraging its market power in certifications and revoking the certifications of psychiatrist and neurologists who do not buy MOC.

187.    ABPN's illegal tie of its certification product and its CME MOC product is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### ABPN's Certification And CME MOC Products Are Separate And Distinct

188.    Certifications and MOC are separate and distinct products for which there is separate consumer demand, as demonstrated by the above allegations, including:

(a)    ABPN's website has different sections for its certification and MOC products, separately describing the different standards, processes, schedules and requirements for each;

(b)    ABPN sold only certifications for decades before it first began selling CME products;

(c)    ABPN has always, up to today, sold its certifications and its CME products separately;

(d)    ABPN does not require "grandfathers" to purchase MOC;

(e)    "Grandfathers" who do not buy MOC because they are not required to do so, buy other CME products from different CME vendors separate from certifications;

(f)    other CME vendors have sold CME products for decades, up to today, without selling certifications;

(g)    psychiatrists and neurologists would buy CME products other than MOC from different vendors but for ABPN's tie;

(h)    ABPN and ABMS describe certifications and MOC as separate products with different purposes, and as satisfying different demands of psychiatrists and neurologists;

(i)    ABPN sells MOC to psychiatrists and neurologists only after they have purchased certifications;

(j)     Psychiatrists and neurologists can purchase CME products (other than MOC) without buying certifications;

(k)     Doctors pay ABPN a one-time fee for certification, then afterwards pay MOC annual fees throughout their careers, paying for ABPN's certification and MOC products separately and at different times; and

(l)     ABPN separately charges and accounts for certifications and MOC.

189.    Given the separate and sufficient consumer demand by psychiatrists and neurologists for certification products and CME products, it is efficient to sell certifications and CME products separately.

190.    Because certifications and CME products are separate and distinct, they are not interchangeable or a component of one another. To the extent the products are integrated at all it is solely because of ABPN's tie.

191.    The fact that ABPN maintained a monopoly in certifications for decades before it sold MOC, demonstrates MOC is a separate product and not essential to the success of ABPN's certification product.

**MOC Is Interchangeable With Other Products In The CME Market**

192.    ABPN's CME MOC product and other CME products are in the same product market and geographic market.

193.    MOC and other CME products have the same purpose. The AMA defines a CME product as "consisting of educational activities which serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships that a physician uses to provide services to patients, the public or the profession." ABPN describes MOC in the same fashion as promoting "lifelong learning through continuing medical education and other educational programs, and some assessment of practice-based performance."

194.    MOC and other CME products have the same customer base: psychiatrists and neurologists.

195.    The uses of MOC and other CME products are the same: lifelong learning to stay current in the fields of psychiatry and neurology.

196.    MOC and other CME products compete in the continuing medical education market by providing CME credits for, among other things, state licensure.

197.    MOC and other CME products are developed and administered by the same types of psychiatric and neurologic specialists.

198.    There is no functional advantage of MOC over other CME products except as a result of ABPN's tie.

199.    All stakeholders in the continuing medical educational product market consider MOC to be a substitute for and interchangeable with other CME products, as demonstrated by the above allegations, including:

(a)    Consumers (doctors) view MOC and other CME products interchangeably, recognizing they serve the same purpose and are commercial substitutes;

(b)    ABPN (the seller) promotes MOC as a CME product describing it as "lifelong learning through continuing medical education and other educational programs";

(c)    ABPN acknowledges MOC and other CME products are interchangeable as it allows the purchase of other CME products to satisfy some MOC requirements;

(d)    ABPN waives CME self-assessment requirements otherwise required for MOC to doctors who purchase ABPN's own CME MOC product;

(e)    AMA, the organization responsible for developing and implementing the CME credit system, gives CME Category 1 credits to doctors who purchase MOC that can be used for state licensure purposes;

(f)    Other CME vendors through its accrediting organization ACCME, are working towards "the integration of CME and MOC"; and

(g)     State medical boards accept MOC in place of other CME products for licensure.

200.    ABPN refuses to sell MOC to psychiatrists and neurologists unless they have previously bought ABPN certifications, artificially suppressing (and, in fact, eliminating) the demand for MOC by doctors without certifications.

201.    Because doctors are price sensitive, but for ABPN's tie, the cross elasticity of MOC and other CME products would be high. For example, a price increase in MOC would lead to significant switching by doctors to other CME products but for ABPN's tie that would result in their certifications being revoked.

202.    Absent ABPN's tie, doctors would choose to buy MOC or other CME products from different vendors based on subject, quality, and price rather than to keep their certifications.

## ABPN's Tying Of Certification And MOC Is Coercive

203.    ABPN concedes on its website that its CME MOC product is mandatory and required to maintain certifications.

204.    Psychiatrists and neurologists who do not buy MOC are identified by ABPN on its website as "Not Certified."

205.    ABPN certification is not voluntary. Instead, it is an economic necessity without which a successful medical career is impossible.

