# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

EMILY ELIZABETH LAZAROU )
and AAFAQUE AKHTER, individually and )
on behalf of all others similarly situated )
)
    Plaintiffs, )
)
    v. )    No. 1:19-cv-01614
)
AMERICAN BOARD OF PSYCHIATRY )    Honorable Jeremy C. Daniel
AND NEUROLOGY, )
)
    Defendant. )


## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS SECOND AMENDED COMPLAINT

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
200 North LaSalle Street, Suite 1550
Chicago, Illinois 60601
Tel. (312) 663-3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com

# TABLE OF CONTENTS

**Page**

PLEADING STANDARD APPLICABLE TO THIS MOTION ........................................... 1

PRIOR HISTORY ........................................................................................................ 3

THE SAC ALLEGES MOC IS BOTH INTERCHANGEABLE WITH
AND A SUBSTITUTE FOR OTHER ACCREDITED CME PRODUCTS ........................... 6

*The American Medical Association ("AMA") CME Accreditation System* .................. 6

*MOC is an Accredited CME Product Interchangeable With Other
Accredited CME Products* ........................................................................................... 7

*MOC Is Also A Substitute For Other Accredited CME Products* ................................ 8

*ABPN Has A Substantial Financial Stake In MOC* ..................................................... 9

ARGUMENT ............................................................................................................. 10

    A.    Well-Pled Facts of the SAC Plausibly Allege That MOC Is
            Both Interchangeable With and A Substitute For Other Accredited
            CME Products Used For State Licensure Purposes ......................................... 10

    B.    Pleading Interchangeability and Substitute Products In
            the Relevant Market ...................................................................................... 13

    C.    *Siva* Rejected the Separate Product Analysis in the Prior District Court
            Opinions Relied On By ABPN ........................................................................ 15

    D.    ABPN's *Stare Decisis* Argument That "Nothing Material Has Changed"
            Ignores the SAC's Substantial Additional Factual Allegations ....................... 16

    E.    The Remaining ABPN "Single Product" Arguments Also Fail ....................... 16

    F.    The Additional SAC Allegations Fully Address This Court's
            Ruling On the FAC ........................................................................................ 17

    G.    Allegations That ABPN Revokes Certifications of Doctors Who
            Do Not Purchase MOC Meet the Well-Settled Definition of "Forcing" ........... 19

    H.    Plaintiffs Allege MOC Competes In and Is a Threat to Competition
            In the CME Product Market ........................................................................... 22

I.     The Court Has Supplemental Jurisdiction Over the Unjust Enrichment
Claim, Which Is Properly Pled ........................................................................ 24

CONCLUSION ....................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 1, 2, 18, 25

*Beacon Oil Co. v. O'Leary*,
   71 F.3d 391 (Fed. Cir. 1995) ............................................................................ 16

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 1

*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962) ................................................................................... 13, 14

*Dixon v. National Hot Rod Association,*
   No. 1:19-cv-01470-JRS-DML, 2021 U.S. Dist. LEXIS 59443 (S.D. Ind. Mar. 29, 2021)  ... 13

*Eastern R Pres, Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) .......................................................................................... 21

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
   637 F.3d 435, 444 (4th Cir. 2011) ......................................................................3

*Envirosource, Inc. v. Horsehead Res. Dev. Co.,*
   95 Civ. 5106 (TPG), 1997 U.S Dist. LEXIS 12570 (S.D.N.Y. Aug. 20, 1997).................... 13

*Gen. Cas. Co. of Wis. v. Techloss Cons. & Restor.*,
   461 F. Supp. 3d 804 (N.D. Ill. 2020) ................................................................. 25

*Gociman v. Loyola Univ. of Chi.*,
   41 F.4th 873 (7th Cir. 2022) ........................................................................... 1, 2

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006).............................................................................................2

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
   190 F. Supp. 2d 600 (S.D.N.Y. 2002) ............................................................... 13

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ...................................................................................... *passim*

*Kenney v. Am. Bd. of Internal Medicine*,
   412 F. Supp. 3d 530 (E.D. Pa. 2019) ......................................................... 3, 4, 15

*Lawline v. American Bar Ass'n*,
 956 F.2d 1378 (7th Cir. 1992) .......................................................... 21

*Levine v. Supreme Court of Wisconsin*,
 679 F. Supp. 1478 (W.D. Wis. 1988) ................................................ 16

*Northern Pacific Railway Co. v. United States*,
 356 U.S. 1 (1958) ............................................................................... 2

*Photovest Corp. v. Fotomat Corp.*,
 606 F.2d 704 (7th Cir. 1979) ............................................................ 13

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
 124 F.3d 430 (3d Cir. 1997) ............................................................. 13

*Reed v. Palmer*,
 906 F.3d 540 (7th Cir. 2018) .............................................................. 2

*Reifert v. South Central Wisconsin MLS Corp.*,
 450 F.3d 312 (7th Cir. 2006) .............................................................. 6

*Richards v. Mitcheff*,
 696 F.3d 635 (7th Cir. 2012) .............................................................. 2

*Schachar v. Am. Acad. Of Opth., Inc.*,
 870 F.2d 397 (7th Cir. 1989) ............................................................ 21

*Siva v. Am. Bd. of Radiology*,
 38 F.4th 569 (7th Cir. 2022) ..................................................... *passim*

*Siva v. Amer. Bd. of Radiology*,
 512 F. Supp. 3d 864 (N.D. Ill. 2021) ......................................... 3, 4, 15

*Tamayo v. Blagojevich*,
 526 F.3d 1074 (7th Cir. 2008) ....................................................... 2, 17

*U.S. Board of Oral Implantology v. Am. Bd. Of Dental Specialties*,
 390 F. Supp. 3d 892 (N.D. Ill. 2019) ............................................... 21

*United States v. LaSalle Bank, N.A.*,
 No. 07 C 6196, 2008 U.S. Dist. LEXIS 60756 (N.D. Ill. July 29, 2008) ................................ 2

*Vasquez v. Toko Elec.*,
 No. 23 CV 1799, 2024 U.S. Dist. LEXIS 963 (N.D. Ill. Jan 3, 2024) ........................... 1, 2, 25

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ........................................................................ *passim*

*Williams v. Estates LLC*,
   No. 1:19-CV-1076, 2020 U.S. Dist. LEXIS 30932 (M.D.N.C. Feb. 4, 2020) .................... 2-3

*Zimmerman v. Bornick*,
   25 F.4th 491 (7th Cir. 2022) ........................................................................ 4, 17

## **Rules**

Federal Rule of Civil Procedure 12(b)(6) .................................................................. 2, 13

## **Other**

9 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1700i (4th ed. 2018) ................................................ 19

