UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMILY ELIZABETH LAZAROU, and AAFAQUE AKHTER,<br>   Plaintiffs<br><br>   v.<br><br>AMERICAN BOARD OF PSYCHOLOGY AND NEUROLOGY,<br>   Defendant | No. 19 CV 1614<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

The plaintiffs, licensed psychiatrists, filed a second amended class action complaint against the American Board of Psychology and Neurology (the "Board"), alleging that the Board violated federal antitrust statutes by unlawfully "tying" its maintenance of certification product to initial certification. (R. 94 ("SAC").) The Board now moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). (R. 96; R. 98.) Because the second amended complaint does not cure the deficiencies identified in the Court's previous Memorandum Opinion, the Court grants the motion and dismisses the plaintiffs' federal claims with prejudice.

**BACKGROUND**

The Board and its certification products are described at length in this Court's previous Memorandum Opinion. *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 19 C 1614, 2023 WL 6461255 (N.D. Ill. Oct. 4, 2023). To recap, the Board has a nation-wide monopoly on psychiatric and neurological certifications which, although not required to practice medicine in any state, are advantageous for obtaining higher

compensation and better malpractice coverage. (SAC ¶¶ 3, 4, 38, 52–74.) Although the organization used to grant certifications for life, in or around 2006, it began to require Board-certified doctors or "diplomates" to purchase a program called "maintenance of certification" or "MOC" to preserve their certification status. (*Id.* ¶ 98.) If a certified psychiatrist or neurologist does not complete MOC's requirements, their certification will be revoked, thus depriving them of the associated advantages. (*Id.* ¶ 91, 98.)

As described in the second amended complaint, MOC consists of two components: "Activity Requirements" and an "Assessment." (*Id.* ¶¶ 100, 101.) To satisfy the Activity Requirements portion of MOC, participants must complete ninety continuing medical education or "CME" credits every three years. This requirement is further broken down into sixty-six "Category 1" CME credits and twenty-four "Category 2" CME credits. (*Id.* ¶ 100.) Category 1 and Category 2 are designations created by the American Medical Association ("AMA"), a third-party accrediting agency for CME products. (*Id.* ¶ 80.) Category 1 encompasses directed study activities, while Category 2 refers to self-assessment activities. (*Id.* ¶¶ 80–84.) MOC participants can earn Category 1 and Category 2 products by purchasing products from accredited CME vendors who have offered these products "for decades." (*Id.* ¶¶ 81, 100.) Participants can also obtain "direct credit" for unaccredited CME products by applying directly to the AMA. (*Id.* ¶ 82.)

The "Assessment" component of MOC requires participants to either complete an "Article-Based Pathway" assessment every three years or pass a "Recertification

2

Examination" every ten years. (*Id.* ¶ 101.) The Article-Based Pathway requires doctors to read medical journal articles and answer related multiple-choice questions. (*Id.* ¶ 102.) The Recertification Examination is a proctored, closed-book examination developed and administered by the Board. (*Id.* ¶ 103.) If a MOC participant successfully completes the Article-Based Pathway, then the Board waives sixteen of the twenty-four Category 2 CME self-assessment credits from the Activity Requirement. (*Id.* ¶ 105.) If a participant completes the Recertification Exam, the Board waives eight of the twenty-four self-assessment credits. (*Id.*)

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter are licensed psychiatrists who claim that the Board's practice of requiring diplomates to purchase MOC to maintain their certification is unlawful. (*See id.* ¶¶ 152–57.) Lazarou's Board certification lapsed when she was unable to complete the Recertification Exam in 2017. (*Id.* ¶¶ 160–69.) Akhter remains certified, but complains about the additional "time, money, and effort" required to comply with MOC. (*Id.* ¶¶ 174–77.)

The plaintiffs contend that MOC is a separate product from initial certification and occupies the product market for CME products. CME products are sold to psychiatrist and neurologists after their residency training and specialist qualifications have been completed. (*Id.* ¶¶ 6–8, 92, 96.) They "promote individual, self-directed lifelong learning and the development of medical and non-medical competencies after residency . . . ." (*Id.* ¶ 76.) CME products are typically sold by third party vendors. (*Id.* ¶¶ 29, 75, 81, 100.) The plaintiffs allege that, "almost all states

3

require doctors to purchase a certain number of CME category 1 credits to maintain their licenses." (*Id.* ¶¶ 34, 83, 118.)