206.    By tying its certification and CME MOC products, ABPN gains an unwarranted and unlawful competitive advantage for its own CME product. Psychiatrists and neurologists are forced to buy MOC at supra-competitive monopoly prices, or have their certifications revoked.

39

207.    Other CME products are at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their certifications revoked by ABPN.

208.    But for their certifications being revoked, psychiatrists and neurologists would buy CME products from other CME vendors instead of MOC, including CME products that are less expensive and more relevant to their practice. ABPN's illegal tying, however, makes it impossible or economically infeasible to do so.

### ABPN's Monopoly Power In The Tying Market Restrains Free Competition

209.    ABPN has long been the monopoly supplier of certifications for psychiatrists and neurologists. No other organization or entity provides meaningful competition to ABPN in the certification market for psychiatrists and neurologists.

210.    There are high barriers to entry in the certification market for psychiatrists and neurologists, including technical, economic, organizational, and historical barriers, as demonstrated by the fact that no other organization or entity has ever sold certifications to psychiatrists or neurologists in successful competition with ABPN.

211.    Due to its monopoly power, ABPN controls the market in certifications for psychiatrists and neurologists, and has sufficient economic power to restrain free competition in the continuing medical education market.

### ABPN's Illegal Tie Affects A Not-Insubstantial Amount Of Interstate Commerce

212.    Plaintiffs and other Class Members nationwide have paid ABPN millions of dollars in MOC fees.

213.    ABPN's illegal tie affects a not insubstantial amount of interstate commerce.

40

**ABPN Has An Economic Interest In The Sales of MOC**

214.     That ABPN has realized millions of dollars in MOC fees also demonstrates its economic interest in MOC.

**Antitrust Injury**

215.     ABPN's illegal tie forces psychiatrists and neurologists to buy MOC at a substantial cost in money, time, and effort, or suffer the substantial economic consequences of having their certifications revoked.

216.     ABPN's unlawful restraint allows ABPN to charge supra-competitive monopoly prices for MOC.

217.     The illegal tie threatens a substantial foreclosure of competition in the continuing medical education market. According to the ACCME, since ABPN and other ABMS Member Boards began selling their own CME MOC products in or about 2005 through November 2023, the number of accredited CME providers in the ACCME system has declined almost 40 percent from 2,322 to 1,414.

218.     ABPN's unlawful restraint results in the diminishing of the quality of CME products, and inhibits innovation in the contents and delivery of CME products to psychiatrists and neurologists. Due to its tie, ABPN has a captive market for MOC, giving it little if any economic incentive to innovate and improve its product. For example, it has used the "Articles-Based Pathway" since 2019 and the ten-year Recertification Examination since 2007.

219.     The illegal tie entrenches ABPN's monopoly position in the market for certification of psychiatrists and neurologists.

220.     As a result of ABPN leveraging its monopoly power in certifications to tie certifications and MOC, psychiatrists and neurologists are unable to negotiate the price and other MOC requirements unilaterally set by ABPN.

221.     ABPN's illegal tie raises the cost of the practice of medicine for physicians; restricts the supply of psychiatrists and neurologists, thereby harming competition; increases the cost of medical services to patients; creates or increases barriers to patient care; and inhibits entry to the market for psychiatrists' and neurologists' services.

222.     ABPN uses its monopoly power in certifications to create a captive market for its CME MOC product, leaving psychiatrists and neurologists with no choice but to buy MOC. This allows ABPN to set MOC's cost and other requirements without regard to normal competitive factors.

223.     Severing ABPN's illegal tie will dismantle ABPN's leverage over the continuing medical education market, once again make ABPN's CME MOC product voluntary, and allow the marketplace to decide the merits of MOC.

<u>**COUNT TWO**</u>
**Alternative Rule Of Reason Illegal Tying In**
**Violation Of Section 1 Of The Sherman Act**

224.     Plaintiffs incorporate by reference all of the above allegations.

225.     ABPN's illegal tie of its certification and CME MOC products is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

226.     ABPN's illegal tie has significant anti-competitive impact in the market for CME products.

227.     By forcing psychiatrists and neurologists to buy its CME MOC product or have their certifications revoked, ABPN coerces the abdication of psychiatrists' and neurologists'

42

independent judgment concerning the merits of MOC, and insulates MOC from the benefits and stresses of an openly competitive market for CME products. As a result, the number and quality of CME products constituting realistic alternatives to MOC has been diminished.

228.   ABPN's illegal tie thwarts competition in the CME market.

229.   The illegal tie limits the choices of psychiatrists and neurologists in the CME market.

230.   ABPN charges supra-competitive monopoly prices for MOC, thus raising the cost of the practice of medicine for psychiatrists and neurologists, and their patients.

231.   The illegal tie prevents current and potential participants in the CME market from competing with ABPN on a level playing field.

232.   ABPN's illegal tie raises the barriers for entry into the market for certification of psychiatrists and neurologists, thereby enhancing ABPN's control of the market for certification of psychiatrists and neurologists.