10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1745d1 (4th ed. 2018) ............................................ 3

10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1752b (4th ed. 2018) ............................................ 19

10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1752e (4th ed. 2018) ............................................ 19

11 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1802d6 (4th ed. 2018) ........................................... 3

8 Black's Law Dictionary 329 (9th ed. 2009) .............................................................. 14

This Court in dismissing the First Amended Complaint ("FAC") (Dkt. #87), relying on the Seventh Circuit opinion in *Siva v. Am. Bd. of Radiology*, 38 F.4th 569 (7th Cir. 2022) ("*Siva*"), found Plaintiffs had failed to state a tying claim because they had not adequately alleged that Maintenance of Certification ("MOC") is a Continuing Medical Education product ("CME product"). The argument of Defendant American Board of Psychiatry and Neurology ("ABPN") that the Second Amended Complaint ("SAC") is simply more of the same ignores substantial additional factual allegations demonstrating that MOC is both interchangeable with and a substitute for other accredited CME products, and that as a CME product MOC is plausibly alleged to be a separate product from ABPN's certification product.

## PLEADING STANDARD APPLICABLE TO THIS MOTION

"At the motion to dismiss stage for failure to state a claim, [courts] test the sufficiency of the complaint, not the merits of a case." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022); *Vasquez v. Toko Elec.*, No. 23 CV 1799, 2024 U.S. Dist. LEXIS 963, *1 (N.D. Ill. Jan 3, 2024) (Daniel, J.). A motion to dismiss should be denied when the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *See also*, *Vasquez*, 2024 U.S. Dist. LEXIS 963, *2 (claim plausible when "right to relief [is] above a speculative level"). "The bar to survive a motion to dismiss is not high ... [d]ismissal is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Gociman*, 41 F.4th at 881 (internal quotation omitted). "[J]udges must not make findings of fact at the pleading stage" and "cannot reject a

complaint's plausible allegations by calling them 'unpersuasive.' Only a trier of fact can do that, after a trial." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012).

Plaintiffs claim unlawful tying by ABPN. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). To allege unlawful tying, a plaintiff must plausibly allege two separate products. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5-6 (1958). If monopoly power or sufficient market power is alleged and proven, the tying arrangement is unlawful *per se* without the need to prove anticompetitive effects or other market conditions. *Jefferson Parish*, 466 U.S. at 15, 17.

ABPN disputes the separate product element of Plaintiffs' tying claim. Whether separate products exist, however, presents an issue of fact. Because ABPN's Motion to Dismiss is "premised on factual assertions," the motion "must be denied." *United States v. LaSalle Bank, N.A.*, No. 07 C 6196, 2008 U.S. Dist. LEXIS 60756, at *9 (N.D. Ill. July 29, 2008). Further, on a Rule 12(b)(6) motion, allegations are to be "taken as true and considered in the light most favorable" to plaintiff. *Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018). The Court must also draw "all possible inferences in [plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Motions to dismiss fact intensive antitrust cases are disfavored unless a complaint suffers "glaring deficiencies." *Williams v. Estates LLC*, No. 1:19-CV-1076, 2020 U.S. Dist. LEXIS 30932, *22 (M.D.N.C. Feb. 4, 2020) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011)).

## PRIOR HISTORY

ABPN relies heavily on the district court opinions in *Siva* v. *Amer. Bd. of Radiology*, 512 F. Supp. 3d 864 (N.D. Ill. 2021), and *Kenney v. Am. Bd. of Internal Medicine*, 412 F. Supp. 3d 530 (E.D. Pa. 2019), *aff'd.* 847 F. App'x. 137 (3rd Cir. 2021) (designated "NOT PRECEDENTIAL") ("*Kenney*"), as well as Judge Pacold's ruling dismissing the original Complaint in this case (Dkt. #60). ABPN Br. 2, 3, 6, 7, 10, 11. All three district court judges, however, dismissed the tying claims after erroneously analyzing the separate products element at the post-tie stage, that is, *after* the tie had already been imposed.

On appeal from the *Siva* district court ruling, the Seventh Circuit, relying on *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), made clear that when considering separate products, only the pre-tie stage matters:

> "Courts performing this inquiry [the demand for the two items] must assess market demand 'at the pre-contract rather than post-contract stage'—before the alleged tying arrangement went into effect. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 469 (7th Cir. 2020) (citing Areeda & Hovenkamp ¶ 1802d6). Doing otherwise by looking at market demand in the post-tie world runs the risk of 'immuniz[ing] the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly in the tying product into a monopoly in the tied product.' Areeda & Hovenkamp ¶ 1745d1."

*Siva*, 38 F.4th at 575.

*Siva* went on with regard to the MOC allegations specifically, to criticize the district court for using a post-tie perspective, finding that by doing so the district court may have "drifted … into a fact-finding role":

> "In reaching the conclusion that certification and MOC were a single product in part because of the degree of 'integrat[ion]' between the two, the district court improperly approached the analysis from a post-tie perspective. *See Viamedia*, 951 F.3d at 469. And in crediting the Board's characterization of its product over the well-pleaded and contrary allegations in Siva's complaint, the district court also 'may have drifted beyond reviewing the legal sufficiency of [Siva's] allegations into a fact-

> finding role.' *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022). The mere fact that, as the district court found, 'radiologists buy [MOC] to maintain [Board] certification,' does not mean that MOC 'is not "fungible" with CPD products that do not serve that purpose'—it may just mean that alleged the tying arrangement has worked as planned."

*Siva*, 38 F.4th at 577-78.

In short, the Seventh Circuit found that the prior district court rulings had mistakenly analyzed separate products *after* the tie had already been imposed. To wit, the *Kenney* district court wrongly analyzed separate products at the post-tie stage, 412 F. Supp. 3d at 543-549; the *Siva* district court found *Kenney* "persuasive," 512 F. Supp. 3d at 870; and Judge Pacold in dismissing the original Complaint in this case found both the *Kenney* and *Siva* district court opinions "persuasive," Dkt. #60, at 7. This house of cards, however, collapsed under the weight of *Siva*, a fact ABPN conveniently ignores.