The plaintiffs claim that, by requiring diplomates to purchase MOC to preserve their certification status, the Board is using its monopoly power in the certification market to foreclose competition in the CME market. They allege that the arrangement is an unlawful tie that "thwarts competition in the CME market," "limits the choices of psychiatrists and neurologists in the CME market," and "prevents current and potential participants in the CME market from competing with [the Board] on a level playing field." (*Id.* ¶¶ 228–31.) Additionally, because several states now accept MOC in lieu of CME requirements for state licensure or allow Category 1 CME credits earned as part of MOC's Activity Requirement to satisfy state CME requirements, the plaintiffs claim that MOC reduces competition in the market for CME products used to maintain state licensure. (*Id.* ¶ 118–24, 196.)

The plaintiffs filed this putative class action lawsuit alleging violations of § 1 of the Sherman Antitrust Act. 15 U.S.C. § 1. (*See generally id.*) The Court dismissed the plaintiffs' previous complaints due to failure to plausibly allege cross-price elasticity between MOC and other CME products. (R. 60; R. 87.) The plaintiffs have now filed a second amended complaint, and the Board again moves to dismiss. (R. 96; R. 98.) Because the second amended complaint does not cure the deficiencies previously identified, the Court grants the Board's motion and dismisses the plaintiffs' antitrust claims with prejudice.

4

**LEGAL STANDARD**

To state a claim, a complaint must contain a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289–90 (7th Cir. 2016). When considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016). A party need not plead "detailed factual allegations," but "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter that when "accepted as true . . . 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Ensuring compliance with this standard is particularly important in the antitrust context to avoid 'the potentially enormous expense of antitrust discovery in cases with no reasonably founded hope' of success." *Siva v. Am. Bd. of Radiology,* 38 F.4th 569, 573 (7th Cir. 2022) (quoting *Twombly*, 550 U.S. at 579).

**ANALYSIS**

"A tying arrangement" that violates § 1 of the Sherman Act "is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases

5

a different (or tied) product.'" *Siva,* 38 F.4th at 573 (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)). To state a tying claim, the plaintiffs must allege: (1) the existence of an arrangement that involves "two separate products or services"; (2) that the defendant has "sufficient economic power" in the tying product market to restrain free competition in the tied product market; (3) that the tie affects "a not-insubstantial amount of interstate commerce in the tied product"; and (4) that the defendant has some economic interest in the sales of the tied product. *Id.* at 573.[1]

Although the Board does not dispute that certification and CME occupy distinct product markets, and that the Board has a monopoly in the certification market, it argues that MOC is not truly a CME product. (R. 99 at 5–12.) And without plausible allegations that MOC is a CME product, the plaintiffs' theory that MOC is a separate product from certification collapses. (*See id.*)

As before, the Seventh Circuit's decision in *Siva* is instructive. There, the Seventh Circuit affirmed dismissal of tying claims challenging the American Board of Radiology's maintenance of certification product. 38 F.4th at 581. Noting that "[a] savvy lawyer can describe any product as a tie of its components, and any tie as a single product," the Seventh Circuit emphasized the need to "look through labels to substance" to determine whether a plaintiff has adequately alleged separate products under § 1. *Id.* at 572, 575.

---

[1] As in the first amended complaint, the plaintiffs assert both a *per se* tying claim and a claim pursuant to the rule of reason. (SAC ¶¶ 185–246.) "Because *per se* and rule of reason tying claims must satisfy common elements, we consider them together." *Lazarou*, 2023 WL 6461255, at *4 (citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020)).

6

Per *Siva*, to establish that MOC competes in the CME market, the plaintiffs must allege facts "making it plausible that MOC is a substitute for other [CME] products." *Id.* at 578 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006)). This is assessed "at the pre-contract rather than post-contract stage," *i.e.*, before the alleged tie is imposed. *Id.* at 574 (quoting *Viamedia*, 951 F.3d at 469). Because the inquiry assumes a "world without the tying agreement," the defendants cannot escape liability by arguing that MOC and certification are "essentially integrated," nor can the plaintiffs appeal to the potential revocation of their certification to bootstrap their claim. *Id.* at 577, 578. The question is whether MOC—stripped of any connection to certification—is "reasonably interchangeable" with CME products "in the minds of relevant consumers." *Id.* at 578 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In economic terms, this requires a plausible inference of "cross-price elasticity" or that, in a world without the tying agreement, an increase in the price of other CME products relative to MOC would shift sales to MOC. *Id.*

In *Siva*, the Seventh Circuit concluded that maintenance of certification was not a true substitute for other CME products because it imposed a "redundant obligation" on diplomates to purchase CME products from third parties. *Id.* The program was, in the Seventh Circuit's view, an empty vessel that contained none of the educational content characteristic of CME products. *Id.* ("The [] CME market is a market for educational content . . . but the MOC program contains no such content. MOC thus does not plausibly compete in the market for [] CME products.").