233.   The illegal tie harms competition by diminishing innovation in the content and delivery of CME products to psychiatrists and neurologists.

234.   There are no cognizable pro-competitive benefits from the illegal tie that outweigh the anti-competitive harms alleged herein. In fact, there are no pro-competitive benefits from ABPN's illegal tie.

235.   Because there is sufficient demand for certification without MOC, it is efficient for ABPN to sell its certification product alone. Indeed, ABPN has done so for many decades.

236.   ABPN's certification and CME MOC products do not operate more efficiently when tied by ABPN than they would if separated. This is demonstrated by the fact that ABPN

was the monopoly supplier of certification for psychiatrists and neurologists for decades before it began selling MOC.

237.    ABPN will maintain its monopoly in the certification market without the illegal tie.

238.    There will be no decrease in demand for certifications without ABPN's illegal tie.

239.    There are no transactional efficiencies gained by the illegal tie. Psychiatrists and neurologists could just as easily purchase other CME products from different CME vendors, and many would choose to do so, but for their certifications being revoked.

240.    The separate demand for certification and CME products demonstrates the lack of cognizable pro-competitive efficiencies benefitting psychiatrists and neurologists from ABPN's illegal tie.

241.    The illegal tie does not result in production efficiencies. ABPN's sale of its certification product does not make it more efficient at providing MOC.

242.    ABPN's illegal tie does not save production costs since certification and MOC have different purposes and are sold to psychiatrists and neurologists at different times and at different stages in their careers.

243.    The fact that ABPN charges supra-competitive monopoly prices for MOC establishes that there are no economies of scale that benefit psychiatrists and neurologists forced to buy MOC as a result of ABPN's illegal tie.

244.    The illegal tie does not improve the quality of ABPN's MOC product which is an inferior product with no demonstrated causal connection to improved patient care or patient outcomes, or any other benefits of MOC claimed by ABPN.

245.     There is no evidence in the medical literature or elsewhere that the illegal tie protects ABPN's reputation, either as a seller of certifications to candidates for entry to the specialized medical practices of psychiatry or neurology or in any other way.

246.     ABPN has no legitimate justifications for its tie. For example, there is no supply inadequacy of CME products to justify the captive MOC market created by ABPN.

## COUNT THREE
### Unjust Enrichment

247.     Plaintiffs incorporate by reference all of the above allegations.

248.     Plaintiffs and other psychiatrists and neurologists conferred a benefit on ABPN in the form of the money and property that ABPN wrongfully obtained by forcing them pay MOC fees, as described in detail above.

249.     ABPN wrongfully obtained MOC fees not as a result of any bargain, but by forcing Plaintiffs and other psychiatrists and neurologists to purchase MOC or have their certifications revoked.

250.     ABPN has retained the benefits obtained by these inappropriate, unreasonable, and unlawful MOC fees. ABPN is aware of and appreciates these benefits.

251.     ABPN's conduct has caused it to be unjustly enriched at the expense of Plaintiffs and other psychiatrists and neurologists. As such, it would be unjust to permit retention of these moneys by ABPN under the circumstances of this case without the payment of restitution. ABPN should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against ABPN as follows:

252.     The Court determine that this action may be maintained as a Class Action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class

Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class.

253.　ABPN's illegal conduct alleged herein be adjudged and decreed to constitute:

    a.　A *per se* violation of Section 1 of the Sherman Act;

    b.　Alternatively, an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

    c.　Unjust enrichment.

254.　Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, including treble damages, and Defendant be required to disgorge the amounts by which it has been unjustly enriched.

255.　ABPN, its affiliates, successors, transferees, assignees, Directors, management, officers, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined from revoking the certifications of Class Members who do not buy MOC; be permanently enjoined from reporting Class Member certifications as invalid or describing Class Members as "Not Certified" unless they have also bought ABPN's CME MOC product; and be directed to document on its records and report on its website, without any qualification, that Class Members are "Certified" regardless of whether they have ever purchased MOC.

256.　Plaintiffs and other Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the original Complaint.

257.　Plaintiffs and other Class Members be awarded their costs of suit, including reasonable attorneys' fees, as provided by law.

258.     Plaintiffs and other members of the Class be granted all such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date:   December 15, 2023                         Respectfully submitted,

                                        By:      */s/ C. Philip Curley*

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
200 North LaSalle Street, Suite 1550
Chicago, IL 60601
Tel: (312) 663-3100
Fax: (312) 663-0303
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com

*Attorneys for Emily Elizabeth Lazarou
and Aafaque Akhter individually and
on behalf of all others similarly situated*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on December 15, 2023, he caused

the foregoing **SECOND AMENDED CLASS ACTION COMPLAINT** to be filed with the

Clerk of the Court for the Northern District of Illinois, Eastern Division, using the Court's

CM/ECF system, pursuant to which notification of such filing has been made to all counsel of

record.


*/s/ C. Philip Curley*