ABPN is wrong when it claims the only difference between the FAC and SAC is the use of "CME product" rather than Continuing Professional Development product ("CPD product") or CPD/CME product. ABPN Br. 5-8. The terms are synonymous and have been used as such in the medical industry and throughout this litigation to refer to medical "lifelong learning" educational products. [1] As *Siva* noted: "The complaint goes on to explain that … '[t]he terms CME and CPD are sometimes used interchangeably or in tandem, for example as "CPD/CME."'" *Siva*, 38 F.4th at

---

[1]     *E.g.*, Complaint, ¶¶ 42, 43 ("the stated MOC goals [are] continuous and ongoing learning and improvement" and "CME is also already designed to identify knowledge gaps, develop educational programs to address those gaps, and utilize adult learning principles to give physicians the skills, competencies, and intellectual fulfilment required for their practice. These are precisely the goals of ABPN MOC."); FAC, ¶¶ 8, 113 ("CPD products like MOC promote individual, self-directed lifelong learning and the development of both medical and non-medical competencies after residency … " and "The terms CME and CPD are sometimes used interchangeably or in tandem, for example as 'CPD/CME.'"); SAC ¶¶ 9, 92, ("Over time, the AMA, ABPN, and others have sometimes referred to CME products as continuing professional development ([CPD]) products, using the terms interchangeably" and "MOC promotes 'commitment to lifelong learning through continuing medical education and other educational programs, and some assessment of practice-based performance.'"). *Siva* also referred to such "lifelong learning" products even more generally as "continuing education products." *Id*. at 580.

579. The Seventh Circuit ultimately focused on CME in its analysis of the relevant antitrust product market, emphasizing that the market for CPD/CME products "seems primarily to be one for educational content accredited to satisfy state CME requirements." *Id*. Referring to "CME products" in the SAC simply acknowledges *Siva's* analysis that the relevant market is premised on the primary importance of accredited CME products for State licensure purposes.

Rejecting the post-tie analysis relied on by the *Siva* district court and the other district courts, the Seventh Circuit nonetheless affirmed for "different reasons," questioning instead whether MOC had been adequately alleged to be a CME product. *Id*. at 575. It did so even though the district court "did not quibble" with plaintiff's allegations that "MOC is a kind of CPD product," *id*. at 574, and despite the fact that the issue had not been briefed or argued. Because all of the complaints dismissed by the district courts including the FAC in this case were filed before *Siva,* the SAC is the first time Plaintiffs' additional factual allegations made in response to *Siva,* that MOC is both interchangeable with and a substitute for other accredited CME products, will be considered by any court.

While the *Siva* district court did not "quibble" with plaintiff's allegations that MOC was a CME product, the Seventh Circuit did. First, it noted that "everyone seems to agree" that the character of the demand for CME products "is distinct from that for certifications, so they are separate products under *Jefferson Parish*, 466 U.S. at 19." *Siva*, 38 F.4th at 576. Second, *Siva* acknowledged plaintiff's argument that since CME products and certifications "are separate products, and (as [plaintiff] alleges) MOC is a [CME] product, then MOC and certifications must also be separate products." *Id*. But third, the Seventh Circuit found plaintiff had failed to "plead facts making it plausible that MOC is a substitute for other [CME] products. *See Reifert*, 450 F.3d

at 318 ("Products and services are in the same market when they are good substitutes for one another.")." *Id.* at 578.

In doing so, *Siva* focused on the character of the demand for CME products: "Crucially, [the] complaint indicates that the demand for this content seems to be driven largely by state licensing requirements." *Id.* at 579. Where the plaintiff's allegations fell short, according to the Seventh Circuit, was that "there is no indication in the complaint that the Board itself actually produces, offers, or otherwise has a financial stake in any accredited CME products." *Id.* at 579. As the SAC makes clear, however, (1) MOC is itself an "accredited CME product" interchangeable with other accredited CME products, (2) MOC is also a substitute for other "accredited CME products," and (3) ABPN has a substantial "financial stake" in MOC.

## THE SAC ALLEGES MOC IS BOTH INTERCHANGEABLE
## WITH AND A SUBSTITUTE FOR OTHER ACCREDITED CME PRODUCTS

Plaintiffs' additional factual allegations about MOC are ignored by ABPN.

*The American Medical Association ("AMA") CME Accreditation System*

*Siva* in addressing the relevant antitrust product market focused on the fact that the demand for CME products is "driven" by their accreditation for State licensure purposes. *Id.* at 579. A license to practice medicine in the United States is granted by the medical boards of the individual States. SAC ¶ 33. Doctors must be licensed in order to practice medicine lawfully. *Id.* The AMA has implemented a credit system for CME products, creating two discrete categories of continuing education credits, CME Category 1 and CME Category 2. *Id.* ¶ 80.

Virtually all States require doctors to purchase a certain number of CME hours to remain licensed, including CME Category 1 credits and CME Category 2 credits. *Id.* ¶ 118. For example, Illinois requires doctors to purchase 60 hours of CME Category 1 credits every three years. *Id.* ¶ 83. Many States, in addition to CME Category 1 requirements, allow doctors to apply CME

Category 2 credits toward licensing requirements. *Id.* at ¶ 84. For example, New Jersey requires 100 CME hours every two years, 60 of which can be CME Category 2 credits. *Id.* ¶ 84. The Accreditation Council for Continuing Medical Education ("ACCME") accredits CME vendors and activities. *Id.* ¶ 30. According to the ACCME, it collaborates with Member Boards of the American Board of Medical Specialties ("ABMS"), which includes ABPN, "to facilitate the integration of CME and MOC." *Id.* ¶ 31.

Doctors earn CME Category 1 credits one of two ways. First, by purchasing CME products from vendors accredited by the ACCME or ACCME-recognized State or local medical societies. *Id.* ¶ 81. And second, by completing other educational activities not accredited in advance by ACCME, and applying to the AMA for "direct credit." *Id.* ¶ 82. CME Category 2 credits are self-designated and self-claimed by individual doctors for participation in educational activities not certified for CME Category 1 credit. Doctors earn CME Category 2 credits by, among other things, purchasing CME self-assessment products. *Id.* ¶ 84.

*MOC is an Accredited CME Product Interchangeable With Other Accredited CME Products.*

As explained by ABPN, the purpose of MOC, like other CME products, is to promote individual "involvement in lifelong learning." *Id.* ¶ 94. The ABMS CertificationMatters.org website likewise describes MOC as "ongoing learning and assessment" and "lifelong learning and self-assessment." *Id.* ¶ 92. Because MOC is an educational product, doctors obtain additional Category 1 credits for MOC through the AMA "direct credit" process, separate from whatever CME credits they may earn directly from other CME providers as part of MOC. *Id.* ¶¶ 82, 120, 199(e). Doctors can apply this MOC "direct credit" toward State requirements for Category 1 CME credits. *Id.*

For example, one of the Plaintiffs, Dr. Aafaque Akhter, applied for "direct credit" from the AMA for MOC and received 60 additional hours of Category 1 credits from the AMA over and above the credits he had already earned from his purchases of CME as part of his MOC "Activity Requirements." *Id*. ¶ 177. Dr. Akhter used these additional credits to meet State licensure requirements instead of buying different CME products from other CME vendors. *Id*. As stated in a New England Journal of Medicine article, "MOC used as CME" is a "viable way" to "pick up bonus points" for licensure. *Id*. ¶ 118.