7

With that background in place, the Court now considers the tying claims at issue in this case. In their first amended complaint, the plaintiffs alleged that MOC required diplomates to take a closed book examination once every ten years and purchase a specified number of CME credits from an "approved product list." (R. 63 ¶¶ 186–90.) The plaintiffs alleged this framework placed "sellers of other [CME] products at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their certifications revoked by [the Board]." (*Id.* ¶ 19.) The Court dismissed the plaintiffs' tying claims due to failure to allege separate products. *Lazarou*, 2023 WL 6461255, at *8. The Court noted that there were no allegations that the Board had an economic interest in the CME products on the approved products list. *Id.* at *6. The Court also observed the absence of allegations that any state required psychiatrists or neurologists to purchase MOC to fulfill these CME requirements for licensure. *Id.* at *5–6.

In the second amended complaint, the plaintiffs omit any reference to an "approved products list," and instead refer only to quotas of sixty-six Category 1 credits and twenty-four Category 2 CME credits that diplomates must complete every three years. Although up to sixteen of these the Category 2 credits may be waived by completing MOC's Assessment (*i.e.*, the Article-Based Pathway or the Recertification Exam), MOC still requires participants to complete a minimum of seventy-four CME credits every three years. The complaint does not draw any distinction between Category 1 CME products that are required for state licensure and those required to

8

satisfy MOC's Activity Requirement. (*See generally id.*) Finally, while the complaint alleges that diplomates can apply to receive direct credit for non-accredited CME products, it tells us "next to nothing" about "a standalone market for non-accredited [CME] products." *Siva*, 38 F.4th at 579.

Critically, as in the first amended complaint, there are no allegations indicating that the Board provides accredited CME products to satisfy MOC's Activity Requirement, selects the courses or activities that participants must enroll in to obtain these credits, or has any interest (financial or otherwise) in which CME products MOC participants purchase to fulfill the Activity Requirement. *See generally* SAC; R. 104 at 15.) Indeed, the complaint indicates that CME products are accredited by third party entities that have "no role in [the Board's] sales of certifications to psychologists and neurologists." (*Id.* ¶ 32; *see id.* ¶¶ 5, 6, 80–82.) As before, the Activity Requirement appears to be a "redundant obligation" to purchase CME products from third parties. *Siva*, 38 F.4th at 579; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1709e5 (4th ed. 2015) (Areeda & Hovenkamp) ("The tying seller who lacks an economic interest in the tied market can hardly gain incremental revenue or exploit its customers in any additional way when it takes nothing from the seller of the second product.").

Although MOC itself is not an accredited CME product, the plaintiffs allege that diplomates may apply for Category 1 direct earned through their participation in MOC and use this credit to satisfy CME requirements for state licensure. (SAC

9

¶¶ 176, 177.) Specifically, Plaintiff Akhter alleges that he applied for and received sixty hours of Category 1 direct credit "[a]fter passing the ten-year MOC [Recertification Examination]" in 2014, and then used this direct credit to partially satisfy his state licensure requirements. (*Id.*) These allegations distinguish the second amended complaint from both the first amended complaint, as well as the complaint in at issue in *Siva*. *See Siva*, 38 F.4th at 580 ("Radiologists cannot earn CME credits by completing the weekly [] tests or practice improvement projects.").

To the extent that the plaintiffs' tying theory relies on drawing a connection between the direct credit system and the market for accredited CME products, it runs into several issues. The first problem is the lack of clarity as to what aspect of the MOC program gives rise to direct credit. In Akhter's case, the complaint gives no indication of whether he earned direct credit by *studying* for the Recertification Examination, or from *taking* the exam itself. If it is the former, then the credits Akhter received would not necessarily be attributable to the MOC, but rather to the activities or materials he used to prepare. And there is no allegation that the Board provides, selects, or has any interest in self-study activities or materials. While the Court is bound to draw all inferences in the plaintiffs' favor, the lack of clarity on this point is at odds with both the factual specificity demanded by *Twombly* and Rule 8's demand for a "short and plain statement."