*MOC Is Also A Substitute For Other Accredited CME Products.*

In addition to accreditation as a CME product through the AMA "direct credit" process, MOC is also a substitute for other accredited CME products for State licensure purposes. *Id*. ¶¶ 118, 199(g). For example, several States, including Idaho, Minnesota, Oregon, New Hampshire, and West Virginia, accept MOC as a complete substitute for other accredited CME requirements. *Id*. ¶ 119. In other States, including California, Kentucky, and Michigan, the MOC-required ABPN assessment examination is by itself a substitute for some or all of the State's other accredited CME requirements. *Id*. ¶ 121. That States apply MOC toward licensure requirements in these additional ways shows they recognize MOC is a substitute for accredited CME products. *Id*. ¶ 122. Doctors licensed in States that accept MOC as a complete substitute for accredited CME products can also obtain licenses from other States using the Interstate Medical Licensure Compact as a substitute for those other States' own accredited CME requirements. *Id*. ¶¶ 123-124.

As part of MOC, doctors must complete an ABPN assessment examination, either "a set of article exams" described by ABPN as the "Article-Based Pathway" or a ten-year MOC examination. *Id*. ¶¶ 101-103. While ABPN requires doctors to purchase 24 self-assessment CME credits from other vendors as part of MOC, it waives 16 of those required credits for doctors who

take ABPN's own "Article-Based Pathway" examination and eight of those required credits for doctors who take the ABPN ten-year MOC examination. *Id*. ¶¶ 100, 105. As a result of ABPN substituting its own MOC educational assessment products, doctors purchase fewer self-assessment CME credits from other CME vendors. *Id*. ¶ 105.

*ABPN Has A Substantial Financial Stake In MOC.*

ABPN has a substantial financial stake in its MOC CME product. ABPN currently requires doctors to pay a $175 annual MOC fee or forfeit their certifications. *Id*. ¶ 99. According to its Forms 990, ABPN reported net assets of $12,610,227 before the launch of MOC. *Id*. ¶ 145. In the twenty years since ABPN began forcing doctors to buy MOC, its net assets have skyrocketed 1,344 percent to $169,554,844 in 2022, including more than $140,000,000 in holdings in cash, savings, and securities at year-end 2022. *Id*. Most of the over $155,000,000 increase in net assets is attributable to MOC fees charged to psychiatrists and neurologists. *Id*.

Also according to ABPN's Forms 990, MOC revenue increased exponentially from $761,650 in 2013 to $9,580,374 in 2022 (the only years ABPN has publicly disclosed MOC data separately), or approximately 1,257 percent. *Id*. ¶ 146. ABPN certification revenue was mostly stagnant during this time. *Id*. These data demonstrate that MOC has been an increasingly lucrative and important revenue source for ABPN. *Id*. ¶ 147. This is confirmed by the fact that MOC revenue has increased at a much faster rate than certification revenue, and, based on the latest publicly available data, is more than a third of ABPN program revenue. *Id*.

## ARGUMENT

In *Siva,* the Seventh Circuit found "everyone seems to agree" that the character of the demand for CME products "is distinct from that for certifications, so they are separate products." *Siva*, 38 F.4th at 576. But after concluding that the market for such products "seems primarily to be one for educational content accredited to satisfy state CME requirements," *Siva* held plaintiff had not alleged sufficient facts to make it plausible that MOC is a CME product. *Id.* at 579-580.

The Seventh Circuit, however, identified the missing factual allegations, providing a roadmap for Plaintiffs to follow in the SAC. *Id.* at 578 (plaintiff must "plead facts making it plausible that MOC is a substitute for other [CME] products.") (citation omitted). Thus, the only hurdle remaining for Plaintiffs after *Siva* is to "allege[] sufficient facts to make it plausible that MOC is in fact a [CME] product" that meets the needs of doctors for "educational content accredited to satisfy state CME requirements." *Id.* at 578-79. As set forth below, the SAC alleges precisely that.

### A. Well-Pled Facts of the SAC Plausibly Allege That MOC Is Both Interchangeable With and A Substitute For Other Accredited CME Products Used For State Licensure Purposes.

The Seventh Circuit held the *Siva* complaint lacked allegations showing how doctors "looking to fulfill [their] state CME obligations" could use MOC to do so. *Siva*, 38 F.4th at 579-80. In their Supplemental Brief in opposition to ABPN's Motion to Dismiss the First Amended Complaint, Plaintiffs armed with the *Siva* roadmap described the additional allegations they would make if this Court granted leave to amend, alleging that MOC is a "substitute" for other accredited CME products used to meet State licensure requirements. Dkt. #85 at 9-10. The SAC includes the promised allegations, making it plausible that MOC and certifications are separate products.

First, the SAC demonstrates that MOC is interchangeable with other accredited CME products. MOC is itself an accredited CME product. Doctors receive Category 1 CME credits for

MOC by applying to the AMA for "direct credit." SAC ¶¶ 82, 120, 199(e). Dr. Akhter received "direct credit" for 60 hours of Category 1 CME credits for MOC over and above the credits he had already earned from his purchase of other CME products and used those credits to meet State licensure requirements instead of buying different accredited CME products from other CME vendors. *Id*. ¶ 177. These allegations show MOC is viewed by doctors as interchangeable with other accredited CME products. *Id*. ¶ 199(a) .

Second, the SAC describes how MOC is a substitute for other accredited CME products required for State licensure. MOC is accepted in lieu of accredited CME requirements altogether in several states, including Idaho, Minnesota, Oregon, New Hampshire, and West Virginia. *Id*. ¶¶ 119, 199(g). In these states, MOC is a complete substitute for accredited CME products sold by other CME vendors. In several States, including California, Kentucky, and Michigan, a MOC-required ABPN assessment examination, including the examination taken by Dr. Akhter, is by itself a substitute for some or all of the State's accredited CME requirements. *Id*. ¶¶ 121, 176, 199(g). Doctors who use MOC to satisfy CME requirements for State licensure will purchase fewer CME products from other vendors. That States accept MOC for licensure in place of other accredited CME products shows MOC is reasonably interchangeable with other CME products. SAC ¶ 122.