Assuming that Akhter received sixty hours of direct credit merely because he took the Recertification Examination, it still does not follow that MOC is a plausible substitute for accredited CME products. In the first place, to receive Category 1 CME

10

credit for unaccredited CME products like MOC, diplomates must do the extra legwork of applying for credit from the AMA. Even if this process were costless, there is no indication that this direct credit can be used to satisfy MOC's *own* Activity Requirement. Indeed, Akhter, alleges he received "60 *additional* hours of Category 1 credits" from the AMA that were "over and above the credits he had already earned from his purchases of CME as part of MOC 'Activity Requirements.'" (SAC ¶ 177.) The plaintiffs further describe the CME credits obtained through the direct credit process as "additional" credits or "bonus points" "separate from whatever CME credits [diplomates] may earn directly from other CME providers as part of MOC." (SAC ¶¶ 118, 177); (R. 104 at 13); *see Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (providing that courts may consider elaborations of allegations in a plaintiff's response brief in deciding a motion to dismiss so long as they are "consistent with the pleadings.").[2]

Absent allegations that direct credit earned through MOC can be applied to satisfy MOC's own Activity Requirement as well as state licensure requirements, MOC is clearly a poor substitute for other accredited CME products. No psychiatrist looking to earn sixty hours of Category 1 CME credit would choose MOC over other accredited CME products, because—even if the diplomate successfully obtained sixty

---

[2] The possibility that diplomates can use direct credit obtained through a MOC assessment to satisfy the Activity Requirement also seems inconsistent with the structure of MOC that the complaint describes. Indeed, if diplomates could satisfy sixty credits of the Activity Requirement simply by completing a MOC Assessment and applying for direct credit from the AMA, what would be the purpose of requiring 90 CME credits for a given three-year period as opposed to a lower number? The fact that the Board already waives Category 2 credits for diplomates who complete the Assessment further supports the conclusion that diplomates cannot engage in "double-dipping" by applying direct credit earned through MOC toward the Activity Requirement.

11

hours of direct credit from the AMA—MOC would impose an additional obligation to obtain *ninety* CME credits from other providers. Although some of these credits would be waived if the diplomate completing the Assessment portion of MOC, the number of additional credits needed would still exceed the sixty hours of direct credit that Akhter alleges he obtained. On such facts, MOC would be simply creating a redundant (and excessive) obligation to obtain CME products. *Siva*, 38 F.4th at 579.

Even if plaintiffs could apply direct credit earned through MOC towards satisfying both state licensure requirements *and* MOC's own Activity Requirement (a fact that is alleged nowhere in the complaint), the sixty hours of direct credit earned would be insufficient to satisfy the ninety-credit Activity Requirement. In other words, MOC would still require diplomates to purchase additional CME products from third party vendors. Without allegations comparing the number of additional CME credits needed to satisfy MOC to the baseline requirement for state licensure, the Court cannot infer that the number of additional CME credits required by MOC would be less than the number of CME credits that a licensee would need to purchase in the absence of MOC (thus rendering MOC a plausible substitute). In Akhter's case, the complaint contains no factual detail about the number of CME credits required for state licensure in *any* state where he is licensed, thus precluding the inference described above. (*See generally* SAC.)

Finally, the Recertification Examination for which Akhter allegedly obtained direct credit is offered once every ten years. (*Id.* ¶ 101.) Even if Akhter could apply the direct credit to satisfy both the Activity Requirement and state licensure

12

requirements in a given three-year period, he would still need to purchase ninety credits worth of CME products in the subsequent three-year periods to maintain his certification. In the long run, this means that MOC is an implausible substitute for accredited CME products and poses no risk of completely "foreclosing competition in the market for [] CME products." *Siva*, 38 F.4th at 579; *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) (describing the "[t]he traditional antitrust concern" with tying agreements as the risk that the tie will create "a second monopoly" in the tied product market).

In sum, while it is possible to imagine circumstances in which the acceptance of direct credit could lead to customers substituting MOC for accredited CME products, such a theory relies on a daisy-chain of assumptions that the second amended complaint does not spell out in the sufficient detail. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The complaint does not indicate what portion of MOC gives rise to "direct credit," whether direct credit can be applied to MOC's own Activity Requirement (in addition to state licensure requirements), or whether the acceptance of direct credit to satisfy state licensure requirements would, in a particular case, lead to diplomates purchasing less accredited CME products than they otherwise would. The plaintiffs' failure to plead sufficient detail on these points might be forgiven if this was their first or second attempt. But the plaintiffs have had multiple chances and have failed to do so in over 250 paragraphs of allegations.