Third, ABPN itself uses MOC as a substitute for different CME products sold by other CME vendors. As part of MOC, doctors must complete an ABPN assessment examination. *Id*. ¶¶ 101-103. While ABPN requires doctors as part of MOC to purchase 24 self-assessment CME credits from other vendors, it waives 16 of those required credits for doctors who take ABPN's own "Article-Based Pathway" examination and eight of those required credits for doctors who take the ABPN ten-year MOC examination. *Id*. ¶¶ 100, 105. As a result of ABPN substituting its

own MOC education assessment products, doctors purchase fewer self-assessment CME products from other CME vendors.  *Id.* ¶ 105.

Further, doctors licensed in States that accept MOC as a complete substitute for accredited CME products can obtain licenses from other States using the Interstate Medical Licensure Compact ("Compact") as a substitute for those other States' own accredited CME requirements. *Id.* ¶¶ 123-124. For example, a doctor in New Hampshire can use MOC as a complete substitute for other accredited CME products for licensure purposes, and then through the Compact obtain licenses in the other 34 States that are members of the Compact, including the many States that do not accept MOC as a complete substitute for accredited CME requirements.

The foregoing are specific, well-pled allegations describing how doctors "looking to fulfill [their] state CME obligations" could use MOC to do so. *Siva*, 38 F.4th at 579-80. In fact, Dr. Akhter has done exactly that. SAC ¶ 177. Consistent with the well-pled allegations set out above, not just doctors but "[a]ll stakeholders" in the CME product market consider MOC to be interchangeable with and a substitute for other accredited CME products. SAC ¶ 199. As the prestigious New England Journal of Medicine explained, "MOC used as CME" is a "viable way" to "pick up bonus points" for licensure. *Id.* ¶ 118.

Finally, *Siva* was concerned that MOC might simply impose "a redundant obligation that the [doctor] purchase [CME] credits elsewhere." *Siva*, 38 F.4th at 579. Not so. Doctors obtain additional (non-redundant) Category 1 credits for MOC through the AMA "direct credit" process, separate from CME credits they purchase directly from other CME providers as part of MOC. SAC ¶¶ 82, 120, 199(e). Dr. Akhter used these additional credits to meet State licensure requirements instead of buying different CME products from other CME vendors. *Id.* ¶ 177. This demonstrates that MOC is not redundant of other accredited CME products and instead provides

doctors an additional way to earn Category 1 credits in place of purchasing different accredited CME products from other CME vendors.

States accept MOC as a substitute for accredited CME requirements. *Id.* ¶¶ 119-121, 199(g). This also demonstrates that MOC is not redundant of other CME products, for if it were the States would still require doctors to complete the other accredited CME requirements. Finally, by accepting its own MOC educational assessment products in place of self-assessment CME products from other CME vendors, ABPN itself shows MOC is not redundant of other CME products. For all of these reasons, MOC is not "redundant" of other CME products.

**B.     Pleading Interchangeability and Substitute Products In the Relevant Market**

"The boundaries of [a relevant product market] may be determined by examining [] practical indicia." *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 325 (1962). "A court making a relevant market determination … [about] whether a product is interchangeable … [looks] to the uses to which the product is put by consumers in general." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997). Thus, "[i]n the context of a Rule 12(b)(6) motion to dismiss, the complaint must either allege facts regarding substitute products, distinguish among comparable products, or allege facts relating to cross-elasticity of demand." *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 609 (S.D.N.Y. 2002). *See also Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 (7th Cir. 1979) (quoting *Brown Shoe Co.*, 370 U.S. at 325).

Because the pleading requirement is disjunctive, "[a]n antitrust complaint need not expressly include the magic words 'cross-elasticity of demand' to state a claim … ." *Dixon v. National Hot Rod Association*, No. 1:19-cv-01470-JRS-DML, 2021 U.S. Dist. LEXIS 59443, *22 (S.D. Ind. Mar. 29, 2021). "Extensive analyses of reasonable interchangeability and cross elasticity of demand ... are not required at the pleading stage." *Envirosource, Inc. v. Horsehead Res. Dev. Co.,* 95 Civ. 5106 (TPG), 1997 U.S Dist. LEXIS 12570, *8 (S.D.N.Y., Aug. 20, 1997).

The Seventh Circuit in *Siva* agreed with this standard, holding that allegations need only "permit an inference of what economists call 'cross-price elasticity' between MOC and other [CME] offerings … in plainer English, the two products must be 'reasonab[ly] interchangeab[le]' in the minds of relevant consumers [citing to *Brown Shoe*] … meaning that a [doctor] shopping for [CME] products might see [ABPN's] MOC program as a viable option for filling that need." *Siva*, 38 F.4th at 578. The SAC more than meets these pleading requirements of *Siva*.

Plaintiffs allege that, "Because doctors are price sensitive, but for ABPN's tie, the cross elasticity of MOC and other CME products would be high." SAC ¶ 201. In other words, while demand is currently skewed by ABPN's tie, because doctors are price sensitive a price increase in either MOC or other CME products would shift sales to the other. Plaintiffs have alleged as well that MOC is both "reasonably interchangeable" with and also a substitute for other accredited CME products. *Id*. ¶¶ 82, 118-120, 122-124,177, 199(e), 199(g). Indeed, MOC is more than "reasonably" interchangeable; it is completely interchangeable through the AMA "direct credit" process with other accredited CME products, as shown by Dr. Akhter, and is also a substitute for some or all State accredited CME licensure requirements. *Id*. [2]

Lastly, Plaintiffs have alleged how MOC is "a viable option" for filling the need for CME products for State licensure purposes, and that Dr. Akhter has used MOC in exactly that fashion. *Id*. ¶ 177. In short, all stakeholders in the CME product market—doctors, ABPN, AMA, ACCME, and the States—"consider MOC to be a substitute for and interchangeable with other CME

---

[2] ABPN dismisses SAC ¶ 201 as "conclusory" (ABPN Br. 12), ignoring the well-pled allegations in support of that paragraph. *See* 8 BLACK'S LAW DICTIONARY 329 (9th ed. 2009) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Because the underlying facts supporting cross-price elasticity are alleged in accordance with *Siva*, including that MOC is both interchangeable with and a substitute for other accredited CME products, ¶ 201 is not conclusory. ABPN makes no other argument about cross-price elasticity and Plaintiffs' supporting allegations, which they totally ignore.

products." *Id*. ¶ 199. As such, MOC is plausibly alleged to be a CME product separate from ABPN's certification product.

## C.     *Siva* **Rejected the Separate Product Analysis in the Prior District Court Opinions Relied On By ABPN.**

A major theme of ABPN is that the district court opinions in *Kenney* and *Siva* and the opinion of Judge Pacold dismissing the original Complaint in this case have already put the separate products issue to rest.  ABPN Br. 2, 3, 6, 7, 10, 11.[3] As explained above, however, all three opinions erroneously analyzed separate products *after* the tie had already been imposed.  *See* pp. 3-6, *supra*.  Without repeating that explanation, one instance of ABPN's reliance on the *Siva* district court opinion is especially problematic.