Relatedly, the second amended complaint emphasizes that some states accept CME credits earned through MOC's Activity Requirement in complete or partial satisfaction of CME credit quotas required to maintain licensure. (SAC ¶¶ 118--24, 199(g); R. 104 at 17–19.) Again, while these allegations distinguish this case from *Siva*, they do not move the needle as to the sufficiency of the plaintiffs' tying claims. As in the first amended complaint, there are no allegations that any state *requires* MOC to maintain state licensure. Nor are there allegations that the Board places any limits on what Category 1 CME products diplomates can choose to satisfy MOC's Activity Requirement.

Without allegations that the Board sells, limits, or selects which CME credits that the plaintiffs must obtain as part of MOC, the fact that diplomates may use Category 1 credits obtained through MOC's Activity Requirement to satisfy state licensure requirements says nothing about whether a consumer would plausibly substitute MOC for other CME products in the first instance. This is because—as in *Siva*—MOC consists primarily of an obligation to purchase accredited CME content from third parties. The fact that doctors may earn CME Category 1 direct credit through the Assessment portion of MOC "and then apply those credits towards their state requirements," does not change this analysis, since, as indicated above, the number of additional CME credits required by MOC would exceed the number of direct credits diplomates may receive through this process. (SAC ¶ 120.)

That said, it is possible to imagine a scenario in which a state's acceptance of MOC as a total substitute for CME requirements *might* have anticompetitive effects

14

on the market for CME products. Suppose, for example, that a state required psychiatrists to obtain 120 CME credits every three years to maintain their license, but accepted MOC, which requires only ninety CME credits, in lieu of this 120-credit requirement. A psychiatrist who selected MOC to fulfill their state CME requirements would be purchasing thirty less CME credits than they otherwise would. Such a framework might harm competition by privileging MOC over other CME vendors in the eyes of consumers and reducing the overall demand for CME products. Put a different way, an increase in the price of CME products would shift sales to MOC, since MOC would require less CME credits to satisfy the same licensure requirements.

To the extent that the plaintiffs are asserting such a theory, it is insufficiently pled. The only states that allegedly accept MOC in total satisfaction of CME credit requirements for licensure are Idaho, Minnesota, Oregon, New Hampshire, and West Virginia. (SAC ¶ 119.) The complaint also alleges that California, Kentucky, and Michigan accept "passing a MOC examination [as] as substitute for some or all of the State's CME requirements." (*Id.* ¶ 121.) Importantly, the complaint contains no detail about the number of CME credits that these states require for licensure, thus precluding an inference that the acceptance of MOC harms competition in the manner described above. (*See id.*)

More fundamentally, neither of the plaintiffs are licensed in any of the states listed above, and therefore lack standing to assert claims based solely on these

15

product markets.³ *See Viamedia*, 951 F.3d at 482 ("The general rule is that customers and competitors *in the affected market* have antitrust standing.") (emphasis added); *see also Lazarou*, 2023 WL 6461255, at *5 ("The First Amended Complaint does not allege that MOC would satisfy Plaintiffs' continuing education requirements for practicing as licensed psychiatrists *in their respective states*.") (emphasis added); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.").

Considering only the states in which the plaintiffs are licensed, their allegations are insufficient to state a claim. For example, Plaintiff Lazarou alleges that she is licensed in Illinois, which "requires doctors to purchase 60 hours of CME Category 1 credits every three years." (SAC ¶ 83.) The complaint does not allege that Illinois accepts Category 1 CME credits earned in connection with MOC to satisfy this requirement. (*See generally id.*) Nor is there a plausible explanation why—in a world where MOC is not tied to certification—doctors in Illinois would substitute MOC, which requires participants to purchase ninety CME credits, to satisfy Illinois' baseline requirement of sixty CME credits.

---

³ Lazarou is licensed in Florida, Texas, Mississippi, and Illinois (SAC ¶ 157), and Akhter is licensed in Connecticut, Florida, Hawaii, Massachusetts, and New York. (*Id.* ¶ 172.) While the plaintiffs allege that the market for CME products is nationwide, (SAC ¶ 75), the Court is not bound to accept conclusory allegations regarding product market definition. *See, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 7834, 2014 WL 6845862, at *4 (N.D. Ill. Dec. 4, 2014). To the extent that the plaintiffs' tying theory is based on state licensure requirements, it is appropriate to consider standing on a state-by-state basis, as the plaintiffs are not "consumers" of accredited CME products required for licensure in states where they are not licensed. *Viamedia*, 951 F.3d at 482.