ABPN cites to the *Siva* district court opinion as support for its arguments that MOC is a "component" of certification, and that Plaintiffs fail to account for MOC's "integration" with certification. ABPN Br. 10. But the Seventh Circuit specifically held it was error for the district court to accept the post-tie characterization of MOC as a component of certification. *Siva*, 38 F.4th at 577-578 (rejecting argument that "a [CME]-style component is not subject to antitrust scrutiny."). The Seventh Circuit also rejected ABPN's post-tie argument about MOC's "integration" with certification. *Siva*, 38 F.4th at 577 ("In reaching the conclusion that certification and MOC were a single product in part because of the degree of 'integrat[ion]' between the two, the district court improperly approached the analysis from a post-tie perspective."). It is concerning

---

[3]      The Third Circuit opinion in *Kenney* likewise does not help ABPN. ABPN Br. 3, 6. First, that decision by its terms was "NOT PRECEDENTIAL," and pursuant to Third Circuit Internal Operating Procedures 5.7, "Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing." If the issuing court cannot rely on its opinion, neither should this Court.  In addition, the Third Circuit in *Kenney*, like the *Kenney* district court, runs afoul of Seventh Circuit law that a must court assess "market demand 'at the pre-contract rather than post-contract stage'—before the alleged tying arrangement went into effect." *Siva*, 38 F.4th at 575 (quoting *Viamedia*, 951 F.3d at 469). *Siva* did not cite the Third Circuit *Kenney* opinion, presumably because it had no precedential value and was decided on grounds that *Siva* rejected.

for ABPN to cite to the *Siva* district court opinion in support of specific arguments without advising that the Seventh Circuit has explicitly rejected the district court's reasoning.

**D.    ABPN's *Stare Decisis* Argument That "Nothing Material Has Changed" Ignores the SAC's Substantial Additional Factual Allegations.**

By pretending there are no additional allegations in the SAC, ABPN sidesteps their significance. As set out in detail above, there are substantial additional allegations demonstrating that MOC is both interchangeable with and a substitute for other accredited CME products.  *See* pp. 6-9 (in particular pp. 8-9), *supra*. These additional allegations, along with those carried forward from the FAC make it more than plausible that MOC is a CME product separate from certifications. Thus, the doctrine of s*tare decisis* has no application here. *See*, *e.g.*, *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995) ("*Stare decisis* applies only to legal issues that were actually decided in the prior action."); *Levine v. Supreme Court of Wisconsin*, 679 F. Supp. 1478, 1493 (W.D. Wis. 1988) ("*stare decisis* does not apply where the facts are essentially different").

**E.    The Remaining ABPN "Single Product" Arguments Also Fail.**

First, even without citing to the wrongly decided prior district court opinions, ABPN continues to make arguments based on a post-tie perspective, contrary to both *Siva* and *Viamedia*. ABPN Br. 8 ("While, in the past, the ABPN offered lifelong certifications, for the past twenty-five years or so it has only offered time-limited certifications requiring additional activities to maintain that certification"; "MOC is not a separate stand-alone product that is offered distinctively from initial certification"; "MOC is not a stand-alone product that any physician demands separate from certification"); *id*. 9 ("[doctors] are not buying two products – the [certification] product itself and a [MOC] 'renewal' product – they are buying one product which they wish to renew").

Second, ABPN manipulates Plaintiffs' allegations that ABPN requires doctors to purchase MOC or have their certifications revoked (admitted on ABPN's website, SAC ¶ 203), to somehow

argue that doctors "admit" MOC is a part of certification. ABPN Br. 9 (citing SAC ¶¶ 12, 24, 58, 62, 85, 91, 96). But that is not in any sense a proper inference from Plaintiffs' allegations, and is contrary to the well-established standard that all possible inferences must be drawn in favor of the Plaintiffs. *Tamayo*, 526 F.3d at 1081. Consistent with that standard, *Siva* criticized the district court for taking similar liberties with the allegations in that case. *Siva*, 38 F.4th at 577-78 ("The mere fact that, as the district court found, 'radiologists buy [MOC] to maintain [Board] certification,' does not mean that MOC 'is not 'fungible' with CPD products that do not serve that purpose'—it may just mean that the alleged tying arrangement has worked as planned.") (internal citation and quotation omitted).

Third, ABPN provides no authority to support its argument that ABPN automatically enrolling doctors in MOC is "proof" of one product. ABPN Br. 8-9 (citing SAC ¶¶ 159, 174). At best, it is "proof" only of ABPN's monopoly power in certifications. And by advancing its own characterization over the well-pled and contrary allegations in Plaintiffs' complaint, ABPN is inviting the Court to "drift[] beyond reviewing the legal sufficiency of [Plaintiffs'] allegations into a fact-finding role." *Zimmerman*, 25 F.4th at 493.

### F. The Additional SAC Allegations Fully Address This Court's Ruling On the FAC.

The SAC also addresses this Court's ruling on the FAC. Dkt. #87. Relying on *Siva*, the Court held the FAC: "failed to plausibly allege that MOC and other CPD products are reasonably interchangeable in the minds of psychiatrists and neurologists such that they are part of the same product market"; "does not allege that MOC would satisfy Plaintiffs' continuing education requirements for practicing as licensed psychiatrists in their respective states"; and "contains no allegation that purchasing MOC alone would satisfy state licensure requirements." *Id.* at 11, 12, 14.

As detailed above, substantial additional factual allegations addressing these concerns are now made by Plaintiffs in the SAC. *See* pp. 6-9, *supra*.

The Court also found that because CME products "are required to maintain state licensure, but MOC is generally not," it is "implausible" that any doctor would view MOC as a substitute for CME products. Dkt. #87 at 13. While MOC specifically is not "required" for State licensure, neither is any other specific CME product sold by any other CME vendor "required." What the SAC does clearly allege is that through the AMA "direct credit" process MOC is interchangeable with other accredited CME products, as shown by Dr. Akhter, and that MOC is also a substitute for some or all State accredited CME licensure requirements. SAC ¶¶ 82, 118-120, 121-124, 177, 199(e), 199(g). [4]

Finally, the Court examined certain allegations of the FAC (doctors differentiate between MOC and certification, MOC and certifications are sold separately, ABPN's own views of MOC and certification, MOC and certifications are billed separately) and concluded that none of the allegations alone showed separate products. Dkt. #87 at 15-19. The totality of the SAC, however, including both the additional allegations and those carried forward from the FAC, are more than enough to raise the "reasonable inference" that MOC is a CME product separate from certifications. *Iqbal*, 556 U.S. at 678. This is especially so given *Siva* has found that "everyone seems to agree" that the character of the demand for CME products "is distinct from that for certifications, so they are separate products under *Jefferson Parish*, 466 U.S. at 19." *Siva*, 38 F.4th at 576.