16

Similarly, Plaintiff Akhter alleges that he is licensed in Massachusetts, which "require[s] a specified number of CME Category 1 credits" for licensure and allows licensees to "apply [MOC] credits toward State CME Category 1 requirements." (SAC ¶ 120.) As with other states, the complaint does not state how many credits are required for licensure in Massachusetts or how MOC credits are counted relative to this baseline requirement. (*See generally id.*) Without such factual detail, the Court cannot infer that Massachusetts' policy of accepting MOC credits reduces competition in the CME product market. *Twombly*, 550 U.S. at 555.[4]

Finally, the plaintiffs allege that, via the Interstate Medical Licensure Compact, doctors licensed in states that accept MOC in lieu of compliance with CME requirements can apply to practice medicine in other states regardless of what those other states' CME credit requirements might be. (SAC ¶¶ 123–24.) Because this theory relies on the inference that substituting MOC's CME requirements for those required by state licensing entities is anticompetitive, and because there are insufficient facts upon which to conclude that the acceptance of MOC restricts competition for CME products in any state, these allegations do not render the plaintiffs' tying claims any more plausible.

The upshot is that the plaintiffs have once again failed to plead sufficient facts to suggest that MOC is a CME product, or that there is a "distinct product market in which it is efficient to offer MOC separately from certification." *Siva*, 38 F.4th at 581

---

[4] The complaint alleges no facts about any of the remainder of the states in which the plaintiffs are licensed, thus precluding an inference that the acceptance of MOC harms competition in these states. (*See generally* SAC.)

(quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21–22 (1984)). Like the MOC program in *Siva*, the MOC program described in the second amended complaint is primarily a requirement that participants to obtain educational content rather than a vehicle for providing that content. Even if MOC has *some* educational content by virtue of its Assessment component, the amount of this content, when considered in light of the program's other requirements, is not enough to plausibly render MOC a substitute for CME products. This point is underscored by surveys cited in the complaint indicating that as many as 75% of surveyed physicians agreed that MOC had "no significant value . . . beyond what is already achieved from continuing medical education." (SAC ¶ 142); *see also* Areeda & Hovenkamp ¶ 1750a ("The second item [in an alleged tying scheme] is a 'phantom product' when no buyer of the first item would want the second because it adds no value to the first.").

The Court "does not doubt the sincerity of [the plaintiffs'] frustrations with the MOC program." *Siva* 38 F.4th at 580. On the plaintiffs' view, MOC disadvantages working physicians by forcing them to pay fees that they otherwise would not have incurred, or by taking valuable time away from patient care. (*See* SAC ¶¶ 136, 142, 176.) These concerns, however legitimate, are not antitrust harms. *Siva*, 38 F.4th at 580 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) ("[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.")). Whether MOC is a sound policy of

18

accrediting physicians is a separate question from whether it restricts competition in the CME product market.[5] Since the second amended complaint does not plausibly allege the latter, the plaintiffs' tying claims fail.

Since the plaintiffs have once again failed to plead separate products under *Siva*, the Court grants the Board's motion to dismiss and does not reach the parties' other arguments. A district court is not required to grant leave to amend "when a plaintiff has had multiple opportunities to state a claim upon which relief may be granted." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012). Accordingly, the dismissal is with prejudice. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818–19 (7th Cir. 2013) ("[I]n court, as in baseball, three strikes and you're out"). The Court declines to exercise supplemental jurisdiction over the plaintiffs' state law unjust enrichment claim. *See Thomas v. City of Chi.*, No. 20 C 4323, 2021 WL 1923406, at *4 (N.D. Ill. May 13, 2021) (citing 28 U.S.C. § 1367(c)(3)).

---

[5] Similarly, the plaintiffs' allegations concerning the Board's increased revenue from MOC (*See* SAC ¶¶ 145–47) are irrelevant. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system").

19

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, the defendant's motion to dismiss [96, 98] is granted and the plaintiffs' antitrust claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the plaintiffs' unjust enrichment claim. 28 U.S.C. § 1367(c)(3). Civil case terminated.

Date: May 13, 2024

JEREMY C. DANIEL
United States District Judge