---

[4]     The SAC does not contain the allegations about the ABPN "approved products list" that the Court found insufficient. Dkt. #87 at 14.

### G. Allegations That ABPN Revokes Certifications of Doctors Who Do Not Purchase MOC Meet the Well-Settled Definition of "Forcing."

Plaintiffs allege that ABPN forces doctors to buy MOC (the tied product) because if they do not ABPN revokes their certifications (the tying product). *See*, *e.g.*, SAC ¶¶ 11, 12, 24, 58, 62, 91, 98, 117, 162, 202, 208. This conditioned sale—buy MOC or ABPN will take away your certification—meets the well-established standard for the "forcing" necessary for a tying claim. ABPN's argument on this issue misunderstands Plaintiffs' "forcing" allegations and is contrary to settled law.

An illegal tie exists when the seller imposes the "condition that the buyer purchase the tied goods from the seller" if they want the tying product. *Viamedia*, 951 F.3d at 473; *see also id.* at 496 (Brennan, J., concurring in part, dissenting in part) (forcing found where "the defendant improperly imposes *conditions* that explicitly or practically require buyers to take the second product if they want the first one") (emphasis in original; quoting 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1752b, p. 291 (4th ed. 2018) ("Areeda")). The requisite "conditioning" "is present when the defendant has utilized customers' desire for its product A to constrain improperly their choice between its product B and that of its rivals." Areeda, ¶ 1752e at 295. *See also id.* ¶ 1752e at 298 ("[T]he language of 'coercion,' 'forcing,' and 'voluntariness,' should be understood as inviting a specific factual inquiry about whether the defendant has illegitimately constrained buyer choices").

The "conditioning" sufficient to establish an illegal tie is "clearly present" when, as here, "the seller ... continues to supply the tying product only to those who purchase its tied product." Areeda, ¶ 1700i, at 13. Plaintiffs allege that ABPN by revoking certifications of doctors who do not purchase MOC, has "utilized customers' desire for" certifications "to constrain improperly

their choice between" purchasing MOC and different CME products from other CME vendors.[5] ABPN's forcing is found in the express condition it imposes on doctors to buy MOC or forfeit their certification. SAC ¶¶ 11, 12, 24, 58, 62, 91, 98, 117, 162, 202, 208. This is all Plaintiffs need allege to sustain a tying claim.[6]

Economic realities are also relevant in assessing whether the seller's condition "constrains" the buyer's choice. In *Viamedia*, the Seventh Circuit found the purported option of retail cable providers bringing the tied product in-house (ad rep services) was "not a viable option," and it "cannot affirm summary judgment by overlooking [the] evidence about the realities of the parties' dealings and the economic realities of the market." *Viamedia*, 951 F.3d at 471 and n. 17. Here the "economic realities of the market" include hospitals, insurers, and employers that require doctors to hold certifications. SAC ¶¶ 52-53, 55-57, 65-70, 71-72.

ABPN confuses Plaintiffs' allegations of economic realities with the allegations that ABPN conditions certifications on the purchase of MOC. The economic realities are not necessarily the "forcing," but help explain why ABPN's express condition constrains doctors' choices. ABPN's confusion is reflected by the inapposite cases they cite, none of which is a tying case. They stand only for the unremarkable proposition that providing information, without any means to constrain

---

[5] At most, whether the condition ABPN has imposed constrains doctors' choices is a fact question that cannot be resolved without a full evidentiary record. *See Viamedia*, 951 F.3d 470-474 ("a seller is not immunized from a tying claim if there is a factual dispute as to whether the buyer wished to purchase" the tied product "from the defendant with market power" in the tying product).

[6] Judge Pacold, citing *Viamedia*, agreed that tying encompasses selling the tying product only on the condition that the buyer also purchase the tied product, but concluded that since at the time the original Complaint was filed doctors could buy certifications without buying MOC, there was no "conditioning." Dkt. #60, p. 12. Now, however, unlike at the time of the original Complaint, ABPN automatically enrolls doctors in MOC when they purchase certifications. ABPN Br. 8-9; SAC ¶¶ 159, 174. In other words, doctors cannot buy certifications without buying the tied MOC product.

choices, is not an actionable restraint of trade under antitrust law. Those cases are inapposite because by revoking certifications ABPN constrains buyers' choices.

*Schachar v. Am. Acad. Of Opth., Inc.*, 870 F.2d 397 (7th Cir. 1989), concerned a claim of conspiracy to restrain trade based on a statement in an Academy press release describing a procedure the plaintiffs performed as "experimental." There was no tying claim alleged, and there was no "restraint of trade" because, unlike here, the Academy did not employ an "enforcement device" against doctors who chose not to heed the Academy's advice and continued performing the procedure. *Id.* at 398-399 ("It did not expel or discipline or even scowl at members who performed [the procedure]"). Here, ABPN employs the "enforcement device" of revoking certifications of doctors who do not purchase MOC.

*Lawline v. American Bar Ass'n*, 956 F.2d 1378 (7th Cir. 1992), also did not involve a tying claim, but rather an alleged conspiracy between bar associations, the ARDC, state and federal court justices, the U.S. Trustee, and the Assistant U.S. Trustee "to monopolize the dissemination of legal advice" through the promulgation of ethical rules against the practice of law by non-lawyers. *Id.* at 1382. The antitrust claims failed not for any reason relevant to this case, but because the pertinent defendants were immune under *Eastern R Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961), and its progeny. As with *Schachar*, the mere promulgation of rules did not support antitrust liability, as there was no actionable enforcement device due to the courts and ARDC being immune state actors. *Lawline*, 956 F.2d at 1383. Similarly, *U.S. Board of Oral Implantology v. Am. Bd. Of Dental Specialties*, 390 F. Supp. 3d 892 (N.D. Ill. 2019), did not involve a tying claim, but a claim for conspiracy to restrain trade that failed because the allegations of conspiracy were not plausible. *Id.* at 902-05.

As *Viamedia* and Areeda make clear, ABPN's conditioned sale itself constitutes an illegal tie. Thus, even assuming "economic realities of the market" alone are insufficient to support a tying claim, ABPN "forces" doctors to buy MOC through its enforcement device of revoking certifications if they do not. [7]

### H. Plaintiffs Allege MOC Competes In and Is a Threat to Competition In the CME Product Market.

As part of its "forcing" argument, ABPN claims Plaintiffs have failed to allege that MOC is a competitor in the CME product market and poses a "threat" to competition in the CME market. (ABPN Br. 14-15). As an initial matter, the notion that Plaintiffs must plead competitive harm in the tied product market (CME products) is a non-starter with respect to Count I, which alleges a *per se* tying claim. There is no dispute that, as alleged, ABPN is a monopolist with substantial market power in the tying market (certifications). Thus, ABPN's tie is unlawful *per se* without the need to prove anticompetitive effects or other market conditions. *Jefferson Parish*, 466 U.S. at 15, 17; *Viamedia*, 951 F.3d at 468.

The SAC contains a myriad of allegations showing MOC is a competitor in the CME market. The allegations discussed at pp. 6-9, *supra*, totally ignored by ABPN, demonstrate MOC is a CME product offered by ABPN that is both interchangeable with and a substitute for other accredited CME products used for State licensure purposes. As such, MOC is a competitor in the CME market. ABPN is also alleged to have a substantial financial stake in MOC to the tune of tens of millions of dollars. *See* p. 9, *supra*.

---

[7]   While this Court found the "forcing" allegations in the FAC lacking, it did so, like Judge Pacold earlier, based on the allegation that doctors "may purchase ABPN's certification product without buying MOC … ." Dkt. #87, p. 20 (citing to FAC ¶ 348). That allegation, however, is not in the SAC as ABPN now automatically enrolls doctors in MOC when they purchase certifications. (ABPN Br. 8-9; SAC ¶¶ 159, 174.)

The SAC likewise alleges that MOC poses a threat to competition in the CME market. Doctors buy fewer CME products from other CME vendors as a result of the illegal tie, doctors use MOC as a "substitute" for other CME products, other CME vendors are at a competitive disadvantage as a result of ABPN's tie, and MOC "threatens a substantial foreclosure of competition in the [CME] market." *See, e.g.*, SAC ¶¶ 105, 117, 118 , 174, 177, 192-202, 206-208, 217. The SAC further alleges that "since the advent of MOC … according to the [ACCME], the number of accredited providers of continuing medical education has declined almost 40% from 2,322 to 1,414." *Id.* ¶ 217. *See also id.* ¶¶ 209-11, 226-31 (by exercising its monopoly power in the tying product market, ABPN restrains free competition in the CME market). All of these allegations belie ABPN's argument that Plaintiffs have failed to allege that MOC is a threat to the CME market.

ABPN also misrepresents Plaintiffs' allegations. It bookends its argument by asserting the SAC alleges that MOC is "useless" even though the word does not appear anywhere in Plaintiffs' allegations. (Def. Br. 14). SAC ¶ 142 does not allege, as ABPN selectively quotes, that MOC has "no significant value" (ABPN Br. 14), but that 75 percent of rheumatologists in a survey "agreed there was no significant value in MOC, *beyond what is already achieved from continuing medical education*." SAC ¶ 142 (emphasis added). This confirms that as Plaintiffs allege, "MOC and other CME products have the same purpose" and that doctors "view MOC and other CME products interchangeably, recognizing they serve the same purpose and are commercial substitutes." *Id*. ¶¶ 193, 199(a).

The other SAC allegations referred to by ABPN concern studies and surveys (ABPN Br. 14) showing ABPN's CME MOC product to be inferior to other CME products. SAC ¶¶ 136-44. These allegations, however, do not undercut ABPN's tie but are instead the paradigm

of an illegal tying arrangement. *See*, *e.g.*, *Viamedia*, 951 F.3d at 468 (seller purchases the tied product "not because the party imposing the tying requirement has a better product or a lower price" but because the seller has "power or leverage" in the market for the tying product) (internal quotation omitted). As Plaintiffs specifically allege, "But for their certifications being revoked, psychologists and neurologists would buy CME products other than MOC from different CME providers, including CME products that are less expensive and more meaningful and relevant to their practice." SAC ¶ 117. *See also id*. ¶¶ 174, 202.

Finally, ABPN's quote from *Jefferson Parish* (ABPN Br. 14-15) simply provides there are no anticompetitive consequences "when a purchaser is 'forced' to buy *a product he would not have otherwise bought even from another seller in the tied-product market*." 466 U.S. at 16 (emphasis added). Because MOC is a CME product and but for the illegal tie doctors would purchase other CME products "from another seller in the tied [CME] product market" this *Jefferson Parish* hypothetical is not applicable here. SAC ¶¶ 117, 174, 202, 208.

## I.     The Court Has Supplemental Jurisdiction Over the Unjust Enrichment Claim, Which Is Properly Pled.

Because for the foregoing reasons Plaintiffs state a federal antitrust claim for tying upon which relief can be granted, the Court has supplemental jurisdiction over the unjust enrichment claim. The only substantive argument ABPN makes for dismissing the unjust enrichment claim is baseless. While ABPN contends the "certifications and purchase of MOC are governed by contracts, which preclude their unjust enrichment claim under Illinois law" (ABPN Br. 15), it does not identify any such contract or provide its terms. Moreover, Plaintiffs do not allege the existence of a contract, much less a contractual breach. SAC ¶ 50, which ABPN cites, merely quotes language from the ABPN website describing requirements for purchasing certifications. ABPN also fails to acknowledge that other fact issues, including mutuality and consideration, must be

resolved before a Court can determine whether a contract even exists. *See Gen. Cas. Co. of Wis. v. Techloss Cons. & Restor.*, 461 F. Supp. 3d 804, 809 (N.D. Ill. 2020) ("existence or non-existence of an agreement is a question of fact").

## CONCLUSION

There is no dispute that certifications and CME products are separate and distinct. *See Siva*, 38 F.4th at 576. As already noted, the Second Amended Complaint is the first time Plaintiffs' additional factual allegations that MOC is both interchangeable with and a substitute for other accredited CME products will be considered by any court. For the reasons stated above, those allegations easily raise a "reasonable inference" that MOC is a CME product and, thus, is separate from certifications. *Iqbal*, 556 U.S. at 678. The Second Amended Complaint also demonstrates that Plaintiffs' claimed "right to relief" is more than plausible, rising well "above the speculative level." *Vasquez*, 2024 U.S. Dist. LEXIS 963, *2. ABPN's Amended Motion To Dismiss Plaintiffs' Second Amended Class Action Complaint (Dkt. #98) should be denied.

Dated: March 15, 2024        Respectfully submitted,

    /s/ *C. Philip Curley*

**Counsel for Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter, individually and on behalf of all others similarly situated**

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
200 North LaSalle Street, Suite 1550
Chicago, IL 60601
pcurley@robinsoncurley.com
rmargolis@robinsoncurely.com
Tel: 312.663.3100
Fax: 312.663.0303